**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

STATE OF NEW YORK
28 Liberty St.
New York, NY 10005

STATE OF MARYLAND
200 Saint Paul Pl.
Baltimore, MD 21202

COMMONWEALTH OF MASSACHUSETTS
One Ashburton Pl.
Boston, MA 02108

STATE OF CALIFORNIA
1300 I Street
Sacramento, CA 95814

STATE OF COLORADO
1300 Broadway
Denver, CO 80203

STATE OF CONNECTICUT
165 Capitol Ave.
Hartford, CT 06106

STATE OF DELAWARE
820 N. French St.
Wilmington, DE 19801

STATE OF HAWAI‘I
425 Queen St.
Honolulu, HI 96813

STATE OF ILLINOIS
115 S. LaSalle St.
Chicago, IL 60603

OFFICE OF THE GOVERNOR *ex rel. Andy Beshear, in his official capacity as Governor of the* COMMONWEALTH OF KENTUCKY,
501 High St.
Frankfort, KY 40601

Case No. 1:26-cv-03405

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

STATE OF MAINE
6 State House Station
Augusta, ME 04333

STATE OF MICHIGAN
525 W. Ottawa St.
Lansing, MI 48909

STATE OF MINNESOTA
445 Minnesota St.
St. Paul, MN 55101

STATE OF NEVADA
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

STATE OF NEW JERSEY
124 Halsey St.
Newark, NJ 07101

STATE OF NEW MEXICO
408 Galisteo St.
Santa Fe, NM 87501

STATE OF OREGON
100 SW Market St.
Portland, OR 97201

JOSH SHAPIRO, *in his official capacity as Governor of the* COMMONWEALTH OF PENNSYLVANIA
30 North 3rd St.
Harrisburg, PA 17101

STATE OF RHODE ISLAND
150 South Main St.
Providence, RI 02903

STATE OF VERMONT
109 State St.
Montpelier, VT 05609

COMMONWEALTH OF VIRGINIA
202 North Ninth St.
Richmond, VA 23219

STATE OF WASHINGTON
800 Fifth Ave.
Seattle, WA 98104

STATE OF WISCONSIN
PO Box 7857
Madison, WI 53707-7857

Plaintiffs,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
200 Independence Ave. SW
Washington, DC 20201

ROBERT F. KENNEDY, JR., *in his official capacity as the* SECRETARY OF HEALTH AND HUMAN SERVICES,
U.S. Department of Health and Human Services
200 Independence Ave. SW
Washington, DC 20201

OFFICE OF THE ASSISTANT SECRETARY FOR HEALTH
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

BRIAN CHRISTINE, *in his official capacity as Assistant Secretary for Health*
Office of the Assistant Secretary for Health
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

OFFICE OF POPULATION AFFAIRS
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

AMY MARGOLIS, *in her official capacity as Deputy Director of OPA*
Office of Population Affairs
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

Defendants.

## INTRODUCTION

1. Plaintiffs the State of New York, State of Maryland, Commonwealth of Massachusetts, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaiʻi, State of Illinois, Office of the Governor, *ex rel.* Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, State of Maine, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of Oregon, Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, Commonwealth of Virginia, State of Washington, and State of Wisconsin, challenge the latest effort by the Trump Administration, through Defendants U.S. Department of Health and Human Services ("HHS" or "the Department") and HHS Secretary Robert F. Kennedy, Jr., to achieve its political agenda by attaching sweeping and often unrelated restrictions to federal funding. Specifically, Plaintiffs challenge terms directing applicants and grantees for federal family planning dollars appropriated under Title X of the Public Health Service Act ("PHSA") to demonstrate "alignment" with the administration's political priorities, including conditions that undermine the program's purpose and conflict with the governing statute and regulations.

2. For over 50 years, Title X has been the only federal funding stream dedicated specifically to providing low-income, uninsured, or underinsured individuals with access to comprehensive family planning services. Title X funds provide crucial access to high-quality family planning and related preventive services to underserved individuals in Plaintiff States and across the United States, including lifesaving cervical cancer testing; testing and treatment for sexually transmitted infections ("STIs") that preserve health and long-term fertility and prevent community spread; and contraception and fertility care that empowers individuals to have children if, when, and how they choose.

3. In July 2026, the Office of Population Affairs ("OPA") published a Notice of Funding Opportunity for Title X grants for the 2027 Fiscal Year (the "2027 NOFO" or "NOFO") (attached as Exhibit A) to establish the competitive terms and conditions governing the 2027–2032 Title X grant cycle and solicit applications. The NOFO instituted new policy priorities for Title X, incorporating several sets of priorities articulated by HHS and various sub-agencies within HHS (collectively, the "Agency Priorities"), including OPA and its parent office, the Office of the Assistant Secretary for Health ("OASH"). Plaintiffs challenge a subset of those Agency Priorities (collectively, "the Challenged Conditions") as incorporated in the NOFO, including mandates to (a) end diversity, equity, and inclusion ("DEI") policies and practices; (b) "end[] support for gender ideology" and to "accurately reflect science, including the biological reality that a person's sex, as either male or female, is unchangeable and determined by objective biology"; (c) end "overmedicalization," a category that the NOFO indicates includes hormonal contraception; (d) "enforce[e] the Hyde Amendment" and "safeguard "life-affirming" program delivery; (e) adopt directive counseling that pushes patients towards parenthood and marriage; and (f) advance miscellaneous priorities such as "[f]urther[ing] our understanding of autism," "[i]nvestigat[ing] and car[ing] for those with Long COVID," "[a]dvanc[ing] the scientific understanding of the agency process," "[e]nd[ing] crime and disorder on America's streets," and improving "oversight of foreign funded institutions" that are irrelevant to Title X.

4. The 2027 NOFO embeds the Agency Priorities into every step of the grant cycle. It directs applicants to address the Agency Priorities in their project proposals; specifies that these submissions will be judged disproportionately based upon their ability to "advance" the Priorities; and requires prospective recipients to "demonstrate ongoing compliance with these priorities" throughout the duration of any award or face termination of funding.

5. The 2027 NOFO's incorporation of the Challenged Conditions harms Plaintiff States. To compete under the 2027 NOFO's terms, Plaintiff States and other direct grantees within their borders must either commit to alter their current Title X programs to conform with the Challenged Conditions, which are inconsistent with Title X's core statutory and regulatory requirements, or submit applications based on their existing, compliant programming and risk rejection for failing to satisfy the Agency Priorities. Under either option, Plaintiff States are harmed.

6. Title X funding to state agencies, nonstate grantees, and subgrantees in Plaintiff States is crucial to the States' public health infrastructure. Title X services, delivered by trusted and highly qualified health care providers, provide essential care and access to cost-effective preventative, screening, and early-stage interventions that safeguard patients' health and the economic stability of state safety nets. With federal Title X funds in jeopardy due to the NOFO's radical and abrupt shift, Plaintiff States will be forced to scramble to fill the funding gap from their own coffers to preserve these critical services; many will not be able to continue funding these programs at the same level using state-only dollars. And the result—curtailing services and even shuttering clinics—will deprive many low-income residents of crucial services. Plaintiff States will bear the substantial costs of increased health care needs caused by worsened immediate and long-term health outcomes. Plaintiff States will also shoulder increased demands on their safety-net programs.

7. The incorporation of the new Challenged Conditions into the 2027 NOFO is unlawful several times over. First, to the extent HHS is attempting to graft new substantive requirements onto the Title X program, it has violated the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(D). The Agency Priorities were announced through publication of a NOFO

without any indication of whether and how the priorities had been assessed for consistency with the governing statutory and regulatory frameworks, and without providing notice or an opportunity for public comment that is required for an amendment to the applicable regulations governing providers.

8. Second, the incorporation of the Challenged Conditions into the NOFO is contrary to law and exceeds the agency's authority. The Challenged Conditions are not authorized by Congress; appear to directly conflict with the statutory requirement that "all pregnancy counseling shall be nondirective," Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 262 (2026); and undermine Title X's core purpose of providing low-income individuals with access to a "broad range" of family planning methods, *see* 42 U.S.C. § 300(a). The Challenged Conditions also clash with Title X regulations requiring services be provided in an "inclusive" and "equitable" manner, 42 C.F.R. § 59.5(a)(3); prohibiting discrimination based on gender identity or marital status, *id.* § 59.5(a)(4); encouraging participation from "diverse persons," *id.* § 59.5(a)(3), (b)(3)(iii); *see id.* § 59.2; requiring applicants to demonstrate an "ability . . . to advance health equity," *id.* § 59.7(a)(3); and requiring the provision of non-directive options counseling, *id.* § 59.5(a)(5). And the Challenged Conditions are in tension with the Department's own guidance regarding national standards of care for family planning services providers, which recommends specific, concrete strategies providers should adopt to operationalize health equity and gender-inclusivity in the scope of family planning services and to facilitate access to contraception and nondirective counseling. *See id.* § 59.5(a)(3).

9. Third, the incorporation of the Challenged Conditions is arbitrary and capricious because the Conditions (a) are vague, ambiguous, and contradictory; (b) depart from prior policies without explanation; and (c) lack reasoned consideration by HHS of important aspects of the

problem. Many of the Challenged Conditions are so vague as to be meaningless in practical application: for instance, it is wholly unclear what "ending support for gender ideology," or "contributing to [] efforts to safeguard life affirming" program delivery mean in the context of Title X *family planning services* programs. And the Conditions' few Title X-specific applications often seem to conflict so strongly with statutory and regulatory requirements that applicants cannot discern how the NOFO's inconsistent generic savings clauses might reconcile these apparent conflicts or what standard OPA intends to apply. Next, by requiring alignment with the Challenged Conditions, HHS silently departed from its prior Title X policies without acknowledgement, explanation, or consideration of reliance interests or relevant evidence. Last, HHS failed to consider important aspects of the problem, including reliance interests by Plaintiff States that have structured their states' family planning programs to comply with existing regulations and evidence-based, peer-reviewed guidance promulgated by OPA in previous grant cycles.

10. Fourth, the incorporation of the Challenged Conditions violates the Spending Clause of the U.S. Constitution and therefore is contrary constitutional right, power, privilege, or immunity under the APA, 5 U.S.C. § 706(2)(B), because the Challenged Conditions to receive and maintain Title X funds are vague and ambiguous, and because the Challenged Conditions are wholly unrelated to and even undermine Title X's purpose of providing family planning services to low-income individuals.

11. Plaintiff States accordingly seek a court order vacating Defendants' incorporation in the 2027 NOFO of the Challenged Conditions (a) ending DEI policies and practices; (b) ending support for "gender ideology" and "sex-rejecting procedures"; (c) deprioritizing access to contraceptives (to the extent required by the "overmedicalization" priority); (d) requiring directive counseling that pushes patients towards parenthood and marriage; (e) "safeguarding life-

affirming" program delivery in the name of enforcing the Hyde Amendment; and (f) the HHS priorities that are irrelevant to Title X's purpose. Plaintiff States also seek an injunction prohibiting Defendants from imposing the Challenged Conditions.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

13. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff State of Maryland is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Maryland.

## PARTIES

### A. Plaintiffs

14. Plaintiff the State of New York is a sovereign State of the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

15. Plaintiff the State of Maryland is a sovereign State of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

16. Plaintiff the Commonwealth of Massachusetts is a sovereign State of the United States of America. Massachusetts is represented by Andrea Joy Campbell, the Commonwealth's chief legal officer.

17. Plaintiff the State of California, represented by and through their Attorney General, Rob Bonta, brings this action on behalf of the sovereignty of the State of California. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the People in this matter.

18. Plaintiff the State of Colorado is a sovereign state of the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colorado Revised Statute § 24-31-101 to pursue this action.

19. Plaintiff the State of Connecticut is a sovereign State of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under Conn. Gen. Stat. § 3-125 to pursue this action on behalf of the State of Connecticut.

20. Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

21. Plaintiff the State of Hawaiʻi, represented by and through its Attorney General Anne E. Lopez, is a sovereign state of the United States of America. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Haw. Rev. Stat. § 28-1 to pursue this action.

22. The State of Illinois is a sovereign State of the United States. Illinois is represented by Attorney General Kwame Raoul, who is the State's Chief Law Officer.

23. Plaintiff the Office of the Governor, ex rel. Andy Beshear, brings this suit in his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," KY. CONST. § 69, and gives the Governor, and only the Governor, the duty to

"take care that the laws be faithfully executed," KY. CONST. § 81. In taking office, Governor Beshear swears an oath that he will support the Constitution of the United States and the Kentucky Constitution. KY. CONST. § 228.

24. Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

25. Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan and authorized to pursue this action on the State's behalf.

26. Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

27. Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

28. Plaintiff the State of New Jersey is a sovereign State of the United States of America, and by and through Attorney General Jennifer Davenport, brings this action. The Attorney General of New Jersey is the New Jersey's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern. N.J. Stat. Ann. § 52:17A-4.

29. Plaintiff the State of New Mexico, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Raúl Torrez is the chief legal

officer of the State of New Mexico. He is authorized to prosecute all actions and proceedings on behalf of New Mexico when, in his judgment, the interest of the State requires such action. N.M. Stat. Ann. § 8-5-2(B). Likewise, he shall appear before federal courts to represent New Mexico when, in his judgment, the public interest of the state requires such action. N.M. Stat. Ann. § 8-5-2(J). This challenge is brought pursuant to Attorney General Torrez's statutory authority.

30. Plaintiff the State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

31. Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6).

32. Plaintiff the State of Rhode Island is a sovereign State in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

33. Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by its Attorney General, Charity R. Clark, who is the chief legal officer of Vermont and has authority to represent the State in this matter.

34. Plaintiff the Commonwealth of Virginia is a sovereign State of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. *Id.* § 2.2-513.

35. Plaintiff the State of Washington, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Nick Brown is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030(1) to pursue this action.

36. Plaintiff the State of Wisconsin is a sovereign State in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

**B. Defendants**

37. Defendant U.S. Department of Health and Human Services ("HHS") is a cabinet agency within the executive branch of the United States government and an agency under the definition provided in the Administrative Procedure Act. 5 U.S.C. § 551(1). HHS is the agency responsible for implementing Title X.

38. Defendant Robert F. Kennedy, Jr., is the Secretary of HHS and is named in his official capacity.

39. Defendant Office of the Assistant Secretary for Health ("OASH") is an office within HHS that administers the competitive review of applications for Title X funding.

40. Defendant Brian Christine is the Assistant Secretary for Health within HHS. He heads OASH and is named in his official capacity.

41. Defendant Office of Population Affairs ("OPA") is the office within OASH that administers the Title X program. OPA is the entity that announced the release of the NOFO and administers the Title X application process.

42. Amy L. Margolis is the Deputy Director of OPA and is charged with administering the Title X NOFO that is the subject of this lawsuit. Defendant Margolis is named in her official capacity.

## FACTUAL ALLEGATIONS

### A. Title X Provides Federal Funding for Family Planning and Related Preventive Health Services.

#### i. Title X Statutory Structure

43. Congress enacted Title X of the Public Health Service Act over 50 years ago as part of the "Family Planning Services and Population Research Act of 1970." 42 U.S.C. §§ 300-300a-6; Pub. L. No. 91-572, 84 Stat. 1504 (1970). It is the nation's only federal grant program dedicated to providing comprehensive family planning and related preventive health services.

44. Title X's first stated purpose was "mak[ing] comprehensive voluntary family planning services readily available to all persons desiring such services." Pub. L. No. 91-572 § 2(1). Through Title X, Congress directed HHS to make grants to and enter into contracts with public or nonprofit private entities to establish and operate voluntary family planning projects which offer a broad range of effective family planning methods and services. 42 U.S.C. § 300(a).

45. Since its enactment, Title X has been critical in Congress's goal of helping low-income people around the country meet their family planning and preventive health care needs. Title X programs have proven highly effective at helping prevent unintended pregnancies, obtain early detection and treatment for cervical and breast cancer, diagnose and treat sexually transmitted infections, and control the spread of HIV and AIDS. These services have helped millions of people, especially low-income women, control their own reproductive decision making and improve their social and economic futures.

46. Over the last five decades, Title X-funded entities, including Plaintiff States' health agencies as direct grantees and non-governmental nonprofit grantees within Plaintiff States, have used Title X funds to provide family planning services directly or through subgrantees. This network of Title X-funded programs forms the backbone of the public health infrastructure for

family planning services and related preventative health care in Plaintiff States. Principal among these services is the provision of contraception, including contraceptive devices and oral contraception (i.e., "the pill"), testing for STIs, and community education.

47. The program has been funded continuously and enjoys bipartisan support. In 2026, Congress appropriated $286,479,000 for the Title X program. *See* Consolidated Appropriations Act, 2026, Pub. L. 119-75, tit. II, 140 Stat. 173, 262 (2026).

48. The Title X program has 77 current grantees administering 84 grants.

**ii. Agency Regulations and Guidance Governing the Title X Program**

49. HHS issues grants to public and nonprofit private entities that provide voluntary family planning and related health services. 42 U.S.C. § 300(a). The purpose of the Title X program is "the establishment and operation of voluntary family planning projects" which "shall consist of the educational, comprehensive medical, and social services necessary to aid individuals to determine freely the number and spacing of their children." 42 C.F.R. § 59.1.

50. When issuing grants to Title X applicants, the Secretary of HHS (the "Secretary") "shall" consider "the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance." 42 U.S.C. § 300(b). The statute authorizes HHS to issue regulations accordingly and requires that "[g]rants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate." *Id.* § 300a-4(a). Grant recipients must also abide by the Title X implementing regulations which, consistent with the statute, make clear that the purpose of the Title X program is "the establishment and operation of voluntary family planning projects" which "shall consist of the educational, comprehensive medical, and social services necessary to aid individuals to determine freely the number and spacing of their children." 42 C.F.R. § 59.1. The regulations restate and elaborate on the statutory

factors for evaluating applicants and add consideration of "the ability of the applicant to advance health equity," *id.* § 59.7(a)(3), and define "health equity" as ensuring that "all persons have the opportunity to attain their full health potential and no one is disadvantaged from achieving this potential because of social position or other socially determined circumstances," *id.* § 59.2.

51. Congress mandated that Title X funds may not be used for abortion and that "all pregnancy counseling [supported by Title X funds] shall be nondirective." 42 U.S.C. § 300a-6; Pub. L. 119-75, 140 Stat. at 262. Regulations therefore require providers to offer neutral counseling to pregnant clients regarding their options and provide referrals to abortion services upon request. 42 C.F.R. § 59.5(a)(5)(i)-(ii).

52. Family planning services supported by Title X funds must "include a broad range of medically approved services, which includes . . . (FDA)-approved contraceptive products and natural family planning methods, for clients who want to prevent pregnancy and space births, pregnancy testing and counseling, assistance to achieve pregnancy, basic infertility services, sexually transmitted infection (STI) services, and other preconception health services." *Id.* § 59.2. The "broad range" of medically approved services explicitly includes the provision of contraceptive practices, devices and supplies. *Id.* § 59.5(a)(1), (b)(1).

53. A service site that is "unable to provide clients with access to a broad range of acceptable and effective medically approved family planning methods and services" must provide prescriptions and referrals for those services to be obtained by a different provider, *id.* § 59.1, and give priority in the provision of services "to clients from low-income families," *id.* § 59.5(a)(6).

54. Title X projects must be "inclusive," *id.* § 59.5(a)(3), which is defined as "when all people are fully included and can actively participate in and benefit from family planning, including, but not limited to, . . . Black, Latino, and Indigenous and Native American persons,

Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons." *Id.* § 59.2.

55. To that end, Title X projects must provide services in a manner "that does not discriminate against any client based on religion, race, color, national origin, disability, age, sex, sexual orientation, gender identity, sex characteristics, number of pregnancies, or marital status." *Id.* § 59.5(a)(4).

56. Title X funding recipients must provide care in a manner that is "client-centered, culturally and linguistically appropriate, inclusive, and trauma-informed; protects the dignity of the individual; and ensures equitable and quality service delivery consistent with nationally recognized standards of care." *Id.* § 59.5(a)(3); *see also id.* § 59.2 (defining "quality healthcare" as healthcare that is safe, effective, and "equitable."). The regulations also require recipients to "[p]rovide services in a manner that does not discriminate against any client based on" protected characteristics including "sex, sexual orientation, gender identity, sex characteristics, number of pregnancies, or marital status." *Id.* § 59.5(a)(4).

57. Title X projects must provide family planning services "consistent with nationally recognized standards of care." *Id.* § 59.5(a)(3).

58. OPA's most recent PPN guidance (attached as Exhibit B),[1] and the Title X Program Handbook (attached as Exhibit C),[2] designate the OPA and CDC publication *Providing Quality Family Planning Services in the United States: Recommendations of the U.S. Office of Populations*

---

[1] Off. of Population Affs., *OPA Program Policy Notice 2024-02—Implementing Quality Family Planning Services Recommendations within Title X Projects*, U.S. Dep't Health & Hum. Servs. (Nov. 19, 2024), https://opa.hhs.gov/node/4173.
[2] Off. Of Population Affs., *Title X Program Handbook*, U.S. Dep't Heath & Hum. Servs., at 10 (Dec. 2024), https://opa.hhs.gov/sites/default/files/2025-03/title-x-program-handbook-dec-2024.pdf.

*Affairs* ("2024 QFP") (attached as Exhibit D),[3] as a set of guidelines that fulfill grantees' regulatory obligation to adhere to "a nationally recognized standard of care when implementing Title X requirements," Ex. C, 10. Issued and developed by OPA, the 2024 QFP supplies practitioners with "specific recommendations for how to provide high-quality [sexual and reproductive health] care and connects users to relevant guidelines, primary research, and other resources to inform best practices." Ex. D, S41. OPA has required adherence to the QFP's first edition, published in 2014. The agency has offered "training and technical assistance . . . to facilitate adoption of the QFP recommendations," Ex. C, 10, and has embedded QFP recommendations directly into the rubrics the agency uses to assess grantee compliance with quality requirements, which it also encourages recipients to use both "as a self-assessment" and "for monitoring their subrecipients and service sites," *see, e.g.*, Off. of Population Affairs, Title X Program Review Tool (Dec. 2019), https://www.hhs.nd.gov/sites/www/files/documents/DHS%20Legacy/OPA_Program_Review_Tool_FINAL_1.16.20_corrected.pdf.

59. The 2024 QFP was developed using an extensive process including literature reviews, environmental scans, technical expert panel consultations, and consultation with federal agencies and relevant professional organizations. Ex. D, S45.

60. The 2024 QFP emphasizes health equity and inclusivity, including for LGBTQ people, *see id.*, S42, S46–S48, and S72, and recognizes contraception as a crucial family planning method. It directs providers to meet the family planning needs of transgender clients through practices such as integrating fertility planning into medical transition and accurately documenting patients' names and pronouns in their medical records. *Id.* at S72. It instructs providers to make

---

[3] Sarah E. Romer et al., *Providing Quality Family Planning Services in the United States: Recommendations of the U.S. Office of Population Affairs (Revised 2024)*, 67 Am. J. Prev. Med. S41 (2024).

available "a full range" of contraceptive methods and to support patients interested in using contraceptives for reasons other than preventing pregnancy (e.g., STI prevention, gender-affirming care, management of chronic conditions). *Id.* at S55. The 2024 QFP further states that "the decision about which method to use should be made by the patient," *id.* at S57, and centers empowering patients "to *self-determine* and achieve *their reproductive goals*," *id.* at S44 (emphasis added).

**iii. Title X Program Grant Process**

61. Title X grants are awarded through a competitive process administered by OPA.

62. At the beginning of each grantmaking cycle, OPA solicits applications by issuing a NOFO. A NOFO announces the availability of funding and sets forth the program's requirements, priorities, and scope in a given cycle. A NOFO describes the criteria by which applications will be evaluated and specifies the terms that will govern awards, including their duration, awardees' opportunities to apply for noncompeting continuation grants in future years, and grounds for grant termination. A NOFO establishes the core parameters of the funding opportunity, defines the substantive scope of permissible programming services, and imposes requirements as a condition of funding and continued funding that apply across the entire grantmaking cycle.

63. Each application must include a Project Narrative that describes how the grantee or subgrantees will deliver Title X services and provide supporting documentation, a Work Plan, and a Budget Narrative.

64. Formulating an application is time-consuming and labor-intensive, requiring months of time from numerous staff. Applicants must tailor their applications to the requirements of the statute, regulations, and guidance governing the Title X program and the requirements in the NOFO.

65. State agency applicants face special burdens due to their size, the complexity of coordination with different divisions and agencies within state government, their role in coordinating networks of subrecipients, and regulatory obligations as government entities.

66. Applicants are bound to the representations made in their applications and must certify the veracity of their statements on pain of criminal, civil, or administrative penalties, and must, at the time of application, swear to the program's operational capacity to complete the proposed project. *See* Ex. A, 31, 42-3, and 62 (explaining that the "approved project or activity [for any grant funding] is the project described in your application"; and requiring applicants submit Standard Form 424 and a list of additional certifications).

67. For the last several years, Title X applications were due the first week of January, with an annual award period from April 1 through March 31 the following year. The Department typically makes award decisions and issues grants by April 1.

68. Title X grant funds have historically been awarded for a period of performance of up to five years, to be funded in annual increments. To obtain funding each year, grantees must submit noncompeting continuation grant applications that meet certain requirements.

69. Applications are evaluated using criteria established by the NOFO and based in statute and regulations. HHS has historically relied on a "three-stage" review process: first, submissions are reviewed for basic compliance with application formalities (e.g., inclusion of required forms); second, an independent "merit review panel" of external experts scores each application under a points system dictated by the NOFO; and finally, agency staff review those scores and make final funding recommendations. *Id*. at 36–37.

**B. The Title X Program in Plaintiff States**

70. Many Plaintiff States have received funding since the inception of the Title X program half a century ago, making them longstanding partners in the delivery of family planning

services. Other Plaintiff States that do not receive direct Title X funds rely on nongovernmental or local government grantees as critical components of the States' public health infrastructure.

71. Plaintiff States that receive direct Title X funds are integral to the administration of family planning services and may operate public health clinics themselves and/or administer funding to subrecipient nonprofit organizations operating health centers that deliver services.

**i. New York**

72. Title X funds play a critical role in covering the costs of family planning services in New York. New York has two Title X grantees: the New York State Department of Health ("NYS DOH") and Public Health Solutions ("PHS"), a nonprofit Title X recipient since the early 1980s. NYS DOH received $11,154,003 in Title X funding in 2024 and delivers services to approximately 250,000 individuals statewide through a mix of subrecipient agencies, including county health departments, hospitals, stand-alone family planning clinics, and federally qualified health centers ("FQHCs"), which are federally funded, community-based clinics that provide primary care services to medically underserved populations. As of the last grant cycle, PHS serves approximately 21,000 clients in four of New York City's five boroughs through five subrecipient agencies with ten clinical service sites that include FQHCs.

73. In 2025, the New York State Family Planning Program provided essential preventative and reproductive health services to 253,975 clients through a total of 379,120 visits. More than 176,200 clients (approximately 70 percent) had household incomes below the federal poverty level.

74. NYS DOH uses Title X funds to support the New York State Family Planning Program, which ensures access to a wide range of reproductive health services, including contraception, pregnancy testing, and non-directive options counseling, education, and preventative care, including breast and cervical cancer screenings and STI testing and treatment.

Providers prioritize populations most in need, including low-income, uninsured or underinsured individuals; racial and ethnic minorities; and adolescents, with a strong emphasis on equitable, client-centered care. To ensure cost is never a barrier, all family planning clinics offer sliding fee scales for patients with incomes at or below 250 percent of the federal poverty level. By offering services that are free or low-cost, the Program serves as the foundation for New York's reproductive healthcare safety net and aligns with the State's health agenda priorities on health equity, reproductive rights, maternal health, and affordability.

75. The majority of New York's Title X funds go to support contracts with 35 clinical providers to deliver reproductive health care at 165 clinics across the State. Subrecipients include county health departments, hospitals, FQHCs, and standalone family planning clinics. Funding to these subrecipients largely supports staffing, operating expenses (contraceptive methods, direct medical supplies, laboratory supplies, and educational materials), rent, utilities, and subcontracts. Title X funds also support ten full-time agency staff to oversee the program; three contracts needed for training, monitoring, and data management; and administrative and related costs.

76. NYS DOH is currently determining whether it would be possible to craft an application under the 2027 NOFO. However, the directive to align with the Agency Priorities, including the Challenged Conditions, directly conflicts with the goals of the New York State Family Planning Program and with the mission, vision, and values of NYS DOH. Full compliance with the Challenged Conditions is incompatible with the current New York State Family Planning Program and with the mission of many of the current subgrantees.

77. The loss of federal Title X dollars will adversely impact New York if NYS DOH continues operating its program as it currently exists. The loss of federal Title X dollars could

result in staff and contract reductions starting April 1, 2027, directly affecting the workforce capacity available to provide family planning services.

**ii. Maryland**

78. The Maryland Department of Health ("MDH") has participated in the Title X program for more than 50 years and has never been denied a Title X grant. MDH currently administers the Maryland Family Planning Program ("MFPP") through 23 subrecipients—19 local health departments and four private nonprofits. MFPP is supported by both federal Title X and State funds, which are braided to support subrecipients' projects. In other words, State and federal funds together support the operations and services of each subrecipient, rather than funding distinct sets of providers or services. Accordingly, any change in either the federal or State allocation would affect the State of Maryland's entire Title X network, rather than any one subrecipient.

79. MFPP typically operates with an annual baseline of approximately $6.3 million in State funding alongside a federal Title X allocation of about $4 million. Currently, MFPP operates with slightly less funding, having received $3,778,151 in federal Title X funding in Fiscal Year 2026 along with the State's $6,319,404 cost-sharing contribution for State Fiscal Year ("SFY") 2027. As of August 2026, 64 health centers provide funded family planning services. The MFPP program employs 3.6 full-time equivalent staff, and other MDH staff assist as needed. Additionally, program funding supports 37.38 full-time equivalent roles across 78 positions with various local health departments.

80. In SFY 2025, covering July 1, 2024 through June 30, 2025, MDH's Title X subrecipients served 51,561 individuals. Approximately 61.4 percent (31,657 individuals) received services at no cost, and nearly 30 percent were uninsured. Rural health is a significant portion of MFPP's client base, as 18 of 24 Maryland jurisdictions are classified as rural and 27 percent of individuals received services in rural counties in SFY 2025. A reduction in family planning funds

would disproportionately limit access to essential screenings and care for rural Marylanders. MFPP addresses significant public health needs, including the prevention and treatment of sexually transmitted infections. MDH records reflect 30,744 chlamydia infections; 9,678 gonorrhea infections; and 1,607 primary and secondary syphilis infections in 2024. If MDH does not have access to Title X funding, MFPP expects to provide 1,447 fewer Pap smears each year, resulting in an anticipated 25 high-grade cervical pre-cancers going undetected annually.

81. The experience of individual subrecipients illustrates the scope and importance of Maryland's Title X network. For example, the Baltimore City Health Department ("BCHD"), which has participated in the Title X program since the early 1970s, currently receives $1,341,143 in funding through MFPP. Its Title X subrecipients include, among others, school-based health centers; Baltimore Systems, Inc.; and the University of Maryland Adolescent and Young Adult Clinic. During SFY 2025, BCHD served 3,095 individuals, 96.8 percent of whom received services at no cost. The Calvert County Health Department provides another, longstanding example. It currently receives a $334,046 award from MDH. During SFY 2025, the Calvert County Health Department served 659 individuals through two health centers; 99.8 percent (all but one individual) received services at no cost. These providers are representative examples of the longstanding network of Maryland providers that rely on Title X funding to provide essential family planning services to Maryland residents.

82. Maryland law reflects a commitment to providing comprehensive family planning services. Maryland law prohibits MDH from accepting restrictive federal Title X rules that exclude comprehensive family planning providers or mandate abortion-related censorship, requiring the State to backfill any federal funding declined on this basis with State funding. *See* Md. Code, Health-Gen. §§ 13-3401 to -3402. Accordingly, whenever MDH must decline federal funding

because the conditions attached to that funding are inconsistent with the State's statutory requirements, the State of Maryland is manifestly harmed by the loss of federal resources that would otherwise support MFPP.

83. To apply under the 2027 NOFO, MDH must choose between substantially restructuring its existing application and usual programming to conform to the NOFO's new priorities—which appear to be inconsistent with the existing Title X statute and regulations—or risk being denied federal funding for MDH's longstanding approach and programming. Maryland's Title X network and Maryland residents would be best served by continued access to the comprehensive services that they have historically received. If, because of this inconsistency and substantial burden, MDH cannot pursue or does not receive Title X funding, the loss of funding would represent a 38.5 percent reduction in MFPP's total operating revenue. MDH's standard allocation of State-only family planning funding could sustain only a limited portion of the program's existing activities.

**iii. Massachusetts**

84. Title X plays a critical role in family planning services in Massachusetts. In Fiscal Year 2026, the Commonwealth's two direct grantees received $6,506,688 in Title X family planning services grants: $5,538,547 to the Massachusetts Department of Public Health ("MA DPH") and $968,141 to Action for Boston Community Development ("ABCD"). MA DPH, which began participating in Title X in 2014, delivers services to approximately 104,000 clients a year through a network that includes 73 service sites and subrecipients statewide. ABCD, a nonprofit that has been a Title X recipient since 1973, delivers services to approximately 27,000 clients a year and supports a network that includes 28 service sites and subrecipients concentrated in Boston.

85. MA DPH administers its Title X grant through its Sexual and Reproductive Health Program. The Program breaks down barriers to care in the Commonwealth by providing voluntary, confidential, high-quality services regardless of patients' ability to pay, without judgment, and with respect for each patient's unique needs. It offers a comprehensive range of care that includes preconception health services and counseling; basic infertility services; pregnancy testing and counseling; FDA-approved long-acting and short-acting contraceptives; natural family planning methods; comprehensive STI and HIV-related services (including education, counseling, screening, treatment, PrEP, PEP, and expedited partner therapy); breast and cervical cancer screening; HPV vaccination; screening for intimate partner violence, mental health, obesity, and substance use; and adolescent-friendly health services. In 2025, MA DPH facilitated 152,875 family planning visits for 103,709 individuals; conducted 33,398 gonorrhea tests, 23,576 syphilis tests, and 49,674 HIV tests; and administered 27,102 chlamydia tests and 14,748 Pap tests to female users. The Program serves as the foundation of the Commonwealth's reproductive health care safety net by supporting inclusive and accessible sexual and reproductive health services for all people and communities.

86. The complexity of managing a statewide network requires MA DPH to begin its application process early. MA DPH must initiate conversations with its partners as soon as this fall to continue to support a high-quality network of hospitals, family planning clinics, FQHCs, and school-based health centers, while also fulfilling its legal obligations as a governmental agency subject to both state and federal regulation. *See, e.g.*, Mass Gen. Laws ch. 29, § 6B; 815 Mass. Code Regs. 2.00.

87. In 2025, Title X-funded sites in the Commonwealth served 103,709 family planning clients. 50,303 (48 percent) clients received care at no cost at all, as their incomes were

at or below 100 percent of the federal poverty line; the remainder received care on a sliding fee scale. With respect to insurance, 49,818 (48 percent) had public coverage and 10,440 (10 percent) were uninsured.

88. Title X participation provides invaluable health and significant economic benefits to the Commonwealth. In 2014, research documented that Title X-funded providers' dispensing of contraceptive and related services in the Commonwealth averted 16,200 unintended pregnancies; prevented the spread of 490 cases of chlamydia and 40 cases of gonorrhea among partners; and averted 23 cervical cancer cases, 11 precancer cases, and 49 cases of pelvic inflammatory disease in a single year alone. Absent those critical screening, contraceptive, and early-stage interventions, public sector healthcare costs for necessary downstream procedures such as maternity and birth-related services to 60 months, miscarriage and ectopic pregnancy management, and downstream STI testing would have totaled $155,220,000. Jennifer J. Frost et al., *Return on Investment: A Fuller Assessment of the Benefits and Cost Savings of the US Publicly Funded Family Planning Program*, 92 Milbank Q. 667, online app. tbls. 3–4 (2014), https://doi.org/10.1111/1468-0009.12080.

89. The Massachusetts legislature already reaches deep into the Commonwealth's coffers to provide millions of dollars in additional funding to "enhanc[e] comprehensive family planning services currently funded or previously funded by Title X." *See, e.g.*, FY2027 General Appropriations Act, 2026 Mass. Acts ch. 137, § 2, item 4513-1005. MA DPH has also invested in developing durable infrastructure to support its program, such as the Massachusetts Sexual and Reproductive Health Training Center, which provides training, technical assistance, and resources to program clinicians, administrators, support staff, and other family planning service professionals.

**iv. California**

90. Title X funds play a critical role in covering the costs of family planning services in California. California's sole Title X grantee, Essential Access Health, Inc. ("Essential Access"), is a nonprofit that has been a Title X recipient since the program's inception in the 1970s.

91. In 2024, Essential Access received $13,084,368 in Title X funding, which it then issued to 52 subgrantees. These subgrantees include comprehensive family planning providers, STI prevention partners, and community-based outreach and education partners. Essential Access also provides training and technical assistance to its subgrantees to enhance the capacity of Title X-funded providers to meet the individual family planning needs of all Title X patients.

92. Last year, approximately 461,218 individuals received Title X services in California. And 67 percent of the Title X-funded care was provided at no cost.

93. California's network of Title X providers ensures that California residents have access to a wide range of reproductive and preventive health services, including contraceptive care; STI and HIV prevention education, counseling, testing and treatment; adolescent services; infertility services; and pregnancy testing and options counseling. Compared with other publicly funded family planning providers, Title X-funded providers are more likely to offer certain specialized services on-site, including vasectomies and long-acting reversible contraception, which can have higher up-front costs. Access to effective family planning services has also been demonstrated to be a cost-effective use of public funds, generating significant savings in health care expenditures. Title X-funded providers also demonstrate greater adherence to evidence-based protocols, such as chlamydia screening guidelines; are more likely to incorporate advanced technologies in their clinics; and are more likely to participate in clinical training opportunities.

94. California's Title X-funded providers also play an important role in serving populations that face barriers to accessing care. They have greater proportions of bilingual staff

and are more likely to serve individuals who have low incomes, are uninsured, are under age 25, or identify as a person of color. Title X-funded providers are also more likely than other publicly funded family planning providers to offer extended clinic hours and provide sexual and reproductive health education.

95. Essential Access intends to submit an application in response to the 2027 NOFO and is currently assessing how its Title X program could be restructured to respond to the NOFO's Agency Priorities, including the Challenged Conditions, while continuing to comply with existing Title X program requirements. Several of these new priorities create significant tension with the current program model and with the goals, mission, and values of Essential Access and some current subrecipients. For example, it is unclear how to appropriately deemphasize hormonal birth control while continuing to ensure access to hormonal contraception consistent with Title X program requirements, or how the priority of reducing crime should be operationalized within a family planning program. These tensions create significant uncertainty regarding how Essential Access can structure its program to respond to the 2027 NOFO while maintaining compliance with existing Title X requirements and supporting its current work.

**v. Other Plaintiff States' Title X Programs**

96. In Fiscal Year 2026 (FY2026), $3,966,199 in Title X family planning services grant funding flowed into Colorado to the state's only direct grantee, the Colorado Department of Public Health and Environment.

97. In FY2026, $2,365,504 in Title X family planning services grant funding flowed into Connecticut.

98. In FY2026, $1,070,842 in Title X family planning services grant funding flowed into Delaware to the state's only direct grantee, Delaware Health and Social Services.

99. In FY2026, $1,942,880 in Title X family planning services grant funding flowed into Hawaiʻi.

100. In FY2026, $8,014,106 in Title X family planning services grant funding flowed into Illinois, including a direct grant of $5,055,829 to the Illinois Department of Public Health.

101. In FY2026, $4,693,969 in Title X family planning services grant funding flowed into Kentucky, to the state's only direct grantee, the Kentucky Cabinet for Health and Family Services. The Department for Public Health, an agency of the Cabinet for Health and Family Services, receives and administers Title X funds. See KRS 11.065. The Governor of Kentucky appoints the Cabinet Secretary and approves the Cabinet Secretary's appointment of the Commissioner of the Department for Public Health. KRS 12.050; KRS 12.255; KRS 194A.030.

102. In Maine, the Family Planning Association of Maine, Inc. ("Maine Family Planning") has received Title X funding since the 1970s. The funding supports Maine Family Planning's network of approximately 63 sites throughout Maine, which include health centers directly operated by Maine Family Planning and its subgrantee partners. Maine Family Planning was awarded $1,780,971 in Title X family planning services funds for FY2026.

103. Under Maine law, the Department of Health and Human Services must provide funding to offset any reduction in Title X funds received by a Title X grantee, as compared to the Title X funding it received in fiscal year 2024–2025, if the reduction is due to an action by the Federal government or a decision by the grantee to withdraw from receiving Title X funds due to conditions attached to them. 22 M.R.S.A. § 1912 (2026).

104. In FY2026, $7,178,497 in Title X family planning services grant funding flowed into Michigan, to the state's only direct grantee, the Michigan Department of Health and Human Services.

105. In FY2026, $3,313,063 in Title X family planning services grant funding flowed into Minnesota.

106. In FY2026, $3,985,318 in Title X family planning services grant funding flowed into Nevada, including a direct grant of $174,750 to the Nevada Department of Human Services.

107. In FY2026, $8,075,812 in Title X family planning services grant funding flowed into New Jersey.

108. In FY2026, $2,993,324 in Title X family planning services grant funding flowed into New Mexico, to the state's only direct grantee, the New Mexico Department of Health.

109. In FY2026, $2,961,906 in Title X family planning services grant funding flowed into Oregon, to the state's only direct grantee, the Oregon Health Authority Public Health Division.

110. In FY2026, $12,729,659 in Title X family planning services grant funding flowed into Pennsylvania.

111. In FY2026, $1,083,848 in Title X family planning services grant funding flowed into Rhode Island to the Rhode Island Department of Health.

112. In FY2026, $790,719 in Title X family planning services grant funding flowed into Vermont, to the state's only direct grantee, the Vermont Agency of Human Services.

113. In FY2026, $5,608,656 in Title X family planning services grant funding flowed into Virginia, including a direct grant of $3,258,656 to the Virginia Department of Health.

114. In FY2026, $4,297,649 in Title X family planning services grant funding flowed into Washington, to the state's only direct grantee, the Washington State Department of Health.

115. In FY2026, $2,864,620 in Title X family planning services grant funding flowed into Wisconsin, to the state's only direct grantee, the Wisconsin Department of Health Services.

**C. The 2027 NOFO**

116. On July 9, 2026, the Department published the 2027 NOFO soliciting applications for a five-year term with an anticipated grant award date of April 1, 2027. The July 9 NOFO replaced an earlier version issued on April 3, 2026. The deadline to apply for funding under the 2027 NOFO is January 11, 2027. Ex. A, 1.

117. The 2027 NOFO marks a drastic change in Title X policy, requiring Title X programs to "align" with Agency Priorities established by multiple agencies, specifically HHS, OASH, and OPA. The 2027 NOFO directs applicants' proposals to address the Agency Priorities, incorporates assessments of each proposal's conformity with the priorities at several stages of the evaluation process, and conditions funding on ongoing alignment with the priorities in both "program design and activities" after grants have been awarded. *Id.* at 7. The Agency Priorities contain novel conditions that depart from the Department's past practices, are vague and undefined, and are in tension with the statutory and regulatory requirements of Title X.

118. Specifically, Section B of the 2027 NOFO, entitled "Required Alignment with OASH Mission and Agency Priorities," announces that "recipients" must align "program design and activities" with OASH priorities (attached as Exhibit E). Ex. A, 7. The OASH Priorities, included by reference in the NOFO, are:

- Addressing the chronic disease epidemic;
- Ending diversity, equity, and inclusion (DEI) policies and practices across OASH's programs;
- Reducing overmedicalization in health care and increasing focus on optimal health and addressing underlying root causes;
- Providing medically accurate and reliable information necessary for informed consent;
- Ending support for gender ideology, including sex-rejecting procedures for children, and ensuring evidence-based care;

- Enforcing the Hyde Amendment;
- Ensuring gold standard science, curtailing corporate capture and preventing conflicts of interest;
- Ensuring OASH funds benefit eligible individuals and not illegal aliens;
- Ensuring adolescent program materials are age appropriate;
- Protecting parental rights to direct the religious upbringing of their children.

Ex. E, 1–3 ("OASH Priorities").

119. Section B also requires Title X projects to "demonstrate ongoing compliance" with three additional OPA-specific "objectives," including advancement of "reproductive goals counseling." Ex. A, 7.

120. Section C.a.4.i. provides that proposals should align with priorities from OPA, which are "informed" by the OASH priorities and include the three additional OPA-specific objectives:

- Addressing the chronic disease epidemic through the delivery of Title X services;
- Reducing overmedicalization in health care and increasing focus on optimal health through the delivery of Title X services;
- Promoting body and health literacy through the delivery of Title X services;
- Advancing reproductive goals counseling through the delivery of Title X services;
- Promoting evidence-based care through the delivery of Title X services;
- Enforcing the Hyde Amendment through the delivery of Title X services;
- Ensuring OASH funds benefit eligible individuals and not illegal aliens through the delivery of Title X services;
- Implement[ing] a Quality Improvement and Quality Assurance (QI/QA) Plan.

Ex. A, 10–14 ("OPA Priorities").

121. The 2027 NOFO further states that the OPA program office will consider "[a]lignment with HHS [] priorities" when making its recommendations for funding. Ex. A, 41. The 2027 NOFO does not list, cite, or link to these priorities, nor does it qualify or explain their application in the Title X context. HHS's official agencywide priorities, published on its website, list "combat[ing] gender ideology" and "prohibit[ing] funding recipients from conducting DEI programs," as well as other priorities apparently unrelated to either the provision of family planning services or the NOFO, such as "[e]nd[ing] crime and disorder on America's streets." *See HHS Priorities*, U.S. Dep't Health & Hum. Servs. (rev. Sept. 30, 2025), https://www.hhs.gov/about/priorities/index.html ("HHS Priorities") (attached as Exhibit F).

122. The incorporation of these Agency Priorities in the 2027 NOFO defines and constrains the scope of the entire Title X grantmaking process from the pre-submission application stage all the way to the post-award grant stage.

123. Overall, the NOFO requires that projects "must align program design and activities with agency priorities . . . [and] demonstrate ongoing compliance with [them]" to avoid termination and binds applicants to the "activities" described in the application. Ex. A, 7.

124. As early as the application stage, the NOFO imposes its priorities to constrain prospective recipients' proposals. The NOFO requires applicants to provide a Project Narrative, which is "the primary basis to determine whether [a] project merits an award," and makes clear that to be successful, the "proposal should include . . . plans and strategies for providing family planning services that address OPA program priorities." *Id.* at 19–21.

125. The NOFO also embeds the Agency Priorities in the process for evaluating applications at both the merit review stage and the federal staff review stage that follows it. For the merit review, the NOFO establishes a 100-point scoring rubric based on various review criteria

according to which "[f]ederal staff and an independent merit review panel will assess all qualified eligible applications." *Id.* at 39. The most significant single criterion in the merit review rubric—valued at 35 potential points out of a total of 100—is the "extent to which the applicant proposes strategies that meaningfully advance OPA's program priorities . . . and HHS priorities." *Id.* at 40.

126. Meanwhile, factors drawn directly from the Title X statute are awarded significantly fewer points. For example, "the degree to which [applications] adequately provide[] for the requirements set forth in the Title X statute, regulations . . . and legislative mandates" is worth only 15 points. *Id.*

127. The NOFO also incorporates consideration of alignment with HHS and OASH Priorities at the final stage of federal staff review. After receiving the merit scores, OPA "coordinate[s] with a senior appointee to provide recommendations for funding to the Grants Management Officer." *Id.* at 41. When providing these recommendations, "the program office will take into consideration . . . [a]lignment with HHS and OASH priorities." *Id.*

128. Last, the NOFO establishes that applicants' proposed project designs will become grounds for subsequent termination of awards if later deemed not aligned with the Agency Priorities: "[R]ecipients must demonstrate ongoing compliance with these priorities, in all programs that are authorized to advance them, through program design, implementation, reporting, and evaluation. Failure to meaningfully align . . . may result in corrective action . . . including termination pursuant to 2 C.F.R. 200.340(a)(4) for no longer effectuating program goals or agency priorities." *Id.* at 7. Applicants' behavior is necessarily shaped by this threat of funding termination for failure to align a program's design with the Agency Priorities.

129. The NOFO occasionally and inconsistently appends vague savings clauses to the priorities incorporated across these stages of the grant cycle. For instance, when embedding the

priorities into application preparation requirements, it states that "to the extent authorized by law and within the scope of the program, OPA expects recipients to develop and implement plans to address the program priorities and provide evidence of the project's capacity to address program priorities." *Id*. at 10. However, when embedding the priorities into the merit review rubric, the NOFO includes no such limiting clause. *Id*. at 40. The NOFO never explains what limits these clauses functionally impose.

130. Plaintiff States, Title X grantees, and the public at large were not given notice and an opportunity to comment on any of the terms contained in the 2027 NOFO.

**D. Plaintiff States' Challenge to the 2027 NOFO**

**i. The Challenged Conditions**

***The Anti-DEI Priority***

131. The 2027 NOFO conditions funding upon a prospective recipient's alignment with both HHS's and OSHA's Anti-DEI Priority. Ex. A, 7, 11. Collectively, these HHS and OASH anti-DEI priorities constitute the Department's "Anti-DEI Priority."

132. Where the HHS Anti-DEI Priority specifically calls for the end of DEI programs *by funding recipients*, the OASH Anti-DEI Priority states that "[e]nding diversity, equity, and inclusion (DEI) policies and practices *across OASH's programs*" is a priority. Ex. E, 1 (emphasis added). The Priority explains that OASH seeks to "prioritize efforts that go beyond the use of ideologically laden concepts," like "health equity," which it defines as a focus "on identifying and documenting worse health outcomes for minority populations." *Id*. at 2.

133. To the extent the Anti-DEI Priority deprioritizes programs that advance inclusivity and equity, then it contradicts Title X regulations in two ways. *First*, Title X regulations require grantees to provide services in an "inclusive" and "equitable" manner and encourage participation from "diverse persons." 42 C.F.R. §§ 59.5(a)(3), (b)(3)(iii); *see also id.* § 59.2 (defining "inclusive"

as "when all people are fully included and can actively participate in and benefit from family planning, including, but not limited to, individuals who belong to underserved communities," specifically identifying racial and ethnic minorities and "lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons").

134. Additionally, the 2027 NOFO gives no explanation of how applicants are expected to align with the Anti-DEI Priority, nor does it ever acknowledge or explain Defendants' decision to reverse Title X policies upon which grantees have long relied. Rather, Defendants imposed the Anti-DEI Priority without providing any guidance on how prospective grantees are expected to reconcile the apparent conflicts with Title X regulations in their applications. That confusion is heightened by the NOFO's generic and sporadic disclaimers that Agency Priorities apply only "to the extent authorized by law." For example, the NOFO does not clarify to what "extent" OPA expects applicants can reject health equity while simultaneously still advancing it.

135. The NOFO never directly addresses, acknowledges, or offers a reasoned explanation for the agency's apparent about-face on the role of diversity, health equity, and inclusiveness in Title X programs.

136. Moreover, the NOFO does not explain what the Anti-DEI Priority means in the context of Title X family planning services grants and how applicants, including those in Plaintiff States, can craft grant proposals that will align with it. Nor does it offer a reasoned explanation of its decision to depart from past practices that have engendered serious reliance interests among Plaintiff States, which now depend on longstanding Title X programs and networks that have been designed to comply with Title X statutes and regulations.

***The Anti-Gender Ideology Priority***

137. The 2027 NOFO conditions Title X funding on applicants' compliance with a number of priorities targeting transgender individuals and transgender healthcare in contravention of the law of Title X.

138. Under the 2027 NOFO, the Department will "prioritize funding for grantees who maintain a science-driven approach to healthcare, including by protecting children, [and] respecting biological reality." Ex. A, 13. Applicants are expected "to demonstrate how their Title X projects promote physical and reproductive health priorities established by HHS," *id.*, including the HHS Priority to "[c]ombat gender ideology and protect children," which the Department describes as ensuring programs "accurately reflect science, including the biological reality that a person's sex as either male or female is unchangeable and determined by objective biology," Ex. F, 6.

139. Similarly, the 2027 NOFO adopts the OASH priority of "[e]nding support for gender ideology, including sex-rejecting procedures for children, and ensuring evidence-based care." Ex. E, 2. The OASH Priority states that it will "deprioritize programs" that engage in medical interventions, such as "puberty blockers, cross-sex hormones, and surgeries, that attempt to reject a child's sex," and prioritize programs "that accurately reflect the scientific biological reality of sex." *Id*.

140. Collectively, these priorities targeting transgender individuals and transgender health care form the "Anti-Gender Ideology Priority."

141. To the extent the Anti-Gender Ideology Priority deprioritizes programs that provide reproductive healthcare for LGBTQ+ individuals, it appears to conflict with Title X regulations that explicitly require family planning projects to ensure they are conducted in an "inclusive" and "equitable" manner and encourage participation from "diverse persons." 42 C.F.R. §§ 59.5(a)(3),

(b)(3)(iii); *see id.* § 59.2 (defining "inclusive" as "all people . . . including . . . lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons").

142. Title X regulations also require that transgender persons be "fully included and can actively participate in and benefit from family planning," *id.* § 59.2, and prohibit the provision of services in a manner that discriminates on the basis of "gender identity" and "sex characteristics," *id.* § 59.5(a)(4).

143. The Anti-Gender Ideology Priority's expectation that applicants "ensure" that programs "reflect . . . the biological reality that a person's sex as either male or female is unchangeable" is in tension with these regulatory commands. Ex. F, 6. Fully including transgender individuals in Title X family planning, and providing care in an equitable and nondiscriminatory manner, necessarily involves recognizing the needs and interests of transgender individuals—realities that Title X applicants must now reject to receive funding.

144. The Anti-Gender Ideology Priority is contrary to (i) the prevailing views of most major medical organizations, including multiple nationally recognized standards of family planning care recognized by OPA in agency materials and the agency's own such standard, *see* Ex. C, 10–11; Ex. D, S72–73, (ii) the prevailing standard of care in Plaintiff States, and (iii) laws in many Plaintiff States that protect transgender individuals against discrimination and guarantee access to gender affirming medical care.

145. The NOFO never directly addresses, acknowledges, or explains OPA's apparent departure from its past position on transgender nondiscrimination and inclusion within Title X programs.

146. Moreover, Defendants have not explained what the Anti-Gender Ideology Priority means in the context of Title X programs and how applicants, including those in Plaintiff States,

can craft proposals that will demonstrate alignment with it while still complying with existing Title X regulations.

***The Overmedicalization Priority***

147. The NOFO conditions Title X funding on applicants' and recipients' alignment with OPA's priority to "[r]educe overmedicalization in health care and increas[e] focus on optimal health through the delivery of Title X services . . . ." Ex. A, 11 (hereinafter the "Overmedicalization Priority"). The NOFO refers to contraception only once—within the context of the Overmedicalization Priority. To the extent it requires applicants and grantees to deemphasize contraception, the Overmedicalization Priority is contrary to law and is arbitrary and capricious.

148. According to the 2027 NOFO, OPA "recognizes the overreliance on pharmaceutical and surgical treatments" and expects applicants "to demonstrate how their Title X projects will integrate noninvasive, evidence-based practices that promote health literacy, fertility awareness, and reproductive health without unnecessary medicalization or symptom suppression." *Id*. at 11–12. The 2027 NOFO further states that "[k]ey strategies for advancing optimal health through Title X services include, but are not limited to, expanding access to fertility-awareness-based methods (often referred to as natural family planning) . . . ." *Id.* at 12.

149. The NOFO does not explain what it means to "integrate noninvasive, evidence-based practices that promote health literacy, fertility awareness, and reproductive health without unnecessary medicalization or symptom suppression." *Id.* Rather, the NOFO appears to equate any form of contraception other than "fertility-awareness-based methods" with "unnecessary medicalization or symptom suppression." *Id.*

150. Despite Title X's historical focus on offering a broad range of contraceptive services to program clients, the 2027 NOFO strongly suggests that applicants that provide access

to a broad range of methods of family planning would not be considered to be sufficiently "aligned" with the Overmedicalization Priority.

151. And if the Overmedicalization Priority does require grantees to deemphasize medical contraception in favor of natural family planning, that would be contrary to nationally recognized standards, depart from OPA's own evidence-based best practices, and contravene Title X's core mandate to "offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a).

152. By definition, "family planning services include a broad range of *medically* approved services, which includes [FDA]-approved contraceptive products." 42 C.F.R. § 59.2 (emphasis added). The Title X regulations further explain that Title X projects "shall" consist of the "comprehensive medical . . . services necessary to aid individuals to determine freely the number and spacing of their children." *Id.* § 59.1.

153. Moreover, the regulations require that if any organization "offers only a single method of family planning, it may participate as part of a project as long as the entire project offers a broad range of acceptable and effective medically approved family planning methods and services." *Id.* § 59.5(a)(1); *see also id.* (a service site that cannot provide a range of acceptable and effective medically approved family planning methods and services "must be able to provide a prescription to the client for their method of choice or referrals to another provider.").

154. The shift away from contraception as a method of family planning also contradicts OPA guidance defining its own 2024 QFP as "a nationally recognized standard of care" for providers to follow "when implementing the Title X requirements." Ex. B, 2. The 2024 QFP instructs providers to keep "a broad range of Food and Drug Administration (FDA)-approved or FDA-cleared contraceptive products . . . available on-site," recognizes the variety of indications

for use of contraception "other than pregnancy prevention" (such as menstrual regulation, STI prevention, and endometriosis), and adopts a patient-centered approach. Ex. D, S54–57.

155. The NOFO never directly addresses, acknowledges, or offers a reasoned explanation supported by relevant evidence for its apparent departure from OPA's past position on contraception within Title X programs.

156. Defendants have not explained what the Overmedicalization Priority means in the context of Title X programs and how applicants, including those in Plaintiff States, can craft proposals that will demonstrate alignment with it while still complying with existing Title X regulations and fulfilling Title X's core mandate established by statute.

***The Hyde Amendment Priority***

157. The 2027 NOFO directs applicants and grantees to align with OPA's priority entitled "Enforcing the Hyde Amendment" (hereinafter the "Hyde Amendment Priority"). Ex. A, 13–14.

158. Despite the name, this priority is not connected with enforcing the Hyde Amendment; rather, it seeks to impose additional restrictions beyond the Hyde Amendment. The Department states that it "will prioritize programs and funding that uphold Hyde protections and do not use taxpayer resources to promote or support elective abortion," and that recipients are expected to "demonstrate how their Title X projects maintain strict separation from prohibited activities and contribute to broader HHS efforts to safeguard life-affirming, lawful, and ethical program delivery." *Id.* at 14.

159. The Hyde Amendment does not apply to Title X. Rather, by statute, Title X funds may not be used in programs where abortion is a method of family planning. *See* 42 U.S.C. § 300a-6.

160. Since 1996, Congress has included in every appropriations bill for Title X the mandate that "all pregnancy counseling [in the Title X program] shall be nondirective." *See* Pub. L. 119-75, 140 Stat. at 262. Title X regulations also require that funded programs provide "neutral, factual information and nondirective counseling" when asked about pregnancy options, including "[p]regnancy termination," and that Title X programs provide referrals to abortion services upon request. 42 C.F.R. § 59.5(a)(5)(i)–(ii).

161. The 2027 NOFO does not explain what it means to "enforce the Hyde Amendment through the delivery of Title X services" or to "contribute to broader HHS efforts to safeguard life-affirming, lawful, and ethical program delivery." Ex. A, 14. Applicants are left in an untenable position of committing themselves to aligning with the indefinite and unclear Hyde Amendment Priority for the duration of the grant.

162. It is also not clear what the applicant must do "to safeguard life-affirming, lawful, and ethical program delivery" or "maintain strict separation from prohibited activities." The inclusion of these terms under the heading "Enforcing the Hyde Amendment" appears to indicate that they reflect opposition to abortion and extend to matters beyond what the Hyde Amendment requires. Absent any effort by Defendants to explain the priority's concrete meaning in the current Title X regulatory context, its language raises the prospect that any grantee or subgrantee that provides abortion outside of the Title X program would not be considered sufficiently "aligned" with this Agency Priority to receive funding.

163. To the extent that the Hyde Amendment Priority's requirements of "life-affirming" program delivery and "maintain[ing] strict separation" differ from existing regulations, such as by prohibiting non-directive options counseling or referrals to abortion care upon request, they conflict with Title X's statutory and regulatory requirements.

164. To the extent the Hyde Amendment Priority represents a change in agency position relating to abortion counseling or compliance with separation requirements, the NOFO never directly addresses, acknowledges, or offers a reasoned explanation supported by relevant evidence for its departure from OPA's past positions.

165. Defendants have not explained what the Hyde Amendment Priority means for Title X and how applicants, including those in Plaintiff States, can craft proposals that will demonstrate alignment with it while still complying with existing Title X regulations.

166. In addition, Plaintiff States, and Title X recipients within them, have built and rely on systems to ensure compliance with the prohibition of using federal Title X funds for abortion. Those systems are not designed to enforce the significant changes from existing Title X requirements that the Hyde Amendment Priority appears to represent.

***The Directive Counseling Priority***

167. The 2027 NOFO states that OPA is interested in "innovative strategies to . . . advance reproductive goals counseling for all clients," referred to herein as the "Directive Counseling Priority." Ex. A, 3. "Advanc[ing] reproductive goals counseling" is one of the three OPA-specific priorities singled out as special "objectives in Title X." *Id.* at 7; *see also id.* at 12–13. The Directive Counseling Priority is embedded at all stages of the grant process: applicants must address it, submissions are judged on it, and grantees face termination if they fail to align with it.

168. Based on this priority, Title X clinics will be "expected to offer reproductive goals counseling that presents evidence-informed pathways associated with improved economic stability and family stability, including . . . marriage prior to childbearing . . . . Program counseling should affirm marriage and parenthood as meaningful and valued components of adult life." *Id.* at 13.

169. The 2027 NOFO informs applicants that "[s]uccessful proposals" will include a Project Narrative addressing OPA program priorities including "[a]dvancing reproductive goals counseling." *Id.* at 19, 21. Further, applicants' Work Plan *must* indicate, "[f]or each direct service site," the specific "services (including . . . reproductive goals counseling . . .) that will be provided directly at the site" and offer "a justification for any . . . services that will not be available at the site along with a description of how you will ensure client access for" those services. *Id.* at 23–24.

170. The Directive Counseling Priority is contrary to congressional and regulatory requirements for Title X.

171. The 2027 NOFO's prioritization of projects that "advance reproductive goals counseling *for all clients*," *id*. at 3 (emphasis added), by advising them on the "meaningful and valued" nature of parenthood, *id.* at 13, conflicts with Congress's mandate that "all pregnancy counseling shall be nondirective" in Title X projects, Pub. L. 119-75, 140 Stat. at 262. And regulations that require programs offer pregnant clients the opportunity to receive "neutral, factual information and nondirective counseling" about any of a slate of options, of which parenthood is only one, cannot coexist with the Directive Counseling Priority. *See* 42 C.F.R. 59.5(a)(5).

172. It is not clear how Title X grantees can, on the one hand, promote "marriage prior to childbearing" and "affirm marriage and parenthood as meaningful and valued," Ex. A, 13, while, on the other hand, provide "client-centered" care "in a manner that does not discriminate against any client based on . . . number of pregnancies, or marital status," 42 C.F.R. § 59.5(a)(3)–(4).

173. It is similarly unclear how grantees can comply with the Directive Counseling Priority while also meeting the obligation to offer "quality service delivery consistent with nationally recognized standards of care." *Id.* at § 59.5(a)(3). OPA's own recommended standard,

the QFP, reflects consensus in directing providers to facilitate patients' "ability to self-determine . . . their reproductive goals" and to "avoid attempts to redirect their goals." Ex. D, S44, S50.

174. The NOFO never directly addresses, acknowledges, or offers a reasoned explanation supported by relevant evidence of any apparent departure from OPA's past position on nondirective counseling within Title X programs.

175. Defendants have not explained what the Directive Counseling Priority for Title X means in the context of Title X programs, or how applicants, including those in Plaintiff States, can craft proposals that will demonstrate alignment with it while still complying with statutory and regulatory requirements to provide nondirective, nondiscriminatory, client-centered counseling.

***The Irrelevant HHS Priorities***

176. The 2027 NOFO incorporates a directive to align with several HHS priorities that have nothing to do with Title X or the provision of family planning services. The largest portion of a Title X applicant's score (35 points out of a possible 100 points) will be based on the "extent to which the applicant proposes strategies that meaningfully advance" OPA and HHS priorities. Ex, A, 39–40. The HHS priorities include "[f]urther[ing] our understanding of autism," "[i]nvestigat[ing] and car[ing] for those with Long COVID," "[a]dvanc[ing] the scientific understanding of the agency process," "[e]nd[ing] crime and disorder on America's streets," and "[i]mprov[ing] oversight of foreign funded institutions." Ex. F, 3–7. Collectively, these five priorities together constitute the "Irrelevant HHS Priorities."

177. Defendants do not explain how alignment with these seemingly irrelevant HHS priorities is "within the scope" of the Title X Program, or what they mean in the context of Title X programs. Ex. A, 41. None of these priorities advance the goals or purposes of the Title X program. Nor have Defendants explained how applicants, including those in Plaintiff States, can craft proposals that will demonstrate alignment with them.

**ii. The 2027 NOFO Harms Plaintiff States and Their Citizens**

178. Without intervention, the 2027 NOFO will harm Title X applicants, including Plaintiff States, and their citizens.

179. For decades, Plaintiff States have effectively managed Title X programs in their States directly, indirectly through subgrantees and grant recipients, or in both ways. These Title X programs, as Congress intended, provide high-quality family planning services to millions of citizens, many of whom live in rural and underserved communities and are among marginalized populations.

180. Now, Plaintiff States face imminent fiscal injuries in the potential loss of grant funds, increased administrative costs to reformulate applications and modify programs to remain competitive, increased state budget costs to fill the gap of any Title X funding shortfall and/or increased downstream healthcare costs if additional state funding isn't available to continue offering covered services. All such fiscal injuries are directly traceable to Defendants' conduct.

181. Plaintiff States have relied on Title X funding to establish and maintain their family planning programs, and their citizens have relied on their programs to obtain critical—and sometimes even lifesaving—services. Plaintiff States' participation in the Title X program has strengthened not just the health of their citizens but also the financial health of their public health infrastructure. Every dollar of Title X funding saves over $7 of downstream public expenditures, in large part because it invests in critical early-stage screening and preventive care. Jennifer J. Frost et al., *Return on Investment: A Fuller Assessment of the Benefits and Cost Savings of the US Publicly Funded Family Planning Program*, 92 Milbank Q. 667, 696 (2014), https://doi.org/10.1111/1468-0009.12080. For example, birth control access reduces rates of unintended pregnancies; STI testing means fewer untreated and transmitted STIs; and Pap smears allow earlier-stage cervical cancer diagnoses. And, in reliance on consistent Title X funding to

other grantees in Plaintiff States, Plaintiff States have built up state-funded counterparts and state-specific infrastructure to bolster the federal Title X program and ensure their citizens receive these critical reproductive health services.

182. Plaintiff States have established long-term relationships with trusted community partners that provide Title X services, and many of those partners will be unable to continue to provide these essential services should Title X funding be denied to Plaintiff States or to longstanding qualified grantees within Plaintiff States.

183. Plaintiff States reasonably fear that their existing programs will not satisfy the 2027 NOFO's requirement of alignment with the Agency Priorities, including the Challenged Conditions, should they seek to maintain current Title X programs that are structured to comply with Title X's existing statutory and regulatory mandates.

184. Because the NOFO gives disproportionate weight to an application's alignment with the Agency Priorities—35 points of 100, representing more than one third of the total, including the remaining statutory and regulatory factors—it is highly likely that Defendants will deny grants to existing grantees that it views as not aligned with those priorities. The NOFO thus places existing grantees, including Plaintiff States and other grantees within their borders, at a significant disadvantage. Plaintiff States have built their existing Title X programs in light of the program's statutory and regulatory framework and core purpose. Applicants must either craft a grant application based on their existing, well-established programming that meets Title X's statutory and regulatory mandates and risk rejection for lack of alignment with the Agency Priorities or attempt to craft an application based on an entirely new program to increase their chances of being considered aligned and therefore meaningfully competitive under the NOFO.

185. Applicants that take the latter path will be forced to expend hundreds of hours of additional staff time and effort to creating entirely new programs, over and above what would be required to apply based on their established programs. To do so would also likely require finding new subgrantees to provide services. And it would leave many well-established, qualified grantees and subgrantees that serve critical populations to languish and even close, to the detriment of Plaintiff States and their citizenry.

186. Plaintiff States that apply for new programs also face increased administrative costs and increased healthcare costs. Realigning state programs away from family planning programs that meet Title X's statutory and regulatory factors and guidance—including the Department's own guidance regarding nationally-recognized standards of care—and towards the new Agency Priorities, including the Challenged Conditions, will increase States' downstream healthcare costs by redirecting state spending away from cost-effective, evidence-based services.

187. Plaintiff States applying for new programs will also be forced to expend significant administrative costs to reorganize longstanding subrecipient networks and existing Title X infrastructure to ensure subgrantee alignment.

188. Plaintiff States attempting to comport with the Challenged Conditions will struggle to conform their applications to the Agency Priorities on the one hand, and with inconsistent Title X regulations and guidance and their own state laws on the other.

189. For example, some state laws mandate the provision of a comprehensive family planning program; prohibit discrimination in provision of health care including on the basis of gender identity; and protect access to gender-affirming care. States with such requirements, including many Plaintiff States, face grave difficulty in crafting a program that will satisfy the

Agency Priorities, including the Challenged Conditions, and still comply with their state laws, even if they can determine what the new priority terms mean or require.

190. In States that lose Title X funding, many Title X providers will face risk of closure. Losing access to critical Title X resources would reduce the healthcare workforce, increase wait times for patient appointments, eliminate or severely cut back community outreach and education and quality improvement activities, and reduce capacity to meet the family planning needs of patients. States will be forced to cover the long- and short-term cost of the resulting worsened health outcomes for their residents, including higher rates of unintended pregnancy, STIs, cancer, and HIV and AIDS.

191. Plaintiff States also suffer here-and-now competitive injury because Defendants have changed the rules to tilt the process against Plaintiff States' Title X programs. The 2027 NOFO renders Plaintiff States and other Title X grantees within their borders unable to fairly compete for Title X funds despite their programs' long history of providing Title X services, both denying them their one-time chance to participate in a fair competition and favoring their competitors.

192. To the extent the Challenged Conditions conflict with or purport to alter existing legislative Title X regulations, the Department was required to provide notice and comment, and its failure to do so harmed Plaintiff States by depriving them of the opportunity to comment on a regulatory issue critical to Plaintiffs States and their citizens.

## CAUSES OF ACTION

### COUNT I
### (Violation of the APA – Contrary to Law, 5 U.S.C. § 706(2)(A), (C))

193. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

194. The Department is an "agency" under the APA. 5 U.S.C. § 551(1).

195. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). This includes action that is contrary to or violative of the agency's own "existing valid regulations." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

196. The Title X statute requires that "[g]rants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate." 42 U.S.C. § 300a-4(a).

197. The 2027 NOFO constitutes final agency action and marks the consummation of the agency's decision-making process as to its policy priorities and criteria for evaluating Title X grant applications and issuing awards for fiscal year 2027. Because the NOFO establishes criteria and mandates for Title X applications and grant awards, rights and obligations are therefore determined by, and legal consequences flow from, the NOFO.

198. The Challenged Anti-DEI Priority, Anti-Gender Ideology Priority, Overmedicalization Priority, Hyde Amendment Priority, and Directive Counseling Priority either undermine or directly conflict with numerous Title X regulations and law.

199. For example, the Anti-DEI Priority conflicts with Title X regulations that require grantees to provide services in an "inclusive" and "equitable" manner and encourage participation from "diverse persons." 42 C.F.R. §§ 59.5(a)(3), (b)(3)(iii); *see also id.* § 59.2.

200. The Anti-Gender Ideology Priority, to the extent it requires applicants to mistreat, treat differently, or refuse to provide transgender individuals services in an inclusive manner, conflicts with Title X regulations which require Title X projects to provide services in a manner

that is "inclusive" and "equitable," encourage participation from "diverse persons," and prohibit discrimination on the basis of gender identity and sex characteristics. *Id.* §§ 59.5(a)(3), (b)(3)(iii); *id.* § 59.5(4); *see also id.* § 59.2.

201. The Overmedicalization Priority, to the extent it requires an emphasis on the promotion of fertility and natural family planning and deemphasis on contraception (including hormonal contraception), contravenes Title X's central purpose to support the establishment and operation of voluntary family planning projects which shall offer "a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a); *see* 42 C.F.R. § 59.2 (defining "family planning services" to include "[FDA]-approved contraceptive products and natural family planning methods"). Moreover, the Overmedicalization Priority contradicts the mandate that Title X projects consist of "comprehensive medical [] services necessary to aid individuals to determine freely the number and spacing of their children," 42 C.F.R. § 59.1.

202. The Directive Counseling Priority, to the extent it requires counseling "all clients" towards marriage and parenthood, conflicts with the congressional mandate that "all pregnancy counseling be nondirective" under Title X, Pub. L. No. 119-75, 140 Stat. at 262, and regulations that require grantees to offer "pregnant clients" "neutral, factual information and nondirective counseling" on any pregnancy option (of which parenthood is only one), 42 C.F.R. § 59.5(a)(5). The Directive Counseling Priority also conflicts with regulations that require grantees to provide client-centered, quality services that do not discriminate based on marital status. *Id.* § 59.5(a)(3).

203. The Hyde Amendment Priority, to the extent it forbids grantees from providing nondirective counseling to pregnant clients about their pregnancy options, including termination, conflicts with federal regulations and the congressional appropriations rider requiring them to do just that. 42 C.F.R. § 59.5(a)(5); Pub. L. No. 119-75, 140 Stat. at 262.

204. The 2027 NOFO thus exceeds the Agency's authority and is contrary to the Title X statute and regulations.

**COUNT II**
**(Violation of the APA – Arbitrary, Capricious, and Abuse of Discretion, 5 U.S.C. § 706(2)(A))**

205. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

206. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

207. The 2027 NOFO is arbitrary and capricious because, among other things, the Challenged Conditions are vague; reverse course within Title X without acknowledgement, reasoned explanation, or consideration of reliance interests; and are unreasoned, fail to consider important aspects of the problem, and are counter to the evidence before the agency.

208. The Challenged Conditions are arbitrary and capricious because their ambiguous language and unresolved conflicts with other Title X requirements preclude prospective grantees from ascertaining what standard the OPA and the Department expects them to follow, and denies them fair notice.

209. The Anti-DEI, Anti-Gender Ideology, Overmedicalization, Hyde Amendment and Directive Counseling Priorities are also arbitrary and capricious because they depart from prior Department positions on DEI, health equity, nondiscrimination, contraception, and nondirective counseling, without any acknowledgment, explanation, or fair notice of these changes to Title X—much less any consideration of Plaintiff States' reliance interests in existing Title X programs. Further, OPA has not justified its apparent abandonment of former research-backed positions by

making claims that either implicitly misstate or actively run counter to the evidence before the agency.

210. Finally, the Irrelevant HHS Priorities are arbitrary and capricious because they demand applicants and grantees align themselves with mandates that do not appear to relate to Title X, provide no reasoned explanation for their application to Title X grant awards, and are ambiguous as to how applicants and recipients can comply with these provisions within the context of Title X.

**COUNT III**
**(Violation of the APA – Without Observance of Procedure Required by Law, 5 U.S.C. § 706(2)(D))**

211. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

212. The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

213. An agency may only reverse or amend a legislative rule issued through notice and comment rulemaking through notice and comment rulemaking.

214. The Title X regulations were a product of notice and comment rulemaking. *See* 42 C.F.R. §§ 59.1-59.11; 86 Fed. Reg. 56177 (Oct. 7, 2021).

215. Neither the 2027 NOFO nor the Agency Priorities, including the Challenged Conditions, were promulgated through notice-and-comment rulemaking.

216. To the extent the Challenged Conditions constitute an amendment or reversal of any legislative Title X regulations, *see supra* Count I, the Department failed to observe the notice and comment rulemaking procedure required by law. 5 U.S.C. § 706(2)(D).

**COUNT IV**
**(Violation of the Spending Clause, U.S. CONST. ART. I, § 8, CL. 1; Violation of APA § 706 (2)(B), Contrary to Constitutional Right)**

217. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

218. Art. I, § 8, cl.1 of the U.S. Constitution provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

219. The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

220. While Congress may attach conditions on the receipt of federal funds, it must do so unambiguously such that the recipient can make an informed choice. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981).

221. The Challenged Conditions are unconstitutionally vague and ambiguous under the Spending Clause because they do not give applicants fair notice of the conditions for receiving or maintaining Title X funding.

222. The Spending Clause also requires that conditions imposed on funding be reasonably related to the federal interest in the program at issue. *See Massachusetts v. United States,* 435 U.S. 444, 461 (1978) (plurality opinion).

223. The Challenged Conditions are not reasonably related to Title X's purpose of providing family planning services to individuals with low income and as such unconstitutionally violate the relatedness requirement of the Spending Clause.

224. The Challenged Conditions accordingly also violate the APA, 5 U.S.C. § 706(2)(B), as being contrary to a constitutional right, power, privilege, or immunity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that this Court:

i. Issue a judicial declaration that the Challenged Conditions of the 2027 NOFO, and specifically the requirements that Title X applicants or grantees demonstrate alignment with:

   a. The Anti-DEI Priority;

   b. The Anti-Gender Ideology Priority;

   c. The Overmedicalization Priority;

   d. The Hyde Amendment Priority;

   e. The Directive Counseling Priority; and

   f. The Irrelevant HHS Priorities

   are unlawful because they violate the Administrative Procedure Act and the Spending Clause of the U.S. Constitution;

ii. Pursuant to 5 U.S.C. § 706, vacate the incorporation of the Anti-DEI Priority, Anti-Gender Ideology Priority, Overmedicalization Priority, Hyde Amendment Priority, Directive Counseling Priority, and Irrelevant HHS Priorities in the 2027 NOFO;

iii. Enjoin Defendants from applying or imposing the Challenged Conditions of the 2027 NOFO to or upon any applicant or grantee in evaluating applications submitted under the NOFO, or in evaluating grantee compliance with award terms and conditions;

iv. Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

v. Grant such other relief as this Court may deem proper.

Dated: August 27, 2026

Respectfully submitted,

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson (D. Md. Bar No. 31472)
James C. Luh (D. Md. Bar No. 31776)
Adam Kirschner (D. Md. Bar No. 31767)
*Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6584
vwilliamson@oag.maryland.gov

*Attorneys for State of Maryland*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Galen Sherwin*
Galen Sherwin*
*Special Counsel for Reproductive Justice*
Rabia Muqaddam*
*Chief Counsel for Federal Initiatives*
Ivan Navedo*
Molly Brachfeld*
Victoria Ochoa*
*Assistant Attorneys General*
28 Liberty St.
New York, NY 10005
(929) 736-3392
galen.sherwin@ag.ny.gov
rabia.muqaddam@ag.ny.gov
ivan.navedo@ag.ny.gov
molly.brachfeld@ag.ny.gov
victoria.ochoa@ag.ny.gov

*Attorneys for the State of New York*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Allyson Slater*
Allyson Slater*
*Director, Reproductive Justice Unit*
Morgan Carmen*
*Assistant Attorneys General*
One Ashburton Pl.
Boston, MA 02108
(617) 963-2255
allyson.slater@mass.gov
morgan.carmen@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Ketakee Kane*
Neli N. Palma*
*Senior Assistant Attorney General*
Ketakee Kane*
David Houska*
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612
(510) 879-1519
Ketakee.Kane@doj.ca.gov

*Attorneys for the People of the State of California*

**PHIL WEISER**
Attorney General of Colorado

By: */s/ Gabe Podesta*
Gabe Podesta*
Ryan Lorch*
*Senior Assistant Attorneys General*
1300 Broadway, 10th Fl.
Denver, CO 80203
(720) 508-6000
gabe.podesta@coag.gov
ryan.lorch@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Alma Nunley*
Alma Nunley*
*Assistant Solicitor General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5318
Alma.Nunley@ct.gov

*Attorney for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston*
*Director of Impact Litigation*
Vanessa L. Kassab*
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorney for the State of Hawaiʻi*

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Caitlyn G. McEllis*
Caitlyn G. McEllis*
*Senior Policy Counsel*
Holly F.B. Berlin*
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St. Chicago, IL 60603
(312)814-3000
Caitlyn.McEllis@ilag.gov
Holly.berlin@ilag.gov

*Attorneys for the State of Illinois*

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
Governor of the Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo*
*General Counsel*
Sam Flynn*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
Attorney General of Maine
By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
kate.thompson@maine.gov

*Attorneys for State of Maine*

**DANA NESSEL**
Attorney General of Michigan
By: */s/ Neil Giovanatti*
Neil Giovanatti*
*Assistant Attorney General*
P.O. Box 30212
Lansing, MI 48909
(517) 241-1050
GiovanattiN@michigan.gov

*Attorney for the State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/Katherine Bies*
Katherine Bies*
*Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Attorney for the State of Minnesota*

**AARON D. FORD**
Attorney General of Nevada

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorney for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Meghan K. Musso*
Meghan K. Musso*
*Deputy Attorney General*
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
Meghan.Musso@law.njoag.gov

*Attorney for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Aletheia V.P. Allen*
Aletheia V.P. Allen*
*Solicitor General*
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
aallen@nmdoj.gov

Seth C. McMillian*
*Deputy Solicitor General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-546-9919
smcmillan@nmdoj.gov

*Attorneys for State of New Mexico*

**DAN RAYFIELD**
Attorney General State of Oregon

By: */s/ Leanne Hartmann*
Leanne Hartmann*
*Senior Assistant Attorney General*
Galen Knowles*
*Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Leanne.Hartmann@doj.oregon.gov
Galen.Knowles@doj.oregon.gov

*Attorneys for the State of Oregon*

**JOSH SHAPIRO**
Governor for the Commonwealth of Pennsylvania

By: */s/ Jacob B. Boyer*
Jennifer C. Selber*
Jacob B. Boyer*
*Deputy General Counsel*
Governor's Office of General Counsel
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Attorneys for Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Kathryn T. Gradowski*
Kathryn T. Gradowski*
*Special Assistant Attorney General*
150 South Main St.
Providence, RI 02903
(401) 274-4400
kgradowski@riag.ri.gov

*Attorney for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: /s/ Ryan Patrick Kane
Ryan Patrick Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov

*Attorney for the State of Vermont*

**JAY JONES**
Attorney General for the Commonwealth of Virginia

By: */s/ Megan C. Keenan*
Megan C. Keenan (D. Md. Bar No. 32426)
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: /s/ *Lauryn K. Fraas*
Lauryn K. Fraas*
*Assistant Attorney General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Tel (206) 464-7744
lauryn.fraas@atg.wa.gov

*Attorney for the State of Washington*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Lynn K. Lodahl*
Lynn K. Lodahl*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, WI 53707
(608) 264-6219
lynn.lodahl@wisdoj.gov

*Attorney for the State of Wisconsin*

* *pro hac vice application forthcoming*