# Exhibit 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.
123 William Street, 10th Floor
New York, NY 10038

*Plaintiff*,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
200 Independence Avenue SW
Washington, DC 20201

OFFICE OF THE ASSISTANT SECRETARY FOR HEALTH
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

OFFICE OF POPULATION AFFAIRS
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of Health and Human Services*
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

BRIAN CHRISTINE, *in his official capacity as Assistant Secretary for Health*
Office of the Assistant Secretary for Health
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

Civil Action No. 1:26-cv-02656

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

AMY L. MARGOLIS, *in her official capacity as Deputy Director of the Office of Population Affairs*
Office of Population Affairs
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

*Defendants.*

## COMPLAINT

Plaintiff Planned Parenthood Federation of America, Inc. ("PPFA"), by and through its attorneys, hereby alleges as follows:

## INTRODUCTION

1. PPFA brings this challenge to stop the Department of Health and Human Services ("HHS") from misusing the Title X program for an overtly political and ideological agenda that is at odds with Title X's statutory purpose of funding comprehensive family-planning care for those who cannot afford it. HHS's funding announcement for Title X grants for fiscal year 2027 outlines priorities that require prospective grantees to "align" with political positions such as advocating for fertility tracking while disfavoring contraceptives, counseling patients towards a narrow set of reproductive choices and family structures, and ending support for what the Trump Administration calls "gender ideology," among other things. Absent judicial intervention, these funding priorities severely disadvantage PPFA's members in competing for Title X funding and risk devastating access to family-planning services for low-income patients across the country.

2. Title X of the Public Health Service Act is the only domestic federal program devoted solely to family planning for uninsured, underinsured, and low-income people. Congress enacted Title X in 1970 with broad bipartisan support in response to growing recognition of the effects of unintended childbearing on poverty levels, educational attainment, and adverse maternal

and child health outcomes—and of the fact that newly available contraceptive options like oral contraceptives (i.e., "the pill") were unaffordable for too many Americans. Congress declared that Title X's "purpose" was "making comprehensive voluntary family planning services readily available to all persons desiring such services." Family Planning Services and Population Research Act of 1970, Pub. L. No. 91-572, § 2, 84 Stat. 1504, 1504.

3. Since the program's inception, PPFA members have used Title X funds to fulfill exactly this purpose, providing reproductive and family-planning care to millions of low-income patients.

4. Notwithstanding PPFA members' critical role in providing Title X services, the White House announced that "this year will be the last that Planned Parenthood is funded by [Title X] grants."[1]

5. On July 9, 2026, Defendants issued a notice of funding opportunity for Title X grants to be awarded for fiscal year 2027 that no longer supports the goals of the Title X program. U.S. Dep't of Health & Human Servs., Off. of Population Affs., Notice of Funding Opportunity: Title X Family Planning Services Grants, No. PA-FPH-27-001 (July 9, 2026), attached as Exhibit 1 ("NOFO"). According to the NOFO, in evaluating and awarding Title X grants, Defendants will consider the extent to which applicants "advance" and "align with" a series of political priorities. Those priorities include mandates such as "[r]educing overmedicalization in health care" by promoting natural family-planning methods, contributing to agency efforts to "safeguard life-affirming … program delivery," counseling patients about "marriage prior to childbearing," and "respecting biological reality" (collectively, the "Challenged Priorities"). NOFO at 11-14. The

[1] Mary Margaret Olahan, *Citing Legal Challenges, Trump Admin Extends Biden Era Planned Parenthood Awards Another Year*, Daily Wire (Mar. 31, 2026), https://perma.cc/J25M-SF3T.

Challenged Priorities are each contrary to law and/or arbitrary and capricious. By requiring alignment with these Challenged Priorities in order to be competitive for a Title X grant—including priorities that conflict with Title X regulations—the NOFO places PPFA's members at a competitive disadvantage in the FY 2027 Title X grant cycle. The Challenged Priorities are also so vague that applicants are left to guess at how to demonstrate "alignment" with many of them, both in their proposals and should they be selected as grantees.

6. Compounding the confusion for applicants, in addition to the Challenged Priorities, the NOFO references two other sets of priorities: (1) "HHS priorities"; and (2) priorities of the Office of the Assistant Secretary for Health ("OASH"), *see, e.g.*, NOFO at 7, 40-41, without clear guidance as to *which* of them apply to Title X applicants or how applicants can be expected to align with them. The NOFO therefore further fails to give applicants fair notice of what is required of them either at the application stage or in performing Title X services upon receipt of funding.

7. PPFA members' inability to compete on a fair footing for Title X funding due to the unlawful NOFO provisions, which is likely to result in the denial of Title X funds, would cause serious harm not only to their organizations but also to low-income patients nationally, including loss of necessary services like access to birth control, cancer screenings, and sexually transmitted infection ("STI") testing, ultimately translating to grave health consequences for patients who lose access to care.

8. The NOFO's requirements violate the Administrative Procedure Act (the "APA") several times over and attempt to impose conditions inconsistent with the Spending Clause of the United States Constitution. Accordingly, PPFA, on behalf of its members who intend to apply for grants for the 2027-2031 Title X funding cycle, respectfully requests that the Court set aside the NOFO's requirements that applicants align with the Challenged Priorities as well as with the HHS

and OASH priorities and enjoin Defendants from considering those priorities during the 2027 Title X funding competition and grant cycle.

**PARTIES**

9. PPFA is a 501(c)(3) not-for-profit corporation organized under the laws of New York. PPFA is a membership organization whose members are 46 separately incorporated 501(c)(3) charitable organizations that provide essential reproductive health care services. PPFA and its members share a mission of ensuring that people can receive high-quality, inclusive, and comprehensive sexual and reproductive health care regardless of income, insurance, gender identity, sexual orientation, or race. PPFA's members have played a central role in fulfilling Title X's mission since the inception of Title X over half a century ago.

10. PPFA does not itself provide health care but instead provides support to its member organizations, which collectively operate approximately 550 health centers across 46 states and the District of Columbia and serve over two million patients each year.

11. Title X provides funding for grantees who either offer direct services to low-income Americans or contract with subgrantees to offer those services, or both. Currently, 32 PPFA members participate in Title X, seven as direct grantees and others as subgrantees. Over 240 health centers operated by PPFA members across 29 states participate in the Title X program.

12. PPFA brings this lawsuit on behalf of its members that intend to apply for the next cycle of Title X funding, including members that are currently direct grantees of Title X. The current direct grantees are Planned Parenthood of Southern New England ("PPSNE"), Planned Parenthood of Northern New England ("PPNNE"), Virginia League for Planned Parenthood ("VLPP"), Planned Parenthood North Central States ("PPNCS"), Planned Parenthood South Atlantic ("PPSAT"), Planned Parenthood of Greater Ohio ("PPGOH"), and Planned Parenthood Association of Utah ("PPAU").

13. The direct grantees and other PPFA members that receive Title X funds as subgrantees provide services such as comprehensive birth-control options, cancer screenings, and testing for STIs. They have spent years developing clinical best practices, building an unparalleled group of health centers dedicated specifically to reproductive health, and establishing a reputation for high-quality, accessible, and nonjudgmental care. PPFA's members routinely offer weekend, after-work hours, and same-day appointments, and other measures to make their services broadly accessible.

14. HHS is an agency under the definition provided in the Administrative Procedure Act. 5 U.S.C. § 551(1). HHS is the agency responsible for implementing Title X.

15. Defendant Robert F. Kennedy, Jr. is the United States Secretary of Health and Human Services. He is sued in his official capacity. Secretary Kennedy is responsible for all operations within HHS, including overseeing the offices within HHS that manage the Title X funding process.

16. OASH is an office within HHS that administers the competitive review of applications for Title X funding.

17. Defendant Brian Christine is the Assistant Secretary for Health and heads OASH. He is sued in his official capacity.

18. The Office of Population Affairs ("OPA") is the office within OASH that administers the Title X program. OPA is the entity that announced the release of the NOFO and administers the Title X application process.

19. Defendant Amy L. Margolis is the Deputy Director of OPA. She is sued in her official capacity.

## JURISDICTION AND VENUE

20. The Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1346(a)(2) because PPFA's claims arise under federal law, including the U.S. Constitution and the Administrative Procedure Act, and because Defendants are the United States Secretary of Health and Human Services and two offices within that agency, the Assistant Secretary for Health, and the Deputy Director of OPA, who are all sued in their official capacities. The Court is authorized to issue the relief sought here under the APA, 5 U.S.C. §§ 702, 705, and 706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's inherent equitable powers.

21. Venue is proper under 28 U.S.C. § 1391(e) because the individual Defendants, who are sued in their official capacities, reside in Washington, D.C.

## FACTUAL ALLEGATIONS

### I. TITLE X PROVIDES CONGRESSIONAL FUNDING FOR COMPREHENSIVE AND EFFECTIVE FAMILY-PLANNING CARE

#### A. Title X's Purpose And Impact

22. Enacted in 1970, the Family Planning Program established by Title X of the Public Health Service Act makes family-planning services available to low-income individuals for free or at low cost. *See* 42 U.S.C. §§ 300 *et seq.*

23. The original impetus for the law arose when the Food and Drug Administration (the "FDA") first approved the oral-contraceptive pill in 1960. The pill was available only with a physician's prescription and often at a high cost. As a result, it was inaccessible to many low-income women. Research conducted at the time established that low-income women often had more children than they wanted because of inequitable access to oral contraceptives, with

significant effects on poverty levels. This led lawmakers to undertake an effort to make all types of family-planning services available more broadly.

24. The result was Title X, which was enacted with broad bipartisan support. The basic purpose of Title X is to fund family-planning services for people unable to afford them. The Senate Report explains that it was intended to help Americans who were "forced to do without, or to rely heavily on the least effective nonmedical techniques for fertility control unless they happen to reside in an area where family planning services are made readily available by public health services or voluntary agencies." S. Rep. No. 91-1004, at 9 (1970). And President Richard Nixon, who later signed the bill, explained that it sought to fulfill the promise that "no American woman should be denied access to family planning assistance because of her economic condition." Richard Nixon, *Special Message to the Congress on Problems of Population Growth* (July 18, 1969), in Public Papers of the Presidents of the United States: Richard M. Nixon 528 (1971).

25. Today, Title X provides grants to fund family-planning services, making them accessible for free or at low cost to patients in almost every state. It funds a broad range of services, including contraceptive methods and services, information, and education; education about natural family-planning methods; infertility services; services to adolescents; testing and referral for STIs and HIV; basic preventive care such as well-woman visits and breast and cervical-cancer screenings; pregnancy testing and counseling; and training for providers and clinic personnel.

26. Many Title X-funded organizations have been providing care for decades—indeed, from the inception of the Title X program in 1971. Several PPFA members are among this group.

27. The Title X program has benefited millions of people. In a single year, Title X providers serve almost three million patients. In 2023, Title X health centers provided contraceptives to 1.9 million people, and Title X funds helped provide 4.6 million STI tests,

including nearly one million confidential HIV tests, as well as over 460,000 Pap tests. Patients who receive this care largely do not have the financial resources to pay for it: More than 60 percent of people receiving preventive care through the Title X program live in poverty, and 83 percent have incomes that are at or below 250 percent of the federal poverty level.[2]

28. Title X's impact on public health has been significant. For instance, as compared to clinics that do not receive Title X funds, Title X-funded clinics "provide[] 52 percent more of the most effective contraceptives"—i.e., long-acting reversible-contraception methods ("LARCs") such as intrauterine devices ("IUDs") and contraceptive implants—"to women at risk for pregnancy."[3] As another example, Title X providers play a critical role in efforts to identify and treat STIs by screening for chlamydia and treating it early to help prevent infertility. Title X sites are more likely than other public non-Title X providers and private providers to follow chlamydia-screening guidelines for testing those most at risk for chlamydia.[4] In addition to STI testing, Title X providers also perform hundreds of thousands of screenings for breast, cervical, and other forms of cancer each year.[5]

---

[2] Phil Killewald et al., Off. of Population Affs., Off. of Assistant Sec'y for Health, U.S. Dep't of Health & Hum. Servs., *Family Planning Annual Report: 2023 National Summary* 9-16 (2024) ("*Family Planning Annual Report*"), https://perma.cc/LR95-JQMJ.

[3] Blair G. Darney et al., *Title X Improved Access To Most Effective And Moderately Effective Contraception In US Safety-Net Clinics, 2016–18*, 41 Health Affs. 497, 497-498, 502 (2022), https://perma.cc/9AKH-3K2D.

[4] Joan M. Chow et al., *Comparison of Adherence to Chlamydia Screening Guidelines Among Title X Providers and Non-Title X Providers in the California Family Planning, Access, Care, and Treatment Program*, 21 J. Women's Health 837 (2012), https://perma.cc/PF74-4W7Z; Daniel Teixeira da Silva et al., *Chlamydia Trachomatis/Neisseria Gonorrhea Retesting Among Adolescents and Young Adults in a Primary Care Network*, 71 J. Adolescent Health 545 (2022), https://perma.cc/L3WV-BC53 (finding significantly greater guideline-recommended retesting rates at Title X clinics compared to non-Title X clinics).

[5] *Family Planning Annual Report*, *supra* note 2, at 16.

29. Title X's role is particularly important because Title X projects provide services to many people who otherwise would be unlikely to receive the relevant care. According to survey data, 60 percent of people who received Title X services reported that a Title X clinic was their only source of health care in the previous year.[6] Because healthy women of child-bearing age may not otherwise seek out care, Title X health centers facilitate a crucial "touch" with medical personnel that might otherwise not have happened (and create the potential for referrals for other health care).

30. The Title X program's impact is particularly significant in rural areas and for communities of color. In rural areas, Title X health centers are often the only providers of reproductive and family-planning care for low-income individuals. In many communities, a Title X-backed health center is the only comprehensive family-planning option for people without the means to seek other care.[7] And of the 2.8 million patients served by Title X health centers in 2023, almost half were people of color.[8]

**B. Title X's Statutory And Regulatory Scheme**

31. Under the Title X statute, "[t]he Secretary is authorized to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a).

---

[6] *Features and Benefits of the Title X Program*, Guttmacher Inst. (Feb. 2025), https://perma.cc/Z7PN-PX96.
[7] *What Are Title X Family Planning Clinics?*, Off. of Population Affs., U.S. Dep't of Health & Hum. Servs. (July 2024), https://perma.cc/5QL7-7P3V.
[8] *Family Planning Annual Report*, *supra* note 2, at 13-14.

32. As this statutory language reflects, the program's fundamental mission is to make "comprehensive voluntary family planning services readily available to all persons desiring such services." Pub. L. No. 91-572, § 2, 84 Stat. 1504, 1504 (1970).

33. The Title X statute enumerates four factors that HHS "shall take into account" in making grants: (1) "the number of patients to be served" by the applicant; (2) "the extent to which family planning services are needed locally"; (3) "the relative need of the applicant"; and (4) the applicant's "capacity to make rapid and effective use of such assistance." 42 U.S.C. § 300(b).

34. The regulations for the Title X program provide additional program requirements. They specify the criteria the Agency must "tak[e] into account" in deciding which family-planning projects to fund, which includes all of the criteria mandated by statute. *See* 42 C.F.R. § 59.7(a). The regulations further direct the Secretary to take into account "[t]he ability of the applicant to advance health equity" in assessing Title X grant applications. *Id.* § 59.7(a)(3). The regulations define "health equity" as a state of affairs "when all persons have the opportunity to attain their full health potential and no one is disadvantaged from achieving this potential because of social position or other socially determined circumstances." *Id.* § 59.2. The regulations further define "[q]uality healthcare" as health care that is not only safe and effective but also "equitable." *Id.*

35. The regulations also mandate that Title X projects "must" "[p]rovide services in a manner that is client-centered, culturally and linguistically appropriate, inclusive, and trauma-informed." 42 C.F.R. § 59.5(a)(3). "Culturally and linguistically appropriate services" are defined to include health care that is "respectful of and responsive to the health beliefs, practices and needs of diverse patients." 42 C.F.R. § 59.2. "[C]lient-centered care" is defined as care that "is respectful of, and responsive to, individual client preferences, needs, and values; client values guide all clinical decisions." *Id.*

36. The term "[i]nclusive" is defined to mean that "all people are fully included and can actively participate in and benefit from family planning, including, but not limited to, individuals who belong to underserved communities." 42 C.F.R. § 59.2. The regulations specify that "transgender … persons" must be able to receive Title X services. *Id.*

37. The regulations also require projects to provide services in a non-discriminatory manner and incorporate explicit protections from discrimination on the basis of "gender identity" and "sex characteristics," among other traits. 42 C.F.R. § 59.5(a)(4).

38. Elaborating on the objectives of equity and non-discrimination in Title X programs, OPA's Title X Handbook—guidance intended to "help recipients and subrecipients be successful as they implement their Title X projects"—instructs as follows: "Advancing equity for all, including people from low-income families, people of color, and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality, is a priority for HHS, OPA, and Title X." OASH, *Title X Program Handbook* 12 (Dec. 2024), https://perma.cc/CYX6-3Z2F.

39. Title X regulations elaborate that "voluntary family planning projects … shall consist of the educational, comprehensive medical, and social services necessary to aid individuals to determine freely the number and spacing of their children." 42 C.F.R. § 59.1. The regulations provide that family-planning services "include a broad range of medically approved services, which includes [FDA-approved] contraceptive products and natural family planning methods, for clients who want to prevent pregnancy and space births, pregnancy testing and counseling, assistance to achieve pregnancy, basic infertility services, sexually transmitted infection (STI) services, and other preconception health services." *Id.* §§ 59.2, 59.5(a)(1); *see also id.* § 59.5(b)(1) (each project must provide "for medical services related to family planning (including …

contraceptive supplies) … and provide for the effective usage of contraceptive devices and practices”).

40. Although the Title X statute prohibits using Title X funds “in programs where abortion is a method of family planning,” 42 U.S.C. § 300a-6, since 1996 Congress has mandated in annual Title X appropriations riders that all pregnancy counseling be “nondirective,” *see, e.g.*, Department of Health and Human Services Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 2981, 3070–3071 (2018); Department of Health and Human Services Appropriations Act, 1996, Pub. L. No. 104-134, 110 Stat. 1321–221 (1996). Nondirective counseling focuses on a patient’s preferences and desires, ensures a patient has support to make informed choices concerning their options, and does not guide or instruct a patient towards any particular option. *See* Romer et al., *Providing Quality Family Planning Services in the United States: Recommendations of the U.S. Office of Population Affairs (Revised 2024)*, 67 Am. J. Prevention Med. S41, S79 (2024), https://perma.cc/KF7M-7PGC (“2024 QFP”).

41. The regulations further specify that projects must “[o]ffer pregnant clients the opportunity to be provided information and counseling regarding … [p]renatal care and delivery”; “[i]nfant care, foster care, or adoption”; and “[p]regnancy termination.” 42 C.F.R. § 59.5(a)(5)(i)(A)-(C). In response to a patient’s request, a Title X-funded provider must “provide neutral, factual information and nondirective counseling on each of the options, and, referral upon request, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling.” *Id.* § 59.5(a)(5)(ii).

42. All Title X program participants must offer services “consistent with nationally recognized standards of care.” 42 C.F.R. § 59.5(a)(3). Since 2014, Title X projects have been required to adhere to the Office of Population Affairs’ Quality Family Planning (“QFP”)

publication. *See Title X Program Handbook* at 10. The OPA recognizes that the QFP is "a nationally recognized standard of care when implementing the Title X requirements." *See* Off. of Population Affs., OPA Program Policy Notice 2024-02, https://perma.cc/8X5B-W7YJ (last accessed July 28, 2026).

43. The 2014 QFP "support[s] offering a full range of Food and Drug Administration (FDA)-approved contraceptive methods as well as counseling that highlights the effectiveness of contraceptive methods" so that "clients can make a selection based on their individual needs and preferences." CDC, *Providing Quality Family Planning Services Recommendations of CDC and the U.S. Office of Population Affairs* 2 (Apr. 25, 2014), https://perma.cc/DU99-FC5S ("2014 QFP").

44. The 2014 QFP encourages projects to take "a client-centered approach" to providing care, defining "client-centered" care as that which "is respectful of, and responsive to, individual client preferences, needs, and values; client values guide all clinical decisions." 2014 QFP 4 (quoting 42 C.F.R. § 59.2). A "client-centered approach" "highlight[s] that the client's primary purpose for visiting the service site must be respected," "encourag[es] the availability of a broad range of contraceptive methods so that clients can make a selection based on their individual needs and preferences," and "reinforc[es] the need to deliver services in a culturally competent manner so as to meet the needs of all clients, including … those who are lesbian, gay, bisexual, transgender, or questioning their sexual identity (LGBTQ)." *Id.* at 2. The 2014 QFP states that projects should provide "[e]quitable," "[e]vidence-based," and "quality" care that is "consistent with current professional knowledge" and "does not vary in quality because of the personal characteristics of clients." *Id.* at 4.

45. The 2014 QFP was updated in 2024. *See* 2024 QFP.

### C. The Title X Grantmaking Process

46. Title X makes clear that "public or nonprofit private entities" are eligible to receive grants. 42 U.S.C. § 300(a). Implementing regulations reaffirm that "[a]ny public or nonprofit private entity in a State may apply." 42 C.F.R. § 59.3.

47. Since at least 1990, HHS has issued notices of funding opportunities, or NOFOs, inviting applications for Title X funds. A NOFO typically outlines the funds available, describes the requirements for applications, and provides an overview of how applications will be evaluated.

48. HHS typically releases a NOFO months before the application deadline. It takes a significant amount of time for applicants to prepare the requisite in-depth application.

49. Applicants are required to propose a project to be funded. An applicant must apply on its own but may include other entities in its project as grant subrecipients. Once funded, a project is carried out at health centers or service sites run either by the grant recipient or its subrecipients.

50. An application for a Title X award defines the scope of the proposed Title X project, including the family-planning services to be provided and whether the grantee intends to make any subgrants. In the "Project Narrative" portion of the application, applicants typically make representations about how they will provide services. HHS has described the Project Narrative as "the most important part" of the application and stated that the applicant's "work plan should reflect, and be consistent with, the Project Narrative … and must cover all years of the period of performance." NOFO at 19, 23.

51. Funding is typically awarded in multi-year cycles, with funds disbursed annually upon review of additional documentation (called noncompeting continuation-grant applications). These annual submissions include a project narrative, work plan, proposed budget, and budget justification for the following year.

52. The current set of five-year grants is set to end in March 2027.

## II. THE FY 2027 NOFO

53. On April 3, 2026, HHS issued notices of award to current Title X grantees for the last year of funding in the current cycle of five-year grants, including to the seven direct PPFA member-grantees. In response to anti-abortion advocates' negative reactions to this funding, a White House spokesperson announced that "this year will be the last that Planned Parenthood is funded by [Title X] grants."[9]

54. In April 2026, OPA issued a Notice of Funding Opportunity for the Title X program for fiscal year 2027, calling for applications for five-year grants to begin in the Spring of 2027. On July 9, 2026, OPA released a revised Notice of Funding Opportunity.

55. The NOFO specifies January 11, 2027 as the deadline for applications and states that a Technical Assistance Webinar will take place on November 9, 2026.

56. The NOFO outlines the requirements for applications and Defendants' process for evaluating applications and making decisions on grant issuance. A central feature of the application and evaluation process is so-called "alignment" with new political priorities. *See, e.g.*, NOFO at 7. The NOFO lists eight priorities specific to the Title X program set forth by OPA that both influence grant selection and apply as conditions for selected grantees. In addition, the NOFO at various points refers generally to alignment with HHS and OASH priorities.

57. The NOFO describes each OPA priority at a high level and, for some, provides a list of requirements or expectations for Title X participants relevant to that priority.

58. There are no "HHS priorities" set forth anywhere in the NOFO (directly or via a URL). The agency's website lists several priorities, some of which appear entirely unrelated to

[9] Olahan, *supra* note 1.

the types of services funded by Title X. *See* U.S. Dep't of Health & Human Servs., *HHS Priorities*, https://perma.cc/6YLA-FZAY (last accessed July 28, 2026) ("*HHS Priorities Statement*"). For example, the HHS priorities include "[f]urther[ing] our understanding of autism," "[a]dvanc[ing] the scientific understanding of the aging process," and "[t]oxins." *Id.* The HHS priorities also include aims such as "[a]ddress[ing] the chronic disease epidemic," "[e]mpower[ing] patients to make informed decisions about health care," "[f]oster[ing] marriage and family formation," "[e]nd[ing] illegal race discrimination," "and [c]ombat[ting] gender ideology and protect[ing] children." *Id.* The NOFO does not specify which of the HHS priorities the agency considers relevant to applications for Title X grants.

59. As with HHS priorities, the NOFO does not set out the OASH priorities that should apply. *See* NOFO at 7, 14. OASH's priorities, along with a brief description, are listed on the OASH website. *See* Office of the Assistant Secretary for Health, *Priorities of Office of the Assistant Secretary for Health*, https://perma.cc/3UZS-FUNY (last accessed July 28, 2026) ("*OASH Priorities Statement*"). The OASH priorities include goals such as "[a]ddressing the chronic disease epidemic," "[e]nding diversity, equity, and inclusion (DEI) policies and practices across OASH's programs," "[e]nding support for gender ideology," and "[e]nsuring adolescent program materials are age-appropriate." *Id.*

60. According to the NOFO, eligible applications will be assessed by federal staff in two steps: (1) an independent merit review panel (the "merit review") and (2) a "Federal Staff Review." NOFO at 41.

**A. Merit Review**

61. The merit review consists of an "independent merit review panel," made up of experts from academic institutions, non-profit organizations, state and local government, and federal government agencies, that "evaluate[s] applications that are qualified and eligible." NOFO

at 37. The panel assesses applications according to various criteria, each of which is assigned a point value. *Id.* at 39-40.

62. One of the criteria, worth 35 out of 100 points—the largest category by point value—is "[t]he extent to which the applicant proposes strategies that meaningfully advance" (1) the eight OPA priorities set out in the NOFO and (2) "HHS priorities." NOFO at 40. This criterion is presented without further guidance on, or examples of, what it means for initiatives or programs to "meaningfully advance" HHS priorities. NOFO at 40. This stage of review does not appear to include the OASH priorities.

63. Applicants can only earn up to a maximum of 15 points—fewer than half of the prior category—for "[t]he degree to which the project plan adequately provides for the requirements set forth in the Title X statute, regulations (42 C.F.R. part 59, subpart A), and legislative mandates."

64. The NOFO states that grantees "should align their programs" with the priorities "to the extent authorized by law and within the scope of the program" and that they are expected to "develop and implement plans" and "provide evidence of the project's capacity" to address the priorities. NOFO at 10.

**B. Federal Staff Review**

65. In addition to the merits review, the NOFO states that OPA will coordinate with a senior political appointee to conduct a "Federal Staff Review." NOFO at 41. The Federal Staff Review consists of an unnamed "[f]ederal staff" member, also referred to as a "senior appointee," "review[ing] each application for technical (programmatic), budgetary, and grants management compliance." *Id.* The senior appointee will then provide a recommendation for funding to the Grants Management Officer. *Id.* In making this recommendation, the NOFO requires the senior

appointee to "take into consideration" "[a]lignment with HHS and OASH priorities, where authorized by law and within the scope of the program." *Id.*

**C. Conditions On Successful Applicants**

66. The NOFO also purports to impose requirements on successful applicants who become grantees.

67. In a section entitled "Required Alignment with OASH Mission and Agency Priorities," the NOFO states that grantees "must align program design and activities with agency priorities where consistent with program authority and the scope of the award … and when authorized by law according to the Title X statute, regulations, legislative mandates, and additional program guidance." NOFO at 7. It further states that "[f]unded activities must advance and support OASH's mission to improve the health and well-being of Americans." *Id.*

68. Despite most references in this section referring to the requirement to "align" with agency priorities, the NOFO also states that grantees "must demonstrate ongoing compliance with these priorities, in all programs that are authorized to advance them, through program design, implementation, reporting, and evaluation." NOFO at 7.

69. Failure to continually align with agency priorities, as assessed by the agency, comes with significant consequences. "Failure to meaningfully align funded activities with the applicable requirements may result in corrective action." *Id.*

70. In addition to alignment with OASH priorities, the NOFO also mandates that grantees maintain alignment with OPA priorities, though the NOFO contains contradictory provisions discussing which OPA priorities apply to grantees. First, the NOFO mentions alignment with only three of the OPA priorities. NOFO at 7. It then mandates that grantees must align with ***all*** of the OPA priorities: "Title X grantees should align their programs with OPA priorities" and "develop and implement plans to address the program priorities." NOFO at 10.

71. Elaborating on standards applicable to grantees, the NOFO further states that "OPA's program priorities for recipients funded under this NOFO are in part informed by the Office of the Assistant Secretary for Health's Statement of Priorities." NOFO at 10. But the NOFO never makes clear which OASH priorities inform which OPA priorities or to what extent OPA priorities are informed by OASH's priorities.

72. The NOFO represents the consummation of the agency's decision-making process as to the process and criteria for evaluating applications and awarding grants and eventual grantees' obligations to align with agency priorities in implementing their grants. Nothing in the NOFO indicates that it is temporary or subject to revision. Moreover, the NOFO gives rise to direct and appreciable legal consequences for Title X grant applicants.

## III. DEFENDANTS' EVALUATION AND PURPORTED CONDITIONS FOR FY 2027 TITLE X GRANTS ARE UNLAWFUL

### B. Defendants Require Alignment With The Challenged Priorities, Which Are Arbitrary, Vague, And Contrary To Law

73. The Challenged Priorities are arbitrary, contrary to law, in excess of agency authority, and place unconstitutional conditions on Title X funds. The agency's mandate to seek "[a]lignment" with the Challenged Priorities is unlawful.

#### i. The Anti-Contraception Priorities

74. The NOFO requires applicants (and, eventually, recipients) to advance two priorities that deviate from Title X's core purpose and mandate. The first is "[r]educing overmedicalization in health care and increasing focus on optimal health and addressing underlying root causes." This priority includes the NOFO's only mention of contraception, and it is a disfavorable one. NOFO at 11. It states that "OPA recognizes the overreliance on pharmaceutical and surgical treatments," that there has been "a decrease in females' current use of any contraception," and that "the most common reason women reported discontinuing use related

to dissatisfaction was side effects." *Id.* In contrast, the NOFO speaks favorably about "noninvasive, evidence-based practices that promote health literacy, fertility awareness, and reproductive health without unnecessary medicalization or symptom suppression" and directs applicants to show "how their Title X projects will integrate" these practices. NOFO at 12. It states that a "key strateg[y] for advancing optimal health through Title X services" is "expanding access to fertility-awareness-based methods (often referred to as natural family planning)." NOFO at 12.

75. A second, partly overlapping OPA program priority is titled, "[p]romoting body and health literacy through the delivery of Title X services" (together with the overmedicalization priority, the "Anti-Contraception Priorities"). In describing the second priority, the NOFO states that "gaps in biological understanding contribute to delayed diagnosis of health conditions and to the nation's growing infertility crisis," and that, in response, applicants "will be required to incorporate foundational body and health literacy into reproductive health counseling," including "education on menstrual cycle physiology, hormonal health, male and female fertility awareness, and early indicators of reproductive disorders …." NOFO at 12. The goal of this counseling is to "equip individuals to recognize when symptoms such as pain, irregular cycles, hormonal disruption, or changes in sexual health warrant further medical evaluation rather than symptom suppression." *Id.* Together, these two priorities require applicants to show alignment with Defendants' preference for natural family-planning methods over contraceptives, whether for pregnancy prevention or other medical reasons. The language of the NOFO incorporates "restorative reproductive medicine" principles—a priority of the "Make America Healthy Again" movement.

76. A prospective grantee's meaningful advancement of the Anti-Contraception Priorities, along with other OPA and unspecified HHS priorities, is worth 35 of 100 points in the merit review process, while the extent to which the prospective grantee "adequately provides for" statutory and regulatory requirements is worth only 15 points. *See* NOFO at 39-40.

77. The Anti-Contraception Priorities conflict with agency regulations and agency guidance because they require applicants and grantees to prioritize certain types of family planning over others.

78. *First*, the Anti-Contraception Priorities conflict with Title X's implementing regulations, which require that projects "[p]rovide a broad range of acceptable and effective medically approved family planning methods … and services." 42 C.F.R. § 59.5(a)(1).

79. The regulations likewise require that projects "[p]rovide services without subjecting individuals to any coercion to accept services or to employ or not to employ any particular methods of family planning." *Id.* § 59.5(a)(2). The Anti-Contraception Priorities discourage Title X applicants and grantees from offering a "broad range" of family-planning methods and from providing services without coercion because they require prioritizing certain types of family planning over others.

80. These implementing regulations were promulgated through notice-and-comment rulemaking. The NOFO's requirement that applicants align instead with the Anti-Contraception Priorities was not.

81. The NOFO does not address HHS's regulations requiring that projects provide a broad range of acceptable and medically approved family-planning methods in requiring advancement of and alignment with the Anti-Contraception Priorities. Nor does the NOFO explain

how applicants or grantees should reconcile the inconsistency between the Priorities and program requirements.

82. *Second*, the Anti-Contraception Priorities conflict with agency guidance. The 2024 QFP, articulating the national standard of care required under 42 C.F.R. § 59.5(a)(3), states that Title X providers should "not prioritize one method [of contraception] over the other," 2024 QFP at S55, and clarifies that "[p]erson-centered contraceptive care focuses on providing contraception services in alignment with each individual's values, preferences, needs, and desires," *id.* at S54. The 2024 QFP also states that Title X "[p]roviders should also support people interested in using birth control methods for reasons other than contraception." *Id.* at S55. This can include gynecological or endocrine issues like heavy or painful periods, PCOS, endometriosis, PMDD, and acne. *Id.* These are exceedingly common uses of birth control methods.

83. The NOFO does not address the 2024 QFP, which directs Title X providers not to prioritize one method of contraception over another and the QFP's instruction that patients should be supported in using contraceptives for reasons other than preventing pregnancy. The NOFO also does not explain how applicants or grantees should reconcile the inconsistency between the Anti-Contraception Priorities and the 2024 QFP.

84. Defendants have not acknowledged, addressed the consequences of, or otherwise provided a rational explanation for the change in policy represented by the requirement that prospective grantees advance and align with the Anti-Contraception Priorities.

85. The Anti-Contraception Priorities are also vague in that they do not specify what actions are sufficient to constitute "alignment" with those priorities.

86. The NOFO also requires alignment with the Anti-Contraception Priority once grantees receive funding. Because the NOFO fails to describe the actions required in order to align

with these priorities, Defendants have not provided prospective grantees, including PPFA's members, with fair and advance notice of what the condition requires.

**ii. <u>The Marriage & Parenthood Counseling Priority</u>**

87. The NOFO requires applicants (and, eventually, recipients) to advance and administer their projects in accordance with OPA's priority of "[a]dvancing reproductive goals counseling." NOFO at 12. As part of this priority, the NOFO states that grantees will be expected to "offer reproductive goals counseling that presents evidence-informed pathways associated with improved economic stability and family stability, including completion of education, participation in the workforce, and marriage prior to childbearing" (the "Marriage & Parenthood Counseling Priority"). *Id.* at 13. It specifies that "[p]rogram counseling should affirm marriage and parenthood as meaningful and valued components of adult life." *Id.* The description of this priority further states that "[a]s part of these efforts to support family planning, Title X clinics are expected to provide services that support individuals and families seeking to have children," *id.*, but does not mention provision of services to individuals and families who are not seeking to have children. In describing the Marriage & Parenthood Counseling Priority, the NOFO suggests that "[r]esearch demonstrates that individuals who follow" Defendants' preferred sequencing of life milestones "experience substantially lower risks of poverty across socioeconomic groups," without citing any such research. NOFO at 13.

88. A prospective grantee's meaningful advancement of the Marriage & Parenthood Counseling Priority, along with other OPA and unspecified HHS priorities, is worth 35 of 100 points in the merit review process, while the extent to which the prospective grantee adequately provides for statutory and regulatory requirements is worth only 15 points.

89. The Marriage & Parenthood Counseling Priority conflicts with agency regulations and agency guidance because they require applicants and grantees to counsel patients in a way that discriminates against certain reproductive choices and family structures.

90. *First*, the Marriage & Parenthood Counseling Priority conflicts with Title X's implementing regulations, which require that Title X projects provide services that are "client-centered," "inclusive," 42 C.F.R. § 59.5(a)(3), "in a manner that does not discriminate against any client based on … marital status," *id.* § 59.5(a)(4), and "without subjecting individuals to any coercion to accept services or to employ or not to employ any particular methods of family planning," *id.* § 59.5(a)(2). The regulations also provide that, when counseling pregnant patients, organizations must "offer pregnant clients the opportunity to be provided information and counseling regarding" "(A) [p]renatal care and delivery; (B) [i]nfant care, foster care, or adoption; and (C) [p]regnancy termination" and, upon request, must "provide neutral, factual information and nondirective counseling on each of the options, and, referral upon request, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling." 42 C.F.R. § 59.5(a)(5).

91. These regulations make clear that Title X projects may not provide services in a way that discriminates against individuals who are not married, including by suggesting that they should be married or pressuring them to pursue marriage. They also mandate that Title X projects cannot emphasize parenthood over pregnant patients' other options. The Marriage & Parenthood Counseling Priority contravenes both of these regulatory requirements.

92. The Title X regulations regarding the provision of services to people regardless of marital status and the provision of neutral, factual information regarding options concerning

pregnancy were promulgated through notice-and-comment rulemaking. The NOFO's requirement that applicants align instead with the Marriage & Parenthood Counseling Priority was not.

93. The NOFO does not address HHS regulations mandating that Title X projects provide services without discriminating against any client based on marital status and that pregnancy counseling be nondirective. Nor does the NOFO explain how applicants or grantees should reconcile the inconsistency between the Marriage & Parenthood Counseling Priority and regulatory requirements.

94. *Second*, the NOFO conflicts with agency guidance. The 2024 QFP, articulating the national standard of care required under 42 C.F.R. § 59.5(a)(3), states: "Patients should be fully informed about all pregnancy options: parenting, adoption, and abortion." 2024 QFP at S68. It further directs Title X providers to "offer nondirective counseling and be equipped to offer factual, neutral, nonjudgmental information about each option." *Id.* at S69. The 2024 QFP also states that Title X providers should screen for reproductive desires because doing so "enables providers to offer appropriate services for those patients who are seeking to avoid pregnancy as well as for those who are open to or seeking pregnancy and those interested in other mechanisms to build their families." *Id.* at S53. It recognizes that people hold "nuanced, fluctuating, and sometimes contradictory thoughts and feelings … regarding future pregnancy." *Id.* at S54.

95. The NOFO also ignores research showing that alignment with this priority would not lead to improved health outcomes. The NOFO does not reference or cite, for example, studies suggesting that marriage earlier in life is associated with substantially higher likelihood of later-life poverty and, relative to marriage in one's late twenties or early thirties, a higher risk of divorce,

or that delaying childbearing yields measurable gains in women's earnings and career advancement.[10]

96. The NOFO does not address the 2024 QFP, which requires Title X providers to offer nonjudgmental information about all pregnancy options and to offer appropriate services for those people seeking to avoid pregnancy as well as for those people seeking pregnancy, or other current research demonstrating that early marriage can be associated with worse outcomes. The NOFO also does not explain how applicants or grantees should reconcile the inconsistency between the Marriage & Parenthood Counseling Priority and the 2024 QFP.

97. Defendants have not acknowledged, addressed the consequences of, or otherwise provided a rational explanation for the change in policy represented by the requirement that prospective grantees advance and align with the Marriage & Parenthood Counseling Priority.

98. The Marriage & Parenthood Counseling Priority is also vague in that it does not specify what is sufficient to "align" with it. It is unclear what it would mean to "affirm marriage and parenthood as meaningful and valued components of adult life" in the context of providing medical care. The NOFO does not specify how applicants (and, eventually, grantees) would be expected to address this requirement.

99. The NOFO also requires alignment with the Marriage & Parenthood Counseling Priority once grantees receive funding. Because the NOFO fails to describe the actions required in order to align with the priority, Defendants have not provided prospective grantees, including PPFA's members, with fair and advance notice of what the condition requires.

---

[10] Gordon B. Dahl, *Early Teen Marriage and Future Poverty*, 47 Demography 689 (2010), https://perma.cc/T689-BPT8; Amalia R. Miller, *The Effects of Motherhood Timing on Career Path*, 24 J. Population Econ. 1071 (2011), https://www.jstor.org/stable/41488341.

### iii. The "Life Affirming Program Delivery" Priority

100. The NOFO requires applicants (and, eventually, recipients) to advance and align their projects with OPA's priority of "[e]nforcing the Hyde Amendment through the delivery of Title X services." NOFO at 14. This priority includes references to existing restrictions on the use of federal funds to pay for abortions, and also states that applicants are expected to "contribute to broader HHS efforts to safeguard life-affirming, lawful, and ethical program delivery" (the "'Life Affirming Program Delivery' Priority").

101. A prospective grantee's meaningful advancement of the "Life Affirming Program Delivery" Priority, along with other OPA and unspecified HHS priorities, is worth 35 of 100 points in the merit review process, while the extent to which the prospective grantee adequately provides for statutory and regulatory requirements is worth 15.

102. The "Life Affirming Program Delivery" Priority is vague in that the NOFO does not specify what is sufficient to "align" with it. The NOFO fails to define what it would mean for an applicant or grantee to "safeguard life-affirming" care. The NOFO does not specify how applicants (and, eventually, grantees) would be expected to address this requirement in the way they treat patients or some other aspect(s) of their work.

103. The NOFO also requires alignment with the "Life Affirming Program Delivery" Priority once grantees receive funding. Because the NOFO fails to describe the actions required in order to align with this priority, Defendants have not provided prospective grantees, including PPFA's members, with fair and advance notice of what the condition requires.

104. The NOFO also does not address HHS's regulations requiring that the project provide nondirective counseling to pregnant clients and referrals for abortion care upon request, 42 C.F.R. § 59.5(a)(5)(i), (ii); *see also* Consolidated Appropriations Act, 2026, Pub. L. No. 119-

75, 140 Stat. 173, 262 (2026), in requiring advancement of and alignment with the "Life Affirming Program Delivery" Priority. Neither does the NOFO explain how applicants or grantees should reconcile any inconsistency between that Priority and the Title X implementing regulations requiring that care be nondirective and requiring that Title X projects provide referrals for abortion care where requested.

105. The NOFO does not address the 2024 QFP, which directs Title X providers to offer patients nonjudgmental, neutral, and factual information about all pregnancy options and to refer patients for additional health care needs, including abortion. 2024 QFP at S68. The NOFO also does not explain how applicants or grantees should reconcile any inconsistency between the "Life Affirming Program Delivery" Priority and the standard of care under 42 C.F.R. § 59.5(a)(3), as stated in the 2024 QFP.

106. Defendants have not acknowledged, addressed the consequences of, or otherwise provided a rational explanation for any change in policy represented by the requirement that prospective grantees advance and align with the "Life Affirming Program Delivery" Priority.

**iv. <u>The "Biological Reality" Priority</u>**

107. The NOFO requires applicants (and, eventually, recipients) to advance and align their projects with the OPA priority of "[p]romoting evidence-based care," which, according to the NOFO, includes a mandate that applicants "protect[] children" and "respect[] biological reality." NOFO at 13. It also provides that a "[k]ey strategy for this priority" is "providing developmentally appropriate counseling rooted in ***biological science***." *Id.* (emphasis added). This priority (the "'Biological Reality' Priority") targets transgender patients and the health care provided to them. The overlapping HHS and OASH priorities use the same phrases to refer to the denial of gender identity. *See HHS Priorities Statement* (defining "biological reality" as the concept that "a

person's sex as either male or female is unchangeable and determined by objective biology"); *OASH Priorities Statement* ("It is also an OASH priority to ensure OASH programs accurately reflect science, including the biological reality that a person's sex, as either male or female, is unchangeable and determined by objective biology.").

108. A prospective grantee's so-called "meaningful[] advance[ment]" of the "Biological Reality" Priority, along with other OPA and unspecified HHS priorities, is worth 35 of 100 points in the merit review process, while the extent to which the prospective grantee adequately provides for statutory and regulatory requirements is worth only 15 points.

109. The "Biological Reality" Priority diverges from Title X's statutory purpose, HHS regulations, and HHS guidance.

110. *First*, the "Biological Reality" Priority conflicts with Title X regulations, which expressly require that projects "[p]rovide services in a manner that does not discriminate against any client based on … sex, … gender identity, [or] sex characteristics." 42 C.F.R. § 59.5(a)(4). Title X's implementing regulations also require that projects provide services in a manner that is "client-centered," "inclusive," and "protects the dignity of the individual." 42 C.F.R. § 59.5(a)(3). The regulations define "inclusive" as a state of affairs where "all people are fully included and can actively participate in and benefit from family planning, including, but not limited to, … lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons." *Id.* § 59.2.

111. Title X regulations also require that grantees "ensure[] equitable and quality service delivery consistent with nationally recognized standards of care"—and that they do not "discriminate against any client based on … sex, sexual orientation, gender identity, [or] sex characteristics." 42 C.F.R. § 59.5(a)(3)-(4).

112. These existing regulations were promulgated through notice-and-comment rulemaking. The NOFO's requirement that applicants align with the "Biological Reality" Priority was not.

113. In requiring advancement of and alignment with the "Biological Reality" Priority, the NOFO does not address these HHS regulations. Nor does the NOFO explain how applicants or grantees should reconcile the inconsistency between the "Biological Reality" Priority and regulatory requirements.

114. *Second*, the NOFO's "Biological Reality" Priority conflicts with HHS guidance. The 2024 QFP, articulating the national standard of care required under 42 C.F.R. § 59.5(a)(3), states: "Providers should support the sexual and reproductive health care needs of all people regardless of their gender identity." 2024 QFP at S72. The 2024 QFP also emphasizes the use of "gender-inclusive language," *id.* at S43-S44, and directs Title X providers to "ask patients about their sex assigned at birth, current anatomy, preferred name, gender identity, and pronouns," *id.* at S48. It also instructs Title X providers to "take steps to educate themselves and their medical teams about appropriate language and the health care needs of transgender patients." *Id.* at S72.

115. In addition, the "Biological Reality" Priority fails to consider the impact of incentivizing providers of family-planning services to deny patients' gender identity, which goes against current medical guidance. Professional bodies have explained that a physician's nonjudgmental recognition of a patient's gender identity "enhances the ability to render optimal patient care."[11] And research shows that access to affirming, nondiscriminatory care is associated with materially better health outcomes—including significantly reduced rates of depression,

[11] Am. Med. Ass'n, *Health Care Needs of Lesbian, Gay, Bisexual, Transgender and Queer Populations*, Policy H-160.991, https://perma.cc/49TS-CGCE (last modified 2025).

anxiety, and suicidality—while stigmatizing or discriminatory treatment is associated with worse outcomes.[12]

116. The NOFO does not address its inconsistency with the 2024 QFP and other medical guidance, which requires Title X providers to administer gender inclusive care. Nor does the NOFO explain how applicants or grantees should reconcile the inconsistency between the "Biological Reality" Priority and agency guidance.

117. Defendants have not acknowledged, addressed the consequences of, or otherwise provided a rational explanation for the change in policy represented by the requirement that prospective grantees advance and align with the "Biological Reality" Priority. This priority bears no relation to Title X's statutory purpose of funding voluntary and comprehensive family-planning care and is instead based on HHS's current political and ideological preferences.

118. The "Biological Reality" Priority is also vague in that it never specifies what is sufficient for grantees to "align" with it. It is unclear how a project can "align" with a priority to "reflect biological reality" in satisfaction of the requirement to advance and align with the "Biological Reality" Priority. The NOFO does not specify how applicants would be expected to address this priority in the way they treat patients, their staffing, and/or some other aspect(s) of their work.

119. The NOFO also requires alignment with the "Biological Reality" Priority once grantees receive funding. Because the NOFO fails to describe the actions required in order to align

[12] Diana M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 JAMA Network Open 1 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789423; Am. Med. Ass'n, *Advocating for the LGBTQ Community*, https://www.ama-assn.org/public-health/population-health/advocating-lgbtq-community (last accessed July 28, 2026).

with the priority, Defendants have not provided prospective grantees, including PPFA's members, with fair and advance notice of what the condition requires.

### C. Defendants Also Require Alignment With Additional, Unspecified Priorities During The Review Process, Which Is Arbitrary, Contrary To Law, And Exceeds Agency Authority

120. As described above, the NOFO's merit review includes an assessment of whether applicants "meaningfully advance" certain unspecified HHS priorities. NOFO at 40; *see also supra* ¶ 62.

121. In addition to a merits review, the Federal Staff Review includes "consideration [of] … additional factors," including "[a]lignment with HHS and OASH priorities, where authorized by law and within the scope of the program," NOFO at 41, thereby making alignment with both the HHS and OASH priorities part of the review process. Neither set of priorities is identified or described in the NOFO.

122. The websites that presently list HHS and OASH priorities are subject to change at any point, without notice to potential applicants or Title X grantees.

123. The HHS and OASH priorities are also vague and unclear, both as to whether they apply and also as to what they would require if they did apply.

124. Many of the OASH and HHS priorities appear clearly inapplicable to Title X.

125. As of the date of this Complaint, there are 24 HHS priorities listed on HHS's Website. Some of those priorities, such as "[f]oster marriage and family formation," "[c]ombat gender ideology and protect children," and "[e]nforce the Hyde Amendment," overlap with OPA's program priorities. *HHS Priorities Statement*. Consideration of those overlapping HHS priorities in the Title X grant selection process would be unlawful for the reasons described above.

126. Other HHS priorities appear to be entirely inapplicable to the Title X program. For example, HHS's sprawling set of priorities ranges from a heading labeled "[t]oxins" to "[e]nd[ing]

crime and disorder on America's streets," "[p]romot[ing] work and self-sufficiency," and "[i]mprov[ing] oversight of foreign funded institutions." *HHS Priorities Statement*.

127. A third category of HHS priorities appear potentially related to Title X in some contexts, meaning that applicants have no way to be sure whether they are intended to apply under the NOFO. For example, HHS's priorities include "[e]nd illegal race discrimination." *HHS Priorities Statement*.

128. As of the date of this Complaint, there are 10 OASH priorities listed on the OASH website. Some of those priorities, such as "[e]nforcing the Hyde Amendment" overlap with HHS and/or OPA priorities. *OASH Priorities Statement*. As to those overlapping priorities, their consideration in the Title X grant selection process is unlawful for the reasons described above. Others are unclear as to whether or not they are meant to apply to the Title X program.

129. The NOFO does not specify which HHS and OASH priorities are applicable to the evaluation of Title X projects—either during the merits review or during the Federal Staff Review—and thus fails to specify which priorities senior agency personnel will "consider[]" as part of a review and the weight that will give to any particular priority.

130. Therefore, the NOFO fails to identify which HHS and OASH priorities Defendants consider to be within the scope of the Title X program for purposes of making funding recommendations. Nor can Defendants reasonably leave it to individual participants to guess in the first instance—on pain of losing access to essential Title X funding—whether HHS's priorities fall "within the scope of the program." NOFO at 41.

131. Defendants' failure to identify in unambiguous fashion the complete set of HHS and OASH priorities relevant to the agency's evaluation of grant applications under the NOFO deprives applicants of fair notice of what is required of them to obtain Title X funding.

132. In addition to failing to identify the relevant priorities, Defendants fail to explain how an applicant or grantee would be expected to align with them.

133. For example, one of the OASH priorities is titled, "Ending diversity, equity, and inclusion (DEI) policies and practices across OASH's programs." *OASH Priorities Statement*. HHS has a related priority titled "[e]nd illegal race discrimination" that states that, "[r]ather than supporting DEI programs, HHS will end race-based special preferences in grant making and instead direct resources to programs that advance the health and longevity of all Americans." *HHS Priorities Statement*.

134. Under this anti-DEI priority, OASH states that it will prioritize efforts that "go beyond the use of ideologically laden concepts" "like health equity," and "focus on solution-oriented approaches" "includ[ing] actively testing, advancing, scaling, and implementing innovative evidence-based interventions and treatments that address poor health outcomes." *OASH Priorities Statement*. But the website does not say what an organization would need to do to "go beyond" health equity or what "testing, advancing, scaling and implementing innovative evidence-based interventions and treatments that address poor health outcomes" would look like in a program for providing family-planning care.

135. Nor do Defendants acknowledge the Title X regulations' requirement that HHS take into account "[t]he ability of the applicant to advance health equity" when awarding Title X funds, 42 C.F.R. § 59.7(a)(3), or that projects provide services in an "inclusive" manner, ensure "equitable" delivery of services, and encourage participation in the project by "diverse persons," *id.* §§ 59.5(a)(3), (b)(3)(iii); *see also id.* § 59.2 (defining "inclusive" as "when all people are fully included and can actively participate in and benefit from family planning, including, but not

limited to, individuals who belong to underserved communities," specifically identifying racial and ethnic minorities and "lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons").

136. OASH's priority titled, "[e]nsuring adolescent program materials are age-appropriate" is another example of a priority that is so vague as to deprive applicants and grantees of what is required. *OASH Priorities Statement*. This priority states that "OASH will focus on programs that do not promote material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content, including content that encourages, normalizes or promotes sexual activity for minors." *Id.*

137. OASH gives no guidance regarding how a project can ensure its program materials are "age appropriate" and that they "do not promote material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content" and that they do not include "content that encourages, normalizes or promotes sexual activity for minors." Neither the NOFO nor the OASH website explains how an applicant or grantee is expected to align with the OASH priority regarding adolescent materials. Nor do they explain how a Title X project can provide family-planning services to adolescents that does not include content involving discussion of sexual activity for minors.

138. As these two examples show, the NOFO's limited references to the HHS and OASH priorities do not give applicants fair notice of what is required to be considered in alignment with them.

139. In addition, the NOFO's mandate that applicants align with these priorities—many of which are entirely unrelated to the purpose of the Title X program—exceeds the agency's statutory authority to "assist in the establishment and operation of voluntary family planning

projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a).

**D. Requiring Alignment With The OPA Priorities And OASH Priorities After Grants Are Awarded Fails To Give Potential Grantees Adequate Notice Of The Conditions Attached To The Funds**

140. After grants are awarded, the NOFO requires continued alignment with the OPA priorities, and also with the unspecified HHS and OASH priorities.

141. The NOFO does not identify which HHS and OASH priorities Defendants consider to be authorized by law and/or consistent with program authority and the scope of the award for purposes of assessing a grantee's ongoing alignment.

142. In addition, the NOFO requires that grantees administer their programs "in accordance with" the OPA priorities to: "1) Promote body and health literacy; 2) Advance reproductive goals counseling; [and] 3) Implement a Quality Improvement and Quality Assurance (QI/QA) Plan with the goal to achieve optimal health outcomes." NOFO at 7; *see* NOFO at 12-14. Recipients must "demonstrate ongoing compliance with" the priorities through "program design, implementation, reporting, and evaluation." *Id.* This provision in the NOFO implies that grantees must align with only these three OPA priorities.

143. However, on the next page, the NOFO states that "[a]ll activities funded under this announcement" must be "in compliance with additional program guidance issued by OPA," this time without limiting that compliance to just the three priorities listed on page 7. NOFO at 8. This provision—in conflict with the language a few pages earlier listing only a subset of OPA guidance—appears to require grantees to maintain alignment with all OPA priorities.

144. By giving conflicting accounts of which OPA priorities become conditions after grantees receive funding, Defendants fail to specify which OPA priorities they consider to be

authorized by law and/or consistent with program authority and the scope of the award for purposes of assessing a grantee's ongoing alignment.

145. Defendants' failure to identify which OPA, OASH, and HHS priorities grantees will be required to demonstrate alignment with as a condition of accepting a grant issued under the NOFO, or to provide any explanation of how alignment with those priorities will be assessed, deprives applicants of the notice required to knowingly and voluntarily decide whether to apply for and ultimately accept the funds.

## IV. THE NOFO WILL HARM PPFA MEMBERS AND THE PATIENTS THEY SERVE

146. PPFA members have consistently participated in Title X funding opportunities to provide core Title X services. Some PPFA members have done so for decades, tracing back to the program's inception in 1971. Using Title X funding, PPFA members' health centers offer a full range of reproductive health care services, including well-woman preventive-care visits, breast exams, Pap tests, general health assessments, a wide range of contraception methods, risk assessments and referral services for pregnant women, pregnancy testing, STI treatment and testing, urinary tract infection treatment, and cervical cancer and testicular cancer screenings.

147. Nationally, of those who report their income, approximately 64 percent of patients visiting Planned Parenthood health centers have incomes at or below 150 percent of the federal poverty level.

148. Several PPFA members, including current Title X grantees, plan to apply for Title X funds for the fiscal year 2027 grant cycle. Applications under the FY 2027 NOFO are due on January 11, 2027.

149. If the NOFO's requirements to advance and align with HHS, OPA, and OASH priorities are permitted to stand, PPFA members and their patients will be irreparably harmed.

### C. The NOFO Disadvantages PPFA Members During The Title X Grant Selection Process

150. PPFA members provide high-quality inclusive and comprehensive family-planning services with respect and compassion. They do so without regard to patients' income, insurance, gender identity, sexual orientation, or race.

151. To maintain their status as PPFA members, members must, among other things, provide medical services in accordance with national guidelines and adhere to the shared Planned Parenthood mission.

152. In furtherance of their shared mission, PPFA members counsel patients and provide services in a manner that is client-centered, culturally and linguistically appropriate, inclusive, trauma-informed, and that protects the dignity of the individual.

153. Consistent with applicable membership requirements and the Title X statute and regulations, PPFA members provide and/or refer for a broad range of effective, medically approved family-planning methods (including natural family-planning methods) and services (including pregnancy testing and counseling, assistance to achieve pregnancy, basic infertility services, STI services, pre-conception health services, and adolescent-friendly health services).

154. In addition—and consistent with applicable membership requirements, the shared Planned Parenthood mission, and the Title X statute and regulations—PPFA members provide patient-centered counseling about family-planning options and do not direct or coerce patients towards particular methods of family planning or making particular life choices, including getting married before having children or having children at all if that is not what patients want.

155. Consistent with applicable membership requirements, the shared Planned Parenthood mission, and the Title X statute and regulations, PPFA members also provide care to

patients wanting to prevent pregnancy and provide referrals upon request to patients wishing to terminate a pregnancy.

156. PPFA members provide all services in compliance with the Hyde Amendment. PPFA members who are Title X grantees do not use abortion as a method of family planning within their Title X projects. However, where legally permissible, PPFA members provide abortion services. Members maintain separation between these services and their Title X projects, as required by the Title X statute and regulations.

157. Finally, in accordance with federal law and applicable law of the states in which they operate, PPFA members provide services, including Title X services, to patients regardless of religion, race, national origin, age, sex, sexual orientation, gender identity, sex characteristics, number of pregnancies, or marital status.

158. The NOFO's requirement to align with the Challenged Priorities therefore harms PPFA members and puts them at a disadvantage to other prospective applicants who share the political agenda reflected in the priorities, notwithstanding the extent to which PPFA members' proposed projects fulfill Title X's actual purpose and applicable statutory and regulatory requirements.

159. Moreover, PPFA members that wish to apply for Title X grants for FY 2027 are unclear about how to address the requirement to align with the Challenged Priorities, OASH Priorities, and HHS Priorities because the priorities are arbitrary, conflict with federal law, and/or the NOFO is vague about what practices are required in order to show alignment.

160. Nor can PPFA members know what they would be agreeing to "align with" if their applications were successful because the Challenged Priorities, OASH Priorities, and HHS Priorities are also confusing and vague. To the extent that the NOFO purports to condition the

receipt of funds on alignment with the Challenged Priorities, HHS priorities, and OASH priorities, PPFA members are harmed by the lack of fair and advance notice of the conditions needed to knowingly and willingly accept them.

161. PPFA members thus face the risk that, even if their applications are successful, their acceptance of a Title X award would require continued, undefined alignment with agency priorities that are confusing, vague, arbitrary, and contrary to existing law. If they were later determined not to be in alignment, such a finding could result in corrective action or termination of their awards. *See* NOFO at 7.

### D. Excluding PPFA Members From The Title X Program Will Harm Them And The Patients They Serve

162. If PPFA members are excluded from the Title X program—either because they cannot reasonably determine what it would mean to align with requisite agency priorities, or because Defendants determine that PPFA members do not sufficiently align with OPA, HHS, and OASH priorities—they will suffer financial, operational, and reputational harm, and their patients will be harmed by their decreased ability to access subsidized or free family-planning care.

163. ***Harm to PPFA's members*:** Title X funding is critical to helping PPFA members provide services to low-income families and individuals. In addition to providing free or low-cost clinical services, Title X funding is also used to support other critical needs that are not reimbursable under Medicaid or commercial insurance, such as individual patient education, community-level outreach, and public education about family planning and related sexual-health issues.

164. In 2026 alone, PPFA members received over $11 million in direct Title X grant funds.

165. Without Title X funding, some members will no longer be able to offer family planning and other Title X services at reduced or no cost to their patients or, at a minimum, could not do so indefinitely, causing a significant harm to their mission of providing that care.

166. To try to continue offering free or reduced-cost family-planning services without Title X funding, some PPFA member-grantees would need to conduct additional fundraising and/or secure alternative funding streams to make up for funding that would otherwise be reimbursed by Title X. This would require diversion of resources from other aspects of PPFA members' missions and core business activities.

167. If they are unable to secure alternative funding streams, some PPFA member-grantees would be forced to make difficult operational and staffing decisions.

168. If PPFA members were no longer able to offer subsidized care under Title X, this would also tarnish Planned Parenthood's longstanding reputation as a reliable, affordable, and accessible option for patients with nowhere else to turn. That reputation has been built over decades of work in the communities that PPFA's members serve and would be impaired if PPFA's members were forced to turn patients away for lack of means to pay for family-planning services.

169. ***Harm to Patients*****:** The NOFO also poses a grave risk to the health of PPFA members' Title X patients who are low-income individuals already facing barriers to care. PPFA's members that receive Title X funding often work in under-resourced areas where patients face barriers to access appropriate reproductive care. These patients will have an even more difficult time accessing such care if they cannot obtain Title X care from their local Planned Parenthood health center. Many patients risk being cut off from health care services altogether, threatening significant harm to those patients and U.S. public health more broadly.

170. As history shows, PPFA's members are integral to the Title X network.

171. In 2019, a revision to the Title X regulations prohibited Title X grantees from providing abortion referrals; required pregnant patients be provided with a referral to prenatal care; and mandated complete physical and financial separation between Title X-funded activities and abortion-related services, among other things.[13] These requirements forced PPFA members and others to withdraw from the program.[14] Between 2018 and 2020, the number of patients served by Title X clinics fell from 3.9 million to 1.5 million; family-planning visits declined from 6.5 million to 2.7 million; and the number of participating clinic sites dropped from 3,954 to 3,031—a nearly 25 percent decline.[15] As a consequence, for almost two years, several states were left without a single Title-X-funded health center.[16]

172. Today, PPFA direct-grantee members care for a disproportionate number of individuals who depend on publicly funded family-planning services, from a health care-safety-net provider, including low-income patients, patients in rural areas, patients who are not proficient in English, and communities of color. And in at least one state, a PPFA direct-grantee member is the only Title X service provider.

173. Even where there are other Title X service providers in a given area, the health care infrastructure where PPFA's direct-grantee members operate may be unable to absorb the flood of

[13] *See* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7714 (Mar. 4, 2019); Off. of Population Affs., Title X Family Planning Annual Report: 2020 National Summary (2021).
[14] Janice Hopkins Tanne, *Planned Parenthood Rejects Restrictive US Government Funding and "Gag Rule,"* 366 BMJ l5227 (Aug. 20, 2019), https://doi.org/10.1136/bmj.l5227; Rachel Benson Gold & Lauren Cross, *The Title X Gag Rule Is Wreaking Havoc — Just as Trump Intended*, Guttmacher Inst. (Aug. 29, 2019), https://www.guttmacher.org/article/2019/08/title-x-gag-rule-wreaking-havoc-just-trump-intended.
[15] *See* Brittni Frederiksen et al., *Rebuilding Title X: New Regulations for the Federal Family Planning Program*, KFF (Nov. 3, 2021), https://www.kff.org/womens-health-policy/rebuilding-title-x-new-regulations-for-the-federal-family-planning-program/.
[16] *See id.*

new patients that may be triggered if patients are no longer able to receive Title X care at Planned Parenthood health centers. And these providers may not provide the same services as PPFA members, including extended hours, which many patients with low incomes rely on due to work schedules and other responsibilities.

174. With nowhere to turn for low or no-cost, high-quality reproductive-health and family-planning care, many patients with limited means will simply go without these vital services.

175. Patients are especially likely to lose contraceptive care, including access to LARCs, the most effective forms of contraception for preventing unwanted pregnancies, if PPFA's members lose Title X funding. Because LARCs are so expensive, lower-income patients, particularly those who are uninsured, under-insured, or unable to use their insurance, almost certainly would not be able to obtain them absent subsidization from a Title X grantee.

176. As a result of Defendants' unlawful actions, PPFA's members intending to apply for Title X funding and the communities they serve are at risk of irreparable harm.

177. Each of PPFA's members intending to apply for Title X funding under the NOFO would have standing to bring this action in its own right. The interests PPFA is seeking to advance and protect through this action are integral to its core, mission-driven work supporting its members' provision of high-quality, inclusive, and comprehensive sexual and reproductive health care services, regardless of income, insurance, gender identity, sexual orientation, or race. And the claims PPFA is asserting and the relief it is requesting do not require the participation of PPFA members in this suit. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

178. PPFA's members must decide well in advance of the January 2027 application deadline whether to apply and commit resources to the planning, scoping, internal approval, and application pre-drafting processes.

179. The NOFO is currently harming PPFA's members because its unlawful criteria are hampering and burdening members' current decision-making and preparations to apply for fiscal year 2027 Title X grants.

180. PPFA's challenge to the NOFO is purely legal, requiring no additional factual development for this Court to adjudicate the matter. Withholding judicial review would force a costly, imminent decision by PPFA's members about whether to apply for funding while facing an impossible situation. Once final awards issue, the competitive distortion cannot be undone.

**COUNT ONE**
**APA – CONTRARY TO LAW**

181. PPFA incorporates by reference the allegations of the preceding paragraphs.

182. The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

183. "'[I]t is axiomatic that an agency is bound by its own regulations,'" unless the regulations are duly amended or repealed. *Alon Refin. Krotz Springs, Inc. v. EPA*, 172 F.4th 12, 17 (D.C. Cir. 2026) (ellipsis omitted).

184. The NOFO's requirement that applicants and grantees align with the Challenged Priorities constitutes final agency action.

185. The Title X regulations at 42 C.F.R. Part 59—including §§ 59.5(a)(1)-(5), 59.7(a)(3), and 59.10—bind Defendants and require, among other things, nondiscrimination on the basis of gender identity and sex characteristics; client-centered, inclusive care; a broad range of family-planning methods; and that programs advance health equity.

186. The NOFO's "Biological Reality" Priority, Marriage & Parenthood Counseling Priority, and Anti-Contraception Priority, and the HHS and OASH priorities that overlap with them, are contrary to those binding regulations.

**COUNT TWO**
**APA – IN EXCESS OF STATUTORY AUTHORITY**

187. PPFA incorporates by reference the allegations of the preceding paragraphs.

188. The APA requires courts to "hold unlawful and set aside agency action[s], findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

189. The NOFO's requirement that applicants and grantees align with the Challenged Priorities and the HHS and OASH priorities constitutes final agency action.

190. Defendants may exercise only authority granted to them by statute. *See, e.g.*, *FCC v. AT&T, Inc.*, 146 S. Ct. 1418, 1428 (2026); *West Virginia v. EPA*, 597 U.S. 697, 723 (2022).

191. The Title X statute, 42 U.S.C. § 300(a), does not authorize HHS to condition Title X funding on alignment with the NOFO's Challenged Priorities or the HHS and OASH priorities.

**COUNT THREE**
**APA – ARBITRARY AND CAPRICIOUS**

192. PPFA incorporates by reference the allegations of the preceding paragraphs.

193. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary and capricious" or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

194. "'An agency is not free to ignore or violate its regulations while they remain in effect,'" and "'an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations.'" *Alon Refin. Krotz Springs, Inc. v. EPA*, 172 F.4th 12, 17-18 (D.C. Cir. 2026).

195. The NOFO's requirement for applicants and grantees to align with the Challenged Priorities and the HHS and OASH priorities constitutes final agency action.

196. The NOFO's requirement to align with the Challenged Priorities and the HHS and OASH priorities is arbitrary and capricious. Among other reasons, the NOFO's requirement to

align with these priorities demands that prospective grantees align themselves with political goals that directly conflict or are inconsistent with Title X regulations without explaining how to reconcile the conflict; relies on factors that Congress did not intend Defendants to consider and instead supplants Congress's intent and purpose in authorizing grants under Title X; represents departures from regulation and longstanding agency policy without acknowledgment, much less reasoned explanations for those departures; fails to take into account relevant issues and important aspects of the problem; fails to provide applicants with fair notice of what is required of them; and fails to consider the reliance interests of longstanding Title X service providers.

## COUNT FOUR
## APA – FAILURE TO OBSERVE REQUIRED PROCEDURE

197. PPFA incorporates by reference the allegations of the preceding paragraphs.

198. The APA provides that courts "shall … hold unlawful and set aside" final agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

199. To reverse, repeal, or amend an agency rule, an agency must promulgate a new rule based on reasoned decision-making. *See* 5 U.S.C. § 551(5) ("rule making" means "agency process for formulating, amending, or repealing a rule").

200. The APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015).

201. The NOFO's "Biological Reality" Priority, Marriage & Parenthood Counseling Priority, and Anti-Contraception Priority constitute a reversal or amendment of the Title X regulations, promulgated via notice-and-comment, with which those priorities conflict.

202. Having failed to use notice-and-comment rulemaking to issue the "Biological Reality" Priority, Marriage & Parenthood Counseling Priority, and Anti-Contraception Priority, Defendants have failed to follow the procedures required by law to impose such requirements.

**COUNT FIVE**
**VIOLATION OF THE SPENDING POWER UNDER U.S. CONST. ART. I, § 8, CL. 1**

203. PPFA incorporates by reference the allegations of the preceding paragraphs.

204. Congress's power to attach conditions to federal spending is "not unlimited" and is "subject to several general restrictions." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

205. Among other requirements, funding recipients must have fair and advance notice of conditions that apply to federal funds so that recipients can "knowingly and voluntarily" decide whether to accept funds. *Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1941 (2026). Grant recipients cannot knowingly accept conditions they are "unaware" of or "unable to ascertain." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981).

206. The above requirements apply to federal Executive Branch agencies.

207. In addition to requiring applicants to demonstrate how their proposed projects will align with Defendants' political priorities, the NOFO states that funding recipients must "align program design and activities with agency priorities … when authorized by law according to the Title X statute, regulations, legislative mandates, and additional program guidance"; and demonstrate ongoing alignment with those agency priorities. NOFO at 7.

208. The NOFO fails to provide PPFA's members adequate notice of what alignment, implementation, and/or effectuation of the outlined OPA program priorities would require. PPFA's members are thus currently experiencing constitutional injury because they cannot now knowingly decide whether to apply for Title X grants for fiscal year 2027 given unascertainable conditions.

209. In addition, to the extent any PPFA member(s) were to receive an award, the conditions for maintaining that award are likewise unascertainable. The NOFO fails to sufficiently elaborate on the HHS and OASH priorities with which any potential PPFA member grantee would be required to align or what ongoing alignment with those priorities would require. Instead of enumerating specific HHS and OASH priorities, the NOFO directs readers to an external Web site whose contents could change at any time.

210. Therefore, to the extent the NOFO purports to outline conditions for the acceptance of Title X grants, it violates the Spending Clause because it does not provide the notice required for a prospective grantee knowingly and voluntarily to accept them and, separately, to maintain grants if any are awarded.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Court:

211. Declare unlawful and set aside the requirement in the FY 2027 NOFO that applicants demonstrate meaningful advancement of, alignment with, and, if awarded a grant, ensure alignment with the following priorities:

a) "Biological Reality" Priority and the HHS and OASH priorities that overlap with it;

b) Marriage & Parenthood Counseling Priority and the HHS and OASH priorities that overlap with it;

c) Anti-Contraception Priority and the HHS and OASH priorities that overlap with it;

d) "Life Affirming Program Delivery" Priority and the HHS and OASH priorities that overlap with it;

e) HHS priorities;

f) OASH priorities.

212. Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from imposing or implementing the following unlawful provisions of FY 2027 NOFO at all stages of the application process and to the extent that HHS may seek to have funding recipients take any action in accordance with them:

a) "Biological Reality" Priority and the HHS and OASH priorities that overlap with it;

b) Marriage & Parenthood Counseling Priority and the HHS and OASH priorities that overlap with it;

c) Anti-Contraception Priority and the HHS and OASH priorities that overlap with it;

d) "Life Affirming Program Delivery" Priority and the HHS and OASH priorities that overlap with it;

e) HHS priorities;

f) OASH priorities.

213. Pursuant to 5 U.S.C. § 705, grant all appropriate relief to preserve the status quo pending judicial review, including postponing the effective date of, or staying implementation of, the following unlawful provisions of the NOFO:

a) "Biological Reality" Priority and the HHS and OASH priorities that overlap with it;

b) Marriage & Parenthood Counseling Priority and the HHS and OASH priorities that overlap with it;

c) Anti-Contraception Priority and the HHS and OASH priorities that overlap with it;

d) "Life Affirming Program Delivery" Priority and the HHS and OASH priorities that overlap with it;

e) HHS priorities, to the extent that they apply and are contrary to federal law or regulations and/or are arbitrary and capricious;

f) OASH priorities, to the extent that they apply and are contrary to federal law or regulations and/or are arbitrary and capricious.

214. Grant such other relief as this Court deems just and proper.

July 28, 2026

Respectfully submitted,

/s/ *Alan E. Schoenfeld*
ALAN E. SCHOENFELD (DC BAR NO. 1725277)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
alan.schoenfeld@wilmerhale.com

SOFIA BROOKS (*pro hac vice* pending)
CHRISTOPHER R. STEVENSON (*pro hac vice* pending)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
sofie.brooks@wilmerhale.com
chris.stevenson@wilmerhale.com

LEAH FUGERE (*pro hac vice* pending)
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Ave, Suite 2400
Los Angeles, CA 90071
(213) 443-5300
leah.fugere@wilmerhale.com

DEEPA ALAGESAN (D.D.C. BAR NO. NY0261)
CAMILA VEGA (*pro hac vice* pending)
PLANNED PARENTHOOD FEDERATION
OF AMERICA, INC.
123 William Street
New York, NY 10038
(212) 541-7800
deepa.alagesan@ppfa.org
camila.vega@ppfa.org

PAUL R.Q. WOLFSON (DC BAR NO. 414759)
CARRIE Y. FLAXMAN (DC BAR NO. 458681)
ROBIN F. THURSTON (DC BAR NO. 1531399)
DEMOCRACY FORWARD FOUNDATION
1445 New York Ave NW
Washington, DC 20005
(202) 448-9090
pwolfson@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

*Attorneys for Plaintiff Planned Parenthood Federation of America, Inc.*