**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | * | Case No. 1:26-cv-03405-DLB |
| | * | |
| Defendants.f | * | |
| | * | |

* * * * * * * * * * * *

**PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' MOTION TO TRANSFER**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1
BACKGROUND ........................................................................................................ 2
I. Title X and the States' Longstanding Reliance on the Program. ................................... 2
II. The 2027 Notice of Funding Opportunity and the States' Challenge. ........................... 3
LEGAL STANDARDS ................................................................................................ 4
ARGUMENT .............................................................................................................. 5
I. Plaintiffs' Choice of Forum Weighs Heavily Against Transfer. .................................... 6
II. Defendants Have Not Shown That the Convenience Factors Favor Transfer. ..............11
III. The Interests of Justice Favor Keeping this Action in the District of Maryland. ......... 12
A. The States' Distinct Interests Warrant Maintaining Their Own Collective Action. ..... 12
B. The Percolation of Legal Issues Favors Retaining This Action in the District of Maryland. ...................................................................................................... 14
C. The Nature of this Case Minimizes Any Duplication from Parallel Litigation. ........... 15
D. Any First-to-File Principle Does Not Require the States to Litigate Elsewhere. ......... 17
E. The Possibility of Inconsistent Rulings Does Not Overcome Plaintiffs' Forum Choice. 18
F. Transfer Would Add Delay Without Advancing Any Countervailing Principle. .......... 19
IV. The Court Should Permit the Case to Proceed While the Transfer Motion Is Under Advisement. ............................................................................................................. 20
CONCLUSION .......................................................................................................... 20

## TABLE OF AUTHORITIES

### Cases

*Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. of Texas*, 571 U.S. 49 (2013) ........ 6

*Bd. of Trustees, Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253 (E.D. Va. 1988) ........ 12

*Camp v. Pitts*, 411 U.S. 138 (1973) ........ 16

*Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019) ........ 6

*Chase Brexton Health Servs. v. Maryland*, 411 F.3d 457 (4th Cir. 2005) ........ 17

*Coastal Labs, Inc. v. Jolly*, 502 F. Supp. 3d 1003 (D. Md. 2020) ........ 5, 9

*Collins v. Straight, Inc.*, 748 F.2d 916 (4th Cir. 1984) ........ 5, 8, 9

*Continental Grain Co. v. Barge FBL-585*, 364 U.S. 19 (1960) ........ 16

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) ........ 10

*Cross v. Fleet Reserve Ass'n Pension Plan*, 383 F. Supp.2d 852 (D. Md. 2005) ........ 12

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ........ 6

*Equitable Bank v. Finn*, 671 F. Supp. 374 (D. Md. 1987) ........ 5

*Freedom Network v. Trump*, 830 F. Supp. 3d 681 (N.D. Ill. 2026) ........ 7

*Gennari Consulting, Inc. v. Wellington Corp., LLC*, No. 19-cv-1851, 2019 WL 6829102 (D. Md. Dec. 13, 2019) ........ 12

*Glodek v. Richardson*, No. GJH-19-2115, 2020 WL 263476 (D. Md. Jan. 16, 2020) ........ 17

*Helsel v. Tishman Realty & Constr. Co., Inc.*, 198 F. Supp. 2d 710 (D. Md. 2002) ........ 4

*Hennepin County v. U.S. Department of Health and Human Servs.*, No. 26-cv-2460 (CRC), 2026 WL 2426300 (D.D.C. Aug. 19, 2026) ........ 18

*In re Volkswagen of America, Inc.*, 545 F.3d 304 (5th Cir. 2008) ........ 8

*Int'l Painters & Allied Trade Indus. Pension Fund v. Marrero Glass & Metal Inc.*, No. ELH-18-452, 2019 WL 423409 (D. Md. Feb. 1, 2019) ........ 11

*Kendus v. USPack Servs. LLC*, No. SAG-19-00496,
2020 WL 1158570 (D. Md. Mar. 10, 2020) .......... 17

*Menk v. MITRE Corp.*, 713 F. Supp. 3d 113 (D. Md. 2024) .......... 4, 11

*NFPHRA v. Kennedy*, No. 26-cv-01684-JPW (M.D. Pa.) .......... 3, 10, 15, 18, 19

*Planned Parenthood of America, Inc. v. U.S. Department of Health and Human Services*,
No. 26-cv-2656 (D.D.C.) .......... 4, 10

*Ramos-Lopez v. Bondi*, No. 1:26-cv-01175-PX,
2026 WL 1745700 (D. Md. June 17, 2026) .......... 5

*Sierra Club v. Nat'l Marine Fisheries Serv.*, 803 F. Supp. 3d 429 (D. Md. 2025) .......... 4, 6

*Sierra Club v. Nat'l Marine Fisheries Serv.,* No. 25-cv-1627,
2025 WL 3706503 (D. Md. 2025) .......... 6, 11, 12

*Sierra Club v. Nat'l Marine Fisheries Serv.*, No. 20-cv-03060,
2021 WL 4704842 (D. Md. May 24, 2021) .......... 11

*State of California v. Trump*, No. 26-cv-1159-IT (D. Mass.) .......... 14, 15, 17

*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988) .......... 5

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) .......... 15

*Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*,
791 F.3d 436 (4th Cir. 2015) .......... 5, 6

*United States v. Mendoza*, 464 U.S. 154 (1984) .......... 14

*Virginia Agr. Growers Ass'n, Inc. v. Donovan*, 774 F.2d 89 (4th Cir. 1985) .......... 16

**Statutes**

28 U.S.C. § 1391 .......... 5

28 U.S.C. § 1404 .......... 1, 4, 5, 7, 8, 9, 11, 17

42 U.S.C. §§ 300-300a-6 (Public Health Service Act, Title X);
Pub. L. No. 91-572, 84 Stat. 1504 (1970) .......... 2

**Miscellaneous**

15 Charles Alan Wright et al., *Federal Practice and Procedure*
§§ 3849, 3854 (4th ed.) .......... 11, 12, 19

## INTRODUCTION

Twenty-three Plaintiff States, including the State of Maryland, brought this action in the District of Maryland to enjoin Defendants from unlawfully requiring applicants for Title X family planning funds to demonstrate "alignment" with priorities that conflict with Title X's governing statute and regulations. Defendants now ask this Court to transfer the case pursuant to 28 U.S.C. § 1404(a), but the District of Maryland is well-suited to resolve it, and Defendants fall far short of carrying their burden to justify displacing this forum.

This District's connection to this dispute is clear: Plaintiff Maryland has a longstanding Title X program encompassing a statewide network of providers supported by both federal and State funds, and the challenged conditions directly affect the State's administration and funding of that entire network. Given that substantial connection to this District, Maryland joined with the other Plaintiffs in this single proceeding to vindicate their similar governmental interests rather than pursuing separate actions in dozens of different forums across the county. Plaintiffs' decision to sue in Maryland is entitled to substantial weight under § 1404(a), and Defendants fail to show, as they must, compelling reasons to disturb Plaintiffs' selection. Defendants identify no reason this case cannot be resolved efficiently in this District without inconvenience to any party. That private organizational plaintiffs have sued elsewhere in two cases also does not warrant transfer. Although one of those actions has now been resolved, it was dismissed on standing and ripeness grounds rather than on the merits, and the other has not yet resulted in any judicial determination. This action is brought by sovereign States and Governors asserting their unique governmental interests in maintaining longstanding Title X programs and in administering effective public health programs. Whatever efficiencies transfer could offer do not outweigh the Plaintiff States'

substantial interest in litigating in this forum and other interest-of-justice considerations, including the value in percolation of issues of national significance. Defendants' motion should be denied.

## BACKGROUND

### I. Title X and the States' Longstanding Reliance on the Program.

Congress enacted Title X of the Public Health Service Act more than fifty years ago to provide access to comprehensive family planning and related preventative health services to individuals regardless of income. 42 U.S.C. §§ 300-300a-6; Pub. L. No. 91-572, 84 Stat. 1504 (1970). Many Plaintiffs have applied for and received Title X funding, some for as many as 50 years, and all currently, in varying capacities, administer, fund, oversee, and support Title X programs and providers within their borders. *See* ¶ 2, ECF No. 1.[1] Plaintiff States have direct governmental interests in the federal requirements governing Title X funding and the operation of programs in their jurisdictions by qualified providers, as the consequences of ineffective public health programs fall chiefly on the States. *Id.* ¶ 6 (alleging that, without Title X funding, many low-income residents in Plaintiff States will be deprived of crucial services, and "Plaintiff States will bear the substantial costs of increased health care needs caused by worsened immediate and long-term health outcomes").

The Maryland Department of Health ("MDH") has participated in the Title X program for more than 50 years and never has been denied a Title X grant. *Id.* ¶ 78. MDH currently administers the Maryland Family Planning Program ("MFPP") through twenty-three subrecipients—nineteen local health departments and four private nonprofits—with an annual baseline of approximately $4 million in federal funds and $6.3 million in State funds that together support the operations and

[1] Unless otherwise specified, docket citations herein are to the docket in this action, *State of New York, et al. v. U.S. Department of Health and Human Services, et al.*, No. 1:26-cv-03405-DLB.

services of each subrecipient. *Id.* ¶¶ 78–79. Title X funding is critical to Maryland; the loss of this funding would represent a 38.5% reduction in MFPP's total operating revenue and would jeopardize MFPP's capacity to serve the more than 50,000 Marylanders each year who depend on funded providers. *Id.* ¶¶ 80, 83.

## II. The 2027 Notice of Funding Opportunity and the States' Challenge.

The 2027 NOFO represents a drastic shift from existing Title X requirements. Under the current Notice of Funding Opportunity, the "2027 NOFO," applicants must agree at the outset, and throughout the life of the grant, to "align" and "demonstrate compliance" with three sets of agency priorities advanced by the Office of Population Affairs, Office of the Assistant Secretary of Health, and the Department for Health and Human Services. *Id.* ¶ 117. Those conditions have nothing to do with, and even directly undermine, Title X's purpose. The changes incorporated in the NOFO directly affect Plaintiff States, which administer, fund, oversee, or otherwise participate in Title X programs, because they determine how States and other Title X applicants must structure their applications and existing programs in light of these conditions. *See, e.g., id.* ¶¶ 76–77. Maryland, like other Plaintiff States, faces a concrete funding and programmatic consequence: because MDH braids federal and State funds, the loss or reduction of Title X funding would affect Maryland's entire network of Title X subrecipients, with profound impacts on the public health system statewide. *Id.* ¶ 78.

The 2027 NOFO, which shapes a nationwide grant contest, has generated litigation in three federal courts. On June 18, 2026, the National Family Planning & Reproductive Health Association ("NFPRHA") and a Pennsylvania Title X grantee filed *NFPHRA v. Kennedy*, No. 26-cv-01684-JPW (M.D. Pa.), challenging the NOFO published in April 2026. Plaintiffs in that case amended their complaint on July 13, 2026, following Defendants' publication of a new NOFO.

ECF No. 35, *NFPHRA v. Kennedy*, No. 26-cv-01684-JPW (M.D. Pa.). On September 17, 2026, the Middle District of Pennsylvania dismissed the *NFPHRA* action without prejudice, concluding that the plaintiffs had not alleged sufficiently concrete injury to satisfy Article III's case-or-controversy requirement. The court denied the parties' pending summary judgment motions as moot, without reaching the merits of any issue presented in the case. On July 28, 2026, Planned Parenthood Federation of America ("PPFA") filed *Planned Parenthood of America, Inc. v. U.S. Department of Health and Human Services*, No. 26-cv-2656 (D.D.C.). Briefing on the parties' cross-motions for summary judgment in that action is scheduled to conclude on October 23, 2026. This suit, the only one brought by States asserting state governmental interests in the Title X program's administration, was filed shortly after, on August 27, 2026. At the time of the filing of this case, neither of the other actions had completed briefing, let alone reached any decision on the merits.

## LEGAL STANDARDS

Under 28 U.S.C. § 1404(a), a district court may transfer a civil action "[f]or the convenience of parties and witnesses, in the interest of justice," to another district "where it might have been brought." The party seeking transfer bears the burden of first showing that the requested transferee court is one where the action could have been brought. *Menk v. MITRE Corp.*, 713 F. Supp. 3d 113, 132 (D. Md. 2024) (citations and quotation marks omitted). The moving party must also establish that the proposed transfer will "better more conveniently serve the interests of the parties and witnesses and better promote the interests of justice." *Sierra Club v. Nat'l Marine Fisheries Serv.*, 803 F. Supp. 3d 429, 450 (D. Md. 2025) (quoting *Helsel v. Tishman Realty & Constr. Co., Inc.*, 198 F. Supp. 2d 710, 711 (D. Md. 2002)).

"District courts within this circuit consider four factors when deciding whether to transfer

venue: (1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015). "Questions of transfer are discretionary and based on an 'individualized, case-by-case consideration of convenience and fairness.'" *Ramos-Lopez v. Bondi*, No. 1:26-cv-01175-PX, 2026 WL 1745700, at *5 (D. Md. June 17, 2026) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Coastal Labs, Inc. v. Jolly*, 502 F. Supp. 3d 1003, 1021 (D. Md. 2020) (quoting *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir. 1984)); *see also Equitable Bank v. Finn*, 671 F. Supp. 374, 380 (D. Md. 1987) ("The plaintiff's choice of forum is favored, and the defendant carries a heavy burden of proof to shift the forum.").

## ARGUMENT

This is not the rare case in which Plaintiffs' choice of forum should be disturbed. Plaintiff States brought this case in a Plaintiff's home forum, an uncontested proper venue under 28 U.S.C. § 1391(e), see ECF No. 46-1, 11, and Defendants have not carried their burden under § 1404(a) to establish that another forum is more convenient or better suited to resolve this case. In fact, Defendants concede that neither they, nor any witnesses, are inconvenienced by litigating in Maryland, ECF No. 46-1, 13 (arguing "[w]itness and party convenience are [] neutral among the three districts."), and Defendants have fallen short of demonstrating that interest of justice factors are "strongly in favor of the defendant," *Coastal Labs, Inc.*, 502 F. Supp. 3d at 1021 (quoting *Collins*, 748 F.2d at 921). Defendants' motion should be denied.[2]

---

[2] There is no dispute that Plaintiffs *could* have filed suit in another district. But that is of no moment, as Courts in this District regularly deny motions to transfer when Plaintiffs could have

### I. Plaintiffs' Choice of Forum Weighs Heavily Against Transfer.

Plaintiffs filed this action in the District of Maryland, and that choice is entitled to "substantial weight in determining whether transfer is appropriate." *Trustees*, 791 F.3d at 444; *cf. Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. of Texas*, 571 U.S. 49, 63 (2013) ("[P]laintiffs are ordinarily allowed to select whatever forum they consider most advantageous (consistent with jurisdictional and venue limitations)."). That is particularly true where, as here, the chosen forum is a plaintiff's home, and the case otherwise has significant ties to the forum. *Sierra Club*, 803 F. Supp. 3d at 451.

Plaintiffs' choice of the District of Maryland meets this standard. This litigation was filed in Plaintiff State of Maryland's home district, where the State of Maryland has a longstanding connection to Title X and the issues raised in this litigation, as a grantee of more than fifty years with a significant statewide network of subrecipients and tens of thousands of residents who depend on these services. Compl. ¶¶ 78–83. The challenged requirements directly affect Maryland's administration and funding of its family planning provider network, making this District well-suited to resolve Plaintiffs' claims. Despite Defendants' assertion that "no complaint in the three cases [challenging the NOFO] pleads a fact that bears on it," Defs.' Mem in Supp. of Mot. to Transfer at 9, ECF No. 46-1 (hereinafter "Mot."), determining how the NOFO affects this longstanding network may be relevant for establishing unique state reliance interests and jurisdictional threshold matters. Compl. ¶¶ 9, 78–83, 207–209; *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020); *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 704–05 (4th Cir. 2019).

---

sued elsewhere. *See, e.g., Sierra Club v. Nat'l Marine Fisheries Serv.*, No. 25-cv-1627, 2025 WL 3706503, at **4–5 (D. Md. Dec. 22, 2025).

Defendants' arguments that Plaintiffs' choice of forum is entitled to no weight are inconsistent with governing law in this Circuit and otherwise incorrect. Defendants first contend that Maryland has no meaningful connection to this litigation because no applicant has yet applied under the 2027 NOFO and therefore no State has yet experienced an award decision under it. Mot. at 11. But the 2027 NOFO coerces all Plaintiff States *before applying* to review and potentially transform established Title X programs to align with the new, unlawful provisions in order to file a competitive application. ECF No. 1 ¶¶ 183–85, 187. Maryland does not have to wait until Defendants review or deny an application before it faces concrete, specific harms flowing from the Agency Priorities. *Cf. Freedom Network v. Trump*, 830 F. Supp. 3d 681, 698–99 (N.D. Ill. 2026) (rejecting similar argument that an applicant situated like Maryland "lacks standing to challenge [a NOFO's funding conditions] because they do not apply, and therefore cannot harm [the applicant plaintiff], until it receives and accepts a grant offer," because the "government's argument . . . omits a key harm that [the applicant] faces now" in having to resolve "a dilemma now: (a) apply with the project ideas that it wants to pursue, thus running the risk of being disadvantaged or disqualified by the funding conditions during the review process, or (b) give up on its desired mission and tailor its application in accordance with the funding conditions to preserve its chance at receiving federal funding").

Defendants' argument sounds more like a standing and ripeness challenge. Plaintiffs have standing and assert ripe claims, but those issues do not bear on the transfer analysis under § 1404(a). If the absence of an application and award were enough to defeat Maryland's connection to the dispute, it would likewise defeat the connection to every other forum—including the ones that Defendants say should hear this suit—because no State entity has yet received an award under the NOFO. Maryland alleges that the new Agency Priorities directly implicate its

ability to continue obtaining federal funding for its existing program, and that, if it cannot, the consequences to that program will be substantial. That establishes the connection sufficient for venue to lie here.

Defendants' reliance on *In re Volkswagen of America, Inc.*, 545 F.3d 304 (5th Cir. 2008), is misplaced. There, the Fifth Circuit rejected a district court's conclusion that residents of the chosen forum had a local interest merely because a nationally distributed product was available there. *Id.* at 318. The Court explained that such reasoning "could apply virtually to any judicial district or division in the United States" and therefore failed to identify a particular local interest in the controversy. *Id.* But the Fifth Circuit did not hold that a federal policy or federal agency action can never involve particular local interests relevant for venue purposes. This case presents the sort of concrete connection that *Volkswagen* found lacking. Maryland's interest does not arise merely because the challenged NOFO applies within Maryland. Instead, the State of Maryland is itself a Plaintiff and the challenged Agency Priorities govern family planning programming that the State administers and supports and on which Maryland residents depend for effective treatment and preventative healthcare. The State of Maryland also would shoulder the burden of increased demand for its safety-net programs without access to this care. Compl. ¶¶ 6, 80.

Defendants next minimize Plaintiffs' forum choice because Maryland is the home forum of one of the twenty-three Plaintiff States, each of which reside in a different judicial district. But § 1404(a) does not provide that the presence of multiple plaintiffs makes their collective forum selection irrelevant. Maryland is a proper forum in which Plaintiff State Maryland resides and operates affected Title X programming; the other States joined Maryland in bringing a single collective action rather than filing separate suits in their respective home States. The States' decision to proceed together in the District of Maryland reflects an effort to litigate their common

challenge and interests efficiently. Doing so does not diminish Maryland's connection to this forum or the Plaintiff States' interest in choosing where to litigate.

Defendants also get it wrong when they claim that transfer would "displace no one." Mot. at 11. If this Court transfers this action, it will displace the litigation from the forum affirmatively selected by the State of Maryland and the other litigants who joined it, an outcome that should happen "rarely" under the law of this Circuit. *Coastal Labs, Inc.*, 502 F. Supp. 3d at 1021 (quoting *Collins*, 748 F.2d at 921). The possibility that this action could have been brought in the Middle District of Pennsylvania or the District of Columbia does not establish that Plaintiffs' choice should be disrupted, otherwise the § 1404(a) inquiry would not contain case-by-case considerations and would focus solely on where the action could have been brought. Defendants characterize this action as an exercise in impermissible forum shopping, seeking to further diminish Plaintiffs' prerogative to decide where to litigate. Mot. at 12. They protest that permitting this action to proceed in this District could lead plaintiff coalitions to "divid[e] and conquer[], filing in dozens of judicial districts." Mot. at 2, *see also* Mot. at 7–9. But that argument entirely overlooks what Plaintiffs actually did here. In this action, twenty-three States joined together in one action, in one forum, rather than dividing their claims among multiple districts or filing separate actions seeking multiple opportunities for relief. The collective complaint filing is the opposite of the cascading consequences that Defendants invoke. That Plaintiffs have chosen to litigate with like Plaintiffs—other sovereign jurisdictions with similar governmental interests—in a single forum undermines Defendants' arguments that Plaintiffs' choice is anything other a good faith effort to litigate these issues efficiently. Depriving Plaintiff States of their choice of forum *because* they filed together would punish Plaintiffs for trying to conserve judicial resources and encourage them to file separately in the future. This reasoning would also effectively allow defendants to override

plaintiffs' choice of forum in every multistate case where similar litigation by private parties happens to be pending in another state.

Nor did the Plaintiff States "wait out[]" the other cases, filed by organizational plaintiffs who are litigating independently of Plaintiff States, before coming to court. Mot. at 12. The chronology does not support Defendants' characterization. Defendants posted the original FY2027 NOFO on April 3, 2026. Eleven weeks later, on June 18, NFPHRA and a Pennsylvania Title X grantee filed suit challenging that original NOFO. *See NFPRHA*, ECF 1. Thereafter, on July 9, 2026, Defendants withdrew and replaced the April 3, 2026, NOFO with the now-operative version. Then, quickly and over the course of about six weeks, three different complaints challenged various aspects of the new NOFO: the plaintiffs in *NFPRHA* filed an amended complaint, the plaintiff in *PPFA* filed its complaint on July 28, and Plaintiff States filed their suit on August 27. On the date the States filed the complaint in this action, the Title X application deadline was still appropriately 19 weeks away, the awards were due in roughly 31 weeks, no litigation had completed briefing, and no court had reached any merits decision. The Plaintiffs States' timing reflects coordination of twenty-three governmental plaintiffs in response to a federal policy that had already once been substantially revised, not an effort to await the outcome of another case. That three different groups of competitors in the same nationwide grant contest were all sufficiently alarmed by a new NOFO that radically alters the contest's prior lawful terms as to file suits in short succession to prevent it from both disadvantaging them and advantaging competitors is merely a logical outcome of so altering a zero-sum contest—not a justification for consolidating their different suits. *Cf. Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 834 (2024) (Kavanaugh, J., concurring) (discussing why APA litigants such as competitors facing "increased competition for federal grants" logically seek universal relief).

Accordingly, Defendants have not rebutted the deference owed to Plaintiffs' choice of venue, and that selection should carry the day.

**II. Defendants Have Not Shown That the Convenience Factors Favor Transfer.**

The factors of witness and party convenience both favor keeping this action in the District of Maryland. Defendants concede that there will likely be "no witnesses and no discovery" and conclude the factor is "neutral" as to transfer. Mot. at 13. But, on the contrary, Defendants fail to meet their burden under § 1404(a).

"A defendant moving for transfer must show both that the original forum is inconvenient for it and that the plaintiff would not be substantially inconvenienced by a transfer." *Int'l Painters & Allied Trade Indus. Pension Fund v. Marrero Glass & Metal Inc.*, No. ELH-18-452, 2019 WL 423409, at *5 (D. Md. Feb. 1, 2019) (quoting 15 Charles Alan Wright et al., *Federal Practice and Procedure* § 3849 (4th ed.)). Similarly, "the party convenience factor includes assessment of the ease of access to sources of proof, the cost of obtaining the attendance of witnesses, and the availability of compulsory process." *Sierra Club*, No. 25-cv-1627, 2025 WL 3706503, at *8 n.3 (D. Md. 2025) (citing *Menk*, 713 F.3d at 136). It is a movant's burden to show that the parties would be affirmatively inconvenienced. "To say that an APA matter does not give rise to traditional convenience concerns is quite different from showing that the original forum is inconvenient." *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. 20-cv-03060, 2021 WL 4704842 (D. Md. May 24, 2021) (denying motion to transfer).

Defendants give up the ghost when they admit that all three challenges to the NOFO will proceed on the same administrative record that transmits electronically, and that they expect "no witnesses and no discovery." ECF No. 46-1 at 13. And, even if this case ends up in some discovery, this District adjoins the District of Columbia, where Defendants reside, as Defendants

have pointed out. Mot. at 11. By failing to articulate any difficulty arising from litigating the matter in the District of Maryland, Defendants fail to carry their burden. This factor is not "neutral"—it weighs against transfer.

While Defendants need not establish that every factor favors transfer, they must show, on balance, that the relevant considerations warrant displacing Plaintiffs' chosen forum. They have not done so. Where the case can be litigated in the District of Maryland without imposing material inconvenience on parties or on witnesses, the convenience factors provide no basis for overriding Plaintiffs' substantial forum interest. *See Sierra Club,* No. 25-cv-1627, 2025 WL 3706503, at *8 ("Whatever weight these factors may have in this case, they do not weigh in favor of transfer.").

**III. The Interests of Justice Favor Keeping this Action in the District of Maryland.**

The interest-of-justice factor is "amorphous and somewhat subjective, and allows a court to consider many things." *Gennari Consulting, Inc. v. Wellington Corp., LLC*, No. 19-cv-1851, 2019 WL 6829102, at *9 (D. Md. Dec. 13, 2019) (*citing* Wright et al, *supra*, § 3854). This factor "is intended to encompass all those factors bearing on transfer that are unrelated to convenience of witnesses and parties." *Cross v. Fleet Reserve Ass'n Pension Plan*, 383 F. Supp.2d 852, 857 (D. Md. 2005) (quoting *Bd. of Trustees, Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253 (E.D. Va. 1988)). Here, the range of interests-of-justice considerations favor keeping this action in the District of Maryland.

**A. The States' Distinct Interests Warrant Maintaining Their Own Collective Action.**

Defendants argue that the interests of justice favor transfer because the Plaintiff States' claims overlap with those brought by organizational plaintiffs in other courts and because the States could have intervened in those actions. Mot. at 8–10. But the States are not merely additional plaintiffs seeking to litigate anew. They are sovereign governments asserting their own interests in federal funding conditions that directly affect programs they administer, fund, oversee,

and depend on, and protecting their residents' interests in cost-effective, evidence-based, effective health care. *See* Compl. ¶¶ 186. Unlike other Title X recipients or subrecipients, Plaintiff "States will be forced to cover the long- and short-term cost of the resulting worsened health outcomes for their residents, including higher rates of unintended pregnancy, [sexually-transmitted infections], cancer, and HIV and AIDS." Compl. ¶ 190; *see also* Compl. ¶ 6 ("With federal Title X funds in jeopardy due to the NOFO's radical and abrupt shift, Plaintiff States will be forced to scramble to fill the funding gap from their own coffers to preserve these critical services; many will not be able to continue funding these programs at the same level using state-only dollars. And the result—curtailing services and even shuttering clinics—will deprive many low-income residents of crucial services. Plaintiff States will bear the substantial costs of increased health care needs caused by worsened immediate and long-term health outcomes. Plaintiff States will also shoulder increased demands on their safety-net programs"); ¶ 80 ("[Maryland Family Planning Program] addresses significant public health needs, including the prevention and treatment of sexually transmitted infections. . . . If MDH does not have access to Title X funding, MFPP expects to provide 1,447 fewer Pap smears each year, resulting in an anticipated 25 high-grade cervical pre-cancers going undetected annually."). Without legal support, Defendants argue that the States' interests in the enforceability of their own laws "do[es] not matter." *See* ECF No. 46-1 at 9 ("[S]overeign Plaintiffs may hold interests that private plaintiffs do not" but, here, "those interests do not matter."). Of course, state sovereign interests distinguish this case from the other two cases, and this Court should not find that the interests of justice allow this case to be transferred to join either *PPFA* or *NFPRHA*.

That Plaintiff States' legal claims overlap with those asserted in one other action does not make Plaintiffs' institutional interests identical or require them to intervene in litigation brought

by different plaintiffs. Intervention is an available procedural mechanism, but the States are also entitled to file their own action, unlinked to another pending matter, in an appropriate forum. The States exercised that choice collectively. Nor did the States multiply proceedings across the country: twenty-three States joined together in a single action in a single forum. Justice favors those States—representing nearly half the States in the union—being permitted to litigate their claims in their own action.

**B. The Percolation of Legal Issues Favors Retaining This Action in the District of Maryland.**

The interests of justice also favor declining to displace this action because the related cases present an opportunity for the legal issues to percolate among multiple courts before they may ultimately be resolved by a higher court. Percolation allows courts to consider unsettled questions independently and contribute different judicial perspectives that foster appellate review. *Cf. United States v. Mendoza*, 464 U.S. 154 (1984) (recognizing, in the context of whether the federal government could be bound by nonmutual offensive collateral estoppel, that such a rule "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue," "depriv[ing] th[e] [Supreme] Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari").

Relying on this principle, in *State of California v. Trump*, the District of Massachusetts recently declined to transfer two cases challenging Executive Order 14,399, even though three related challenges to the same Executive Order were already pending in the District of Columbia. No. 26-cv-1159-IT, slip op. (D. Mass.) ECF No. 126. In denying the transfer motion, the District of Massachusetts quoted from Justice Kavanaugh's concurrence in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which observed that, following the Court's decision restricting the issuance of

nationwide injunctions, in "nationally significant matters, . . . one would expect a flood of decisions from lower courts, resulting eventually in the case, 'if sufficiently important,' being decided by the Supreme Court." *State of California*, No. 26-cv-11581-IT, slip op. at 5 (quoting *CASA* 606 U.S. at 873–74). The District of Massachusetts reasoned that "'[d]espite th[e] likely multitude of cases in the lower courts, not a single Justice in *CASA* suggested that the way to avoid this result would be to impose a first-to-file rule where suits are brought by different plaintiffs." *Id.*

That consideration has particular force here. Although the related cases are at different procedural stages, no court has reached a merits decision, and Defendants changed the operative NOFO itself shortly after the earliest action was filed. Indeed, the Middle District of Pennsylvania recently dismissed one of the parallel actions, holding that plaintiffs' theory of injury—a "competitive disadvantage [Plaintiffs] face now because of the unlawful aspects of the NOFO," *NFPRHA*, ECF No. 79 at 5–6 (citing ECF No. 69 at 2–3)—was not ripe. This case, however, raises several distinct theories of injury that the Middle District of Pennsylvania did not evaluate in *NFPRHA*. *See* Compl. ¶¶ 178–92. The *NFPRHA* decision illustrates that related challenges involving different plaintiffs may proceed along different procedural paths and need not culminate in a common merits determination. Here, the unique nature of the plaintiffs as sovereign states administering public health systems may further inform questions surrounding jurisdiction, including standing. Allowing these cases to proceed in the courts where they were properly brought permits the legal issues to develop without prematurely concentrating them in a single forum.

**C. The Nature of this Case Minimizes Any Duplication from Parallel Litigation.**

The interests of justice also do not warrant transfer because this case lacks the characteristics that typically would make parallel litigation inefficient. As Defendants themselves

acknowledge, there are no anticipated witnesses or discovery, and the administrative record can be produced to Plaintiff States immediately because it is the same record already compiled and produced in other cases.

Defendants' reliance on *Continental Grain Co. v. Barge FBL-585*, 364 U.S. 19 (1960), is misplaced. The Supreme Court there emphasized the waste that would result from parallel proceedings concerning the same occurrences where the cases involved the same parties and witnesses, and where the related case had already been tried. *Id.* at 26. Here, by contrast, neither related action has produced a merits decision, Defendants have not suggested that this case involved anticipated discovery or witnesses, and there certainly has been no trial. Some overlap in legal claims does not create the kind of duplicative factual proceedings that drove the Court's analysis in *Continental Grain*. Because this case is likely to be resolved on the administrative record, maintaining separate proceedings does not create the kind of duplicative factual findings that might otherwise warrant transfer. *Cf. Virginia Agr. Growers Ass'n, Inc. v. Donovan*, 774 F.2d 89, 92 (4th Cir. 1985) (in cases challenging agency action, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court" (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973))).

Additionally, the dismissal of the *NFPRHA* action diminishes any potential efficiency that could be gained from transferring this case to the Middle District of Pennsylvania. With no parallel action remaining pending there, transfer would not facilitate consolidation or coordinated proceedings. And Plaintiffs here allege distinct theories of injury—including, among others, increased administrative and downstream health care costs and harms to broader state public health infrastructure arising from the NOFO's conflict with certain state laws—that extend beyond the competitive disadvantage theory addressed in *NFPRHA*. *See* Compl. ¶¶ 180–82, 185–88.

The question is not whether some judicial economy could be achieved by transfer, but whether any potential duplication overcomes Plaintiff States' interests in maintaining their chosen action in the District of Maryland. On this record, it does not.

**D. Any First-to-File Principle Does Not Require the States to Litigate Elsewhere.**

Defendants' arguments also effectively ask this Court to treat the earlier-filed actions as controlling the venue of any subsequent actions challenging the 2027 Title X NOFO. Section 1404(a), however, contains no categorical first-to-file rule, and this Circuit has been clear that this rule is not to be applied mechanically. Rather, courts in this District apply the first-to-file rule when "the two competing actions are substantively the same or sufficiently similar to come within the ambit of the principle." *Glodek v. Richardson*, No. GJH-19-2115, 2020 WL 263476, at *3 (D. Md. Jan. 16, 2020) (internal quotations and citations omitted); *Kendus v. USPack Servs. LLC*, No. SAG-19-00496, 2020 WL 1158570, at *2 (D. Md. Mar. 10, 2020). Three factors guide that analysis: (1) "the chronology of the filings"; (2) "the similarity of the parties involved"; and (3) "the similarity of the issues at stake." *Kendus*, 2020 WL 1158570, at *2.

Here, as discussed above, differences among the plaintiffs warrant declining to apply the first-to-file principle. The Fourth Circuit "ha[s] strictly construed the requirement of parallel . . . suits, requiring that the parties involved be almost identical." *Chase Brexton Health Servs. v. Maryland*, 411 F.3d 457, 464 (4th Cir. 2005). Unlike the other actions, this case is brought by sovereign States asserting their own governmental interests in Title X programs and in administering effective public health programs. Those distinct interests, and the States' corresponding claims concerning the effects of the 2027 NOFO on public health systems, weigh against transferring this action. *See State of California*, No. 26-cv-11581-IT, slip op. at 4

("Defendants offer no other support, and the court has found none, for transferring cases under the first-to-file rule where the plaintiffs differ.").

Relatedly, each case raises unique questions of fact and law and represent separate litigations. The instant case, for example, is the only case that can raise the issue of whether applicants can craft a competitive application and still comply with state laws such as those protecting access to gender-affirming care and contraception, or prohibiting discrimination in health care services on the basis of gender identity. Compl. ¶¶ 188–89.

Defendants make another misstep when they assert that each transferee court "is already invested in the subject." Mot. at 6. Despite Defendants' assertion, the court in *PPFA* has not "already invested in the subject" of the case by virtue of issuing a decision in *Hennepin County v. U.S. Department of Health and Human Servs.*, No. 26-cv-2460 (CRC), 2026 WL 2426300 (D.D.C. Aug. 19, 2026)—a review of a distinct NOFO for the federal Teen Pregnancy Prevention program. ECF No. 46-1 at 6. And while, on September 17, 2026, the Middle District of Pennsylvania dismissed the *NFPRHA* action without prejudice and on standing and ripeness grounds, that dismissal confirms that the Middle District has not invested substantial resources in resolving the merits of the common issues.

**E. The Possibility of Inconsistent Rulings Does Not Overcome Plaintiffs' Forum Choice.**

Defendants also invoke the possibility of inconsistent decisions. Mot. at 6. Transferring this action to the Middle District of Pennsylvania or the District of Columbia would not eliminate parallel litigation altogether. One other action would remain pending in its court, and there is no guarantee that transfer would produce a single definitive ruling, meaning there is no plain benefit from having, for example, two cases litigated in the District of Columbia and one (now dismissed) action in the Middle District of Pennsylvania as compared to having the cases litigated in the

forums where the plaintiffs filed. Moreover, because the Middle District of Pennsylvania dismissed the *NFPRHA* action without reaching any decision on the merits, there is no merits ruling from that action which could conflict with any decision of this Court.

More importantly, the potential for different rulings must be weighed against the concrete interests favoring this action proceeding in the District of Maryland. Here, the States have brought a single, collective action asserting their interests as Title X grantees and sovereigns responsible for public health. The generalized possibility of inconsistent ruling does not outweigh the States' legitimate choice of forum or justify transferring their action to a court that has no greater practical ability to resolve any common legal questions. *See* 15 Wright et al., *supra*, § 3854 (in federal courts deciding federal questions of law, "all federal judges are considered adept at interpreting the various aspects of federal law").

**F. Transfer Would Add Delay Without Advancing Any Countervailing Principle.**

Finally, transfer would risk delaying resolution of this challenge concerning an upcoming Title X funding cycle with looming deadlines. The applications are due January 11, 2027, and awards are expected April 1, 2027; those Plaintiffs that intend to apply would have to begin work on their applications imminently in order to be competitive. The filing of this case was timed to provide the parties adequate time to brief the relevant issues and the Court time to resolve them before applications must be filed and awards determined. However, if the action is transferred, there is likely to be delay in briefing and resolving this litigation, which is likely to interfere with Plaintiffs' ability to obtain timely relief.

Defendants assert that they can brief the merits expeditiously if the case is transferred. Mot. at 7. But they offer no reason why briefing could not proceed just as expeditiously in this District. If the issues are sufficiently straightforward to permit expedited briefing elsewhere, Defendants

presumably can brief the issues just as efficiently here. This is particularly true because Defendants have already prepared and produced the relevant administrative record, and no discovery other proceedings stand in the way of merits resolution.

## IV. The Court Should Permit the Case to Proceed While the Transfer Motion Is Under Advisement.

Defendants ask the Court to decide the transfer motion "first," Mot. at 13, but there is no reason to delay merits briefing while the Court takes the motion under advisement. Defendants conceded that they can produce the administrative record because it has already been compiled. Mot. at 13. Thus, transfer would not facilitate production of the record or otherwise eliminate a procedural obstacle to moving this case forward. Nor is there any reason to limit Defendants' offer to brief the merits expeditiously, Mot. at 7, to a potential transferee court. The Court can take the transfer motion under advisement while the parties proceed with briefing, avoiding delay without prejudicing Defendants.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to transfer.

Dated: September 18, 2026

Respectfully submitted,

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson (D. Md. Bar No. 31472)
James C. Luh (D. Md. Bar No. 31776)
Adam Kirschner (D. Md. Bar No. 31767)
*Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6584
vwilliamson@oag.maryland.gov

*Attorneys for State of Maryland*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Galen Sherwin*
Galen Sherwin†
*Special Counsel for Reproductive Justice*
Rabia Muqaddam†
*Chief Counsel for Federal Initiatives*
Andres Ivan Navedo†
Molly Brachfeld†
Victoria Ochoa†
*Assistant Attorneys General*
28 Liberty St.
New York, NY 10005
(929) 736-3392
galen.sherwin@ag.ny.gov
rabia.muqaddam@ag.ny.gov
ivan.navedo@ag.ny.gov
molly.brachfeld@ag.ny.gov
victoria.ochoa@ag.ny.gov

*Attorneys for the State of New York*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Allyson Slater*
Allyson Slater†
*Director, Reproductive Justice Unit*
Nita K. Klunder†
Morgan Carmen†
Abigail Gabrieli*
*Assistant Attorneys General*
One Ashburton Pl.
Boston, MA 02108
(617) 963-2255
allyson.slater@mass.gov
morgan.carmen@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Ketakee Kane*
Neli N. Palma‡
*Senior Assistant Attorney General*
Ketakee Kane‡
David Houska‡
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612
(510) 879-1519
Ketakee.Kane@doj.ca.gov

*Attorneys for the People of the State of California*

**PHIL WEISER**
Attorney General of Colorado

By: *<u>/s/ Gabe Podesta</u>*
Gabe Podesta†
Ryan Lorch†
*Senior Assistant Attorneys General*
1300 Broadway, 10th Fl.
Denver, CO 80203
(720) 508-6000
gabe.podesta@coag.gov
ryan.lorch@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: *<u>/s/ Alma Nunley</u>*
Alma Nunley†
*Assistant Solicitor General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5318
Alma.Nunley@ct.gov

*Attorney for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: *<u>/s/ Vanessa L. Kassab</u>*
Ian R. Liston†
*Director of Impact Litigation*
Vanessa L. Kassab†
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

By: *<u>/s/ Kalikoʻonālani D. Fernandes</u>*
Kalikoʻonālani D. Fernandes†
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorney for the State of Hawaiʻi*

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Caitlyn G. McEllis*
Caitlyn G. McEllis†
*Senior Policy Counsel*
Holly F.B. Berlin†
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St. Chicago, IL 60603
(312)814-3000
Caitlyn.McEllis@ilag.gov
Holly.berlin@ilag.gov

*Attorneys for the State of Illinois*

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
Governor of the Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo†
*General Counsel*
Sam Flynn*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
Attorney General of Maine
By: */s/ Katherine W. Thompson*
Katherine W. Thompson*†
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
kate.thompson@maine.gov

*Attorneys for State of Maine*

**DANA NESSEL**
Attorney General of Michigan
By: */s/ Neil Giovanatti*
Neil Giovanatti†
*Assistant Attorney General*
P.O. Box 30212
Lansing, MI 48909
(517) 241-1050
GiovanattiN@michigan.gov

*Attorney for the State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/Katherine Bies*
Katherine Bies†
*Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Attorney for the State of Minnesota*

**AARON D. FORD**
Attorney General of Nevada

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland†
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorney for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Meghan K. Musso*
Meghan K. Musso†
*Deputy Attorney General*
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
Meghan.Musso@law.njoag.gov

*Attorney for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Aletheia V.P. Allen*
Aletheia V.P. Allen†
*Solicitor General*
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
aallen@nmdoj.gov

Seth C. McMillian†
*Deputy Solicitor General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-546-9919
smcmillan@nmdoj.gov

*Attorneys for State of New Mexico*

**DAN RAYFIELD**
Attorney General State of Oregon

By: */s/ Leanne Hartmann*
Leanne Hartmann†
*Senior Assistant Attorney General*
Galen Knowles†
*Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Leanne.Hartmann@doj.oregon.gov
Galen.Knowles@doj.oregon.gov

*Attorneys for the State of Oregon*

**JOSH SHAPIRO**
Governor for the Commonwealth of Pennsylvania

By: */s/ Jacob B. Boyer*
Jennifer C. Selber*
Jacob B. Boyer*
*Deputy General Counsel*
Governor's Office of General Counsel
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Attorneys for Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Kathryn T. Gradowski*
Kathryn T. Gradowski†
*Special Assistant Attorney General*
150 South Main St.
Providence, RI 02903
(401) 274-4400
kgradowski@riag.ri.gov

*Attorney for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: /s/ Ryan Patrick Kane
Ryan Patrick Kane†
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov

*Attorney for the State of Vermont*

**JAY JONES**
Attorney General for the Commonwealth of Virginia

By: */s/ Megan C. Keenan*
Megan C. Keenan (D. Md. Bar No. 32426)
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Lynn K. Lodahl*
Lynn K. Lodahl†
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, WI 53707
(608) 264-6219
lynn.lodahl@wisdoj.gov

*Attorney for the State of Wisconsin*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: /s/ *Lauryn K. Fraas*
Lauryn K. Fraas†
*Assistant Attorney General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Tel (206) 464-7744
lauryn.fraas@atg.wa.gov

*Attorney for the State of Washington*

* *pro hac vice application forthcoming*
‡ *pro hac vice application pending*
† *appearing pro hac vice*