**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

STATE OF NEW YORK, *et al.*,

Plaintiffs,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

Defendants.

Civil Action No. 1:26-cv-03405-DLB

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

A. This is how grants work. ..... 2

B. The 2027 NOFO. ..... 3

C. Three lawsuits followed. ..... 4

D. What this Complaint pleads. ..... 5

E. The first ruling. ..... 5

LEGAL STANDARD ..... 5

ARGUMENT ..... 6

I. No Plaintiff Has Suffered an Article III Injury, Because the NOFO Evaluates Rather Than Allocates. ..... 6

A. The allocation-evaluation line decides competitive injury. ..... 6

B. This NOFO evaluates proposals and governs future awards. ..... 8

C. The asserted disadvantage is a prediction about how the priorities will be applied. ..... 9

D. The claimed redesign costs rest on the same prediction. ..... 11

E. The derivative theories inherit the contingency, and sovereign status changes the plaintiff, not the calendar. ..... 12

F. A remedy needs a score. ..... 12

II. The Result Is the Same Under the Prudential Inquiry. ..... 13

III. Each Count Depends on the Same Unripe Application of the NOFO. ..... 14

IV. The Spending Clause Count Fails to State a Claim. ..... 14

V. Sequencing. ..... 16

CONCLUSION ..... 16

# TABLE OF AUTHORITIES

Cases Page(s)

*Abbott Laboratories v. Gardner*,
387 U.S. 136 (1967) .......... 9
*Adams v. Bain*,
697 F.2d 1213 (4th Cir. 1982) .......... 5
*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
548 U.S. 291 (2006) .......... 15
*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6
*Bennett v. Ky. Dep't of Educ.*
470 U.S. 656 (1985) .......... 16
*Charter Fed. Sav. Bank v. Office of Thrift Supervision*,
976 F.2d 203 (4th Cir. 1992) .......... 10, 13
*City of Los Angeles v. Barr*,
929 F.3d 1163 (9th Cir. 2019) .......... 15
*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 6, 10, 11
*Doe v. Va. Dep't of State Police*,
713 F.3d 745 (4th Cir. 2013) .......... 6
*Franks v. Ross*,
313 F.3d 184 (4th Cir. 2002) .......... 10
*Freedom Network USA v. Trump*,
830 F. Supp. 3d 681 (N.D. Ill. 2026) .......... 12
*Goines v. Valley Cmty. Servs. Bd.*,
822 F.3d 159 (4th Cir. 2016) .......... 6, 8, 11
*Kerns v. United States*,
585 F.3d 187 (4th Cir. 2009) .......... 5
*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 5, 14
*Massachusetts v. EPA*
549 U.S. 497 (2007) .......... 12
*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) .......... 6
*Miller v. Brown*,
462 F.3d 312 (4th Cir. 2006) .......... 10, 14
*Nat'l Park Hospitality Ass'n v. Department of the Interior,*
538 U.S. 803 (2003) .......... 9, 11, 14
*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006) .......... 14
*NEA v. Finley*,
524 U.S. 569 (1998) .......... 15

*Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*,
508 U.S. 656 (1993) .......... 1, 7, 13
*Ohio Forestry Ass'n v. Sierra Club*
523 U.S. 726 (1998) .......... 11
*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 14
*Planned Parenthood of Greater Wash. & N. Idaho v. HHS*,
946 F.3d 1100 (9th Cir. 2020) .......... 8
*Planned Parenthood of Wis., Inc. v. Azar*,
316 F. Supp. 3d 291 (D.D.C. 2018) .......... 3, 4, 13
*Reno v. Catholic Social Services*,
509 U.S. 43 (1993) .......... 1, 7
*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
549 U.S. 422 (2007) .......... 16
*South Dakota v. Dole*,
483 U.S. 203 (1987) .......... 15
*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .......... 16
*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 14
*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 6, 11
*Texas v. United States*,
523 U.S. 296 (1998) .......... 6
*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967) .......... 9
*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 5, 14
*Trump v. California*,
2026 WL 2473573 (U.S. Aug. 24, 2026) .......... 10
*Wild Va. v. Council on Env't Quality*,
56 F.4th 281 (4th Cir. 2022) .......... 14

Statutes

42 U.S.C. § 300(b) .......... 15
42 U.S.C. §§ 300(a)–(b), 300a-4(a)–(b) .......... 2

Regulations

2 C.F.R. §§ 200.204, 200.205 .......... 2
42 C.F.R. § 59.7 .......... 2

## INTRODUCTION

There's a difference between an instrument that allocates and one that evaluates. That difference decides this case, and the Supreme Court drew it in two decisions issued days apart.

In *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, a city ordinance set aside ten percent of its contracts for one group of contractors. A contractor outside that group, able and ready to bid, could challenge the ordinance without submitting a bid, because the ordinance itself denied equal treatment "resulting from the imposition of the barrier." 508 U.S. 656, 666 (1993). The line was in the document, and nothing had to happen for a court to see who was on each side of it.

*Reno v. Catholic Social Services*, decided the same month, came out differently. The regulations would have made members of the plaintiff classes ineligible for a benefit, but promulgation alone did not make their claims ripe. They "impose[d] no penalties" and instead "limit[ed] access to a benefit" that was "not automatically bestowed on eligible" applicants. 509 U.S. 43, 58–59 (1993) ("*CSS*"). The applicant had to take the available affirmative steps before the agency could block the way by applying the regulation. *Id.* at 59. And the Court explained why *Northeastern Florida* differed: its injury was "the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Id.* at 58 n.19.

That footnote supplies the distinction. In *Northeastern Florida*, the document completed the comparison: contracts were closed to one group whatever it proposed. This rubric leaves the comparison to proposed strategies and their evaluation. Neither exists yet.

The 2027 Notice of Funding Opportunity (Compl. Ex. A, "NOFO") falls on the *CSS* side of the line. It assigns 35 of 100 merit-review points to priority alignment, applies that criterion to every applicant, and confines alignment to the program's lawful scope. NOFO at 7, 10, 39–41.

Section B also requires alignment of program design and activities to the extent permitted by law, and it permits corrective action or termination for noncompliance. *Id.* at 7. Those terms govern the newly funded project, not awards a State already holds.

The Middle District of Pennsylvania just drew this line in a challenge to this NOFO. *Nat'l Family Planning & Reprod. Health Ass'n v. Kennedy*, No. 1:26-cv-01684, ECF No. 73, slip op. at 7–10 (M.D. Pa. Sept. 17, 2026) ("*NFPRHA*") (attached as Ex. 1). Judge Wilson found no part of the competition closed to the plaintiffs and held that uncertainty over "how to best apply for a federal grant" was not enough. *Id.* at 7–8.

Plaintiffs say the NOFO puts them behind competitors, forces program redesign, and threatens services. Compl. ¶¶ 180–91. But the text neither ranks their existing programs nor commands their replacement. It calls for lawful Title X proposals and leaves their comparative merit to evaluation. Treating that evaluation as already adverse supplies the missing premise.

If the Department applies a priority unlawfully and concretely affects a State or applicant, a later challenge can address what it did and what relief would cure the harm. That case arrives with facts.

The Court should dismiss without prejudice. If it reaches the alternative merits ground, Count IV also fails.

## BACKGROUND

### A. This is how grants work.

There's nothing new in the basic structure. Title X is a competitive grant program. The Department announces that money is available. Organizations apply. Reviewers read the applications and score them against published criteria. The Department makes awards. *See* 42 U.S.C. §§ 300(a)–(b), 300a-4(a)–(b); 42 C.F.R. § 59.7; 2 C.F.R. §§ 200.204, 200.205. Along the

way, it tells applicants what it cares about. Applicants read the announcement, write to it, and compete. For decades, across Administrations, that was the whole of it.[1]

In 2018, applicants challenged a scoring system that tied 35 of 100 points to announced priorities. The district court rejected the challenge; the announcement, it explained, "largely makes explicit what has been implicit for years." *Planned Parenthood of Wis., Inc. v. Azar*, 316 F. Supp. 3d 291, 307 (D.D.C. 2018) (cleaned up), *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019).

**B. The 2027 NOFO.**

The Department published the NOFO for the 2027–2032 cycle on April 3, 2026, and revised it on July 9. NOFO at 1. The machinery has three stages: threshold screening, merit review, and the program office's funding decision. *Id.* at 37–43. Priority alignment accounts for 35 of 100 merit-review points and also bears on the program office's selection decision. *Id.* at 39–41. Section B then requires recipients to align program design and activities, "where consistent with program authority and the scope of the award," and permits corrective action or termination for noncompliance. *Id.* at 7.

Applications are due January 11, 2027. Before then, OPA will hold a technical-assistance webinar on November 9. The NOFO directs applicants to subscribe for amendments and question-and-answer documents, and says it will "typically post an FAQ" after the webinar. NOFO at 1, 35. The anticipated project start date is April 1, 2027. *Id.* at 1. No application has been submitted or evaluated, and no award has been made or denied.

---

[1] Pairing a statutory-compliance score with a priority-advancement score under one criterion is hardly new. *See* Off. of Population Affairs, HHS, Notice of Funding Opportunity: Title X Family Planning Services Grants, No. PA-FPH-22-001, at 36 (Ex. 2) (FY 2022 announcement pairing 20 points for "[t]he degree to which the project plan adequately provides for" Title X's statute, regulations, and legislative mandates, and 20 points advancing priorities).

**C. Three lawsuits followed.**

On June 18, the national association of Title X grantees and one Pennsylvania grantee sued in Harrisburg. *NFPRHA v. Kennedy*, No. 1:26-cv-01684 (M.D. Pa.), Compl. (June 18, 2026). They initially challenged the April version. When the Department revised the NOFO on July 9, they amended the complaint and kept going. *Id.*, Am. Compl. (July 13, 2026) (ECF No. 35). The association pleaded that its members include "state, county, and local health departments" and "Planned Parenthood affiliates" in forty-five States, that fifty-six of the seventy-seven current Title X grantees belong to it, and that it sued "in a representative capacity on behalf of its member organizations that intend to apply for a FY 2027 Title X grant." *Id.* ¶¶ 13, 15–16.

On July 28, Planned Parenthood Federation of America sued in Washington, D.C. *Planned Parenthood Fed'n of Am., Inc. v. HHS*, No. 1:26-cv-02656 (D.D.C.) ("*PPFA*"). Its affiliates hold Title X grants or subgrants in 46 States and the District of Columbia, including many of the Plaintiff States. *PPFA* Compl. ¶¶ 10–12.

On August 27, Plaintiffs sued here. They challenge the same NOFO and press claims in *PPFA*: the priorities are contrary to law, arbitrary and capricious, adopted without notice and comment, and inconsistent with the Spending Clause. Compl. ¶¶ 193–224.

Three suits by overlapping plaintiffs, in three circuits, within ten weeks, challenge one document—each, according to the States, "timed" for a ruling "before applications must be filed." ECF 93 at 19 (States' Opp'n to Transfer). Each asks a court to assess how the priorities will be applied before any application exists to apply them to.

The States' Complaint turns 35 points into a gate and future award terms into a command to change programs now. It quotes the legal qualifier, then argues that it does not resolve the conflict. Compl. ¶ 134. But the limit remains in the NOFO: alignment must stay within program

authority and the scope of the award, and must be authorized by law under the Title X statute, regulations, and legislative mandates. NOFO at 7, 10, 39–41.

**D. What this Complaint pleads.**

The Complaint pleads conflict and uncertainty together. The priorities conflict with Title X, it alleges, "to the extent" they require the conduct Plaintiffs describe. Compl. ¶¶ 133, 141, 200–03. Yet their "ambiguous language" and "unresolved conflicts" allegedly prevent applicants from "ascertaining what standard the OPA and the Department expects them to follow." *Id.* ¶ 208. Notice and comment was required "[t]o the extent" the priorities "constitute an amendment or reversal" of "any legislative Title X regulations." *Id.* ¶ 216. Count IV alleges inadequate notice and conditions unrelated to Title X. *Id.* ¶¶ 217–24.

**E. The first ruling.**

On September 17, the first court to reach the question dismissed the complaint. The *NFPRHA* plaintiffs, Judge Wilson held, had "not alleged a sufficiently concrete harm to satisfy Article III's case or controversy requirement." Ex. 1, *NFPRHA* slip op. at 1. The dismissal was without prejudice to refiling when the controversy became ripe. *Id.* at 10.

**LEGAL STANDARD**

A facial motion under Rule 12(b)(1) takes well-pleaded facts as true and reads them in Plaintiffs' favor; Plaintiffs are "afforded the same procedural protection as [they] would receive under a Rule 12(b)(6) consideration." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). Plaintiffs must establish standing for each claim and form of relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

Where an exhibit's terms conflict with the complaint's characterization of them, "the exhibit prevails," and attaching an exhibit does not make its disputed factual assertions true.

*Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166–68 (4th Cir. 2016). Here, the NOFO is the challenged instrument, and the dispute concerns what it requires.

Under Rule 12(b)(6), the Court asks whether the complaint states a plausible claim, accepting well-pleaded facts but not legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I. No Plaintiff Has Suffered an Article III Injury, Because the NOFO Evaluates Rather Than Allocates.

Standing and constitutional ripeness overlap when a plaintiff challenges action not yet applied to it. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014). Threatened injury suffices if certainly impending or presenting a substantial risk of occurrence. *Susan B. Anthony List*, 573 U.S. at 158. A claim resting on "contingent future events that may not occur as anticipated, or indeed may not occur at all" does not. *Texas v. United States*, 523 U.S. 296, 300 (1998); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–14 & n.5 (2013).

The Fourth Circuit recognizes constitutional and prudential dimensions of ripeness. *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). This Part addresses the constitutional question; Part II addresses prudential fitness and hardship in the alternative.

#### A. The allocation-evaluation line decides competitive injury.

A competitive injury is a comparison: the plaintiff is worse off than someone else. The question is whether the NOFO makes that comparison or leaves it to the reviewers.

In *Northeastern Florida*, the ordinance reserved ten percent of contracts for a favored group. The injury was "the denial of equal treatment resulting from the imposition of the barrier," not failure to win a contract. 508 U.S. at 666.

*CSS*, in contrast, addressed regulations that would have made members of the plaintiff classes ineligible for legalization—a more severe barrier than the 35-point weighting challenged here. Yet promulgation alone did not make their claims ripe. Each applicant had "to take further affirmative steps, and to satisfy criteria beyond those addressed by the disputed regulations"; the statute "delegate[d] to the INS the task of determining on a case-by-case basis whether each applicant has met all of the Act's conditions." 509 U.S. at 58–59. A class member's claim would therefore "ripen only once he took the affirmative steps that he could take before the INS blocked his path by applying the regulation to him." *Id.* at 59.

The Court reconciled *CSS* with *Northeastern Florida* in a footnote. The contractors' injury was "the inability to compete on an equal footing in the bidding process, not the loss of a contract," while access to the *CSS* benefit was "conditioned on several nontrivial rules other than the two challenged," making denial under the challenged rules "much more difficult to predict firmly." *Id.* at 58 n.19. The question was whether the rule "actually makes a concrete difference" to the applicant. *Id.* at 59 n.20. Here, the NOFO itself does not decide who competes on unequal terms.

Able and ready to bid is half the rule. *Northeastern Florida* also requires "a discriminatory policy" preventing competition "on an equal basis." 508 U.S. at 666. Here, the NOFO scores what applicants propose, not who they are. There is a difference between changing the pool and changing the scoring. A set-aside takes contracts out of the competition. An eligibility bar takes competitors out of it. Both are facts about the present, visible in the document the day it issues, because the document itself decides who competes for what. A criterion that leaves its competitive effect to the evaluation of proposed strategies does not itself establish who competes on unequal terms. This NOFO does not change the pool. Eligibility is what it was: "Any public or private nonprofit entity is eligible to apply." NOFO at 4. No applicant is excluded on the basis of

alignment, and no portion of the funds is set aside. What Plaintiffs challenge is how applications they have not yet written will be scored.

**B. This NOFO evaluates proposals and governs future awards.**

Begin with the NOFO. *Goines*, 822 F.3d at 166–68. Plaintiffs read it as a command to abandon compliant programs or accept a competitive penalty. Its terms distinguish entry, evaluation, and performance.

Threshold review addresses "eligibility, responsiveness, formatting, and submission requirements." NOFO at 6. Merit review assigns 35 points for strategies advancing priorities—and 15 for how the project plan provides for Title X's statute, regulations, and legislative mandates. *Id.* at 40. Program-office selection also considers alignment, where authorized by law and within the program's scope. *Id.* at 41.

Thirty-five points tells the Court how much a criterion counts in scoring. But it does not tell the Court who loses. Reviewers assess "[t]he extent to which the applicant proposes strategies that meaningfully advance" the priorities. NOFO at 40. The rubric assigns no separate weight to a priority, prescribes no automatic deduction, and does not say every priority must be advanced to earn all 35 points. A proposal could excel at one and do little to advance another. The text does not say what score that combination earns. Plaintiffs' prediction supplies a scoring judgment the text leaves open.

*Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1106–08 (9th Cir. 2020), is instructive by contrast. The announcements there required every grantee to incorporate one of two named assessment tools and tied 25 of 100 points to doing so. An applicant unwilling to adopt a named tool was foreclosed from a fixed share of the score the day the announcement issued, whatever else it proposed. Even then, the court sustained the same requirement in the tier whose statute left room for it. *Id.* at 1110–12. Here, no tool, protocol, or

practice is named, and no share of the score turns on adopting one. The criterion is comparative: the extent to which proposed strategies "meaningfully advance" the priorities. NOFO at 40. The disadvantage Plaintiffs describe appears only after reviewers weigh strategies that do not yet exist.

Section B governs funded projects. Recipients must align program design and activities and show ongoing compliance; noncompliance can bring corrective action, additional reporting, or termination. NOFO at 7. Performance is tied to notice of awards, approved applications, and accepted terms. *Id.* at 42–44. These terms govern awards a State seeks, not awards it already holds.

That is the distinction between *Abbott Laboratories v. Gardner* and *Toilet Goods Ass'n v. Gardner*. *Abbott* involved an "immediate and significant change" in conduct backed by serious penalties. 387 U.S. 136, 153 (1967). *Toilet Goods*, decided the same day, withheld review where agency action lay in the future. 387 U.S. 158, 163–64 (1967). Section B governs a future award; the application provisions call for proposals. Neither commands replacement of today's programs.

Finality does not answer that question. *National Park Hospitality Ass'n v. Department of the Interior* required review to "await a concrete dispute about a particular concession contract," although the question was "a purely legal one" and the rule was "final agency action." 538 U.S. 803, 812 (2003). The regulation was final. The dispute was not ripe.

### C. The asserted disadvantage is a prediction about how the priorities will be applied.

Paragraph 191 alleges "here-and-now competitive injury" because Defendants "changed the rules" of the competition. Compl. ¶ 191. Paragraphs 183–84 supply the premise: the States "reasonably fear" that preserving existing programs will put them behind, and think it "highly likely" that awards will go elsewhere. Compl. ¶¶ 183–84. But the NOFO evaluates proposed strategies for advancing priorities within Title X. Its rubric fixes no consequence for any particular shortfall. NOFO at 7, 19, 40–41. The claimed disadvantage depends on how reviewers weigh those strategies together. The Complaint predicts a judgment the NOFO does not make.

The missing proposals matter for the same reason. The States' existing programs do not establish how their proposed strategies will fare under the rubric. New York, for example, is still determining whether it can craft an application. Compl. ¶ 76. The uncertainty concerns the alleged disadvantage itself.

A case is fit for decision where the action giving rise to the controversy is "final and not dependent upon future uncertainties or intervening agency rulings." *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992); *accord Franks v. Ross*, 313 F.3d 184, 188–89 (4th Cir. 2002); *see Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). Here, the evaluation is the intervening ruling, and the Complaint treats it as already made and the Plaintiffs already disqualified.

The Supreme Court recently declined to credit a similar chain of hypothetical implementation decisions involving a directive limited by applicable law. "Any prediction how the Executive Branch might eventually implement" such a directive is "no more than conjecture," and "Article III prohibits federal courts from stacking hypothetical on hypothetical to speculate that harm will eventually materialize." *Trump v. California*, 2026 WL 2473573, *2 (U.S. Aug. 24, 2026) (per curiam) (cleaned up). The NOFO's legal and programmatic limits likewise count in assessing threatened injury. Standing cannot rest on "guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413.

The Complaint's pairing of conflict and ambiguity, *see supra* Background D, leaves Plaintiffs with a fork. If the priorities require conduct contrary to Title X, Plaintiffs can identify that command in the NOFO. They identify none; they quote the NOFO's legal limit and argue past it. Compl. ¶¶ 133–41; NOFO at 7, 10. If instead the conflict depends on a meaning the Department has yet to supply, there is no concrete application to review. *See Nat'l Park Hosp. Ass'n*, 538 U.S.

at 812. Either way, the Court can accept the States' descriptions of their programs without accepting an instruction to violate Title X that the NOFO does not give. *Goines*, 822 F.3d at 166.

Nor does the 35-point weight establish a substantial risk of injury. *See Susan B. Anthony List*, 573 U.S. at 158. Paragraph 184 predicts rejection of grantees "that it views as not aligned with those priorities." That qualification assumes the judgment the prediction requires. Thirty-five points measures the stakes of that judgment, not the likelihood that it will go against the States.

**D. The claimed redesign costs rest on the same prediction.**

Plaintiffs allege hundreds of extra hours to redesign programs and find subgrantees. Compl. ¶¶ 184–85. Replacing programs takes work, but the question is whether this NOFO requires it. Paragraph 185 conditions those costs on choosing the redesign path in ¶ 184. But the NOFO calls for lawful proposals, not abandonment of compliant services. NOFO at 7, 19, 38–40. Spending to avert a hypothetical injury cannot manufacture standing. *Clapper*, 568 U.S. at 416.

Preparing a responsive application is the ordinary cost of competing. The alleged program-replacement costs instead anticipate an adverse interpretation. *National Park Hospitality* rejected bid uncertainty as a hardship: "most business transactions could be priced more accurately if even a small portion of existing legal uncertainties were resolved." 538 U.S. at 811. *Ohio Forestry Ass'n v. Sierra Club* likewise distinguished planning for future agency action from a present command to change conduct. 523 U.S. 726, 733–34 (1998).

*Freedom Network USA v. Trump*, 830 F. Supp. 3d 681, 698–99 (N.D. Ill. 2026), involved an express exclusion and a conceded present choice: abandon proposed work or risk adverse treatment. Here, the text supplies neither that exclusion nor that choice. The application requires a family-participation certification, not certification that the State has replaced its programs to satisfy every priority. NOFO at 6, 25.

**E. The derivative theories inherit the contingency, and sovereign status changes the plaintiff, not the calendar.**

The alleged fiscal harm, public-health consequences, and increased demands on state programs follow a predicted funding loss. Compl. ¶¶ 6, 78, 80, 188–90. A derivative injury inherits the contingency of its source.

Sovereign status does not accelerate that sequence. *Massachusetts v. EPA* afforded special solicitude based on a procedural right and sovereign interests, but the Court still required—and found—concrete harm. 549 U.S. 497, 518–23 (2007).

The state-law theory repeats the asserted choice between preserving practices and remaining competitive. Yet the NOFO expressly calls for clinical services "within their scope of practice and allowable under state law." NOFO at 22. Whether those practices would cost points is the prediction Part I.C addresses.

Judge Wilson put it plainly: "In any grant competition, the criteria for selecting awardees are going to favor some applicants and disfavor others." Ex. 1, *NFPRHA* slip op. at 7. That differs from barring applicants from part of the competition. *Id.* at 7–8. The added fiscal and public-health consequences explain why the States care but do not change how the document works.

**F. A remedy needs a score.**

Strike the *Northeastern Florida* set-aside and the contractor gains access to reserved contracts. 508 U.S. at 666. The remedy removes the barrier. Here, a ruling could guide application strategy without establishing that the challenged criterion puts the States behind.

*NFPRHA* called that strategic benefit "unrelated to the harm Plaintiffs allege" of competitive disadvantage. Ex. 1, *NFPRHA* slip op. at 10. Those plaintiffs disclaimed a challenge based on lower scores or denied funding. *Id.* at 9. The States press that theory, which depends on the scoring judgment identified in Part I.C.

The States object to what the Department might do with their applications. That objection becomes justiciable when the Department does it. Applications are due January 11, 2027, and awards are anticipated April 1, 2027. Compl. ¶ 116. A State that is denied funding, or funded at a level it attributes to priorities, will then have an agency decision, an administrative record, and a concrete account of the role priorities played. That is what fitness requires: a controversy no longer "dependent upon future uncertainties or intervening agency rulings." *Charter Fed. Sav. Bank*, 976 F.2d at 208.

The NOFO marks that moment. No award decision is final until the grants management officer issues a notice of award, and a recipient accepts an award by drawing or otherwise obtaining funds. NOFO at 42, 44. Those are the agency's own markers of when an applicant becomes a recipient bound by award terms, and they identify the point at which a court would have something to review. "The question is not whether judicial review will be available but rather whether judicial review is available now." *Azar*, 316 F. Supp. 3d at 307.

## II. The Result Is the Same Under the Prudential Inquiry.

The Fourth Circuit also weighs fitness and hardship. *Miller*, 462 F.3d at 319. Fitness fails because the legal questions (whether the Department demands unlawful conduct, penalizes a practice, or extends a priority beyond Title X) turn on applications not yet made. S*ee Nat'l Park Hosp. Ass'n*, 538 U.S. at 812; Ex. 1, *NFPRHA* slip op. at 9–10. Plaintiffs say they cannot tell what the Department expects. The D.C. Circuit's answer to a Title X association making that claim was to "inquire of HHS exactly how the agency proposes to resolve any of the conflicts that it claims to spot." *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006). The NOFO invites exactly that inquiry. NOFO at 35, 51.

Hardship rests on the same predicted choice and fails for the reasons in Part I.D.

**III. Each Count Depends on the Same Unripe Application of the NOFO.**

Standing must exist for each claim. *TransUnion*, 594 U.S. at 431. Counts I, II, and IV rest on the competitive disadvantage and redesign costs addressed in Part I. Compl. ¶¶ 193–210, 217–24. Count III fares no better. Procedural rights relax immediacy and redressability, *Lujan*, 504 U.S. at 572 n.7, but the procedure must protect a concrete interest threatened by the challenged action. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009); *Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 297 n.8, 299 (4th Cir. 2022). A procedural right does not supply the adverse application on which the threat depends.

**IV. The Spending Clause Count Fails to State a Claim.**

If the Court finds jurisdiction, Count IV fails under Rule 12(b)(6). The Spending Clause asks whether a State has "voluntarily and knowingly accept[ed] the terms of the 'contract'" Congress offered. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987). Plaintiffs' theories, Compl. ¶¶ 217–24, misread that doctrine in three respects, each independently fatal.

*First*, a scoring criterion is not a condition. An applicant that gives a priority little attention may fare worse in a competition but does not forfeit funds it holds. The Supreme Court has declined to demand heightened precision from the criteria by which the Government chooses among applicants for a subsidy. *NEA v. Finley*, 524 U.S. 569, 589–90 (1998). And courts have sustained grant-scoring preferences that "at most . . . encourage" applicants to advance federal priorities. *City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 & n.6 (9th Cir. 2019). Plaintiffs identify no decision applying the clear-notice rule to an agency's pre-award scoring criteria.

*Second*, to the extent Section B imposes actual funding conditions, clear notice is measured at acceptance. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy* asks what "a state official who is engaged in the process of deciding whether the State should accept" the funds would understand

about "the obligations that go with those funds." 548 U.S. 291, 296 (2006). No Plaintiff has applied for a 2027 award, been offered one, or accepted one. If an award is offered, the approved application and award terms will define the funded project, and Section B itself limits alignment to what is "consistent with program authority and the scope of the award" and "authorized by law according to the Title X statute, regulations, legislative mandates, and additional program guidance." NOFO at 7, 43–44.

Title X also makes clear that grant awards may carry program-specific terms set by the Secretary within the authority Congress conferred. Congress directed the Secretary to consider specified factors "[i]n making grants and contracts," 42 U.S.C. § 300(b); authorized grants "in accordance with such regulations as the Secretary may promulgate," *id.* § 300a-4(a); and made awards "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made," *id.* § 300a-4(b). A State thus enters the Title X program knowing that awards are competitively selected and may carry program-specific terms within Title X's statutory bounds.

Nor does clear notice require the agency to resolve every possible application of those terms in advance. *Bennett v. Ky. Dep't of Educ.* rejected the premise that "every improper expenditure" must have been "specifically identified and proscribed in advance" and explained that the Government "simply could not prospectively resolve every possible ambiguity concerning particular applications" of a federal program's requirements. 470 U.S. 656, 666, 669 (1985). The relevant obligations remained those established by "the legal requirements in place when the grants were made." *Id.* at 670.

*Third*, the relatedness theory fails for the same textual reason. Plaintiffs characterize Departmental priorities concerning autism, Long COVID, street crime, foreign-funded

institutions, and other subjects as unrelated to family planning. Compl. ¶¶ 176–77, 222–23. But the NOFO incorporates those priorities only where authorized by law and within Title X's programmatic scope. NOFO at 7, 41. Its stated objectives concern the delivery and quality of Title X services, and the approved application and award terms define the funded undertaking. *Id.* at 7, 43–44. A priority therefore cannot require a recipient to undertake work outside Title X merely because it appears elsewhere in the Department's broader agenda. Reading the NOFO otherwise deletes the limitation Plaintiffs themselves quote. Compl. ¶ 177.

## V. Sequencing.

Because the transfer motion is pending and jurisdiction precedes the merits, *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95 (1998), the Court should resolve both motions before setting a merits schedule. *See also Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431–32 (2007). Either ruling may end this case here.

## CONCLUSION

Defendants respectfully request dismissal of the Complaint without prejudice under Rule 12(b)(1), or, if the Court finds jurisdiction and reaches the alternative merits ground, dismissal of Count IV under Rule 12(b)(6).

**[SIGNATURE BLOCK ON FOLLOWING PAGE]**

September 25, 2026

Respectfully submitted,

/s/ *Landen P. Benson*
MATTHEW C. ZORN*
Senior Counsel to the
Associate Attorney General
TX Bar No. 24106625
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
matthew.zorn2@usdoj.gov

*Notice of Appearance forthcoming

LANDEN P. BENSON
Attorney
GA Bar No. 863909
U.S. Department of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201
landen.benson@hhs.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2026, the foregoing was filed through the CM/ECF system, which will automatically generate notice upon all counsel of record.

/s/ *Landen P. Benson*
LANDEN P. BENSON
Attorney
GA Bar No. 863909
U.S. Department of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201
landen.benson@hhs.gov

*Counsel for Defendants*