**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | * | Case No. 1:26-cv-03405-DLB |
| | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * *

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

STATEMENT OF MATERIAL FACTS ........ 2

I. Title X ........ 2

II. The 2027 Title X NOFO ........ 6

STANDARD OF REVIEW ........ 9

ARGUMENT ........ 9

I. Plaintiffs Have Standing. ........ 9

A. The 2027 NOFO Inflicts Present Competitive Injuries. ........ 11

B. The 2027 NOFO Imposes Present Administrative and Programmatic Burdens. ........ 16

C. The 2027 NOFO Unlawfully Upends the Federal Funding Regime on which Existing Reproductive Health Systems within the Plaintiff States Depend. ........ 17

D. Plaintiffs Need Not Await an Award Decision to Establish Their Present Injuries. ........ 19

II. The NOFO's Incorporation of the Challenged Conditions Violates the APA. ........ 21

A. The NOFO's Incorporation of the Challenged Conditions Constitutes Final Agency Action under the APA. ........ 21

B. The NOFO's Incorporation of the Challenged Conditions is Arbitrary and Capricious ........ 22

C. HHS Failed to Observe Required Notice and Comment Procedures When Implementing the Challenged Conditions ........ 37

D. The NOFO's Incorporation of the Challenged Conditions is Contrary to Law. ........ 39

III. The NOFO's Incorporation of the Challenged Conditions Violates the U.S. Constitution. ........ 45

A. Under the Spending Clause, Conditions on Federal Funding Must Be Unambiguous and Adequately Related to the Statutory Purpose. ........ 45

B. The Requirement that Applicants "Align" and "Comply" with Agency Priorities is Vague, and the Priorities are Themselves Ambiguous. ........ 46

C. The Challenged Conditions Are Unrelated to Title X. ........ 47

D. Defendants' Arguments to the Contrary Are Unavailing. ........ 48

CONCLUSION ........ 50

## TABLE OF AUTHORITIES

**Cases**

*Accord Gresham v. Azar*,
950 F.3d 93 (D.C. Cir. 2020) ... 40

*Am. Acad. of Pediatrics v. F.D.A.*,
379 F. Supp. 3d 461 (D. Md. 2019) ... 38, 39

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
779 F. Supp. 3d 584 (D. Md. 2025) ... 38

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) ... 45, 49

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 50

*Balt. Gas & Elec. Co. v. United States*,
133 F. Supp. 2d 721 (D. Md. 2001) ... 12, 13, 15

*Bedford Cnty. Mem'l Hosp. v. H.H.S.*,
769 F.2d 1017 (4th Cir. 1985) ... 25

*Bennett v. Spear*,
520 U.S. 154 (1997) ... 21

*Biden v. Texas*,
142 S. Ct. 2528, 2544-45 (2022) ... 22

*Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*,
477 U.S. 41 (1986) ... 10

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) ... 27

*California v. U.S. Dep't of Transp.*,
808 F. Supp. 3d 291 (D.R.I. 2025) ... 46, 47, 48

*Casa De Maryland v. D.H.S.*,
924 F.3d 684 (4th Cir. 2019) ... 26

*Children's Hosp. of the King's Daughters, Inc. v. Azar*,
896 F.3d 615 (4th Cir. 2018) ... 37

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ..... 26

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ..... 25

*City of Chicago v. U.S. Dep't of Just.*,
822 F. Supp. 3d 873 (N.D. Ill. 2026) ..... 49

*City of Columbus v. Trump*,
453 F. Supp. 3d 770 (D. Md. 2020) ..... 10, 19

*City of Los Angeles v. Barr*,
929 F.3d 1163 (9th Cir. 2019) ..... 13, 48

*Cnty. of King v. Turner*,
No. 25-3664, 2026 WL 2489361 (9th Cir. Aug. 25, 2026) ..... 43, 48, 50

*Cooksey v. Futrell*,
721 F.3d 226 (4th Cir. 2013) ..... 14

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ..... 12

*D.H.S. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ..... 26, 28, 31

*Deese v. Esper*,
483 F.Supp.3d 290 (D. Md. 2020) ..... 9

*Disability Rts. Md., Inc. v. Seshamani*,
817 F.Supp. 3d 303 (D. Md. 2025) ..... 9

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ..... 23, 29

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) (*Fox I*) ..... 24, 25, 28, 34

*F.C.C. v. Prometheus Radio Project*,
592 U.S. 414 (2021) ..... 23

*F.D.A. v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) ..... 23

*Fort Sumter Tours, Inc. v. Andrus*,
564 F. 2d 1119, 1124 (4th Cir. 1977) ..................................................................... 20

*Freedom Network v. Trump*,
830 F. Supp. 3d 681 (N.D. Ill. 2026) ............................................................ 14, 20, 21, 22, 49

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*,
681 F.3d 581 (4th Cir. 2012) ..................................................................................... 25

*Gen. Elec. Co. v. E.P.A.*,
53 F.3d 1324 (D.C. Cir. 1995) ..................................................................................... 34

*Genesis Healthcare, Inc. v. Becerra*,
39 F.4th 253 (4th Cir. 2022) ....................................................................................... 21

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) .................................................................................................... 34

*Guzman v. Acuarius Night Club LLC*,
167 F.4th 217 (4th Cir. 2026) ....................................................................................... 9

*Hennepin Cnty. v. H.H.S.*,
No. 26-CV-2460, 2026 WL 2426300 (D.D.C. Aug. 19, 2026) ............................. 12, 21, 25, 36

*HIAS, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021) ................................................................................. 36, 49

*Hous. Auth. of City & Cnty. of San Francisco v. Turner*,
No. 25-CV-08859-JST, 2025 WL 3187761 (N.D. Cal. Nov. 14, 2025) .................................. 34

*Illinois v. F.E.M.A.*,
801 F. Supp. 3d 75 (D.R.I. 2025) ...................................................... 14, 22, 46, 47, 48

*Jimenez-Cedillo v. Sessions*,
885 F.3d 292 (4th Cir. 2018) ................................................................................. 24, 29

*Kerns v. U.S.*,
585 F.3d 187 (4th Cir. 2009) ......................................................................................... 9

*Kravitz v. U.S. Dep't of Commerce*,
355 F.Supp.3d 256 (D. Md. 2018) ................................................................................. 9

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ....................................................................................... 20

*Liberty Univ., Inc. v. Lew*,
733 F.3d 72 (4th Cir. 2013) ........ 10, 16, 20

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........ 9

*Maine v. Taylor*,
477 U.S. 131 (1986) ........ 10

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
785 F. Supp. 3d 68 (D. Md. 2025) ........ 23

*Mayor & City Council of Balt. v. Azar*,
392 F. Supp. 3d 602 (D. Md. 2019) ........ 40

*Mayor & City Council of Balt. v. Azar*,
973 F.3d 258 (4th Cir. 2020) ........ 30, 33, 41, 44

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 23, 27

*Multnomah Cnty. v. Azar*,
340 F. Supp. 3d 1046 (D. Or. 2018) ........ 14, 21

*N.L.R.B. v. Bell Aerospace Co.*,
416 U.S. 267 (1974) ........ 26

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) ........ 29

*Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*,
522 U.S. 479 (1998) ........ 10

*Nat'l Family Plan. & Repro. Health Ass'n v. Sullivan*,
979 F.2d 227 (D.C. Cir. 1992) ........ 38

*Nat'l Family Planning & Repro. Health Ass'n v. Kennedy*,
No. 1:26-cv-01683, 2026 WL 2790025 (M.D. Pa. Sept. 17, 2026) ........ 10, 14, 15, 36

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ........ 45

*Nat'l Mining Ass'n v. Jackson*,
768 F. Supp. 2d 34 (D.D.C. 2011) ........ 38

*Ne. Fla. Chapter of Assoc'd Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993)....................10, 11, 13, 15

*NEA v. Finley*,
524 U.S. 569 (1998)....................48

*New York v. Trump*,
764 F. Supp. 3d 46 (D.R.I. 2025)....................46

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)....................39

*Ohio v. E.P.A.*,
603 U.S. 279 (2024)....................10

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981)....................45, 47, 50

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015)....................38

*PFLAG, Inc. v. Trump*,
769 F. Supp. 3d 405 (D. Md. 2025)....................46, 49

*Planned Parenthood of Greater N.Y. v. H.H.S.*,
No. CV 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025)....................30, 34, 36

*Planned Parenthood of Greater Wash. & N. Idaho v. H.H.S.*,
946 F.3d 1100 (9th Cir. 2020)....................12, 13

*Planned Parenthood of N.Y.C., Inc. v. H.H.S.*,
337 F. Supp. 3d 308 (S.D.N.Y. 2018)....................20, 22

*Planned Parenthood of Wis., Inc. v. Azar*,
942 F.3d 512, (D.C. Cir. 2019)....................20, 21

*R.I. Coal. Against Domestic Violence v. Bondi*,
794 F. Supp. 3d 58 (D.R.I. 2025)....................22, 34

*Reno v. Catholic Social Servs.*,
509 U.S. 43 (1993)....................13, 15

*Satellite Broad. Co. v. F.C.C.*,
824 F.2d 1 (D.C. Cir. 1987)....................36

*Scheduled Airlines Traffic Offs., Inc. v. Dep't of Def.*,
87 F.3d 1356 (D.C. Cir. 1996)........................................................................................ 13

*Sherley v. Sebelius*,
610 F.3d 69 (D.C. Cir. 2010)...................................................................................... 12, 14, 17

*Sierra Club v. U.S. Dep't of the Interior*,
899 F.3d 260 (4th Cir. 2018)........................................................................................ 34

*South Dakota v. Dole*,
483 U.S. 203 (1987)...................................................................................................... 45, 46, 47

*Step-Saver Data Sys., Inc. v. Wyse Tech.*,
912 F.2d 643 (3d Cir. 1990)........................................................................................ 14

*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967)...................................................................................................... 20

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...................................................................................................... 9

*Trump v. California*,
No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026)................................................ 36

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016)...................................................................................................... 21

*U.S. Postal Serv. v. Postal Regul. Comm'n*,
785 F.3d 740 (D.C. Cir. 2015)...................................................................................... 35

*United States v. Garcia*,
855 F.3d 615 (4th Cir. 2017)........................................................................................ 5

*Washington v. H.H.S.*,
No. 6:25-CV-01748-AA, 2025 WL 3002366 (D. Or. Oct. 27, 2025)........................... 30

*Weeks Marine, Inc. v. United States*,
575 F.3d 1352 (Fed. Cir. 2009)..................................................................................... 13

*William F. Wilke, Inc. v. Dep't of the Army*,
485 F.2d 180 (4th Cir. 1973)........................................................................................ 10, 11

**Statutes**

42 U.S.C.

§ 300 ... 47
§ 300(a) ... 2, 3, 41
§ 300(b) ... 50
§ 300a-4(a) ... 3, 39
§ 300a-4(b) ... 50
§ 300a-5 ... 41
§ 300a-6 ... 44

5 U.S.C.
§ 706(2)(A) ... 1, 22, 39
§ 706(2)(C) ... 1, 39
§ 706(2)(B) ... 1, 45
§ 706(2)(D) ... 1, 37

Consolidated Appropriations Act of 1996,
Pub. L. No. 104-134, Tit. II, 110 Stat. 1321, 1321-221 (1996) ... 3, 44

Consolidated Appropriations Act of 2026,
Pub. L. No. 119-75, 140 Stat. 173, 262 (2026) ... 3, 32, 40

Pub. L. No. 91-572 § 2(1), 84 Stat. 1504 (1970) ... 2

Pub. L. No. 94-439, § 209, 90 Stat. 1418 (1976) ... 8

**Regulations**

42 C.F.R
§ 59.1 ... 4, 27
§ 59.2 ... 4, 27, 31, 41, 42, 43
§ 59.5(a)(1) ... 27
§ 59.5(a)(2) ... 4, 41
§ 59.5(a)(3) ... 4, 5, 24, 29, 30, 31, 41, 42, 43
§ 59.5(a)(4) ... 4, 29, 42
§ 59.5(a)(5) ... 4, 32, 33, 40, 44
§ 59.7(a)(3) ... 4, 43

Compliance with Statutory Program Integrity Requirements,
84 Fed. Reg. 7714, 7745, 7777, 7789 (Mar. 4, 2019) ... 33, 40

Ensuring Access to Equitable, Affordable, Client-Centered,
Quality Family Planning Services, 86 Fed. Reg. 56144, 56145 (Oct. 7, 2021) ... 32, 33

Grants for Family Planning Services,
36 Fed. Reg. 18465, 18466 (Sept. 15, 1971) ... 27

Grants for Family Planning Services,
45 Fed. Reg. 37433 (June 3, 1980) .......... 42

Standards of Compliance for Abortion-Related Services
in Family Planning Services Projects,
65 Fed. Reg. 41270, 41273, 41279 (July 3, 2000). .......... 32

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 .......... 45

Senate Reports

S. Rep. No. 91-1004 (1970) .......... 2, 42

**Other Authorities**

Kimberly A. Workowski et al., Ctrs. for Disease Control & Prevention,
*Sexually Transmitted Infections Treatment Guidelines, 2021*,
Morbidity & Mortality Wkly. Rep.: Recommendations & Rep., July 23, 2021,
https://www.cdc.gov/std/treatment-guidelines/STI-Guidelines-2021.pdf .......... 5

Kimberly Daniels et al., *Contraceptive Methods Women Have Ever Used: United States, 2015-2019*, National Health Statistics Reports,
No. 195 (Dec. 14, 2023) .......... 7

Kimberly Daniels et al., *Current Contraceptive Status Among Women Aged 15- 49: United States, 2015-2017*, National Center for Health Statistics Data Brief,
No. 327 (Dec. 2018) .......... 7

Kimberly Daniels et al., *Current Contraceptive Status Among Women Aged 15- 49: United States, 2017-2019*, National Center for Health Statistics Data Brief,
No. 388 (Oct. 2020) .......... 7

Kimberly Daniels et al., *Current Contraceptive Status Among Women Aged 15-49: United States, 2022-2023*, National Center for Health Statistics Data Brief,
No. 539 (Aug. 2025) .......... 7

Off. of Population Affairs, Title X Program Review Tool (Sept 2022),
https://opa.hhs.gov/sites/default/files/2022-12/title-x-program-review-tool-december-2022%20rev.pdf. .......... 5

Off. of Population Affs., Fertility Knowledge Survey, 2020: Findings Report (June 30, 2020),
https://opa.hhs.gov/sites/default/files/2021-01/fertility-knowledge-survey-findings-exec-summary-2020.pdf .......... 7

Off. of Population Affs., *OPA Program Policy Notice 2024-02—Implementing Quality Family Planning Services Recommendations within Title X Projects*, U.S. Dep't Health & Hum. Servs. (Nov. 19, 2024), https://opa.hhs.gov/node/4173. ........................................ 5, 24

Off. of Population Affs., *Title X Program Handbook*, U.S. Dep't Heath & Hum. Servs. (Dec. 2024), https://opa.hhs.gov/sites/default/files/2025-03/title-x-program-handbook-dec-2024.pdf......... 5

Sarah E. Romer et al., *Providing Quality Family Planning Services in the United States: Recommendations of the U.S. Office of Population Affairs (Revised 2024)*, 67 AM. J. PREV. MED. S41 (2024)........................................ 5

## INTRODUCTION

Plaintiffs, twenty-one States and two Governors, challenge the Trump Administration's unlawful effort to condition Title X grants—the only federal funding dedicated to providing comprehensive family planning services for low-income, uninsured, or underinsured individuals—on "alignment" with political priorities that undermine Title X. Specifically, Plaintiffs challenge the incorporation of a subset of conditions (the "Challenged Conditions") into the 2027 Notice of Funding Opportunity ("NOFO" or "2027 NOFO") that establishes the terms under which health agencies and nonprofits in Plaintiff States are now applying for this five-year Title X grant cycle.

As States, Plaintiffs uniquely rely on Title X: Title X clinics serve as Plaintiffs' reproductive healthcare safety net whether States compete directly for Title X grants or are home to providers that do. The Challenged Conditions inflict imminent and actual competitive, administrative, fiscal, and sovereign injuries on them and violate the Administrative Procedure Act ("APA") and the Constitution. *First*, Defendants introduced the Conditions in an unreasoned, arbitrary and capricious manner by (a) departing from prior policies without acknowledgment, adequate explanation, or consideration of reliance interests; (b) imposing ambiguous and contradictory standards; and (c) incorporating irrelevant conditions. 5 U.S.C. § 706(2)(A). *Second*, to the extent the Challenged Conditions purport to alter or revoke Title X requirements previously promulgated by notice-and-comment rulemaking, Defendants failed to observe the procedures required by law. 5 U.S.C. § 706(2)(D). *Third*, to the extent the Challenged Conditions conflict with Congressional and regulatory requirements governing Title X, their incorporation in the NOFO is not in accordance with law and exceeds the agency's authority. *Id.* § 706(2)(A), (C). *Finally*, the incorporation of the Challenged Conditions violates the Spending Clause of the U.S. Constitution and the APA, *id.* § 706(2)(B), because it imposes funding conditions that are not only

vague and ambiguous, but are also insufficiently related—and in some respects contrary—to Title X mandates.

Defendants may not abuse their responsibility for superintending a grant competition to create a shadow sub-regulatory regime of "terms for applicants" and "terms for recipients" that overwrite the legal terms for participating in Title X. They may not condition grants on flouting Congress's mandates or award applicants points for violating valid regulations promulgated by past administrations. And they may not hide behind their own ambiguous terms to claim they are acting lawfully. The Court should accordingly deny Defendants' Motion to Dismiss and grant summary judgment and relief for the Plaintiff States.

## STATEMENT OF MATERIAL FACTS

### I. Title X

In 1970, Congress enacted Title X of the Public Health Service Act to "mak[e] comprehensive voluntary family planning services readily available to all persons." Pub. L. No. 91-572 § 2(1), 84 Stat. 1504 (1970). The committee report accompanying Title X noted that, despite "the two major innovations in contraceptive methods of the last decade[,] the oral contraceptive and the intrauterine device," "the medically indigent couple . . . is forced to do without [access to family planning services] or to rely heavily on the least effective nonmedical techniques for fertility control." S. Rep. No. 91-1004, at 9, 11 (1970). Congress therefore directed the Department of Health and Human Services ("HHS") to make grants to entities to establish and operate family planning projects that offer a broad range of effective care. 42 U.S.C. § 300(a).

With bipartisan Congressional support ever since, Title X grants have supported high-quality family planning and related services for underserved individuals nationwide, including cervical cancer screenings that save lives; testing and treatment for sexually transmitted infections

("STIs") that preserve patients' health and fertility and prevent contagion; and contraception and fertility care that empowers individuals to have children if, when, and how they choose. The program is administered by the Office of Population Affairs ("OPA"), a sub-agency in the Office of the Assistant Secretary for Health ("OASH"), within HHS (collectively, "the Agencies").

For decades, Plaintiffs have effectively managed Title X programs in their States, both directly through state health agency grantees and indirectly by partnering with nonprofit and local government grantees. These grantees form the backbone of family planning public health infrastructure in Plaintiff States. Every dollar of Title X funding saves downstream public sector healthcare costs by supporting cost-effective screening and early-stage and preventive care for a population that disproportionately relies on Plaintiff States to pay for their healthcare.[1]

Congress and the Agencies have created rules for Title X. As relevant to this lawsuit, Congress has long required that "all pregnancy counseling [within Title X] shall be nondirective," Consolidated Appropriations Act of 2026, Pub. L. No. 119-75, 140 Stat. 173, 262 (2026), Consolidated Appropriations Act of 1996, Pub. L. No. 104-134, Tit. II, 110 Stat. 1321, 1321-221 (1996), and that grantees "shall offer a broad range of acceptable and effective family planning methods and services," 42 U.S.C. § 300(a). Congress also mandated that "[g]rants . . . shall be made in accordance with such regulations as [HHS] may promulgate." 42 U.S.C. § 300a-4(a).

In turn, Title X regulations set standards that grantees must meet to participate in the program. Grantees must provide "quality service delivery consistent with nationally recognized

---

[1] Ex. 1 (Khalfani Decl.) ¶¶ 8–9, 16; Ex. 2 (Heller Decl.) ¶¶ 7–8, 23; Ex. 3 (Britos Decl.) ¶¶ 6–8, 17; Ex. 4 (Fletcher Decl.) ¶¶ 8–9, 21; Ex. 5 (Nihoa Decl.) ¶¶ 7–8, 16; Ex. 6 (Masinter Decl.) ¶¶ 8–9, 21; Ex. 7 (Caloia Decl.) ¶¶ 8–9, 23; Ex. 8 (Blodgett Decl.) ¶¶ 7–8, 19, 22; Ex. 9 (Harakall Decl.) ¶¶ 8–9, 24; Ex. 10 (Sullivan Decl.) ¶¶ 8–9, 24; Ex. 11 (Lyon-Callo Decl.) ¶¶ 8–9, 21; Ex. 12 (Woodrich Decl.) ¶¶ 7–8, 16; Ex. 13 (Jones Decl.) ¶¶ 7–8, 17; Ex. 14 (Humphrey Decl.) ¶¶ 8–9, 23; Ex. 16 (O'Donnell Decl.) ¶¶ 8–10, 29; Ex. 17 (Shore Decl.) ¶¶ 8–9, 23; Ex. 18 (Rodack Decl.) ¶¶ 8, 15; Ex. 19 (Campagna Decl.) ¶¶ 8–9, 24; Ex. 20 (Walker Harris Decl.) ¶¶ 9–10, 22; Ex. 21 (Stalberg Decl.) ¶¶ 8–9, 21; Ex. 22 (Redick-Ponte Decl.) ¶¶ 8–9, 24; Ex. 23 (Tran Decl.) ¶¶ 8–9, 23.

standards of care." 42 C.F.R. § 59.5(a)(3). They must offer "client-centered" care that is "respectful of, and responsive to, individual client preferences, needs, and values," *id.* § 59.5(a)(3), *see id.* § 59.2, and nondirective pregnancy options counseling that covers abortion, adoption, and parenthood at client request. *Id.* § 59.5(a)(5). They must provide "comprehensive medical . . . services," *id.* § 59.1: each service site must either provide or offer referrals for clients' "method of choice" within "a broad range of acceptable and effective medically approved family planning methods," including "Food and Drug Administration (FDA)-approved contraceptive products," *id.* § 59.5(a)(3), § 59.2. They may not "subject[] individuals to any coercion . . . to employ or not to employ any particular methods of family planning." *Id.* § 59.5(a)(2). They may not discriminate on gender identity or sex characteristics, *id.* § 59.5(a)(4), and must provide services sufficient to ensure that "transgender . . . persons" "are fully included and can actively participate in and benefit from family planning," *id.* § 59.5(a)(3), § 59.2. And grantees must provide care in an "equitable" and "inclusive" manner with "appropriate" services for "diverse persons," *id.* § 59.5(a)(3), § 59.2. Additionally, regulations list the criteria the Agencies will "tak[e] into account" when considering applicants, which include "the ability of the applicant to advance health equity." *Id.* § 59.7(a)(3).

The Agencies review projects for compliance and provide direct feedback. *E.g.*, Ex. 8 (Blodgett Decl.) ¶ 9; Ex. 19 (Campagna Decl.) ¶¶ 9–10; Ex. 4 (Fletcher Decl.) ¶ 9. They also offer instructions, guidance, resources, and training through sub-regulatory materials, most notably OPA's 2024 publication *Providing Quality Family Planning Services in the United States: Recommendations of the U.S. Office of Populations* (the "QFP" or "2024 QFP") (attached as

Exhibit A).[2] OPA's most recent Program Policy Notice guidance (attached as Exhibit B)[3] and its Title X Program Handbook (attached as Exhibit C)[4] both designate the 2024 QFP as a set of guidelines that fulfill grantees' regulatory obligation under 42 C.F.R. § 59.5(a)(3) to follow "a nationally recognized standard of care when implementing Title X requirements."[5] Ex. B; Ex. C, 10. Published by OPA in the peer-reviewed *American Journal of Preventive Medicine*, the 2024 QFP supplies practitioners with "specific recommendations for how to provide high-quality [sexual and reproductive health] care. Ex. A, S41. It collates consensus clinical recommendations from all the "other pertinent nationally recognized standards of care for family planning services" the agency has identified elsewhere. *Compare* Ex. A, S45 and S71 n.160 (listing QFP sources) with Ex. C, 11 (listing "pertinent" standards). The Agencies have required adherence to the QFP since publishing its first edition in 2014 and embed QFP requirements directly in the rubrics they use to assess grantee compliance during site visits, which they also encourage recipients to use both "as a self-assessment" and "for monitoring their subrecipients and service sites." Ex. C, 34; *see, e.g.*, 2022 Title X Program Review Tool (attached as Exhibit E)[6] 2, 8–9; *see also* Ex. 16 (O'Donnell Decl.) ¶¶ 11, 21; Ex. 20 (Walker Harris Decl.) ¶ 11. To support the QFP's adoption,

---

[2] Sarah E. Romer et al., *Providing Quality Family Planning Services in the United States: Recommendations of the U.S. Office of Population Affairs (Revised 2024)*, 67 AM. J. PREV. MED. S41 (2024). The document, promulgated by OPA, is also available at https://www.qfpguide.org/, a "supporting website, managed by" a Title X training center. *Id.* at S47. *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("[D]istrict court may judicially notice a fact that is not subject to reasonable dispute when it. . . can be readily determined from an indisputably accurate source").

[3] Off. of Population Affs., *OPA Program Policy Notice 2024-02—Implementing Quality Family Planning Services Recommendations within Title X Projects*, U.S. Dep't Health & Hum. Servs. (Nov. 19, 2024), https://opa.hhs.gov/node/4173. Documents posted on federal agency websites are subject to judicial notice. *See, e.g., Garcia*, 855 F.3d at 621.

[4] Off. of Population Affs., *Title X Program Handbook*, U.S. Dep't Heath & Hum. Servs. (Dec. 2024), https://opa.hhs.gov/sites/default/files/2025-03/title-x-program-handbook-dec-2024.pdf.

[5] The QFP incorporates several standards in their entirety, including the CDC's Sexually Transmitted Infections Treatment Guidelines (attached as Exhibit D). Ex. A, S60; Kimberly A. Workowski et al., Ctrs. for Disease Control & Prevention, *Sexually Transmitted Infections Treatment Guidelines, 2021*, Morbidity & Mortality Wkly. Rep.: Recommendations & Rep., July 23, 2021, https://www.cdc.gov/std/treatment-guidelines/STI-Guidelines-2021.pdf.

[6] Off. of Population Affairs, Title X Program Review Tool (Sept 2022), https://opa.hhs.gov/sites/default/files/2022-12/title-x-program-review-tool-december-2022%20rev.pdf.

OPA has also provided training, resources, and technical assistance to grantees. Ex. C, 10, 43.

## II. The 2027 Title X NOFO

Within this statutory and regulatory framework, OPA issues NOFOs at the beginning of each grantmaking cycle to establish the concrete terms on which applicants can propose projects and compete for Title X awards. Defendants published the NOFO that is the subject of this lawsuit in July 2026; applications are due in January 2027. A.R. 001. Successful proposals will receive funding starting in April 2027—right as funding from the last Title X grant cycle runs out—and continuing for the next five years, subject only to annual reapproval (a noncompetitive process under which only recipients successful in the first, competitive year of a grant cycle can apply for Title X funds). Applicants' proposals must detail their plans down to the location, hours, and services at each planned service site, and any funding applicants receive will then be limited to "the project described in [their] application." A.R. 113.[7] Many Plaintiff State health agencies have therefore already begun preparing applications in order to provide the requisite detail needed in time, as they must coordinate statewide subrecipient networks while also working across government divisions and meeting their regulatory obligations as state agencies (such as competitive procurement and transparency requirements).[8] They will be notified of rejections and acceptances—without scores—days before grant disbursements start in April. A.R. 113.

Like past NOFOs, the 2027 NOFO lays out the core parameters of the funding opportunity, defines the scope of permissible programming, establishes the application process, and imposes

[7] Indeed, beyond the NOFO's own insistence on this limit, applicants are legally bound not to deviate: to submit projects, they must certify that they will comply with the False Claims Act in administering any potential awards and swear to their capacity to carry out the project, on pain of perjury. A.R. 101, 132.

[8] Ex. 2 (Heller Decl.) ¶ 15; Ex. 6 (Masinter Decl.) ¶ 16; Ex. 7 (Caloia Decl.) ¶ 16; Ex. 10 (Sullivan Decl.) ¶ 16; Ex. 8 (Blodgett Decl.) ¶ 12; Ex. 11 (Lyon-Callo Decl.) ¶ 16; Ex. 14 (Humphrey Decl.) ¶ 16; O'Donnell Decl. ¶18; Ex. 17 (Shore Decl.) ¶ 16; Ex. 19 (Campagna Decl.) ¶ 16; Ex. 21 (Stalberg Decl.). ¶ 16.

requirements as a condition of securing and maintaining funding throughout the grant cycle. It further incorporates several sets of sometimes-overlapping priorities (collectively, the "Agency Priorities") articulated by HHS, OASH, and OPA. *See* Complaint, ECF No. 1, at ¶ 117–128 ("Compl."). Six of these Priorities constitute the Challenged Conditions that are the subject of this lawsuit:

- The **Directive Counseling Priority** states that "Title X clinics will be expected to offer reproductive goals counseling that presents evidence-informed pathways associated with improved economic stability and family stability, including . . . marriage prior to childbearing" and that "[p]rogram counseling should affirm marriage and parenthood as meaningful and valued components of adult life." A.R. 083.[9]

- The **Overmedicalization Priority** contains the NOFO's only mention of contraception. It states that OPA "recognizes the overreliance on pharmaceutical and surgical treatments," reports "a decrease in females' current use of any contraception" and that "the most common reason women reported discontinuing use related to dissatisfaction was side effects," and asserts that "[t]his approach has failed." A.R. 081.[10]

- The **Anti-Gender Ideology Priority** orders grantees to "ensure[] that [Title X] program activities reflect evidence-based practices and biological and reproductive health." A.R. 083. OASH explains that this Priority requires recognizing "the biological reality that a person's sex, as either male or female, is unchangeable and determined by objective biology." A.R. 134; *see also* A.R. 144.

- The **Anti-DEI Priority** states that OASH and HHS "prioritize efforts that go beyond the use of ideologically laden concepts like health equity," which "focus[] on identifying and documenting worse health outcomes for minority populations" and have not led to "measurable improved health for minority populations." A.R. 135; *see also* A.R. 143.

---

[9] In support of the Directive Counseling Priority, the NOFO cites the 2020 Fertility Knowledge Survey. Off. of Population Affs., Fertility Knowledge Survey, 2020: Findings Report (June 30, 2020), https://opa.hhs.gov/sites/default/files/2021-01/fertility-knowledge-survey-findings-exec-summary-2020.pdf (attached as Exhibit F); A.R. 083 (incorporated by reference in the administrative record).

[10] In support of the Overmedicalization Priority, the NOFO cites three Center for Health Statistics Data Briefs on current contraceptive status among women between the ages of fifteen and forty-nine as well as a National Health Statistics Report on contraceptive method use. Kimberly Daniels et al., *Current Contraceptive Status Among Women Aged 15-49: United States, 2022-2023*, National Center for Health Statistics Data Brief, No. 539 (Aug. 2025) (attached as Exhibit G); Kimberly Daniels et al., *Current Contraceptive Status Among Women Aged 15- 49: United States, 2017-2019*, National Center for Health Statistics Data Brief, No. 388 (Oct. 2020) (attached as Exhibit H); Kimberly Daniels et al., *Current Contraceptive Status Among Women Aged 15- 49: United States, 2015-2017*, National Center for Health Statistics Data Brief, No. 327 (Dec. 2018) (attached as Exhibit I); Kimberly Daniels et al., *Contraceptive Methods Women Have Ever Used: United States, 2015-2019*, National Health Statistics Reports, No. 195 (Dec. 14, 2023) (attached as Exhibit J). *See* A.R. 081 (incorporated by reference in the administrative record).

- The **Hyde Amendment Priority** states that the Agencies "will prioritize programs and funding that uphold Hyde[11] protections and do not use taxpayer resources to promote or support elective abortion" and "expect recipients to demonstrate how their Title X projects . . . contribute to broader HHS efforts to safeguard life-affirming, lawful, and ethical program delivery." A.R. 084.

- The **Irrelevant HHS Priorities** include HHS's goals to "[e]nd crime and disorder on America's streets," "[i]mprove oversight of foreign funded institutions," "[i]nvestigate and care for those with Long COVID," "[f]urther our understanding of autism," and "[a]dvance the scientific understanding of the aging process." A.R. 140–46.

Prior to the NOFO's publication, HHS issued an April 3, 2026, Memorandum directing all its grant awarding divisions to "include language" in their NOFOs "regarding alignment with agency priorities" and characterizing this alignment as both a "[t]erm for *[a]pplicants*" and a "[t]erm for *[r]ecipients*." A.R. 149 (emphasis added); *see also* A.R. 160. The NOFO therefore embeds the Challenged Conditions into every stage of the Title X grant process—incorporating alignment into the conditions of Title X itself. Applicants are instructed that "successful proposals should . . . address OPA program priorities" in their Project Narrative, and they must indicate whether they will provide "reproductive goals counseling" at each site or offer a per-site justification for its absence and referral plan in their Work Plan. A.R. 089–91, 093–94. The NOFO establishes that submissions are judged by their conformity with the Priorities. Alignment with OPA and HHS Priorities carries the highest point total of any criterion in the rubric that independent panelists use during merit review—35 points out of 100—and, after scores are in, staff again "consider" application "[a]lignment with HHS and OASH priorities" to make final recommendations. A.R. 110–11. Finally, the NOFO converts alignment into a condition on grants; grant recipients "must align program design and activities with" the Challenged Conditions or face

[11] The Hyde Amendment, first passed as Pub. L. No. 94-439, § 209, 90 Stat. 1418 (1976), does not apply to Title X; instead, the Title X statute prevents the grant funds from being used in programs where abortion is a method of family planning. *See* 42 U.S.C. § 300a-6.

"corrective action," including potential termination. A.R. 077; *see also* A.R. 149.

## STANDARD OF REVIEW

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) "challenges solely the legal sufficiency of the complaint," and a complaint need only "allege[] sufficient factual matter, accepted as true, to provide a sufficient basis to 'state a claim to relief that is plausible on its face'" to survive. *Guzman v. Acuarius Night Club LLC*, 167 F.4th 217, 221 (4th Cir. 2026). Similarly, for a facial challenge to subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Disability Rts. Md., Inc. v. Seshamani*, 817 F. Supp. 3d 303, 313 (D. Md. 2025) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)).

The APA, 5 U.S.C. §§ 551–559, 701–706, authorizes judicial review of federal agencies' and officers' actions. A claim for judicial review under the APA is "properly decided on summary judgment," which is the primary "mechanism by which the court decides as a matter of law whether 'the administrative record permitted the agency to make the decision it did.'" *Deese v. Esper*, 483 F. Supp. 3d 290, 303–04 (D. Md. 2020) (citations omitted). However, the court may consider evidence outside the record in establishing jurisdiction. *See, e.g.*, *Kravitz v. U.S. Dep't of Com.*, 355 F. Supp. 3d 256, 262–63 (D. Md. 2018) (in an APA case, "[a]t the summary judgment stage, Plaintiffs must 'set forth by affidavit or other evidence specific facts' that support a finding of standing") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## ARGUMENT

### I. Plaintiffs Have Standing.

Article III requires an injury in fact that is "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The 2027 NOFO inflicts

multiple present injuries on Plaintiff States. It changes the rules under which they are competing for Title X funding, imposes present administrative and programmatic burdens, and alters the conditions governing Title X funding on which Plaintiff State healthcare systems depend. Although Defendants rely heavily on *Nat'l Family Planning & Repro. Health Ass'n v. Kennedy*, No. 1:26-cv-01683, 2026 WL 2790025 (M.D. Pa. Sept. 17, 2026), that decision is both distinguishable from this case and, to the extent it holds that a competitive injury cannot arise before an application is evaluated, inconsistent with governing precedent.

Government actions inflict cognizable competitive injury when they deny plaintiffs the equal opportunity to compete—including by excluding them from competition, favoring their competitors, or inviting legally ineligible rivals to compete with them in zero-sum contests. *See Ne. Fla. Chapter of Assoc'd Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *William F. Wilke, Inc. v. Dep't of the Army*, 485 F.2d 180, 182–83 (4th Cir. 1973); *cf. Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 488–92 (1998). Administrative burdens imposed by challenged government action also constitute injury in fact. *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013) (administrative burdens can constitute imminent injury where the plaintiff "must take measures to ensure compliance in advance"). States also suffer cognizable injury when federal action interferes with their sovereign interests in enforcing their own laws, *see Maine v. Taylor*, 477 U.S. 131, 137 (1986); *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 50 n.17 (1986); *Ohio v. E.P.A.*, 603 U.S. 279, 291 (2024), or imposes economic costs on them, including by shifting healthcare costs to state and local governments. *See City of Columbus v. Trump*, 453 F. Supp. 3d 770, 787–88 (D. Md. 2020) (standing found where plaintiffs alleged that federal action would harm cities' "budgets for their public health departments, free or reduced-cost clinics, and ambulance services"). The 2027 NOFO itself—

before any further action by Defendants—inflicts injuries of each of these types on Plaintiff States.

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss Plaintiffs' claims for lack of jurisdiction and should find that the jurisdictional prerequisites are met for purposes of reaching the merits of Plaintiffs' summary judgment motion.[12]

### *A. The 2027 NOFO Inflicts Present Competitive Injuries.*

For Plaintiff States that compete for Title X grants directly,[13] the 2027 NOFO has already set the criteria by which their applications will be evaluated and the "terms" of participation. A.R. 077, 089, 107, 149. Defendants deny the competitive injuries it inflicts on Plaintiffs by mischaracterizing their Complaint and precedent and drawing on inapt authorities.

Courts regularly recognize competitive injuries when the government alters the competitive terms on which plaintiffs compete—separate from any injury in being denied the contest's ultimate prize. For instance, in *Northeastern Florida*, the Supreme Court held that plaintiffs who had been deemed ineligible to compete for set-aside contracts suffered a cognizable Article III competitive injury in the "denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the [contract]." 508 U.S. at 666. The Fourth Circuit has recognized a related interest in the lawful administration of government competitions: those seeking government contracts have "a right to reasonable treatment of their bids" and a "litigable

---

[12] Defendants also argue that Plaintiffs have not adequately stated a claim under the Spending Clause. *See* Defs.' Mem. at 14–16. Plaintiffs address these arguments in Section III, demonstrating that they have not only adequately stated a claim, but have also shown that the Challenged Conditions violate the Spending Clause of the Constitution as a matter of law. *See infra* Section III.

[13] Plaintiff States Colorado, Delaware, Illinois, Kentucky, Maryland, Massachusetts, Michigan, New Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, Washington, Wisconsin, and Nevada are all incumbent Title X direct grantees. Plaintiff States California, Connecticut, Hawai'i, Maine, Minnesota, New Jersey, and Pennsylvania are not direct recipients of the program but all rely on Title X funding that flows to partner nonprofits, local governments, and other entities within their borders. *See* Ex. 1 (Khalfani Decl.) ¶ 10; Ex. 3 (Britos Decl.) ¶ 8, 13; Ex. 5 (Nihoa Decl.) ¶ 13; Ex. 9 (Harakall Decl.) ¶ 12; Ex. 12 (Woodrich Decl.) ¶ 13; Ex. 13 (Jones Decl.) ¶ 13; Ex. 18 (Rodack Decl.) ¶ 13.

interest" in the "integrity of the competitive bidding process." *Wilke*, 485 F.2d at 182–83; *see also Balt. Gas & Elec. Co. v. United States*, 133 F. Supp. 2d 721, 726 (D. Md. 2001).

In the grant context, courts have recognized that competitive injuries arise when an agency enacts "[f]undamental programmatic changes that favor certain groups of grant applicants," denies plaintiffs "the opportunity to compete for a pool of funds for which they are able and willing to compete," or drives an "actual or imminent increase in competition," such as, by altering requirements or amending regulations to invite competition from new applicants "whose projects would likely not have qualified under prior criteria." *Hennepin Cnty. v. H.H.S.*, No. 26-cv-02460, 2026 WL 2426300, at *10, *10 n.6 (D.D.C. Aug. 19, 2026) (collecting cases); *cf. Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 834 (2024) (Kavanaugh, J., concurring) (collecting "ubiquitous" administrative law competitor suits, including leading grant competitive injury case *Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010)). Plaintiffs alleged all three types of grant competitive injuries accordingly: the NOFO's rubric disfavors incumbent grantees like them with regulatorily-compliant programs; its conditions and application requirements (including its mandate for per-site counseling plans) attempt to bar their longstanding projects; and it invites competition from new, unfit applicants who do not meet longstanding program requirements. *E.g.*, Compl. ¶ 183–84, 191, 216; *see also* A.R. 161 (HHS memorandum stating that "[d]iscretionary grants [like Title X] should be given to a broad range of recipients rather than to a select group of repeat players"). Defendants' response reflects neither Plaintiffs' allegations nor the law.

Defendants characterize *Northeastern Florida* and its progeny as limited to rules that alter the pool of eligible competitors and emphasize that the 2027 NOFO applies its scoring criterion to every applicant. Memorandum in Support of Defendants' Motion to Dismiss, ECF No. 102-1, at 7–8 ("Defs.' Mem."). But courts routinely find that uniform evaluative factors with unequal effects

impose competitive injuries. *E.g.*, *Planned Parenthood of Greater Wash. & N. Idaho v. H.H.S.*, 946 F.3d 1100, 1109–10 (9th Cir. 2020) (NOFO's uniform rubric disadvantaged incumbent grantees); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019) (NOFO's uniform criteria left plaintiffs "disadvantaged relative to other applicants that were able to choose the illegal immigration focus area"); *Scheduled Airlines Traffic Offs., Inc. v. Dep't of Def.*, 87 F.3d 1356, 1359 (D.C. Cir. 1996); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009). Ignoring all this precedent, Defendants turn to *Reno v. Catholic Social Servs.*, 509 U.S. 43 (1993), to argue that a challenged criterion only imposes ripe injury if it prevents an applicant from winning entirely. Defs.' Mem. at 7–8. *Reno* says the opposite. Whether plaintiffs alleging competitive injuries would have won absent the challenged criterion is "not immediately relevant" because they ask for a chance to compete fairly, not the prize itself. *Reno*, 509 U.S. at 59 n.19 (citing *Ne. Fla.*, 508 U.S. at 666). But, in any event, *Reno* was *not* a competition case. Unlike Plaintiff States, *Reno*'s plaintiffs sought "not an equal opportunity to compete for [benefits], but the [benefits] themselves"—the only reason why knowing whether they would have otherwise been denied mattered.[14] *Id.* Because Plaintiffs here challenge changes to the competition, rather than any outcome, they have established standing. *See Planned Parenthood Wash. & N. Idaho*, 946 F.3d at 1108–09 (when NOFO "impermissibly tilted the playing field," "the magnitude of the alleged tilt is irrelevant," as competitive injury is the tilt, not any lost prize; accordingly, "[e]ntering a bid makes the injury actual; deciding not to bid makes the injury imminent"); *Balt. Gas*, 133 F.

[14] Plaintiff States match *both* distinctions the Court drew between the *Reno* plaintiffs (whose case was not yet ripe without a denial) and the *Northeastern Florida* plaintiffs (whose case was ripe, as they were (1) alleging competitive injury and (2) longstanding competitors with a "history of application behavior"). *Reno*, 509 U.S. at 59 n.19 (1993). Defendants do not appear to challenge Plaintiffs' satisfaction of the second requirement; but for avoidance of doubt, Plaintiff States do indeed include longstanding participants with spotless records of application success, including several who have participated since the program's inception. *See, e.g.*, Ex. 2 (Heller Decl.) ¶ 12; Ex. 6 (Masinter Decl.) ¶ 13; Ex. 7 (Caloia Decl.) ¶ 13; Ex. 20 (Walker Harris Decl.) ¶ 14.

Supp. 2d at 726.

Defendants hardly engage with Plaintiffs' competitive injuries beyond the rubric, but Plaintiffs also alleged that the NOFO's incorporation of the Challenged Conditions altered eligibility. A.R. 149; Compl. ¶¶ 123, 183, 191. Requiring applications to address the Conditions (including site-specific plans for reproductive counseling) and conditioning funding on alignment leaves some incumbent projects "effectively barred from applying for and receiving funds which they are legally entitled to seek." *Freedom Network v. Trump*, 830 F. Supp. 3d 681, 712 (N.D. Ill. 2026) (NOFO grant conditions as applicant eligibility bars); *Illinois v. F.E.M.A.*, 801 F. Supp. 3d 75, 90 (D.R.I. 2025) (same). Defendants ignore this legal reality, deny that applicants must address particular practices, and point to the absence of labeled "eligibility bars" in the NOFO's eligibility section as a last resort. Defs.' Mem. at 7. Further, regardless of the Challenged Conditions' effect on *their* eligibility, Plaintiffs suffer competitive injury from the Agencies' unlawful attempt to change the rules and render *new* "programs that do not qualify under" prior rules eligible, thus "intensif[ying] the competition." *Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1055 (D. Or. 2018); *Sherley*, 610 F.3d at 74; *see* Complaint ¶¶184, 191–92. Defendants' response presumes the legal efficacy of their savings clauses at forestalling such changes in rules—effectively "put[ting] the merits cart before the standing horse." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013).

Defendants' reliance on *NFPRHA* is also misplaced. In *NFPRHA*, the court considered a challenge to the same 2027 NOFO and dismissed the plaintiffs' claims as unripe under the Third Circuit's *Step-Saver* framework. *NFPRHA*, 2026 WL 2790025, at *2–4 (citing *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990)). There, the plaintiffs asserted that the NOFO placed them at a competitive disadvantage in applying for Title X grants, *id.* at *2, and the court concluded that the NOFO imposed no penalty, terminated no existing grant, and left plaintiffs

facing only "uncertainty over how best to apply for a federal grant." *Id.* at *3. It further concluded that the plaintiffs faced no competitive disadvantage because they were not barred from applying for any portion of the grants and the NOFO's guidelines applied "uniformly" to all applicants. *Id.* at *3, *7. That analysis, however, departs from governing competitive injury precedent; misapprehends the nature of the alleged injuries and the effect of the NOFO; and is, in any event, distinguishable from this case.

Contrary to the *NFPRHA* decision, the absence of a penalty or termination of an existing grant is *not* the standard for competitive injury, nor is the fact that a plaintiff remains formally eligible to apply or that the NOFO applies its criteria uniformly. Even without considering other caselaw, *Northeastern Florida* and *Reno* alone confirm that the injury is the inability to compete on equal footing, not the loss of a contract. *See* 508 U.S. at 666; 509 U.S. at 58 n.19. Similarly, in this District, the *Baltimore Gas* court held in a bid solicitation context that "a bidder's right to a legally valid procurement process constitutes a cognizable injury sufficient to confer standing to seek 'forward looking [declaratory and injunctive] relief,'" 133 F. Supp. 2d at 726 (alteration in original), and explained that the plaintiff's injuries were ripe because "[t]he Solicitation is in final form, and it is this form which [plaintiff] alleges causes injury," *id.* at 728. The *NFPRHA* court's suggestion that uniform criteria cannot inflict competitive injury misstates caselaw and conflates facial neutrality with equal effect, limiting its applicability in the instant case.

The *NFPRHA* court also misapprehends the present effect of the NOFO. It does not create mere "uncertainty over how best to apply for a federal grant." *NFPRHA*, 2026 WL 270925, at *3. The NOFO, which assigns 35 of 100 merit review points to alignment, directs applicants to address Agency Priorities in their proposals and conditions funding on ongoing compliance with them—forcing Plaintiffs to account for the Challenged Conditions as they draft applications now.

Finally, *NFPRHA* is distinguishable because this case involves different plaintiffs, different factual predicates, additional theories of injury, and different legal issues.[15] Plaintiff States establish present administrative and programmatic burdens, conflicts between the challenged conditions and state law, and injuries to the reproductive health systems and provider relationships that the States have developed and funded. Those injuries do not turn solely on whether a particular application ultimately receives an award, and they were not evaluated in *NFRPHA*.

***B. The 2027 NOFO Imposes Present Administrative and Programmatic Burdens.***

The Challenged Conditions impose present administrative and programmatic burdens on Plaintiffs. Attempting to comply with the Challenged Conditions is already imposing significant administrative costs on Plaintiffs, who may need to expend hundreds of hours of staff time and effort to create new programs or identify new subgrantees and reorganize longstanding subrecipient networks. *See* Ex. 10 (Sullivan Decl.) ¶ 15; Ex. 11 (Lyon-Callo Decl.) ¶ 16; Ex. 14 (Humphrey Decl.) ¶ 18; Ex. 19 (Campagna Decl.) ¶ 19; Ex. 22 (Redick-Ponte Decl.) ¶ 19. Plaintiffs also must attempt to reconcile the Challenged Conditions with existing Title X requirements—*see, e.g.*, Ex. 14 (Humphrey Decl.) ¶ 17; Ex. 16 (O'Donnell Decl.) ¶ 23; Ex. 19 (Campagna Decl.) ¶¶ 10, 16–17—and their own State laws.[16] Compliance-related burdens are cognizable injury. *Liberty Univ.*, 733 F.3d at 89–90 (where a plaintiff "must take measures to ensure compliance in advance," and those measures "may well incur additional costs," injury was sufficiently imminent.)

Defendants suggest that Plaintiffs' redesign costs are contingent on their own choices to

---

[15] For instance, Plaintiff States, unlike NFPRHA, challenge the Directive Counseling Priority; the NOFO charges applicants with addressing reproductive goals counseling a per-site basis in their applications. *See* A.R. 093–94.
[16] *See, e.g.,* Ex. 2 (Heller Decl.) ¶¶ 19–20; Ex. 10 (Sullivan Decl.) ¶¶ 17, 20; Ex. 14 (Humphrey Decl.) ¶ 19; Ex. 16 (O'Donnell Decl.) ¶ 24; Ex. 17 (Shore Decl.) ¶ 17; Ex. 19 (Campagna Decl.) ¶ 20; Ex. 21 (Stalberg Decl.) ¶ 17; Ex. 22 (Redick-Ponte Decl.) ¶¶ 19–20; Ex. 23 (Tran Decl.) ¶¶ 19–20.

redesign programs or simply the price of applying. Defs.' Mem. at 11–12. But when grant applicants allege that the government unlawfully "intensified the competition for a share in a fixed amount of money," the fact that "plaintiffs will have to invest more time and resources to craft a successful grant application"—*above and beyond* what they would have to invest in a lawfully-administered contest—is no mere contingent or self-inflicted cost but rather "an actual, here-and-now injury." *Sherley*, 610 F.3d at 74. Plaintiffs' burdens arise now from a NOFO that demands they submit ready-to-implement, detailed proposals by January that meet Challenged Conditions that clash with the Title X rules they have structured their existing programs around. *See, e.g.*, Ex. 7 (Caloia Decl.) ¶¶ 10, 17–18; Ex. 10 (Sullivan Decl.) ¶¶ 17–19; Ex. 11 (Lyon-Callo Decl.) ¶¶ 17–18; O'Donnell Decl. ¶¶11, 20–23.

### *C. The 2027 NOFO Unlawfully Upends the Federal Funding Regime on which Existing Reproductive Health Systems within the Plaintiff States Depend.*

The Challenged Conditions also affect the federal funding regime on which existing Title X programs and provider networks within Plaintiff States depend. Plaintiffs include both States that manage Title X programs directly,[17] and those that are not direct recipients but partner with and rely on grant recipients within their borders to meet residents' needs.[18] Many have invested State resources in reliance on consistent Title X funding that supports family planning services that meet the program's mandates, developing statewide subrecipient networks, supporting both other direct grantees and their own subrecipients with braided federal and State funds, and building

[17] Ex. 2 (Heller Decl.) ¶ 4; Ex. 4 (Fletcher Decl.) ¶ 4; Ex. 6 (Masinter Decl.) ¶ 4; Ex. 7 (Caloia Decl.) ¶ 4; Ex. 10 (Sullivan Decl.) ¶ 4; Ex. 8 (Blodgett Decl.) ¶ 3; Ex. 11 (Lyon-Callo Decl.) ¶ 4; Ex. 14 (Humphrey Decl.) ¶ 4; Ex. 16 (O'Donnell Decl.) ¶ 4; Ex. 17 (Shore Decl.) ¶ 4; Ex. 19 (Campagna Decl.) ¶ 4; Ex. 21 (Stalberg Decl.) ¶ 4; Ex. 20 (Walker Harris Decl.) ¶ 5; Ex. 22 (Redick-Ponte Decl.) ¶ 4; Ex. 23 (Tran Decl.) ¶ 4.

[18] Ex. 1 (Khalfani Decl.) ¶ 10; Ex. 3 (Britos Decl.) ¶ 8, 13; Ex. 5 (Nihoa Decl.) ¶ 13; Ex. 9 (Harakall Decl.) ¶12; Ex. 12 (Woodrich Decl.) ¶ 13; Ex. 13 (Jones Decl.) ¶13; Ex. 18 (Rodack Decl.) ¶ 13.

State-funded counterparts and infrastructure to supplement the federal Title X program.[19] All Plaintiff States rely on these Title X grantees to deliver cost-effective early stage and preventive care to a population that disproportionately relies on state funding.[20]

Regardless of whether any particular grantee ultimately receives Title X funding, the NOFO changes the federal funding conditions on which those existing systems depend. Some of these Conditions are in tension with both the very Title X rules that ensure grantees provide comprehensive and medically appropriate services for all populations, *see infra* Argument Section II.B,[21] and State laws in some Plaintiff States.[22] And threatening termination for failure to align turns compliance into a requirement for participation in Title X. Even if in-state grantees *do* receive Title X funding under the 2027 NOFO, the Challenged Conditions inhibit the services they can provide, harming State public health systems. Without access to the full slate of Title X services, Title X clients will rely on state safety nets. States will foot the bill for costly downstream services like maternity care for unwanted pregnancies (born to parents now deprived of

[19] Ex. 2 (Heller Decl.) ¶ 5, 9; Ex. 3 (Britos Decl.) ¶¶ 13, 19; Ex. 4 (Fletcher Decl.) ¶ 23; Ex. 5 (Nihoa Decl.) ¶ 13; Ex. 6 (Masinter Decl.) ¶ 5; Ex. 9 (Harakall Decl.) ¶ 5; Ex. 10 (Sullivan Decl.) ¶ 5; Ex. 8 (Blodgett Decl.) ¶¶ 4, 9; Ex. 11 (Lyon-Callo Decl.) ¶ 5; Ex. 12 (Woodrich Decl.) ¶¶ 6, 16; Ex. 13 (Jones Decl.) ¶¶ 5, 13; Ex. 14 (Humphrey Decl.) ¶¶ 13, 25; Ex. 16 (O'Donnell Decl.) ¶¶ 5, 12; Ex. 17 (Shore Decl.) ¶¶ 5, 8; Ex. 22 (Redick-Ponte Decl.) ¶ 5; Ex. 23 (Tran Decl.) ¶ 5.

[20] *See, e.g.*, Ex. 2 (Heller Decl.) ¶¶ 7, 8, 23; Ex. 3 (Britos Decl.) ¶¶ 6, 7, 8, 17; Ex. 4 (Fletcher Decl.) ¶¶ 8, 9, 21; Ex. 5 (Nihoa Decl.) ¶¶ 7, 8, 16; Ex. 6 (Masinter Decl.) ¶¶ 8, 9, 21; Ex. 7 (Caloia Decl.) ¶¶ 8, 9, 23; Ex. 9 (Harakall Decl.) ¶¶ 8, 9, 24; Ex. 10 (Sullivan Decl.) ¶¶ 8, 9, 24; Ex. 8 (Blodgett Decl.) ¶¶ 7–8, 19, 22; Ex. 11 (Lyon-Callo Decl.) ¶¶ 8, 9, 21; Ex. 12 (Woodrich Decl.) ¶¶ 7, 8, 16; Ex. 15 (Ireland Decl.) ¶ 7; Ex. 13 (Jones Decl.) ¶¶ 7, 8, 17; Ex. 14 (Humphrey Decl.) ¶¶ 8, 9, 23; Ex. 16 (O'Donnell Decl.) ¶¶ 8, 9, 10, 29; Ex. 17 (Shore Decl.) ¶¶ 8, 9, 23; Ex. 18 (Rodack Decl.) ¶¶ 8, 15; Ex. 19 (Campagna Decl.) ¶¶ 8, 9, 24; Ex. 21 (Stalberg Decl.) ¶¶ 8, 9, 21; Ex. 20 (Walker Harris Decl.) ¶¶ 9, 10, 22; Ex. 22 (Redick-Ponte Decl.) ¶¶ 8, 9, 24; Ex. 23 (Tran Decl.) ¶¶ 8, 9, 23.

[21] *See also, e.g.*, Ex. 11 (Lyon-Callo Decl.) ¶¶ 16, 18 (NOFO's Priorities forces Michigan to choose between maintaining an "existing Title X program, which it knows to be efficacious" and creating a new program "despite . . . a lack of evidence base on the expected efficaciousness of these new programs"); Ex. 10 (Sullivan Decl.) ¶¶ 16–17, 19 ("Based on my professional experience, forcing grantees to alter counseling or restrict access to certain contraceptive methods undermines clinical standards of care").

[22] *See, e.g.,* Ex. 2 (Heller Decl.) ¶¶ 19–20; Ex. 10 (Sullivan Decl.) ¶¶ 17, 20; Ex. 14 (Humphrey Decl.) ¶ 19; Ex. 16 (O'Donnell Decl.) ¶ 24; Ex. 17 (Shore Decl.) ¶ 17; Ex. 19 (Campagna Decl.) ¶ 20; Ex. 21 (Stalberg Decl.) ¶ 17; Ex. 22 (Redick-Ponte Decl.) ¶¶ 19–20; Ex. 23 (Tran Decl.) ¶¶ 19–20.

nondirective counseling), treatment for polycystic ovary syndrome complications (for patients who relied on Title X for hormonal contraception that constitutes first-line care), STI treatment in transgender communities (from improper screenings tethered to sex assigned at birth), and late-stage cancer care for patients who do not speak English (from "ending" the Title X inclusiveness programming that invested in medical interpreters). *See also infra* Argument Section II.B.1.

Meanwhile, if in-state grantees do *not* receive federal funding, Plaintiff States will have to fill the gap to prevent ruinous harm to their residents and their public health infrastructure. *See, e.g.*, Ex. 11 (Lyon-Callo Decl.) ¶¶ 20–23, Ex. 4 (Fletcher Decl.) ¶¶ 20–23. Many may be unable to continue funding programs at the same level, and even those that can will face delays and difficult choices as their legislatures determine how to reallocate funds from other critical programs. *See, e.g.*, Ex. 11 (Lyon-Callo Decl.) ¶ 23; Ex. 21 (Stalberg Decl.) ¶ 19; Ex. 20 (Walker Harris Decl.) ¶ 20. The resulting disruptions will increase administrative and State expenditures, threaten provider capacity, workforce, appointment availability, outreach, and family-planning services, and fracture networks that cannot easily be rebuilt. *See, e.g.*, Ex. 16 (O'Donnell Decl.) ¶ 30; Ex. 19 (Campagna Decl.) ¶ 24; Ex. 22 (Redick-Ponte Decl.) ¶ 25. Either way, Plaintiff States will bear costs far beyond a single lost grant. *See, e.g.*, Ex. 2 (Heller Decl.) ¶ 26. Plaintiffs need not establish that every downstream consequence has already occurred, and the involvement of other grantees or providers does not break the causal chain. *City of Columbus*, 453 F. Supp. 3d at 788 ("[T]he defendant's conduct need not be the last link in the causal chain"; standing may rest on the "predictable effect of Government action" on third parties.)

### *D. Plaintiffs Need Not Await an Award Decision to Establish Their Present Injuries.*

Defendants characterize Plaintiffs' injuries as predictions about how HHS will evaluate their applications. Defs.' Mem. at 9–12. But all Plaintiffs' injuries are already occurring or

imminent: their competitive injuries arise from criteria the NOFO already established; their administrative injury arises from work those criteria is forcing them to undertake now; and their programmatic and sovereign injuries arise from the NOFO's alteration of the conditions governing federal Title X funding, which they must anticipate now to protect their health systems from calamity. *See Liberty Univ.*, 733 F.3d at 90. And setting aside the Challenged Conditions would redress Plaintiffs' injuries by removing the criteria and conditions that give rise to their present competitive and administrative burdens; Plaintiffs need not show that vacatur guarantees any particular award. *See* Defs.' Mem. at 16.

Additionally, Plaintiffs' injuries cannot be fully remedied *post hoc*, and delay imposes hardship. *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967); *Fort Sumter Tours, Inc. v. Andrus*, 564 F. 2d 1119 (4th Cir. 1977). A future ruling will not spare Plaintiffs from having to make binding representations in their applications while facing "a dilemma now: (a) apply with the project ideas that [they] want[] to pursue, thus running the risk of being disadvantaged or disqualified by the funding conditions during the review process, or (b) give up on [their] desired mission and tailor [their] application[s] in accordance with the funding conditions to preserve [their] chance at receiving federal funding." *Freedom Network*, 830 F. Supp. 3d at 699 (standing and ripeness in challenge to NOFO with grant conditions); Ex. 2 (Heller Decl.) ¶ 15; Ex. 4 (Fletcher Decl.) ¶ 16; Ex. 6 (Masinter Decl.) ¶ 16; Ex. 7 (Caloia Decl.) ¶ 16; Ex. 11 (Lyon-Callo Decl.) ¶ 16; Ex. 14 (Humphrey Decl.) ¶ 16; Ex. 17 (Shore Decl.) ¶ 16. Moreover, grant contests cannot be rerun. *Planned Parenthood of N.Y.C., Inc. v. H.H.S.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[I]f HHS is allowed to issue grants under the [NOFO], plaintiff's injury will become irreparable: 'there can be no do over and no redress.'")); *Planned Parenthood of Wis., Inc. v. Azar*, 942 F.3d

512, 516 (D.C. Cir. 2019).[23]

## II. The NOFO's Incorporation of the Challenged Conditions Violates the APA.

### *A. The NOFO's Incorporation of the Challenged Conditions Constitutes Final Agency Action under the APA.*

Agency action is final if it (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Courts take a "'pragmatic' approach" to applying this test. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016); *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 262 (4th Cir. 2022).

First, as courts evaluating similar NOFOs have found, the 2027 Title X NOFO "demonstrates the consummation of [OPA's] decision-making process regarding its priorities and considerations in evaluating grant applications." *Freedom Network*, 830 F. Supp. 3d at 711; *see also Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1057 (D. Or. 2018). Although "awardees are yet to be chosen, there is nothing remotely 'tentative' or 'interlocutory' about the rubric that the agency will use." *Hennepin Cnty.,* 2026 WL 2426300, at *18. Its mandate that projects "*must* align program design and activities" with the Challenged Conditions confirms it "represent[s] the agency's 'last word on the matter' of eligibility even if the final awardees have yet to be chosen." *Id.* (HHS NOFO with identical language about award conditions was final).[24]

Second, "legal consequences flow" from the NOFO. The NOFO establishes that recipients

[23] Additionally, the tight schedule the NOFO sets, under which applicants will be notified of their outcomes only a few days before grant turnover, A.R. 113, would all but ensure catastrophic funding disruptions for any denied incumbent grantees, who will face such immediate demands as making payroll, paying rent, filling prescriptions, and meeting scheduled appointments. *See, e.g.*, Ex. 14 (Humphrey Decl.) ¶ 11; Ex. 16 (O'Donnell Decl.) ¶¶ 26, 30; Ex. 20 (Walker Harris Decl.) ¶ 23.

[24] *Cf. Planned Parenthood of Wis., Inc. v. Azar*, 316 F. Supp. 3d 291, 301 (D.D.C. 2018), *vacated and remanded*, 942 F.3d 512 (D.C. Cir. 2019) (distinguishing 2018 Title X funding announcement because it merely "involve[d] scoring criteria, not eligibility criteria" and lacked "definitive language telling applicants that their proposals 'must comply'").

*must* implement their projects in compliance with the Conditions or face termination. And, of course, they must not deviate from the highly-detailed proposals when implementing their projects—or they would face classic False Claims Act liability, as the NOFO requires them to acknowledge. A.R. 132. By locking applicants into either termination or liability if their submissions do not align, it imposes "legal consequences" on them. Essentially, the NOFO ensures that "'[w]ithout agreeing to the challenged conditions, [applicants] are effectively barred from applying for and receiving funds which they are legally entitled to seek. And the challenged conditions will potentially change the lawful scope of activities permitted with grant funds, lead to the termination of grant awards,' and result in civil or criminal liability under the False Claims Act." *Freedom Network*, 830 F. Supp. 3d at 712 (quoting *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 68 (D.R.I. 2025)). Courts examining similar NOFOs have also noted that challenges to agency standard grant conditions "routinely hold that agency action is final where it affects grant eligibility criteria," even before those conditions are embedded in NOFOs. *Planned Parenthood N.Y.C.*, 337 F. Supp. 3d at 329 (collecting cases); *accord. Illinois*, 801 F. Supp. 3d at 89 (collecting agency standard grant conditions cases). Finally, the NOFO engenders legal consequences in governing how review panels and agency personnel will evaluate applications. *E.g.*, *Biden v. Texas*, 142 S. Ct. 2528, 2544-45 (2022). Its incorporation of the Challenged Conditions is thus final agency action.

### *B. The NOFO's Incorporation of the Challenged Conditions is Arbitrary and Capricious.*

Courts must "hold unlawful and set aside agency action" that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). Agency action is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, offered an explanation for

its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the Agencies' decision to impose new "NOFO term[s]" requiring alignment with "agency priorities" on the Title X program, pursuant to a new blanket policy of doing so for *every* discretionary HHS grant program, A.R. 148–50, was neither "reasonable [nor] reasonably explained," *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021). This across-the-board approach precluded consideration of program-specific laws and regulations, existing agency policies, reliance interests, or even the type of services Title X supports. In incorporating the Challenged Conditions in the 2027 NOFO, the Agencies have (1) silently departed from prior Title X policies without acknowledgment, reasoned explanation, or consideration of reliance interests; (2) ignored the need for clear standards for participating in Title X; and (3) unreasonably incorporated Irrelevant HHS Priorities. Plaintiffs are therefore entitled to summary judgment on Count II of their Complaint.

1. *The Agencies abandoned prior positions within Title X without acknowledgement, reasoned explanation, or consideration of reliance interests.*

Agencies are "of course . . . 'free to change their existing policies,'" but only "'as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests.'" *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 111 (D. Md. 2025) (quoting *F.D.A. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) and *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)) (internal quotes partially omitted). And an agency "must" "provide a more detailed justification than what would suffice for a new policy created on a blank slate . . . when . . . its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has

engendered serious reliance interests that must be taken into account." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (*Fox I*); *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 297–98 (4th Cir. 2018). Here, the Directive Counseling, Overmedicalization, Anti-Gender Ideology, Anti-DEI, and Hyde Amendment Priorities depart from positions in regulations and the QFP that encouraged reliance and rested on research. The Agencies were required to acknowledge the change, weigh reliance, and explain why prior findings no longer hold. They did not.

*i. The Directive Counseling Priority*

In ordering clinics to offer unsolicited advice on the value of "marriage prior to childbearing" and "affirm marriage and parenthood as meaningful and valued components of adult life," A.R. at 083, Defendants "depart[ed] from a prior policy *sub silentio* [and] simply disregard[ed] rules that are still on the books." *Fox I*, 556 U.S. at 515. The Directive Counseling Priority breaks with longstanding Agency positions on nondirective counseling and client-centered care expressed in regulations, *see infra* Section II.D.1 (regulatory conflicts), and the QFP, a collection of consensus clinical guidelines which OPA published to offer a "nationally recognized standard of care" grantees can follow to fulfill their regulatory responsibilities. Ex. B; 42 C.F.R. § 59.5(a)(3). To deliver "quality counseling," the QFP instructs providers to "avoid attempts to redirect [patient] goals" and to offer "information that supports [patient] desires . . . that is balanced, nonjudgmental, and supported by scientific research." Ex. A, S50. By contrast, the NOFO's "reproductive goals counseling" requirement conditions funding on providers' promotion of this Administration's vision of what their clients' reproductive goals *should* be. A.R. at 083, 093–94. The QFP states that after delivering "pregnancy test results . . . in a neutral tone," providers should "validate and normalize multiple, complex and varied feelings around pregnancy." Ex. A, S67. They should "offer factual, neutral, nonjudgmental information about

*each option*" patients ask to learn about, including parenthood, adoption, and abortion, and "affirm [their] decision." Ex. A, S68 (emphasis added). Affirming only parenthood, or parenthood only after marriage, contradicts these strictures.

The Agencies failed to offer a reasoned explanation for the change. First, the NOFO asserts, without attribution, that "research demonstrates that individuals who follow [the] sequence [of milestones such as marriage before childbearing] experience substantially lower risks of poverty." A.R. 083. But no such "research" appears in the administrative record, so the Agencies could not have considered it. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977). Second, the NOFO invokes OPA's own 2020 Fertility Knowledge Survey. A.R. 083; Ex. F. But that survey concerned clinicians' role in providing objective medical information, not offering directive advice on client life goals. Ex. F, 19. OPA's "failure to consider problems regarding the . . . relevancy of [the survey]" it used as "the primary factual basis for [its] justification for changing" position renders its action fatally "arbitrary and capricious." *Bedford Cnty. Mem'l Hosp. v. H.H.S.*, 769 F.2d 1017, 1022 (4th Cir. 1985); *see also Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012); *Hennepin* at *21 (HHS NOFO for Teen Pregnancy Prevention Program "reference[s] public health studies that appear either not to exist or not to support the propositions for which they are cited"). Nor has OPA explained why it now disregards the studies underlying the QFP's conclusion that nondirective counseling has "been shown to improve the quality of contraceptive counseling and contraceptive method satisfaction and is recommended in the delivery of a wide range of [sexual and reproductive health] services." Ex. A S50–51; *see also* Ex. A at S56–57; *Fox I*, 556 U.S. at 515.

OPA's past position not only encouraged but demanded reliance from incumbent grantee

states, who have structured their programs to meet 42 C.F.R. § 59.5(a)'s mandates for client-centered services and nondirective pregnancy options counseling and the QFP's standards "'[i]n good-faith reliance on [agency] pronouncements.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012) (quoting *N.L.R.B. v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974)). *See, e.g.*, Ex. 14 (Humphrey Decl.) ¶ 9–10; Ex. 11 (Lyon-Callo) Decl. ¶ 17; Ex. 10 (Sullivan Decl.) ¶ 17; Ex. 16 (O'Donnell Decl.) ¶¶ 4, 21. OPA's site visit rubrics penalize projects that do not meet the QFP "quality counseling" standards, Ex. E (2022 Title X Program Review Tool), 8–9, and OPA has trained grantees to implement nondirective counseling protocols.[25] But the administrative record demonstrates OPA never even "assess[ed] whether there were reliance interests [on its prior position]," let alone "determine[d] whether they were significant, and weigh[ed] any such interests against competing policy concerns." *D.H.S. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) ("*Regents*"); *see also Casa De Maryland v. D.H.S.*, 924 F.3d 684, 705 (4th Cir. 2019).

*ii. The Overmedicalization Priority*

The Overmedicalization Priority's discouragement of hormonal contraception reverses the Agencies' prior evidence-backed position on contraception without acknowledgement, reasoned explanation, or consideration of reliance interests. Contraception—a foundational building block of Title X—appears only in the NOFO's Overmedicalization Priority, which declares that OPA "recognizes the overreliance on pharmaceutical and surgical treatments" and alludes to research showing a "decrease in females' current use of any contraception" and that the "most common reason women reported discontinuing use related to dissatisfaction was side effects." A.R. 081.

[25] *E.g.*, Ex. A, S54. Grantee Plaintiff States have in turn adopted that rubric to monitor their own subrecipients, e.g., Ex. 7 (Caloia Decl.) ¶ 10; paid to send their staff to OPA-endorsed trainings, e.g., Ex. 16 (O'Donnell Decl.)¶ 11; and invested in durable training infrastructure like training centers to support program practitioners and staff, Ex. 8 (Blodgett Decl.) ¶ 9, and educational programming for subrecipients, Ex. 2 (Heller Decl.) ¶ 9.

Mentioning contraception just once, and then negatively, is a sharp break with the past.[26] For over half a century, the Agencies have held the Title X program out as a source of "*comprehensive* medical . . . services necessary to aid individuals to determine freely the number and spacing of their children." 42 C.F.R. § 59.1 (emphasis added); Grants for Family Planning Services, 36 Fed. Reg. 18465, 18466 (Sept. 15, 1971). They have consistently stated that Title X's regulatory requirement that grantees provide a broad range of services, "includ[ing] FDA-approved contraceptive products," includes hormonal contraception. 42 C.F.R. §§ 59.5(a)(1), 59.2; *see also infra* Section III.D.2 (additional regulatory conflicts). The QFP documents that "access to a full range of hormonal and nonhormonal contraceptive options" is medically necessary to serve clients, given noncontraceptive indications for some methods (such as menstrual management, endometriosis, and polycystic ovary syndrome) and contraindications. Ex. A, S54–55.

The Agencies' explanation for this change runs counter both to the evidence before the agency and the facts underlying its prior position. The NOFO cites two sets of sources: first, a set of three Center for Disease Control and Prevention ("CDC") snapshots of contraceptive use to show a "decrease in females' current use of any contraception" between 2015 and 2023; and second, a National Health Statistics Reports ("NHSR") survey indicating that the "most common reason women reported discontinuing use [of contraception] related to dissatisfaction was side effects." A.R. 081; Exs. G–J. Although "satisfactory explanation" requires "'rational connection between the facts found and the choice made,'" none of these sources supports the NOFO's implication that women are quitting contraception due to dissatisfaction with overmedicalization.

[26] *See* Ex. 11 (Lyon-Callo Decl.) ¶ 17 (State that has participated in Title X since 1972 noting that "[n]one of the priorities aim to increase access to contraception despite it being the cornerstone of the Title X regulations").

*State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The CDC studies show that the decrease in contraception users reflects a concordant increase in the number of women who are pregnant, postpartum, or trying to get pregnant; not sexually active; or infertile.[27] And the NHSR survey did not tie this decrease to side effects. Because it only investigated dissatisfaction, it excluded women who stopped using contraception in order to get pregnant—a major driver of the decline the CDC found. Ex. J, 3. More importantly, although the NOFO implies that both sources concern the same "use" of contraception, the NHSR survey did not ask about discontinuing use of contraception entirely but rather asked women about any time they discontinued use *of a specific formulation of a specific method*—including to switch to a different brand or product. *Id.* Finally, OPA already considered evidence that "side effects are one of the most common reasons for discontinuation" of methods—and concluded that research showed that "discontinuation or switching of a method is normal and expected" and clinics therefore should offer a wide range, including hormonal methods. Ex. A, S55–58. The Agency offers no explanation for why it now overlooks that evidence. *See Fox I*, 556 U.S. at 515.

The administrative record again reflects no consideration of reliance interests, even though Plaintiff States have relied on Title X's support in providing services, including contraception, to low-income and underinsured populations to avoid downstream public sector healthcare costs. *See, e.g.*, Ex. 3 (Britos Decl.) ¶¶ 8, 15, 17; Ex. 5 (Nihoa Decl.) ¶ 5–8, 15–16; Ex. 9 (Harakall Decl.) ¶¶ 6–8, 15; *see also Regents*, 591 U.S. at 31 (states' dependence on tax revenue from DACA recipients was "legitimate reliance interest"). The Agencies may not now use leverage of the

[27] *Compare* Ex. G, 2–3 (in most recent data, 45.8% of women were not using contraception: 37.7% because they were pregnant, postpartum, seeking pregnancy, sterile, or not sexually active and 8.2% other nonusers) *with* Ex. H, 2 (34.7% of women were not using contraception: 27.6% because they were pregnant, postpartum, seeking pregnancy, sterile, or not sexually active and 7% other nonusers) *and* Ex. I, 2 (35.1% of women were not using contraception: 27.2% because they were pregnant, postpartum, seeking pregnancy, sterile, or not sexually active and 7.9% other nonusers).

NOFO process to engage in an ad hoc "rapid, untimely overhaul" of their own policies without considering "the impact . . . on the organizations that administer [current] programs and the individuals that rely upon them" and "the harm caused by the funding gaps it create[s]." *Washington v. Dep't of Hous. & Urb. Dev.*, No. 25-CV-626, 2026 WL 1863886, at *3 (D.R.I. June 29, 2026).

*iii. The Anti-Gender Ideology Priority*

Requiring alignment with the Anti-Gender Ideology Priority presents an "unexplained inconsistency" with the Agencies' prior position on family planning services for transgender individuals. *Jimenez-Cedillo*, 885 F.3d at 298 (quoting *Encino*, 579 U.S. at 221 and *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). Conditioning Title X funding on "accurately reflect[ing] . . . the biological reality that a person's sex, as either male or female, is unchangeable and determined by objective biology" is inconsistent with regulations mandating nondiscriminatory care and the QFP. *Compare* A.R. 135, 144 *with* 42 C.F.R. §§ 59.5(a)(3)–(4); *see also infra* Section III.D.3 (regulatory conflicts). The QFP directs providers to meet the family planning needs of transgender clients through practices such as integrating fertility planning into medical transition, accurately documenting patients' names and pronouns in medical records, and providing care "based on the organs that a person currently has." Ex. A, S72–73. While the NOFO cryptically warns that a "key strategy" to meet this Priority is "ensuring referral pathways align with evidence-based care," A.R. at 083, the QFP concretely states that clinics should offer information about accessing gender-affirming care and refer patients to LGBTQ+ community groups. Ex. A, S72–73.

OPA's bare assertion that the Anti-Gender Ideology Priority "ensur[es] that federally supported programs reflect the best available scientific evidence" and is therefore "central to

promoting lifelong physical and reproductive health" is not a reasonable explanation. A.R. 083. Nor does the administrative record contain evidence that supports conditioning family planning services funding on tethering care to patients' "unchangeable" birth sex, contrary to nationally recognized standards of care. A.R. 135; *see also Mayor & City Council of Balt. v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020) (en banc) ("*Mayor of Balt.*") (when altering Title X, the Agencies must provide "a satisfactory explanation for disagreeing with every major medical association" and may not "defend [such a change] only by saying, 'because we said so'"), *cert. granted sub nom. Cochran v. Mayor & City Council of Balt.*, 592 U.S. 1262 (2021), and *cert. dismissed as moot sub nom. Becerra v. Mayor & City Council of Balt.*, 141 S. Ct. 2618 (2021). Indeed, the QFP and other "pertinent" medical standards, which grantees have a duty to follow pursuant to 42 C.F.R. § 59.5(a)(3)'s mandate, establish that clinicians *cannot* provide effective family planning services to transgender clients without recognizing the reality of medical transition. *Cf. Planned Parenthood of Greater N.Y. v. H.H.S.*, No. CV 25-2453, 2025 WL 2840318, at *27 (D.D.C. Oct. 7, 2025) (similar condition was not "reasoned" because "reject[ing] the existence of . . . transgender individuals . . . would be not only scientifically false . . . but also would seem to inhibit . . . the goal of reducing unwanted teen pregnancies"); *Washington v. H.H.S.*, No. 6:25-CV-01748-AA, 2025 WL 3002366, at *16–17 (D. Or. Oct. 27, 2025) (similar condition was "unreasoned" as it was "obvious that gender minority youth are at risk of pregnancy or contracting STIs"). For instance, the QFP explains that Title X grantees must anticipate the changes medical transition brings to provide fertility counseling. Ex. A, S72. Similarly, the CDC's 2021 STI Treatment Guidelines—which are wholly incorporated in the QFP, *id*. at S62, independently designated a "pertinent" standard by OPA, Ex. C, 11, and issued by Defendant HHS's sub-agency CDC—instructs providers to use different procedures when screening transgender men for STIs or cancer

based on anatomic diversity due to medical transition. Ex. D, 22.

The Agencies' cavalier abandonment of their past position likewise ignores the reliance interests it was required to "weigh . . . against competing policy concerns." *Regents*, 591 U.S. at 33. Relying on the Agencies' expressed position, health agencies and other grantees within Plaintiff States have developed Title X networks that recognize their regulatory duty to ensure that transgender patients can actively participate in and benefit from family planning under 42 C.F.R. § 59.5(a)(3), including by developing trainings to teach providers how to offer quality, inclusive family planning care for transgender and nonbinary clients. *See* Ex. 14 (Humphrey Decl.) ¶ 17; Ex. 8 (Blodgett Decl.) ¶¶ 9, 16. The administrative record never assesses or weighs these interests.

*iv. The Anti-DEI Priority*

Title X regulations encode diversity, inclusivity, and equity, *see infra* Section III.D.4, and OPA has identified "health equity" as the "overarching . . . principle[]" that shaped the 2024 QFP update and "the focus of all recommendations at each step in the process." Ex. A, S46. But the Anti-DEI Priority announces OASH's blanket intent to "end" health equity—without acknowledging its central role in Title X. A.R. 134–35. The Agencies do not adequately explain this reversal. Their assertion that "health equity" has "mainly focused on identifying and documenting worse health outcomes for minority populations [and] has not translated into measurable improved health for minority populations" both departs from the meaning of health equity in Title X, *compare* A.R.135 *with* 42 C.F.R. § 59.2 *and* Ex. A, S44, and lacks any support in the administrative record. And the Agencies once again failed to consider the reliance interests of Plaintiff States, which now depend on longstanding Title X programs designed to comply with

Title X's mandates.[28] *See Regents*, 531 U.S. at 33. For instance, OPA has required grantees to comply by incorporating assessments of whether grantees are "[a]dvanc[ing] health equity through the delivery of Title X service" through concrete steps like "staff training" and a sufficient "referrals policy or system/process." Ex. E (Title X 2022 Program Review Tool), 8. States like New Mexico have accordingly incorporated "health equity" throughout its health department's Title X program mission. *See* Ex. 14 (Humphrey Decl.) ¶ 20.

*v. The Hyde Amendment Priority*

The NOFO's incorporation of the Hyde Amendment Priority is arbitrary and capricious to the extent that its call for "life-affirming [and] lawful" Title X programming is not mere surplusage but rather a change in position. A.R. 084. After invoking the inapplicable Hyde Amendment, the Priority repeats one of Congress's two mandates about abortion in Title X: the prohibition on using Title X funds "in programs where abortion is a method of family planning." A.R. 079; 42 U.S.C. § 300a-6. It omits the second mandate: the annual appropriations rider's nondirective pregnancy counseling requirement. Pub. L. No. 119-75, 140 Stat. 173, 262 (2026). All Title X grantees must already meet these requirements, which are encoded in regulations at 42 C.F.R. § 59.5(a)(5) that were initially adopted shortly after Congress first passed the counseling rider. Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41270, 41273, 41279 (July 3, 2000). However, § 59.5(a)(5) was briefly replaced by the 2019 Title X Rule—which contained "undue and improper restrictions" the Agencies have disavowed. Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86

[28] *See* Ex. 8 (Blodgett Decl.) ¶ 18; Ex. 7 (Caloia Decl.) ¶ 18; Ex. 10 (Sullivan Decl.) ¶ 18; Ex. 11 (Lyon-Callo Decl.) ¶ 18; Ex. 14 (Humphrey Decl.) ¶ 18; Ex. 16 (O'Donnell Decl.) ¶ 22; Ex. 17 (Shore Decl.) ¶ 18; Ex. 19 (Campagna Decl.) ¶ 18; Ex. 20 (Walker Harris Decl.) ¶ 19; Ex. 21 (Stalberg Decl.) ¶ 18; Ex. 22 (Redick-Ponte Decl.) ¶ 18; Ex. 23 (Tran Decl.) ¶ 18.

Fed. Reg. 56144, 56145 (Oct. 7, 2021) (rescinding entire 2019 Title X Rule and restoring much of 2000 Title X Rule). The Fourth Circuit also held that the 2019 Title X Rule was arbitrary and capricious and contrary to law. *Mayor of Balt.*, 973 F.3d at 266. But the Hyde Amendment Priority's otherwise-obscure, undefined buzzwords all recall that revoked, unlawful 2019 rule. *Compare* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7714, 7745, 7777, 7789 (Mar. 4, 2019) ("life-affirming counseling," "programmatic compliance," "physical and financial separation," "objective integrity and independence from prohibited activities") *with* A.R. 083–84 ("life-affirming program delivery," "financial and programmatic safeguards," "strict separation from prohibited activities," "integrity of taxpayer funding").

If the NOFO's recycled language signals a reversion to 2019, the Agencies have neither acknowledged that shift nor offered a reasoned explanation that accounts for such important factors as costs to providers, damage to the Title X network, and reliance interests. *Mayor of Balt.* identified costs to providers as an important factor OPA must consider in making such a change. 973 F.3d at 281-82. But the meager administrative record demonstrates no consideration of such costs, nor of the reliance interests of Plaintiff States, whose carefully developed networks of subrecipients have already begun questioning whether "they can continue to participate in the Title X program" after the NOFO's apparent mandate for "'strict separation' of Title X from abortion services, which may require physical separation of abortion and Title X services." Ex. 22 (Redick-Ponte Decl.) ¶ 19. Nor do the Agencies explain why they now appear to disregard the substantial factfinding underlying their readoption of § 59.5(a)(5), which documented that the 2019 Title X Rule's departures from "compliance standards that had been in effect for nearly the entirety of the Title X program" and the 2000 Rule's counseling requirement had produced "significant negative public health consequences," including a "devastating" "decline in clients served and services

provided" by Title X; wreaked havoc on Title X's provider network; contravened national standards of care, including the QFP; and "diver[ted] . . . funds from the core purpose of Title X" towards burdensome separation infrastructure with no "discernible compliance benefits." 86 Fed. Reg. at 56144–48; *see Fox I*, 556 U.S. at 515.

2. *The Agencies have unreasonably ignored applicants' need for fair notice of an ascertainable standard for participating in Title X*

A principle "fundamental to reasoned decision-making" is that an "agency's requirements must be comprehensible and give entities fair notice of what is required of them." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *23 (citing *Gen. Elec. Co. v. E.P.A.*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)); *see also Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 280 (4th Cir. 2018). The Agencies abdicated that responsibility. In publishing a NOFO that "unfairly require[s] [grant applicants] to guess at what formerly unobjectionable activities are now proscribed by a given grant award," they "'entirely failed to consider' . . . that the vague and confusing language in the challenged conditions would cause significant adverse effects on [grant applicants] and the vulnerable populations that they serve." *R.I. Coal. Against Domestic Violence*, 794 F. Supp. 3d at 70–72. Their unreasoned decision forces applicants to decipher the insinuations of vague political posturing and divine how the agency's underdetermined savings clauses could reconcile patently contrary-to-law conditions with Title X requirements.[29] Having embedded "language in the NOFO [that] is too vague to be actionable, but speaks to a desire to develop

[29] Defendants suggest each individual applicant should "inquire of HHS exactly how the agency proposes to resolve any of the conflicts that it claims to spot." Defs.' Mem. at 13. But they cannot pass off to applicants their responsibility for setting stable, coherent standards for Title X participation. Further, their proposed regime of "case-by-case clarification . . . does nothing to 'provide explicit standards for those who apply' the challenged conditions and therefore encourages 'arbitrary and discriminatory application,'" and would engender further regulatory chaos and unfair competitive conditions. *Hous. Auth. of City & Cnty. of San Francisco v. Turner*, No. 25-CV-08859-JST, 2025 WL 3187761, at *15 (N.D. Cal. Nov. 14, 2025) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972)).

programming that is in stark contradiction with current operations and requirements," the Agencies have left long-term grantees "unclear how to propose a Title X project that complies with the 2027 NOFO priorities yet also is functionally possible and consistent with established law." Ex. 17 (Shore Decl.) ¶ 19; *see also* Ex. 10 (Sullivan Decl.) ¶ 19; Ex. 21 (Stalberg Decl.) ¶ 17.

The NOFO's "vague language and undefined conditions" have left longstanding applicants "without clear guidance on what is required for compliance," as it "fails to establish objective standards or define key terms, making it arduous and burdensome to determine how OPA will evaluate applications or monitor ongoing grant execution." Ex. 10 (Sullivan Decl.) ¶ 19. Applicants do not know whether alignment is holistic or requires satisfying *each* Condition individually—an important question when many Conditions appear contrary to law and regulations. Moreover, elements of the Priorities' substantive content are so "cryptic" and without "content" or "an adequate explanation of how the standard applies to the facts" that they are "incomprehensible." *U.S. Postal Serv. v. Postal Regul. Comm'n*, 785 F.3d 740, 754 (D.C. Cir. 2015). The Overmedicalization Priority never specifies which family planning services are "unnecessary medicalization or symptom suppression," A.R. 082, nor does the Anti-Gender Ideology Priority explain which "referral pathways align with evidence-based care," *id.* 083, *cf.* Ex. 2 (Heller Decl.) ¶ 20. The Anti-DEI Priority derides DEI as "poorly defined" "ideologically laden concepts"—and then never defines what, *exactly*, Title X grantees should reject while providing family planning services. A.R. 135, 143.[30] The Hyde Amendment Priority consists

[30] This problem is heightened for OASH's version of this Priority, whose plain language commands applicants not to reject the nebulous concept of DEI in their own family planning services but somehow to end DEI practices *at the federal agency*. A.R. 135; *see also* Compl. ¶ 132. Including such an obviously inappropriate command reflects Defendants' unreasoned, haphazard process in incorporating Agency Priorities wholesale in the NOFO. They appear not even to have considered the basic question of how to tailor agency-facing priorities to a document addressed at grant applicants—let alone how to tailor them to comply with the laws, regulations, and context of Title X.

mostly of buzzwords that oscillate between irrelevance to Title X (the "Hyde Amendment") and indefinite meaning ("life-affirming . . . program delivery," "strict separation"). A.R. 084. Courts have vacated and preliminarily enjoined similar grant conditions—including HHS's Anti-DEI and Anti-Gender Ideology conditions—because expecting applicants to wrest meaning from the insinuation-filled political posturing is arbitrary and capricious. *See, e.g.*, *Hennepin*, 2026 WL 2426300 at *20–21; *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *25 (collecting cases).

More fundamentally, the Agencies' decision to create needless conflicts between the Challenged Conditions and their own regulations and then thrust responsibility for resolving those contradictions onto applicants was unreasoned. Unnecessarily forcing applicants to puzzle out which of multiple "baffling and inconsistent" standards apply based on ambiguous, unclear rules for reconciliation is the essence of caprice. *Satellite Broad. Co. v. F.C.C.*, 824 F.2d 1, 2 (D.C. Cir. 1987). Veteran applicants at state health agencies used to regular "uncertainty over 'how to best apply for a federal grant,'" Defs.' Mot. at 2 (quoting *NFPRHA*, 2026 WL 279025, at *7), have found themselves bewildered by a NOFO that appears to order them to violate Title X's own rules. *E.g.*, Ex. 10 (Sullivan Decl.) ¶ 19; Ex. 8 (Blodgett Decl.) ¶¶ 16–17; Ex. 7 (Caloia Decl.) ¶¶ 17, 19; Ex. 16 (O'Donnell Decl.) ¶ 23. Given how emphatically the NOFO centers the Challenged Conditions at every stage, its sporadic asides that they apply only "to the extent authorized by law" offer little help. Defendants do not and cannot offer a single rational explanation for issuing a NOFO whose savings clauses, "if operational, would nullify the 'clear and specific' substantive provisions" of the actual conditions it announces. *Cf. HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th

Cir. 2021).[31] They have simply demanded applicants hazard their best guesses—in their only opportunity to propose grant projects for the next five years—as to the "extent" to which the Agencies expect they can direct patients towards parenthood and marriage while remaining nondirective, avoid hormonal contraception while still offering a range of products that includes it, provide transgender patients with fertility counseling in anticipation of medical changes while averring that sex is "unchangeable," and reject health equity while simultaneously advancing it.

3. *The Agencies incorporated the Irrelevant HHS Priorities into Title X without engaging in reasoned decision making*

Finally, the NOFO's incorporation of the wholly unrelated Irrelevant HHS Priorities is neither reasoned nor reasonably explained. The Agencies never even tried to explain why family planning services providers should use their grants to assist in "[e]nd[ing] crime and disorder on America's streets" or "[i]mprov[ing] oversight of foreign funded institutions." A.R. 145–46; *see also infra* Section III. Yet they assigned over a third of the merit rubric to aligning with "HHS priorities," without even one of their inadequate savings clauses to nominally limit that incorporation to priorities within Title X's scope. A.R. 110; *cf.* Defs.' Mem. at 4–5.

***C. HHS Failed to Observe Required Notice and Comment Procedures When Implementing the Challenged Conditions***

Because the 2027 NOFO imposes substantive conditions on Title X applicants and awardees that fundamentally alter the regulations governing Title X without using the procedures required by law, Plaintiffs are entitled to summary judgment on Count III of their Complaint. 5

[31] Applicants' plight is even sharper than that faced by the resettlement agencies in *HIAS*, as they directly are responsible for interpreting the savings clauses in the first instance, without even "a procedure for invoking the savings clause[s] or any standards for applying [them]." *HIAS*, 985 F.3d at 325; *see, e.g.*, Ex. 14 (Humphrey Decl.) ¶ 17 (NOFO's vague disclaimers "do not sufficiently identify how applicants are to reconcile potentially competing requirements" and "[t]his ambiguity directly affects New Mexico's ability to prepare an application"). For that same reason, Defendants cannot rely on a decision about the effect of savings clauses in "an internal directive" that "ma[de] no demand of the States" to insulate a public-facing instrument that solicits high-stakes grant proposals. *Trump v. California*, No. 26A124, 2026 WL 2473573, at *1, 5 (U.S. Aug. 24, 2026) (per curiam); Defs.' Mem. at 11.

U.S.C. § 706(2)(D).

As the Title X regulations in 42 C.F.R. part 59 were promulgated through notice-and-comment rulemaking pursuant to delegated statutory authority, these substantive provisions are legislative rules with the force and effect of law. *See Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 619–20 (4th Cir. 2018); *see supra* Statement of Material Facts (overview of relevant Title X regulations). Whether an agency action is legislative turns on its substance and legal effect, not the label the agency gives it. *See Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 612 (D. Md. 2025); *Am. Acad. of Pediatrics v. F.D.A.*, 379 F. Supp. 3d 461, 494 (D. Md. 2019). And an agency must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015). An agency action effectively amends a legislative rule when it "adopts a new position inconsistent with an existing regulation, or effects a substantive change in the regulation." *Am. Acad. of Pediatrics*, 379 F. Supp. 3d at 494 (quoting *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 48 (D.D.C. 2011)).

Applying that principle specifically to Title X, the D.C. Circuit held that HHS could not use a subregulatory directive to "repudiate" the meaning of a legislative Title X regulation and "substitute for it a totally different meaning" without notice and comment. *Nat'l Family Plan. & Repro. Health Ass'n v. Sullivan*, 979 F.2d 227, 231 (D.C. Cir. 1992). Courts in this District have likewise set aside new legislative rules that purport to amend existing legislative rules without notice and comment. For example, in *Am. Acad. of Pediatrics*, a court in this District held that a Food and Drug Administration guidance document was "tantamount to an amendment to the Tobacco Control Act" where it "include[d] commands, requirements, and order[s]" that "cannot be reconciled with the Tobacco Control Act" and that "t[old] manufacturers when they must submit

their applications, report, and requests for new tobacco products." 379 F. Supp. 3d at 497; *see also Am. Fed'n of Tchrs*, 779 F. Supp. 3d at 612 ("Dear Colleague Letter" constituted a legislative rule).

The 2027 NOFO qualifies as a substantive or legislative rule under these standards. It incorporates the Agency Priorities, including the Challenged Conditions, into both the selection of Title X projects and the obligations imposed after an award. The NOFO incorporates the Challenged Conditions into all phases of the competition, from application to termination. *See supra* Statement of Material Facts. The Challenged Conditions thus govern both what applicants must propose and what recipients must do after receiving funding.

The Challenged Conditions also departs from specific requirements of the existing Title X framework, making it a legislative rule because it "adopts a new position inconsistent with existing regulation." *Am. Acad. of Pediatrics*, 379 F. Supp. 3d at 494; *see infra* Section II.D.2–D.4 (demonstrating that the contraception element of the Overmedicalization Priority, the Anti-Gender Ideology Priority, and Anti-DEI Priority conflict with existing regulations).

Because the 2027 NOFO makes these Challenged Conditions central to both funding decisions and continued participation in the Title X program, Defendants could not impose them through the NOFO without first amending the underlying regulations, which establish contrary requirements for participation. Yet Defendants did not engage in notice-and-comment rulemaking. The Challenged Conditions should therefore be vacated.

### *D. The NOFO's Incorporation of the Challenged Conditions is Contrary to Law.*

The Challenged Conditions should be held "unlawful and set aside," because, to the extent that they are inconsistent with the Title X statute and regulations, they are "not in accordance with law" and "in excess of statutory jurisdiction, authority, [and] limitations." 5 U.S.C. § 706(2)(A), (C). "Law," under the APA, "includes, of course, agency regulation." *Norton v. S. Utah Wilderness*

*All.*, 542 U.S. 55, 65 (2004). As the NOFO cannot amend existing regulations, *see supra* Section II.C, the Agencies were bound to follow those regulations both under the APA and under Congress's mandate that Title X "[g]rants . . . shall be made in accordance with such regulations as the Secretary may promulgate." 42 U.S.C. § 300a-4(a). While the Agencies may of course prioritize different emphases within the scope of Title X's law and regulations, they cannot prioritize *contravening* Title X or impose conditions that apparently order what their own law and regulations forbid. *Accord. Gresham v. Azar*, 950 F.3d 93, 104 (D.C. Cir. 2020) (agencies may not "prioritize non-statutory objectives to the exclusion of the statutory purpose"), *vacated and remanded as moot sub nom. Becerra v. Gresham*, 142 S. Ct. 1665 (2022). Because the Challenged Conditions conflict with plain statutory language, statutory purpose, and Title X regulations, Plaintiffs are entitled to summary judgment on Count I of their Complaint.

*1. <u>The Directive Counseling Priority</u>*

The NOFO conditions funding on aligning with the Directive Counseling Priority. A.R. at 077, 089, 091, 093-94. But its demand that "program counseling" present "evidence-informed pathways associated with improved economic stability and family stability, including . . . marriage prior to childbearing" but should also "affirm marriage and parenthood as meaningful and valued components of adult life," A.R. at 083, conflicts with the plain text of Congressional and regulatory mandates. Congress's yearly appropriations rider for Title X requires "that all pregnancy counseling shall be nondirective." Pub. L. No. 119-75, 140 Stat. 173, 262 (2026). Similarly, the Title X regulations require projects offer "neutral, factual information and nondirective counseling'" on request that presents parenthood as one option among others, 42 C.F.R. § 59.5(a)(5), and, when counseling any client, provide "client-centered care," which must be "respectful of, and responsive to, individual client preferences, needs, and values; client values

guide all clinical decisions." 42 C.F.R. § 59.5(a)(3); *see* 42 C.F.R. § 59.2.

To be "nondirective," "the medical professional must 'present[] the options in a factual, objective, and unbiased manner . . . rather than . . . a subjective or coercive manner.'" *Mayor & City Council of Balt. v. Azar*, 392 F. Supp. 3d 602, 616 (D. Md. 2019) (quoting 84 Fed. Reg. at 7747). This Circuit has held that counseling clients towards parenthood in particular is not only directive but also "coercive." *Mayor of Balt.*, 973 F.3d 283 ("Requiring providers to provide a referral list that is limited to those that do not provide abortion, even if the client specifically requests an abortion referral, is coercive, not 'nondirective'" and violates the Title X appropriations rider). An applicant or grantee cannot concurrently abide by the Directive Counseling Priority, which involves counseling clients with the aim of promoting parenthood and marriage, contrary to statutory and regulatory mandates for client-centered, nondirective counseling.

2. *The Overmedicalization Priority*

The NOFO's incorporation of the Overmedicalization Priority is inconsistent with Title X's statute, regulatory requirements, and core mandate, which center comprehensive medical services and patients' freedom to choose between reproductive options. The Priority "recognizes the overreliance on pharmaceutical and surgical treatments," A.R. at 081, and appears to equate medical contraception with "unnecessary medicalization or symptom suppression." Indeed, the NOFO only once references "contraception," and it does so to denigrate it, mischaracterizing cited sources to insinuate that women are increasingly forsaking use of medical contraception because of "dissatisfaction" due to "side effects." See *supra* Section II.B.1.

The Overmedicalization Priority's emphasis on natural family planning methods while discouraging use of medical contraception runs counter to Title X and its regulations. Congress mandated that Title X programs "offer a broad range of acceptable and effective family planning

methods and services." 42 U.S.C. § 300(a); *see* 42 C.F.R. § 59.2 (defining "family planning services" to include "[FDA]-approved contraceptive products and natural "family planning methods"). The ability to choose is critical to the Title X program; projects must "[p]rovide services without subjecting individuals to any coercion . . . to employ or not to employ any particular methods of family planning." 42 C.F.R. § 59.5(a)(2); 42 U.S.C. § 300a-5 (acceptance of Title X services is voluntary); *see also* Grants for Family Planning Services, 45 Fed. Reg. 37433, 37437 (June 3, 1980). The disparagement of medical contraception is also contrary to Title X's purpose and plain language: to ensure that low-income patients can access more than "the least effective nonmedical techniques for fertility control." S. Rep. No. 91-1004 (1970) at 9. The Agencies issuance of a NOFO that discourages medical contraception contravenes the Title X statute, regulations, and purpose.

*3. The Anti-Gender Ideology Priority*

The NOFO conditions funding on complying with the Anti-Gender Ideology Priority, which involves "respecting biological reality," "includ[ing] the biological reality that a person's sex, as either male or female, is unchangeable and determined by objective biology," and "ending support" for the notion that "there is a vast spectrum of genders that are disconnected from one's sex." A.R. 083, 135. But, to the extent that the Priority forbids acknowledging the existence or medical needs of transgender patients, it flouts the regulatory requirement that Title X projects must "[p]rovide services in a manner that is client-centered, culturally and linguistically appropriate, inclusive . . . [and] consistent with nationally recognized standards of care." 42 C.F.R. § 59.5(a)(3); 42 C.F.R. § 59.2 (defining "inclusive" as "when all people are fully included and can actively participate in and benefit from family planning, including, but not limited to . . . *transgender . . . persons*") (emphasis added). Furthermore, Title X regulations prohibit projects

from "discriminat[ing] against any client based on . . . sex . . . [or] gender identity." 42 C.F.R. § 59.5(a)(4). To the extent that the Anti-Gender Ideology Priority requires Title X providers to reject patients' transgender status, those providers would be unable to offer care that is "client-centered," "inclusive," or aligned with "nationally recognized standards of care." For instance, when a Title X provider is taking a transgender patient's medical history, must they omit any reference to medical transition?[32] And, when a Title X provider uses a transgender patient's chosen name and pronouns, would that constitute the prohibited promotion of gender ideology, and thus grounds for termination? *See Cnty. of King v. Turner*, No. 25-3664, 2026 WL 2489361, at *11 (9th Cir. Aug. 25, 2026). Applicants and grantees simply cannot provide care that is "inclusive" of transgender patients, and does not discriminate based on their gender identity, if they must accept a "biological reality" that denies the existence of such patients.

#### 4. *The Anti-DEI Priority*

The NOFO requires projects to align with its Anti-DEI Priority, which eschews "ideologically-laden concepts like health equity." A.R. at 135. But Title X regulations state that HHS will "tak[e] into account . . . [t]he ability of the applicant to advance health equity" when awarding grants. 42 C.F.R. § 59.7(a)(3); *see also* § 59.2 (defining "health equity" as when "all persons have the opportunity to attain their full health potential and no one is disadvantaged from achieving this potential because of social position or other socially determined circumstances").

---

[32] As discussed *supra* Section II.B, OPA has advised grantees to look to the QFP's recommendations to comply with 42 C.F.R. § 59.5(a)(3). Ex. B (OPA Program Policy Notice 2024-02). The QFP itself compiled consensus recommendations from the sources of "other pertinent nationally recognized standards of care for family planning services that Title X projects may implement." *Compare* Ex. A, S45 and S71 n.160 (listing QFP sources) with Ex. C, 11 (listing "pertinent" standards). The Challenged Conditions' many conflicts with the 2024 QFP thus suggest their incompatibility with 42 C.F.R. § 59.5(a)(3)'s requirement.

As the Anti-DEI Priority explicitly rejects "health equity," which the agency is required to consider and applicants are required to address, it is contrary to law.

5. *The Hyde Amendment Priority*

In incorporating the Hyde Amendment Priority, the NOFO directs applicants and grantees to "contribute to broader HHS efforts to safeguard life-affirming . . . program delivery" and states that "OASH will prioritize programs and funding that . . . do not use taxpayer resources to promote or support elective abortion." A.R. 084. While "life-affirming" program delivery is left undefined, to the extent that it requires providers to emphasize the importance of carrying a pregnancy to term and not "support elective abortion," the Hyde Amendment Priority is unlawful.

Title X law and regulations require that providers counsel pregnant patients neutrally, openly, and truthfully about their options, including abortion. *See* 42 U.S.C. § 300a-6; Pub. L. No. 104-134, Tit. II, 110 Stat. 1321, 1321-221 (1996) (Congress's first Title X appropriations rider mandated "that all pregnancy counseling shall be nondirective"). This Circuit has made clear that the nondirective counseling mandate in Congress's long-running annual appropriations rider requires as much: "[r]equiring providers to exclude abortion as one of multiple options available to a client facing an unwanted pregnancy, especially if she has asked about that option, is coercive, not 'nondirective.'" *Mayor of Balt. v. Azar*, 973 F.3d at 283. Title X regulations codify Congress's command: grantees must "offer pregnant clients the opportunity to be provided information and counseling regarding . . . (A) Prenatal care and delivery; (B) Infant care, foster care, or adoption; and (C) Pregnancy termination" and, upon request, "neutral, factual information and nondirective counseling on each of the options, and, referral.'" 42 C.F.R. § 59.5(a)(5). Title X clients are legally entitled to "neutral" counseling; "life-affirming" counseling is neither nondirective, nor neutral. To the extent the Hyde Amendment Priority rejects nondirective, neutral, factual counseling and

services, Title X applicants and grantees cannot adhere to it while following these statutory and regulatory mandates.

## III. The NOFO's Incorporation of the Challenged Conditions Violates the U.S. Constitution.

Plaintiffs not only adequately state a claim that the NOFO's imposition of the Challenged Conditions violates the Spending Clause—and therefore also the APA, 5 U.S.C. § 706(2)(B)—but are also entitled to summary judgment on that basis. The Challenged Conditions are so vague and ambiguous that Plaintiffs lack sufficient notice of the obligations they incur by applying for, and potentially receiving, federal funding, *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 19 (1981), and they are so unrelated to the Title X program as to be an illegitimate funding condition. *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987). The Court can decide these questions as a matter of law and on the basis of the evidence Plaintiffs have submitted.

### *A. Under the Spending Clause, Conditions on Federal Funding Must Be Unambiguous and Adequately Related to the Statutory Purpose.*

The Spending Clause provides that "Congress shall have Power to lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Congress may use this power to grant funds to states and condition such grants upon the states taking certain actions that Congress could not require them to take directly. *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 576 (2012). But conditions on federal funds must be stated "unambiguously" so states can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17, 25); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Ambiguous conditions "undermine the status of the States as independent sovereigns in our federal system." *NFIB*, 567 U.S. at 577.

Additionally, any conditions must be reasonably related to Congress's purpose in authorizing the funding, because "[t]he Executive Branch has a duty to align federal spending and action with the will of the people as expressed through congressional appropriations, not through 'Presidential priorities.'" *New York v. Trump*, 764 F. Supp. 3d 46, 51 (D.R.I. 2025) (emphasis omitted) (cited by *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 434 (D. Md. 2025)). To determine whether the condition and the federal program are sufficiently "related," courts regularly look for some reasonable relationship between the condition and the underlying federal program. *Dole*, 483 U.S. at 209; *see California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 310–11 (D.R.I. 2025) (challenged condition "bears no reasonable relationship" to the programs to which it has been attached); *Illinois*, 801 F. Supp. 3d at 96 (contested conditions were not "reasonably related to the purposes of the grants to which they attach," or "'reasonably calculated' to advance the purposes for which funds are expended").

The Challenged Conditions independently violate each of these requirements.

***B. The Requirement that Applicants "Align" and "Comply" with Agency Priorities is Vague, and the Priorities are Themselves Ambiguous.***

*First*, the 2027 NOFO fails to provide clear notice of what legal commitments programs make by applying. Throughout the NOFO, Defendants demand without explanation that applicants "align" their Title X programs with Agency Priorities that are riddled with ambiguous language and unresolved apparent conflicts with existing rules, A.R. 077, 080, 91, 109 & 111, and "comply" or demonstrate "compliance" with them, *id.* at 091, 101, 109. *See* Compl. ¶¶ 117, 125, 131–175, 176. The single criterion worth most points in the NOFO's rubric is whether applicants "meaningfully advance" and "address" the Agency Priorities. These undefined terms, all of which demand fidelity to the Challenged Conditions, carry harsh consequences if violated; an application

found not to be in alignment will be penalized in evaluations and a recipient may face "corrective action, additional reporting requirements, or other actions . . . including termination." *Id.* at 077.

As Plaintiffs detailed *supra* Argument Section II.B.2, these conditions are on their face so vague as to be incomprehensible and pose conflicts so grave as to be irreconcilable. The evidentiary record confirms that public health agencies and other grantees in Plaintiff States are unable to ascertain what "alignment" with these Conditions would look like in the Title X context or how their "alignment" will be measured to count against them.[33]

Ultimately, Plaintiffs lack sufficient notice of what they are committing to by applying for federal funds under the 2027 NOFO because HHS has made it impossible for them to "ascertain what is expected of [them]" and thus to "knowing[ly] accept[]" the grant conditions. *Pennhurst*, 451 U.S. at 17; *see* Compl. ¶¶ 146, 156, 165, 175. Numerous courts have found similar requirements conditioning federal funds on a vague commitment that applicants will abide by, or further, new executive priorities to be unlawful under the Spending Clause. *See, e.g.*, *Illinois*, 801 F. Supp. 3d at 95 (holding conditions violated the Spending Clause); *see also California*, 808 F. Supp. 3d 291, 311 (finding ambiguous conditions violated the Spending Clause). This Court should do the same here.

***C. The Challenged Conditions Are Unrelated to Title X.***

Separately, the NOFO's incorporation of the Challenged Conditions violates the Spending Clause's prohibition on federal spending conditions that "are unrelated 'to the federal interest in particular national projects or programs.'" *Dole*, 483 U.S. at 207. As previously discussed, the NOFO never explains how Title X funding, which is to be used for the promotion of "effective

[33] *See* Ex. 14 (Humphrey Decl.) ¶ 17; Ex. 16 (O'Donnell Decl.) ¶ 23; Ex. 19 (Campagna Decl.) ¶ 17; Ex. 8 (Blodgett Decl.) ¶¶ 16–17; Ex. 10 (Sullivan Decl.) ¶ 17; Ex. 7 (Caloia Decl.) ¶ 17.

family planning methods and services," 42 U.S.C. § 300, is related to the Irrelevant HHS Priorities, such as "[f]urther[ing] our understanding of autism" or "[e]nd[ing] crime and disorder on America's streets," or to the rest of the Challenged Conditions, which are contrary to the congressional and regulatory requirements of Title X. A.R. 140–46; *see also supra* Section II.B.3; Compl. ¶¶ 3, 131–75, 176–77. Defendants have not, and cannot, explain how alignment with these and other unrelated priorities falls within Title X's scope or advances its goals, nor have they clarified how applicants can craft proposals that demonstrate alignment. *See* Compl. ¶ 177; *supra* Section II.D; *see also California*, 808 F. Supp. 3d at 307; *Illinois*, 801 F. Supp. 3d at 96.

While Defendants may establish priorities and carry out the administration's policy, they can only impose those priorities on funding recipients within the scope of their delegated authority. *See Cnty. of King*, 2026 WL 2489361 at *12 (agency lacked authority "to direct HUD to impose conditions that bar the 'use [of] any Grant Funds to fund or promote elective abortions' in the absence of statutory authorization"). Here, their attempt to graft wide-ranging and unrelated priorities onto Title X funding fails even the most generous construction of the relatedness test.

***D. Defendants' Arguments to the Contrary Are Unavailing.***

Defendants' remaining arguments do not cure the NOFO's inherent constitutional infirmities. First, while Defendants appear to contend that the NOFO does not impose novel conditions at all, arguing that a "scoring criterion is not a condition," Defs.' Mem. at 14, Plaintiffs adequately allege that the NOFO's conditions not only appear as merit review scoring criteria but apply throughout the grant lifecycle. Compl. ¶¶ 4, 116–130. This is apparent on the face of the NOFO. *See* A.R. 077, 080, 091, 101 & 109–111.[34] Second, rather than attempting to relate the

[34] The cases Defendants cite to support this position are either inapposite or wholly unrelated to the Spending Clause. *See City of Los Angeles*, 929 F.3d at 1176 (examining more lenient grant application guidelines that allowed applicants to "select other prioritized focus areas" rather than adhere solely to the challenged condition); *NEA v. Finley*, 524 U.S.

Challenged Conditions to Title X's purpose, Defendants rely entirely on the NOFO's occasional vague assertions that the Challenged Conditions may only apply when "consistent with program authority and the scope of the award" to insist, tautologically, that they *must* satisfy the Spending Clause. *See* Defs.' Mem. at 15–16. But, as in the context of APA violations, *see supra* Section II.B.2, Defendants cannot use their "purely theoretical" savings clauses as "magic words that can override" the Conditions' "plain meaning" and cure all legal infirmities. *PFLAG*, 769 F. Supp. 3d at 436–37 (quoting *HIAS*, 985 F.3d at 325).

Even if these clauses could override the plain incorporation of Challenged Conditions that are outside Title X's scope or contrary to its purpose, they would merely trade one problem for another: from a Spending Clause standpoint, the clauses still unconstitutionally "leav[e] Plaintiffs to guess" the contested terms' meaning, scope, and application. *City of Chicago v. U.S. Dep't of Just.*, 822 F. Supp. 3d 873, 890 (N.D. Ill. 2026); Compl. ¶¶ 9, 129, 134. Defendants' suggestion that *they* may be able to apply the savings clauses to achieve a (never-explained) lawful interpretation of the NOFO is wholly irrelevant to the Spending Clause's inquiry, which centers *Plaintiffs'* knowledge: "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent.*, 548 U.S. at 296. Plaintiffs have alleged, and the record substantiates, that applicants do not understand the terms with which they are required to comply, or how they apply in the context of the Title X program.[35]

Finally, Defendants assert that Plaintiffs had adequate notice of the NOFO's novel terms

569, 589–90 (1998) (upholding statute outlining criteria for NEA grants against First and Fifth Amendment challenge). Defendants' argument also conflates failure to state a claim with ripeness, arguing that whether the NOFO improperly imposes conditions without the requisite notice can only be "measured at acceptance." Defs.' Mem. at 14. Not only is this incorrect as a matter of law, *see Freedom Network*, 830 F. Supp. 3d at 707–08, but also, as discussed *supra* Section I.D, Plaintiffs' claims *are* ripe for adjudication.

[35] *See* Ex. 14 (Humphrey Decl.) ¶ 17; Ex. 16 (O'Donnell Decl.) ¶ 23; Ex. 19 (Campagna Decl.) ¶ 17; Ex. 8 (Blodgett Decl.) ¶¶ 16–17; Ex. 10 (Sullivan Decl.) ¶ 17; Ex. 7 (Caloia Decl.) ¶ 17.

because Congress authorized the Secretary to promulgate regulations, "consider factors," and make awards "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made." Defs.' Mem. at 15 (citing 42 U.S.C. §§ 300(b), 300a-4(b)). But the priorities Defendants seek to impose are not among the statutory criteria listed,[36] nor do they appear anywhere within the regulations the Secretary has promulgated. And the Congressional grant of authority to impose funding conditions is "too thin a reed to support" Defendants' position that *these* grant conditions—which Plaintiffs allege are ambiguous and conflict with the laws and regulations that *do* exist—provide the requisite clear notice. *Pennhurst*, 451 U.S. at 19; *see also Cnty. of King*, 2026 WL 2489361, at *9 (rejecting argument that the statute granting HUD Secretary authority to impose grant conditions "necessary to carry out the CoC program in 'an effective and efficient manner'" authorized ambiguous or wholly unrelated grant conditions).

Accordingly, Plaintiffs have not only provided more than "sufficient factual matter" in their Complaint to support a "claim to relief that is plausible on its face," *Guzman v. Acuarius Night Club LLC*, 167 F.4th 217, 221 (4th Cir. 2026) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), but they have demonstrated that the NOFO's incorporation of the Challenged Conditions violates the Spending Clause as a matter of law.

## CONCLUSION

For the aforementioned reasons, this court should deny Defendants' Motion to Dismiss, grant Plaintiffs' Motion for Summary Judgment, and order the relief requested.

[36] Those statutorily established criteria are "the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance." 42 U.S.C. § 300(b).

Dated: October 9, 2026

Respectfully submitted,

**ANTHONY G. BROWN**
Attorney General of Maryland

By: /s/ Virginia A. Williamson
Virginia A. Williamson (D. Md. Bar No. 31472)
James C. Luh (D. Md. Bar No. 31776)
Adam Kirschner (D. Md. Bar No. 31767)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6584
vwilliamson@oag.maryland.gov

Attorneys for State of Maryland

**LETITIA JAMES**
Attorney General of New York

By: /s/ Galen Sherwin
Galen Sherwin†
Special Counsel for Reproductive Justice
Rabia Muqaddam†
Chief Counsel for Federal Initiatives
Andres Ivan Navedo†
Molly Brachfeld†
Victoria Ochoa†
Assistant Attorneys General
28 Liberty St.
New York, NY 10005
(929) 736-3392
galen.sherwin@ag.ny.gov
rabia.muqaddam@ag.ny.gov
ivan.navedo@ag.ny.gov
molly.brachfeld@ag.ny.gov
victoria.ochoa@ag.ny.gov

Attorneys for the State of New York

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: /s/ Allyson Slater
Allyson Slater†
Director, Reproductive Justice Unit
Nita K. Klunder†
Morgan Carmen†
Abigail Gabrieli†
Assistant Attorneys General
One Ashburton Pl.
Boston, MA 02108
(617) 963-2255
allyson.slater@mass.gov
morgan.carmen@mass.gov
abigail.gabrieli@mass.gov

Attorneys for the Commonwealth of Massachusetts

**ROB BONTA**
Attorney General for the State of California

By: /s/ Ketakee Kane
Neli N. Palma‡
Senior Assistant Attorney General
Ketakee Kane‡
David Houska‡
Deputy Attorneys General
1515 Clay Street
Oakland, CA 94612
(510) 879-1519
Ketakee.Kane@doj.ca.gov

Attorneys for the People of the State of California

**PHIL WEISER**
Attorney General of Colorado

By: /s/ Gabe Podesta
Gabe Podesta†
Ryan Lorch†
Senior Assistant Attorneys General
1300 Broadway, 10th Fl.
Denver, CO 80203
(720) 508-6000
gabe.podesta@coag.gov
ryan.lorch@coag.gov

Counsel for the State of Colorado

**WILLIAM TONG**
Attorney General of Connecticut

By: /s/ Alma Nunley
Alma Nunley†
Assistant Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5318
Alma.Nunley@ct.gov

Attorney for the State of Connecticut

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: /s/ Vanessa L. Kassab
Ian R. Liston†
Director of Impact Litigation
Vanessa L. Kassab†
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

Attorneys for the State of Delaware

**ANNE E. LOPEZ**
Attorney General of Hawai‘i

By: /s/ Kaliko‘onālani D. Fernandes
Kaliko‘onālani D. Fernandes†
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

Attorney for the State of Hawai‘i

**KWAME RAOUL**
Attorney General for the State of Illinois

By: /s/ Caitlyn G. McEllis
Caitlyn G. McEllis†
Senior Policy Counsel
Holly F.B. Berlin†
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St. Chicago, IL 60603
(312)814-3000
Caitlyn.McEllis@ilag.gov
Holly.berlin@ilag.gov

Attorneys for the State of Illinois

**OFFICE OF THE GOVERNOR ex rel. ANDY BESHEAR**
Governor of the Commonwealth of Kentucky

By: /s/ S. Travis Mayo
S. Travis Mayo†
General Counsel
Sam Flynn*
Chief Deputy General Counsel
Laura C. Tipton*
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

Counsel for the Office of the Governor

**AARON M. FREY**
Attorney General of Maine
By: /s/ Katherine W. Thompson
Katherine W. Thompson*†
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
kate.thompson@maine.gov

Attorneys for State of Maine

**DANA NESSEL**
Attorney General of Michigan
By: /s/ Neil Giovanatti
Neil Giovanatti†
Assistant Attorney General
P.O. Box 30212
Lansing, MI 48909
(517) 241-1050
GiovanattiN@michigan.gov

Attorney for the State of Michigan

**KEITH ELLISON**
Attorney General of Minnesota

By: /s/Katherine Bies
Katherine Bies†
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

Attorney for the State of Minnesota

**AARON D. FORD**
Attorney General of Nevada

By: /s/ K. Brunetti Ireland
K. Brunetti Ireland†
Chief of Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

Attorney for the State of Nevada

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: /s/ Meghan K. Musso
Meghan K. Musso†
Deputy Attorney General
New Jersey Office of the Attorney General, Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
Meghan.Musso@law.njoag.gov

Attorney for the State of New Jersey

**RAÚL TORREZ**
Attorney General of New Mexico

By: /s/ Aletheia V.P. Allen
Aletheia V.P. Allen†
Solicitor General
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
aallen@nmdoj.gov

Seth C. McMillian†
Deputy Solicitor General
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-546-9919
smcmillan@nmdoj.gov

Attorneys for State of New Mexico

**DAN RAYFIELD**
Attorney General State of Oregon

By: /s/ Leanne Hartmann
Leanne Hartmann†
Senior Assistant Attorney General
Galen Knowles†
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Leanne.Hartmann@doj.oregon.gov
Galen.Knowles@doj.oregon.gov

Attorneys for the State of Oregon

**JOSH SHAPIRO**
Governor for the Commonwealth of Pennsylvania

By: /s/ Jacob B. Boyer
Jennifer C. Selber*
Jacob B. Boyer*
Deputy General Counsel
Governor's Office of General Counsel
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

Attorneys for Governor Josh Shapiro

**PETER F. NERONHA**
Attorney General of Rhode Island

By: /s/ Kathryn T. Gradowski
Kathryn T. Gradowski†
Special Assistant Attorney General
150 South Main St.
Providence, RI 02903
(401) 274-4400
kgradowski@riag.ri.gov

Attorney for the State of Rhode Island

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: /s/ Ryan Patrick Kane
Ryan Patrick Kane†
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov

Attorney for the State of Vermont

**JAY JONES**
Attorney General for the Commonwealth of Virginia

By: /s/ Megan C. Keenan
Megan C. Keenan (D. Md. Bar No. 32426)
Deputy Solicitor General
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us

Counsel for the Commonwealth of Virginia

**NICHOLAS W. BROWN**
Attorney General of Washington

By: /s/ Lauryn K. Fraas
Lauryn K. Fraas†
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Tel (206) 464-7744
lauryn.fraas@atg.wa.gov

Attorney for the State of Washington

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: /s/ Lynn K. Lodahl
Lynn K. Lodahl†
Assistant Attorney General
17 West Main Street
Post Office Box 7857
Madison, WI 53707
(608) 264-6219
lynn.lodahl@wisdoj.gov

Attorney for the State of Wisconsin

* *pro hac vice application forthcoming*
‡ *pro hac vice application pending*
† *appearing pro hac vice*