# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | * | Case No. 1:26-cv-03405-DLB |
| | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * *

**<u>DECLARATION OF JULIE HELLER</u>**

I, Julie Heller, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I am the Health Services and Connections Branch Director at the Colorado Department of Public Health and Environment ("CDPHE") within the State of Colorado, a position I have held since 2021. My work includes promoting mental and physical health and wellness and preventing chronic disease among Coloradans by managing the work of staff who implement five specialized state and federal programs that fund and facilitate crucial health care services, education, and support for communities, including the Family Planning Program ("FPP"). In this capacity, I am familiar with the State's administration, funding, and delivery of family planning and related preventative health services, including services supported through the federal Title X program.

3. I have personal knowledge of all the facts stated herein, based on my professional experience and information and records available to me in my professional capacity. If called as a witness, I could and would testify competently to the matters set forth below.

Colorado's Title X-Funded Family Planning Programming

4. The State of Colorado, through CDPHE, is a direct recipient of Title X funding. Colorado uses Title X funding to cover the costs of the Colorado FPP. CDPHE offers Title X services through a network of subrecipient agencies and service sites across Colorado. Service sites include a mix of city or county health departments, hospitals, freestanding family planning clinics, and federally qualified health centers. Colorado has participated in the Title X program continuously for over 50 years.

5. For Fiscal Year (FY) 2026, Colorado's FPP had a total annual budget of approximately $9,140,890, consisting of $3,966,199 in federal Title X funding and $5,174,691 in State funding. These funding sources collectively support the State's FPP and provider network. In Colorado, CDPHE receives state and federal funding, which is awarded to subrecipients for staffing and operational costs associated with operating clinics. A small amount of the budget is used for state agency administrative functions at CDPHE, such as administering contracts, monitoring subrecipient funding, and providing training and resources to subrecipients. The FY 2026 budget is representative of the State's typical annual funding for family planning and related preventative health services.

6. Colorado administers Title X through 26 subrecipients, which include local county public health departments, federally qualified health centers (FQHCs) and non-government organizations. Many of these providers are longstanding members of the State's Title X network. The FPP funds a total of 81 service sites. There are FPP funded partner agencies in 31 of the 64 counties of Colorado. These clinics serve urban, rural, and frontier areas of the state.

7. For calendar year 2025, Colorado's subrecipients served over 40 thousand individuals. Approximately 79% of these individuals received services at no cost, with a household income at or below 100% of the federal poverty level (FPL). Approximately 46% who received services were uninsured, and 36% had public insurance. In many Colorado communities, these

providers are an essential source of affordable family planning and preventative health services for individuals who otherwise have limited access to care.

8. The Title X program addresses significant public health needs within Colorado. The FPP network is the safety net for sexual and reproductive health in the state, allowing people and families to make decisions about when and how they want to have children, and providing lifesaving preventative care. In Colorado, Title X has been pivotal in addressing the family planning needs of the vulnerable adolescent population, with a network of trusted, adolescent friendly clinics throughout the state. Title X-funded clinics play an essential role in addressing these needs by providing, among other things, services to support pregnancy prevention and birth spacing, pregnancy testing and nondirective options counseling, assistance to achieve pregnancy, basic infertility services, sexually transmitted infection services, and other preconception health services.

9. Whenever it has accepted and drawn down Title X funds, CDPHE has faithfully complied with applicable law and regulations. During its participation in the Title X program, CDPHE has followed applicable Office of Population Affairs ("OPA") guidance, including implementing recommendations from *Providing Quality Family Planning Services in the United States: Recommendations of the Office of Population Affairs* ("QFP") publication, to the extent required by OPA in its 2014 Title X Family Planning Guidelines, and applicable Funding Opportunity Announcements. CDPHE has invested time and effort to ensure that the FPP network provides high-quality family planning services consistent with nationally recognized standards of care in compliance with applicable program requirements and recommendations. The FPP provides required training to ensure subrecipient compliance with the Title X regulations, including hosting an annual conference to support the network. As applicable during its participation, the FPP has worked hard to adapt its programming to implement OPA feedback, used OPA-provided program review tools to assess its own compliance and that of subgrantees, attended Reproductive Health

National Training Center trainings, and attended grantee conferences held by OPA.

Colorado's Title X Application and the 2027 NOFO

10. CDPHE is responsible for preparing and submitting Colorado's Title X application. Preparing the application requires substantial work by State personnel and coordination with the State's Title X subrecipients and other program partners.

11. Preparing our Title X application takes CDPHE significant time and resources. The process includes developing a Project Narrative, Work Plan, and Budget Narrative; coordinating with subrecipients; collecting program data; developing budgets and performance measures; and completing internal review and approval processes. The application requires the State to make decisions about its program, likely provider network, staffing, services, and budget before an application can be submitted, and well before any grant period begins.

12. CDPHE has applied for Title X family planning services project grants since the program's inception in the 1970s. CDPHE has never been denied a grant award. Historically, Colorado has developed its Title X application considering, and substantially based on, securing funding for the existing program and provider network.

13. The Office of Population Affairs ("OPA") released a revised 2027 Title X Notice of Funding Opportunity ("2027 NOFO") on July 9, 2026. CDPHE has reviewed the 2027 NOFO and determined that its new conditions and priorities significantly change what is expected of Title X applicants and present significant challenges for the State's existing Title X program.

14. In particular, CDPHE understands that the 2027 NOFO requires alignment with new priorities advanced by OPA, the Office of the Assistant Secretary for Health ("OASH"), and the U.S. Department of Health and Human Services ("HHS"). The priorities concern, among other things, diversity, equity, and inclusion and health equity; gender identity; hormonal contraception and "overmedicalization"; abortion and the Hyde Amendment; and reproductive goal counseling,

including concerning marriage and parenthood (together, the "Agency Priorities"). The 2027 NOFO incorporates these priorities into the application and review process and requires successful applicants to demonstrate ongoing alignment with them during the life of the grant (60 months).

15. Applying for funding under the 2027 NOFO has required and will continue to require the State to devote extra staff time and resources to determining if and how its existing program must be modified and to address the new Agency Priorities while continuing to comply with existing Title X requirements. Colorado is faced with a difficult choice: on the one hand, it can apply under the 2027 NOFO with its existing Title X program, which it knows to be efficacious, and risk losing funding in the event the Office of Population Affairs decides that program does not sufficiently align with the new Agency Priorities; or, on the other hand, it can make changes to its established program in an attempt to further align with the new Agency Priorities, despite the vagueness of new conditions, and even though doing so may disrupt services, provider relationships, patient confidence in the program and many other aspects of the State's existing Title X programming.

16. In addition, it has not been made clear to CDPHE what is required to comply with the new Agency Priorities. This creates a challenge for assembling Colorado's application. The difficulty in assembling an application is compounded by the fact that there are conflicts between the OASH priority statement and the Title X regulation. As an example, per the Title X regulation, 42 CFR § 59.5(a)(5), grantees must provide family planning services without imposing any durational residency requirement. However, OASH has not made clear how this provision interacts with the 2027 NOFO priority that states "OASH will prioritize programs, partnerships, and funding mechanisms that further the agency's priority to ensure that federal resources are not used to facilitate or incentivize illegal immigration."

17. Colorado's existing Title X program is the product of decades of planning, investment, and coordination with its provider network, and the State would ordinarily expect to

continue that programming, which has proven successful. To the extent the State must modify its existing program or application to address the new OASH priorities, doing so would require additional, resource-intensive administrative review, coordination, planning, and potentially programmatic changes. If programmatic changes are required, such changes are likely to disrupt established services and provider relationships, impose substantial administrative burdens, and reduce the State's ability to maintain effective Title X programming and thus to provide family planning services and related treatment and preventative health care in Colorado.

18. Priorities exist within the OASH statement that are broad and open to misunderstanding, which will be difficult to comply with. For example, the priority of ensuring that adolescent program materials are age-appropriate may contradict Title X regulation. The priority states that OASH will "focus on programs that do not promote material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content, including content that encourages, normalizes or promotes sexual activity for minors." This definition could be interpreted to limit evidence-based counseling provided to adolescents about contraception, sexually transmitted infection education, screening and treatment, and assessing sexual and reproductive health needs, all of which are services under the Title X regulation.

19. Some of the OASH priorities present conflicts with Colorado law. C.R.S. § 25-6-102 states, "All medically acceptable contraceptive procedures, supplies, and information shall be readily and practically available to each person desirous of the same regardless of sex, sexual orientation, gender identity, gender expression, race, color, creed, religion, disability, age...." As the statute requires Colorado to provide readily and practically available contraceptives regardless of race or color, it may conflict with OASH's priority of "ending diversity, equity and inclusion (DEI) policies and practices across OASH programs." This federal priority specifically states, "OASH is committed to restoring merit-based opportunities and, to the extent permitted by law, removing

discriminatory or otherwise illegal practices, such as providing benefits and advantages based on race or ethnicity rather than need, severity of disease, or another legitimate basis.... OASH has previously invested in ideologically-laden concepts like health equity— mainly focused on identifying and documenting worse health outcomes for minority populations."

20. The OASH priority regarding ending support for gender ideology, including sex-rejecting procedures for children, and ensuring evidence-based care, states, "to the extent permitted by applicable law, including any applicable court orders, OASH will prioritize OASH programs and funding that accurately reflect the scientific biological reality of sex." This vague priority conflicts with Colorado law, which requires providing readily and practically available contraceptive procedures, supplies, and information regardless of sex, sexual orientation, gender identity, and/or gender expression. C.R.S. § 25-6-102.

Consequences of Losing Title X Funding

21. If Colorado does not receive Title X funding for the grant cycle beginning in 2027 it could not replace the approximately $4 million in federal funding within its existing State dollars or other funding sources; any replacement funding would first require legislative appropriations from Colorado's General Assembly. CDPHE also would not be able to determine the availability of any such funds until the State budget is finalized in FY 2027.

22. Without sufficient replacement funding, Colorado could not fund its current Title X network in full. In Colorado, this would mean reduced services and/or loss of provider sites and health centers, loss of staff positions, and reduced access to care for individuals who currently receive Title X-funded services each year. People seeking services in Colorado will face longer wait times, fewer available appointments, reduced services, and/or the need to travel farther for care. This will translate into fewer people getting the care they need when they need it, resulting in an increase in unplanned pregnancies, higher rates of sexually transmitted infections, and fewer people up to date

on related preventative care such as breast and cervical cancer screenings.

23. The State would also face fiscal consequences from the loss of Title X-funded services. Many patients who can no longer obtain affordable family planning, sexually transmitted infection screening and treatment, and related preventative care through Title X-funded providers may have to forgo these cost-effective early-stage interventions or seek replacement care from other sources. This would increase demand for services supported by State and local resources and could increase public expenditures for care that Title X-funded providers currently provide or help prevent through early screening, treatment, and preventative services. Some patients may be unable to obtain this critical health care at all. This will lead to poor health outcomes and costly health care needs for state residents in the immediate and long-term. Colorado is likely to bear these preventative health costs through their state Medicaid programs.

24. Title X funding currently pays for staffing, supplies, and laboratory costs throughout the State's provider network. A loss of Title X funding will result in the disruption of its family planning provider network, including the loss of provider capacity, longstanding community partnerships, and loss of access to services in Colorado communities. Rebuilding that capacity, even if alternative funding later becomes available, would require substantial time and public resources and would leave gaps in access to care in the interim.

25. Colorado also provides approximately $5 million in State funding to 26 subrecipient grantees to provide family planning and related reproductive health services. To prevent the harms caused by the loss of Title X funding, Colorado would have to attempt to fill the shortfall with additional state funds or funds from another source.

26. For these reasons, the loss or substantial reduction of Title X funding would impose costs on Colorado beyond the loss of the federal grant itself. It would disrupt an established network of trusted providers and essential family planning and preventative health care services, increase

demands on other publicly funded health systems, and reduce access to care for people throughout the State who rely on the State's Title X program and Title X-funded services.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 1st day of October 2026, in Oil City, Pennsylvania.

JULIE HELLER
Health Services &
Connections Branch
Colorado Department of
Public Health &
Environment
4300 Cherry Creek S Dr,
Denver, CO 80246