# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | * | Case No. 1:26-cv-03405-DLB |
| | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * *

**DECLARATION OF LISA MASINTER**

I, Lisa Masinter, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I am a Deputy Director at IDPH charged with overseeing the Office of Health Improvement (OHI). I am a physician, board certified in general Obstetrics and Gynecology since 2011, and have been working primarily in the non-clinical, public health and health service research, sector for over ten years. At IDPH, I oversee several large federal initiatives, including the Illinois Family Planning Program (Title X).

3. I have personal knowledge of all the facts stated herein, including based on my professional experience and information and records available to me in my professional capacity. If called as a witness, I could and would testify competently to the matters set forth below.

Illinois's Title X-Funded Family Planning Programming

4. The State of Illinois, through the Illinois Department of Public Health is a direct recipient of Title X funding. Illinois uses Title X funding to cover the costs of its grants to sub-grantees, who provide family planning services. The State has participated in the Title X program since 1970.

5. For Fiscal Year 2026, Illinois's sub-grantee program had a total annual budget of approximately $10,879,229 consisting of $5,055,829 in federal Title X funding, $5,823,400 in State funding. These funding sources collectively support the State's family planning program and provider network. The Illinois Family Planning Program (IFPP) supports operations inclusive of (payroll, travel, supplies, contracts, and indirect) and grants (administrative, operations and direct care for contractive counseling and options). 29 of the 31 subrecipients are funded with a blend of federal and state funds. The remaining 2 are funded exclusively with state funds. The FY2026 budget is representative of the State's typical annual funding for family planning and related preventative health services.

6. Illinois administers Title X through 31 subrecipients, including 18 county health departments. Many of these providers are longstanding members of the State's Title X network.

7. As of September 2026, Illinois's Title X network includes seven health centers. During FY2026, these providers served over 78,700 individuals.

8. In State Fiscal Year 2026, approximately 65% of individuals received services at no cost based on reported household incomes at or below 150% of the Federal Poverty Line. In many Illinois communities, these providers are an essential source of affordable family planning and preventative health services for individuals who otherwise have limited access to care.

9. The Title X program addresses significant public health needs within Illinois. Title X-funded providers play an essential role in addressing these needs by providing, among other things,

cancer screenings and access to contraceptives.

10. Whenever it has accepted and drawn down Title X funds, IDPH has faithfully complied with applicable law and regulations. During its participation in the Title X program, IDPH has followed applicable Office of Population Affairs ("OPA") guidance, including implementing recommendations from the 2014 and, if applicable, 2024 editions of OPA's own *Providing Quality Family Planning Services* ("QFP") publication, to the extent required by OPA in its 2014 Title X Family Planning Guidelines, and applicable Funding Opportunity Announcements. IDPH has invested time and effort to ensure it provides quality family planning services consistent with nationally recognized standards of care in compliance with applicable program requirements and recommendations: As applicable during its participation, it has worked hard to adapt its programming to implement past OPA feedback, used OPA-provided program review tools to assess its own compliance and that of subgrantees, and attended Reproductive Health National Training Center trainings.

Illinois's Title X Application and the 2027 NOFO

11. IDPH is responsible for preparing and submitting Illinois's Title X application. Preparing the application requires substantial work by State personnel and coordination with the State's Title X subrecipients and other program partners.

12. Preparing our Title X application takes IDPH significant time and resources. The process includes developing a Project Narrative, Work Plan, and Budget Narrative; coordinating with subrecipients; collecting program data; developing budgets and performance measures; and completing internal review and approval processes. The application requires the State to make decisions about its program, likely provider network, staffing, services, and budget before an application can be submitted, and well before any grant period begins.

13. Illinois has applied for Title X family planning services project grants since 1970

and has never been denied a grant award.

14. The Office of Population Affairs issued the 2027 Title X Notice of Funding Opportunity ("2027 NOFO") on July 9, 2026. IDPH has reviewed the 2027 NOFO and determined that its new conditions and priorities significantly change what is expected of Title X applicants and significantly alter the application that IDPH must prepare.

15. In particular, IDPH understands that the 2027 NOFO requires alignment with new priorities advanced by OPA, the Office of the Assistant Secretary for Health, and the U.S. Department of Health and Human Services. The priorities concern, among other things, diversity, equity, and inclusion and health equity; gender identity; hormonal contraception and "overmedicalization"; abortion and the Hyde Amendment; and reproductive goal counseling, including concerning marriage and parenthood (together, the "Agency Priorities"). The 2027 NOFO incorporates these priorities into the application and review process and requires successful applicants to demonstrate ongoing alignment with them during the life of the grant (60 months).

16. Applying for funding under the 2027 NOFO has required and will continue to require the State to devote extra staff time and resources to determining if and how its existing program must be modified and to address the new Agency Priorities while continuing to comply with existing Title X requirements. Illinois is faced with a difficult choice: on the one hand, it can apply under the 2027 NOFO with its existing Title X program, which it knows to be efficacious, and risk losing funding in the event the Office of Population Affairs decides that program does not sufficiently align with the new Agency Priorities; or, on the other hand, it can attempt to further align with the new Agency Priorities, despite the vagueness of new conditions, and even though doing so may disrupt services, provider relationships, and many other aspects of the State's existing Title X programming.

17. In addition, it has not been made clear to IDPH what is required to comply with the new Agency Priorities. This creates a challenge for assembling Illinois's application. The difficulty

in assembling an application is compounded by the fact that some priorities appear to be in tension, if not conflict, with existing laws and regulations.

18. Illinois's existing Title X program is the product of many years of planning, investment, and coordination with its provider network, and the State would ordinarily expect to continue that programming, which has proven successful. To the extent the State must modify its existing program or application to address the new Agency Priorities, doing so would require additional, resource-intensive administrative review, coordination, planning, and potentially programmatic changes. If programmatic changes are required, such changes are likely to disrupt established services and provider relationships, impose substantial administrative burdens, and reduce the State's ability to maintain effective Title X programming and thus to provide family planning services and related treatment and preventative health care in Illinois.

Consequences of Losing Title X Funding

19. If Illinois does not receive Title X funding for the grant cycle beginning in 2027, Illinois may not be able to replace that approximately $5 million dollars federal funding with State dollars or other funding sources. Shifting state money to cover this loss would either significantly impact funding for other programs funded by IDPH or require the Illinois General Assembly to pass legislation during the legislative session to appropriate additional money to IDPH through the appropriations process.

20. A loss or substantial reduction in Title X funding would likely mean reduced services and/or loss of provider sites and health centers, loss of staff positions, and reduced access to care for individuals who currently receive Title X-funded services each year. Those who seek services in Illinois are likely to face longer wait times, fewer available appointments, reduced services, and/or the need to travel farther for care.

21. The State would also face fiscal consequences from the loss of Title X-funded

services. Many patients who can no longer obtain affordable family planning, sexually transmitted infection screening and treatment, and related preventative care through Title X-funded providers may have to forego these cost-effective early-stage interventions or seek replacement care from other sources such as Medicaid. This would increase demand for services supported by State and local resources and could increase public expenditures for care that Title X-funded providers currently provide or help prevent through early screening, treatment, and preventative services. Some patients may be unable to obtain this critical heath care at all. This will lead to poor health outcomes and most costly health care needs for state residents in the immediate and long-term. Illinois is likely to bear these costs through their state Medicaid programs or severely limit other priorities to cover these costs.

22. Title X funding currently pays for staffing, supplies, and other needs throughout the State's provider network. A loss of Title X funding could result in the disruption of its family planning provider network, including the loss of provider capacity and longstanding community partnership. Rebuilding that capacity, even if alternative funding later becomes available, would require substantial time and public resources and would likely leave gaps in access to care in the interim.

23. For these reasons, the loss or substantial reduction of Title X funding would impose costs on Illinois beyond the loss of the federal grant itself. It would disrupt an established network of providers and services, increase demands on other publicly funded health systems, and reduce access to care for residents throughout the State who rely on the State's Title X program and Title X-funded services.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 1st day of October 2026, in Chicago, Illinois.

/s/ ______________________________

Lisa Masinter
Deputy Director, Office of Women's Health and Family Services
Illinois Department of Public Health
115 S. LaSalle St., 7th floor
Chicago, Illinois 60603