# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | * | Case No. 1:26-cv-03405-DLB |
| | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * *

**DECLARATION OF LORI CALOIA**

I, Dr. Lori Caloia, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I am the Deputy Commissioner of the Kentucky Department for Public Health within the State of Kentucky as appointed by Governor Andy Beshear, a position I have held since January 2026. My work includes acting as the lead in the development of policies and procedures to provide effective utilization of medical resources for the department and acting as medical authority on behalf of the commissioner for public health, including any actions necessary to safeguard the health of the citizens of the Commonwealth. In this capacity, I am familiar with the State's administration, funding, and delivery of family planning and related preventative health services, including services supported through the federal Title X program.

3. I have personal knowledge of all the facts stated herein, including based on my professional experience and information and records available to me in my professional capacity. If called as a witness, I could and would testify competently to the matters set forth below.

Kentucky's Title X-Funded Family Planning Programming

4. The Commonwealth of Kentucky, through the Department for Public Health, is a direct recipient of Title X funding. Kentucky uses Title X funding to cover the costs of its Kentucky Family Planning Program, where services include contraceptives, pregnancy testing, testing and treatment for sexually transmitted diseases, basic infertility information, health counselling and education. The Commonwealth has participated in the Title X program for over 50 years continuously since 1970.

5. For Fiscal Year 2026, Kentucky Family Planning Program had a total annual budget of approximately $10,502,907.00 consisting of $4,693,969.00 in federal Title X funding, $0 in State funding, and $5,808,938.00 from non-federal cost-sharing and in-kind. These funding sources collectively support the State's family planning program and provider network. In Kentucky, this funding is used to support 5 federally funded, time-limited staff at the Department for Public Health, and half of the salary for 1 other staff member. Remaining funds are allocated to local health departments, federally qualified health centers, rural health clinics, and university-based primary care clinics to provide the above-mentioned services. Funding amounts vary from site to site based on services provided, number of anticipated encounters, geographic area served, and historical data. Local health departments (LHDs) are dependent on these funds and would not be able to carry out services in their counties if federal funding is no longer available. Many of these counties are without any specialty care such as OB/GYNs. The FY 2026 budget is representative of the Commonwealth's typical annual funding for family planning and related preventative health services.

6. Kentucky administers Title X through 50 subrecipients that service 130 clinic sites, including 43 district and county local health departments along with 7 other health care clinic sites. Many of these providers are longstanding members of the State's Title X network

7. As of 2025, Kentucky's Title X network includes 130 health centers. During 2025,

these providers served approximately 32,496 individuals through approximately 52,341 encounters.

8. In 2025, approximately 50% of individuals received services at no cost, approximately 31.5% who received services were uninsured and 39% had public insurance while 29% had private insurance, and approximately 50% had household incomes at or below 100% of the Federal Poverty Level. In many Kentucky communities, these providers are an essential source of affordable family planning and preventative health services for individuals who otherwise have limited access to care.

9. The Title X program addresses significant public health needs within Kentucky. In calendar year 2024 providers of Title X Services were able to screen for cervical cancer through 9,191 Pap tests where 3,316 were completed at a local health department in addition to 34,389 sexually transmitted infection screenings performed. Title X-funded providers play an essential role in addressing these needs by providing, among other things, basic preventive care to address tobacco use, nutrition, and mental health.

10. Whenever it has accepted and drawn down Title X funds, the Kentucky Department for Public Health has faithfully complied with all applicable law and regulations. During its participation in the Title X program, the Kentucky Department for Public Health has followed all applicable Office of Population Affairs ("OPA") guidance, including implementing recommendations from the 2014 and, if applicable, 2024 editions of OPA's own *Providing Quality Family Planning Services* ("QFP") publication. To the extent required by OPA in its 2014 Title X Family Planning Guidelines regarding applicable Funding Opportunity Announcements, the Department for Public Health has invested time and effort to ensure it provides quality family planning services consistent with nationally recognized standards of care in compliance with applicable program requirements and recommendations. The Kentucky Department of Public Health has worked hard to adapt its programming to implement past OPA feedback, used OPA-

provided program review tools to assess its own compliance and that of subgrantees, attended Reproductive Health National Training Center trainings, thoroughly fulfilled all requirements by completing the Family Planning Annual Reports (FPAR) with and participated in Information and Education (I&E) Committees and reviews.

Kentucky's Title X Application and the 2027 NOFO

11. The Kentucky Department for Public Health's Division of Women's Health is responsible for preparing and submitting Kentucky's Title X application. Preparing the application requires substantial work by Department personnel and coordination with Kentucky's Title X subrecipients and other program partners.

12. Preparing Kentucky's Title X application takes the Division of Women's Health significant time and resources. The process includes developing a Project Narrative, Work Plan, and Budget Narrative; coordinating with subrecipients; collecting program data; developing budgets and performance measures; and completing internal review and approval processes. The application requires the Commonwealth to make decisions about its program, likely provider network, staffing, services, and budget before an application can be submitted, and well before any grant period begins.

13. Kentucky has applied for Title X family planning services project grants since 1970 and has never been denied a grant award. Historically, Kentucky has based its Title X application substantially on its existing program and provider network.

14. The Office of Population Affairs issued the 2027 Title X Notice of Funding Opportunity ("2027 NOFO") on July 9, 2026. The Kentucky Department for Public Health has reviewed the 2027 NOFO and determined that its new conditions and priorities significantly change what is expected of Title X applicants and present significant challenges for the State's existing Title X program.

15. In particular, the Kentucky Department for Public Health understands that the 2027

NOFO requires alignment with new priorities advanced by OPA, the Office of the Assistant Secretary for Health, and the U.S. Department of Health and Human Services. The priorities concern, among other things, diversity, equity, and inclusion and health equity; gender identity; hormonal contraception and "overmedicalization"; abortion and the Hyde Amendment; and reproductive goal counseling, including concerning marriage and parenthood (together, the "Agency Priorities"). The 2027 NOFO incorporates these priorities into the application and review process and requires successful applicants to demonstrate ongoing alignment with them during the life of the grant (60 months).

16. Applying for funding under the 2027 NOFO has required and will continue to require the Commonwealth to devote extra staff time and resources to determining if and how its existing program must be modified and to address the new Agency Priorities while continuing to comply with existing Title X requirements. Kentucky is faced with a difficult choice: on the one hand, it can apply under the 2027 NOFO with its existing Title X program, which it knows to be efficacious, and risk losing funding in the event the Office of Population Affairs decides that program does not sufficiently align with the new Agency Priorities; or, on the other hand, it can make changes to its established program in an attempt to further align with the new Agency Priorities, despite the vagueness of new conditions, and even though doing so may disrupt services, provider relationships, and many other aspects of the Kentucky's existing Title X programming.

17. In addition, it has not been made clear to the Kentucky Department for Public Health what is required to comply with the new Agency Priorities. This creates a challenge for assembling Kentucky's application. The difficulty in assembling an application is compounded by the fact that some priorities appear to be in tension, if not conflict with existing laws and regulations. For example, the new Notice of Funding Opportunity (NOFO) appears to conflict with the Title X 2021 Final Rule by shifting the focus from contraceptive use toward natural family planning methods where the 2021

Title X final rule more precisely requires that service sites that do not offer a broad range of methods must provide a prescription or a referral as requested by the client. As a result, drafting the application to advance the priorities established by HHS may place the Department in direct conflict with existing Title X requirements. This creates uncertainty regarding how Kentucky can simultaneously satisfy the expectations articulated in the NOFO and remain fully compliant with applicable federal regulations.

18. Kentucky's existing Title X program is the product of many years of planning, investment, and coordination with its provider network, and the State would ordinarily expect to continue that programming, which has proven successful. To the extent the State must modify its existing program or application to address the new Agency Priorities, doing so would require additional, resource-intensive administrative review, coordination, planning, and potentially programmatic changes. If programmatic changes are required, such changes are likely to disrupt established services and provider relationships, impose substantial administrative burdens, and reduce the State's ability to maintain effective Title X programming and thus to provide family planning services and related treatment and preventative health care in Kentucky.

19. The current NOFO demonstrates a shift in how the applications will be evaluated and awarded. The review will focus on advancing political priorities versus the criteria established under the 2021 Final Rule. Those focus areas such as body literacy, chronic disease management, fertility awareness as opposed to contraceptive use are in direct conflict with the Final Rule and could result in the application being dismissed for abiding by the law as it's written.

20. The mission of the Kentucky Department for Public Health is to improve the health and safety of people in Kentucky through prevention, promotion, and protection. The basis of this application puts the department in conflict with this mission by not providing the appropriate means to prevent unwanted pregnancies, by insisting the department promote body and health literacy as

opposed to evidence-based medical guidance, and threatens Kentucky partnerships where low-income, uninsured populations lose access to safety net providers which protected and provided for their health.

Consequences of Losing Title X Funding

21. If Kentucky does not receive Title X funding for the grant cycle beginning in 2027, Kentucky could not replace that approximately $4.6 million federal funding with State dollars or other funding sources, and any replacement funding would first require the State Legislature to provide an additional appropriation of state general funds. Kentucky also would not be able to determine the availability of any such funds until the next budget cycle beginning FY 2028-2029, presenting challenges in the long-range planning of the program.

22. Without sufficient replacement funding, Kentucky could not fund its current Title X network in full. In Kentucky, this would likely mean reduced services and/or loss of provider sites and health centers, loss of staff positions, and reduced access to care for individuals who currently receive Title X-funded services each year. Those who seek services in Kentucky are likely to face longer wait times, fewer available appointments, reduced services, and/or the need to travel farther for care.

23. The Commonwealth would also face fiscal consequences from the loss of Title X-funded services. Many patients who can no longer obtain affordable family planning, sexually transmitted infection screening and treatment, and related preventative care through Title X-funded providers may have to forego these cost-effective early-stage interventions or seek replacement care from other sources such as Medicaid, local community services entities and other charitable organizations This would increase demand for services supported by State and local resources and could increase public expenditures for care that Title X-funded providers currently provide or help prevent through early screening, treatment, and preventative services. Some patients may be unable

to obtain this critical heath care at all. This will lead to poor health outcomes and most costly health care needs for state residents in the immediate and long-term. Kentucky is likely to bear these costs through their state Medicaid programs.

24. Title X funding currently pays for staffing, education materials, supplies, contraceptives, and medical services throughout the State's provider network. A loss of Title X funding could result in the disruption of its family planning provider network, including the loss of provider capacity, longstanding community partnership, a surge in unintended pregnancies to burden healthcare systems, and delayed prenatal care for unintended pregnancies. Rebuilding that capacity, even if alternative funding later becomes available, would require substantial time and public resources and would likely leave gaps in access to care in the interim.

25. For these reasons, the loss or substantial reduction of Title X funding would impose costs on Kentucky beyond the loss of the federal grant itself. It would disrupt an established network of providers and services, increase demands on other publicly funded health systems, and reduce access to care for residents throughout the State who rely on the State's Title X program and Title X-funded services.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 30th day of September 2026, in Frankfort, Kentucky.

/s/

Dr. Lori Caloia
Deputy Commissioner
Kentucky Department of
Public Health