# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | * | Case No. 1:26-cv-03405-DLB |
| | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * *

**DECLARATION OF SARAH LYON-CALLO**

I, Sarah Lyon-Callo, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I am the Senior Deputy Director for Public Health Administration at Michigan Department of Health and Human Services (MDHHS) within the State of Michigan. My work includes providing oversight and support for numerous public health services including communicable and non-communicable disease control, health promotion, maternal and child health, and emergency preparedness. In this capacity, I am familiar with the State's administration, funding, and delivery of family planning and related preventative health services, including services supported through the federal Title X program.

3. I have personal knowledge of all the facts stated herein, including based on my professional experience and information and records available to me in my professional capacity. If called as a witness, I could and would testify competently to the matters set forth below.

Michigan's Title X-Funded Family Planning Programming

4. The State of Michigan, through MDHHS, is a direct recipient of Title X funding. Michigan uses Title X funding to cover the costs of its Michigan's Family Planning Program, which provides reproductive health care services to women, men, and teens at low or no-cost. . The State has participated in the Title X program continuously since 1972.

5. For federal grant year 2026–2027 (April 1, 2026 – March 31, 2027), the Michigan Family Planning Program has a total annual budget of approximately $27,589,366, consisting of $7,178,497 in federal Title X funding, $5,485,335 in State funding, $2,139,746 from other federal grants (Title V Maternal Child Health Block Grant and CDC Preventive Block Grant), and the remainder from program income collected through fee/collections and insurance billing. These funding sources collectively support the State's family planning program and provider network. In Michigan, all funding sources supporting the program are blended and funds are allocated statewide based on the need for family planning services in each Michigan county and the City of Detroit. The FY2026 budget is representative of the State's typical annual funding for family planning and related preventative health services.

6. Michigan administers Title X through 33 subrecipients, including 30 local health departments, a federally qualified heath center, and two nonprofits. Many of these providers are longstanding members of the State's Title X network.

7. As of September 2026, Michigan's Title X network includes 83 health centers. During calendar year 2025, these providers served approximately 38,410 individuals through approximately 55,460 visits.

8. In calendar year 2025, approximately 52% of individuals received services at no cost, approximately 13% who received services were uninsured and 31% had public insurance, and approximately 66% had household incomes at or below 150% of the federal poverty level. In many Michigan communities, these providers are an essential source of affordable family planning and

preventative health services for individuals who otherwise have limited access to care.

9. The Title X program addresses significant public health needs within Michigan. The program provides reproductive care to clients, who may lack another source of health care, with tools to prevent or plan pregnancy. Access to contraception and birth spacing have been shown to reduce the risks of pregnancy-related maternal morbidity and mortality and improved birth outcomes. The program is critical for screening and treatment of sexually transmitted infections. Title X-funded providers play an essential role in addressing these needs by providing, among other things, access to a broad range of contraceptive methods, cervical cancer screening, breast exams, and testing and treatment for sexually transmitted infections. Providers link clients to other sources of care aimed at addressing health conditions and social and/or behavioral health needs outside the scope of family planning services.

10. Whenever it has accepted and drawn down Title X funds, MDHHS has faithfully complied with applicable law and regulations. During its participation in the Title X program, MDHHS has followed applicable Office of Population Affairs ("OPA") guidance, including implementing recommendations from the 2014 and, if applicable, 2024 editions of OPA's own *Providing Quality Family Planning Services* ("QFP") publication, to the extent required by OPA in its 2014 Title X Family Planning Guidelines, and applicable Funding Opportunity Announcements. MDHHS has invested time and effort to ensure it provides quality family planning services consistent with nationally recognized standards of care in compliance with applicable program requirements and recommendations. As applicable during its participation, it has worked hard to adapt its programming to implement past OPA feedback, used OPA-provided program review tools to assess its own compliance and that of subgrantees, attended Reproductive Health National Training Center trainings, and transitioned to collecting encounter level data in alignment with Family Planning Annual Report 2.0 (FPAR 2.0), which involved costly updates with multiple electronic health record

vendors used by Michigan's subrecipient agencies. .

Michigan's Title X Application and the 2027 NOFO

11. MDHHS is responsible for preparing and submitting Michigan's Title X application. Preparing the application requires substantial work by State personnel and coordination with the State's Title X subrecipients and other program partners.

12. Preparing our Title X application takes MDHHS significant time and resources. The process includes developing a Project Narrative, Work Plan, and Budget Narrative; coordinating with subrecipients; collecting program data; developing budgets and performance measures; and completing internal review and approval processes. The application requires the State to make decisions about its program, likely provider network, staffing, services, and budget before an application can be submitted, and well before any grant period begins.

13. Michigan has applied for Title X family planning services project grants since 1972 and has never been denied a grant award. Historically, Michigan has based its Title X application substantially on its existing program and provider network and has conducted multiple competitive bids to identify its' subrecipient network since 2006.

14. The Office of Population Affairs issued the 2027 Title X Notice of Funding Opportunity ("2027 NOFO") on July 9, 2026. MDHHS has reviewed the 2027 NOFO and determined that its new conditions and priorities significantly change what is expected of Title X applicants and present significant challenges for the State's existing Title X program.

15. In particular, MDHHS understands that the 2027 NOFO requires alignment with new priorities advanced by OPA, the Office of the Assistant Secretary for Health, and the U.S. Department of Health and Human Services. The priorities concern, among other things, diversity, equity, and inclusion and health equity; gender identity; hormonal contraception and "overmedicalization"; abortion and the Hyde Amendment; and reproductive goal counseling,

including concerning marriage and parenthood (together, the "Agency Priorities"). The 2027 NOFO incorporates these priorities into the application and review process and requires successful applicants to demonstrate ongoing alignment with them during the life of the grant (60 months).

16. Applying for funding under the 2027 NOFO has required and will continue to require the State to devote extra staff time and resources to determining if and how its existing program must be modified and to address the new Agency Priorities while continuing to comply with existing Title X requirements. Michigan is faced with a difficult choice: on the one hand, it can apply under the 2027 NOFO with its existing Title X program, which it knows to be efficacious, and risk losing funding in the event the Office of Population Affairs decides that program does not sufficiently align with the new Agency Priorities; or, on the other hand, it can make changes to its established program in an attempt to further align with the new Agency Priorities, despite the vagueness of new conditions and a lack of evidence base on the expected efficaciousness of these new programs, and even though doing so may disrupt services, provider relationships, and many other aspects of the State's existing Title X programming.

17. In addition, it has not been made clear to MDHHS what is required to comply with the new Agency Priorities. This creates a challenge for assembling Michigan's application. The difficulty in assembling an application is compounded by the fact that some priorities appear to be in tension, if not conflict, with existing laws and regulations. For example, current Title X regulations require that clients are provided client- centered, non-directive counseling versus the new priorities which emphasize a desire for marriage prior to pregnancy. Current Title X regulations require that services are provided in accordance with nationally recognized standards of care and evidence-based practices, while, in contrast, the Agency Priorities emphasize a focus on "biological reality." None of the priorities aim to increase access to contraception despite it being the cornerstone of the Title X regulations.

18. Michigan's existing Title X program is the product of many years of planning, investment, and coordination with its provider network, and the State would ordinarily expect to continue that programming, which has proven successful. To the extent the State must modify its existing program or application to address the new Agency Priorities, doing so would require additional, resource-intensive administrative review, coordination, planning, and potentially programmatic changes. If programmatic changes are required, such changes are likely to disrupt established services and provider relationships, impose substantial administrative burdens, and reduce the State's ability to maintain effective Title X programming and thus to provide family planning services and related treatment and preventative health care in Michigan.

Consequences of Losing Title X Funding

19. If Michigan does not receive Title X funding for the grant cycle beginning in 2027, Michigan would not be able to replace approximately $7.1 million in federal funding with State dollars or other funding sources.

20. Without sufficient replacement funding, Michigan could not fully fund its current Title X network. In Michigan, this would likely mean reduced services and/or loss of provider sites and health centers, loss of staff positions, and reduced access to care for individuals who currently receive Title X-funded services each year. Those who seek services in Michigan are likely to face longer wait times, fewer available appointments, reduced services, and/or the need to travel farther for care.

21. The State would also face fiscal consequences from the loss of Title X-funded services. Many patients who can no longer obtain affordable family planning, sexually transmitted infection screening and treatment, and related preventative care through Title X-funded providers may have to forego these cost-effective early-stage interventions or seek replacement care from other sources such as community health centers funded by Michigan's Public Health Service Act or other

providers who accept Medicaid. This would increase demand for services supported by State and local resources and could increase public expenditures for care that Title X-funded providers currently provide or help prevent through early screening, treatment, and preventative services. Some patients may be unable to obtain this critical heath care at all. This will lead to poor health outcomes and most costly health care needs for state residents in the immediate and long-term. Michigan is likely to bear these costs through their state Medicaid programs.

22. Title X funding currently pays for staffing, supplies, education and outreach, building space and infrastructure throughout the State's provider network. A loss of Title X funding could result in the disruption of its family planning provider network, including the loss of provider capacity, longstanding community partnership, and a reduction in reproductive health care access for Michigan families. Rebuilding that capacity, even if alternative funding later becomes available, would require substantial time and public resources and would likely leave gaps in access to care in the interim.

23. As noted above, Michigan also provides approximately $5,485,335 in State funding to 33 grantees to provide family planning and related reproductive health services. This investment is blended with federal funds including Title X to support reproductive health services to clients. To prevent the harms caused by the loss of Title X funding, Michigan would have to attempt to fill the shortfall with additional state-only funds, which is unlikely given the financial strain already imposed on the State of Michigan budget, as the result of H.R. 1.

24. For these reasons, the loss or substantial reduction of Title X funding would impose costs on Michigan beyond the loss of the federal grant itself. It would disrupt an established network of providers and services, increase demands on other publicly funded health systems, and reduce access to care for residents throughout the State who rely on the State's Title X program and Title X-funded services.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 29th day of September 2026, in Lansing, Michigan.

Sarah Lyon-Callo
Senior Deputy Director for Public Health
Michigan Department of Health and Human Services