# EXHIBIT 17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>* | Case No. 1:26-cv-03405-DLB |

* * * * * * * * * * * *

**<u>DECLARATION OF ANNIKA SHORE</u>**

I, Annika Shore, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I am the Reproductive Health Program Manager at the Oregon Health Authority ("OHA") within the State of Oregon, a position I have held since 2022. My work includes overseeing the strategic direction of the Reproductive Health Program, as well as supervising all components of the program's staff and activities. These include clinical operations; data collection, analysis, and dissemination; and strategic partnership development and contract maintenance. In this capacity, I am familiar with the State's administration, funding, and delivery of family planning and related preventative health services, including services supported through the federal Title X program.

3. I have personal knowledge of all the facts stated herein, including based on my professional experience and information and records available to me in my professional capacity. If called as a witness, I could and would testify competently to the matters set forth below.

<u>Oregon's Title X-Funded Family Planning Programming</u>

4. The State of Oregon, through OHA, is a direct recipient of Title X funding. Oregon uses Title X funding to cover the costs of its Reproductive Health ("RH") Program, which works with clinical agencies that provide reproductive health services across the State to offer free or low-cost reproductive health services. These agencies include local public health authorities, Federally Qualified Health Centers, and nonprofits, and more. The State has participated in the Title X program during the years 1970–2019 and 2022–present.

5. For biennium 2024–26, Oregon's RH Program had a total budget of approximately $45,584,158 consisting of $5,923,812 in federal Title X funding, $13,968,510 in other federal funding, and $25,691,836 in State and one-time grant funding. These funding sources collectively support the State's family planning program and provider network. In Oregon, reproductive health services are provided at low or no cost to those with the greatest need through safety net clinics located across the state. These clinics are certified with the OHA's RH Program; the RH Program uses a braided funding fee-for-service model to reimburse clinics for services rendered for all eligible clients and services. This model allows for people in Oregon with the greatest need for these services to access them with few barriers to this comprehensive, culturally competent care. Title X funds are leveraged as the funding of last resort, as the Title X program, to date, has the fewest limitations on who can be provided comprehensive services at low or no cost. This budget is representative of the State's typical biennial funding for family planning and related preventative health services.

6. Oregon administers Title X through 44 subrecipients, including local public health authorities, federally qualified health centers, Planned Parenthood clinics, rural health centers, school based health centers, and other community health centers. Most of these providers are longstanding members of the State's Title X network.

7. As of 2025, Oregon's Title X network includes 92 clinic sites. During 2025, these

providers served approximately 41,144 individuals.

8. In 2025, approximately 90% of individuals received services at no cost; approximately 50% of individuals who received services had Medicaid, 19% were enrolled in Oregon's Reproductive Health Access Fund that provides services at no cost, 25% had private insurance, and 6% had an "Other" payment source which includes self-pay, sliding fee, or other payers such as TriCare. Sixty-two percent of these individuals had incomes at or below 100% of the Federal Poverty Level (FPL) and ninety percent had incomes at or below 250% of the FPL. In many Oregon communities, these providers are an essential source of affordable family planning and preventative health services for individuals who otherwise have limited access to care.

9. The Title X program addresses significant public health needs within Oregon. Statewide, approximately 264,000 women are in need of publicly supported family planning services because of low family income.[1] In 2025, Oregon's Title X program served approximately 15% of these individuals. In addition to family planning services, Title X providers are an important access point for cervical cancer screenings and services related to sexually transmitted infections (STIs). Cervical cancer screening tests can help find early cases of cervical cancer, when it is more easily treated. STIs are common but preventable, and untreated STIs can lead to serious health problems. Oregon's Title X providers play an essential role in addressing these needs and conditions by providing in 2025, among other things:

- 64,000 clinic visits
- 93,000 STI tests
- 800 STI treatments

[1] Frost JJ, Douglas-Hall A and Olson H, *New Measure of Self-Defined Need for Contraceptive Services in the United States, 2023,* New York: Guttmacher Institute (2026), https://www.guttmacher.org/report/new-measure-self-defined-need-contraceptive-services-united-states-2023.

- 7,000 cervical cancer screening tests

10. Whenever it has accepted and drawn down Title X funds, OHA has faithfully complied with applicable law and regulations. During its participation in the Title X program, OHA has followed applicable Office of Population Affairs ("OPA") guidance, including implementing recommendations from the 2014 and, if applicable, 2024 editions of OPA's own *Providing Quality Family Planning Services* ("QFP") publication, to the extent required by OPA in its 2014 Title X Family Planning Guidelines, applicable Funding Opportunity Announcements, and in individual grant terms and conditions. OHA has invested time and effort to ensure it provides quality family planning services consistent with nationally recognized standards of care in compliance with applicable program requirements and recommendations: As applicable during its participation, it has worked hard to adapt its programming to implement past OPA feedback, used OPA-provided program review tools to assess its own compliance and that of subgrantees, and attended Reproductive Health National Training Center trainings. In addition, the RH Program has spent significant staff time and funds on developing robust systems for meeting OPA's requirements for Title X projects. These efforts include developing comprehensive certification requirements that are used on triennial site reviews to ensure all clinics comply with Title X requirements, supporting clinics in updating and upgrading data collection processes, and bringing in contract trainers to provide Title X required trainings.

<u>Oregon's Title X Application and the 2027 NOFO</u>

11. OHA is responsible for preparing and submitting Oregon's Title X application. Preparing the application requires substantial work by State personnel and coordination with the State's Title X subrecipients and other program partners.

12. Preparing our Title X application takes OHA significant time and resources. The process includes developing a Project Narrative, Work Plan, and Budget Narrative; coordinating with

subrecipients; collecting program data; developing budgets and performance measures; and completing internal review and approval processes. The application requires the State to make decisions about its program, likely provider network, staffing, services, and budget before an application can be submitted, and well before any grant period begins.

13. Oregon has received Title X family planning services project grants from 1970–2019 and 2022–present and has never been denied a grant award. Historically, Oregon has based its Title X application substantially on its existing program and provider network.

14. The Office of Population Affairs issued the 2027 Title X Notice of Funding Opportunity ("2027 NOFO") on July 9, 2026. OHA has reviewed the 2027 NOFO and determined that its new conditions and priorities significantly change what is expected of Title X applicants and present significant challenges for the State's existing Title X program.

15. In particular, OHA understands that the 2027 NOFO requires alignment with new priorities advanced by OPA, the Office of the Assistant Secretary for Health, and the U.S. Department of Health and Human Services. The priorities concern, among other things, diversity, equity, and inclusion and health equity; gender identity; hormonal contraception and "overmedicalization"; abortion and the Hyde Amendment; and reproductive goal counseling, including concerning marriage and parenthood (together, the "Agency Priorities"). The 2027 NOFO incorporates these priorities into the application and review process and requires successful applicants to demonstrate ongoing alignment with them during the life of the grant (60 months).

16. Applying for funding under the 2027 NOFO has required and will continue to require the State to devote extra staff time and resources to determining if and how its existing program must be modified and to address the new Agency Priorities while continuing to comply with existing Title X requirements. Oregon is faced with a difficult choice: on the one hand, it can apply under the 2027 NOFO with its existing Title X program, which it knows to be efficacious, and risk losing funding

in the event the Office of Population Affairs decides that program does not sufficiently align with the new Agency Priorities; or, on the other hand, it can make changes to its established program in an attempt to further align with the new Agency Priorities, despite the vagueness of new conditions, and even though doing so may disrupt services, provider relationships, and many other aspects of the State's existing Title X programming.

17. In addition, it has not been made clear to OHA what is required to comply with the new Agency Priorities. This creates a challenge for assembling Oregon's application. The difficulty in assembling an application is compounded by the fact that some priorities appear to be in tension, if not conflict, with existing laws and regulations. For example, the stated priority in the 2027 NOFO of "reducing overmedicalization in health care and increasing focus on optimal health through the delivery of Title X services" and the expectation of "applicants to demonstrate how their Title X projects will integrate noninvasive, evidence-based practices that promote health literacy, fertility awareness, and reproductive health without unnecessary medicalization or symptom suppression" point to a focus on reducing provision of contraceptive services, which may put Oregon's Title X program in conflict with Title X rules and regulations, as well as State law if it were to comply. The Title X statute itself requires that grantees "offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). Additionally, Oregon law provides that a public body cannot "[i]nterfere with or restrict, in the regulation of benefits, facilities, services or information, the choice of a consenting individual to exercise the individual's reproductive health rights." ORS 435.240(1)(b).

18. Oregon's existing Title X program is the product of many years of planning, investment, and coordination with its provider network, and the State would ordinarily expect to continue that programming, which has proven successful. To the extent the State must modify its existing program or application to address the new Agency Priorities, doing so would require

additional, resource-intensive administrative review, coordination, planning, and potentially programmatic changes. If programmatic changes are required, such changes are likely to disrupt established services and provider relationships, impose substantial administrative burdens, and reduce the State's ability to maintain effective Title X programming and thus to provide family planning services and related treatment and preventative health care in Oregon.

19. Given the current landscape in which Oregon's RH Program operates—the influence of Title X statute and rules, State laws and rules, and program structure and operational model—it is unclear how to propose a Title X project that complies with the 2027 NOFO priorities yet also is functionally possible and consistent with established law. The language in the NOFO is too vague to be actionable, but speaks to a desire to develop programming that is in stark contradiction with current operations and requirements.

20. Oregon's RH Program operates with the overarching goal to contribute to OHA's strategic goal, which is to eliminate health inequities in Oregon by 2030. The RH Program also fully embraces OHA's core values, the first of which is health equity as a guiding principle. The current Title X NOFO directs applicants to align their proposed projects with all Agency Priorities, which include elimination of diversity, equity, and inclusion policies and practices. If the RH Program were to change to the extent necessary to align with that priority, it would put the program firmly at odds with OHA's values, operational standards, and strategic vision.

<u>Consequences of Losing Title X Funding</u>

21. If Oregon does not receive Title X funding for the grant cycle beginning in 2027, Oregon may be able to only partially replace that approximately $3,000,000 in annual federal funding with State dollars or other funding sources, and any replacement funding may first require OHA to request replacement funding from the State legislature during the upcoming legislative session. The amount of lost funding will also depend on any budget reductions put in place for the 2027–29

biennium, which have yet to be determined.

22. Without sufficient replacement funding, Oregon could not fund its current Title X network in full. In Oregon, this would likely mean reduced services and/or loss of provider sites and health centers, loss of staff positions, and reduced access to care for individuals who currently receive Title X-funded services each year. Those who seek services in Oregon are likely to face longer wait times, fewer available appointments, reduced services, and/or the need to travel farther for care.

23. The State would also face fiscal consequences from the loss of Title X-funded services. Many patients who can no longer obtain affordable family planning, sexually transmitted infection screening and treatment, and related preventative care through Title X-funded providers may have to forego these cost-effective early-stage interventions or seek replacement care from other sources such as Medicaid coverage or turn to hospital visits to meet preventable healthcare needs. This would increase demand for services supported by State and local resources and could increase public expenditures for care that Title X-funded providers currently provide or help prevent through early screening, treatment, and preventative services. Some patients may be unable to obtain this critical heath care at all. This will lead to poor health outcomes and most costly health care needs for state residents in the immediate and long-term. Oregon is likely to bear these costs through their state Medicaid programs.

24. Title X funding currently pays for clinical services, staff training and professional development, and health education materials throughout the State's provider network. A loss of Title X funding could result in the disruption of its family planning provider network, including the loss of provider capacity and longstanding community partnership, a reduction in services provided to low-income people in Oregon, and the possible elimination of programming areas. Rebuilding that capacity, even if alternative funding later becomes available, would require substantial time and public resources and would likely leave gaps in access to care in the interim.

25. For these reasons, the loss or substantial reduction of Title X funding would impose costs on Oregon beyond the loss of the federal grant itself. It would disrupt an established network of providers and services, increase demands on other publicly funded health systems, and reduce access to care for residents throughout the State who rely on the State's Title X program and Title X-funded services.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 30th day of September 2026, in Portland, OR.

Annika Shore
Reproductive Health Program Manager
Oregon Health Authority
800 N Oregon St., Portland, OR 97232