**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | Civil Action No. 1:26-cv-03405-DLB |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS, CROSS-MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION .......... 1
ARGUMENT .......... 4
I. THERE IS NO ARTICLE III CASE OR CONTROVERSY. .......... 4
A. The States have not shown that the challenged criteria place their programs on worse competitive terms. .......... 5
B. Application work does not establish injury from the alleged unlawful demands. 10
C. The sovereign and fiscal theories depend on the same unresolved events. .......... 12
D. The States' characterizations do not establish an exclusion the document omits. 14
E. Procedural and notice theories still require a threatened concrete interest. .......... 16
II. THE RESULT IS THE SAME UNDER THE PRUDENTIAL INQUIRY. .......... 16
A. Further development would clarify the issues and the relief. .......... 16
B. The asserted hardship does not require adjudication of a contingent injury .......... 17
III. THE STATES HAVE NOT ESTABLISHED ENTITLEMENT TO SUMMARY JUDGMENT. .......... 19
IV. THE APA CLAIMS FAIL ON THE MERITS. .......... 20
A. The challenged criteria are not final agency action. .......... 20
B. The priorities can be advanced consistently with Part 59. .......... 22
C. The criteria do not conflict with governing law or exceed the Secretary's authority.… .......... 23
D. The priorities are not arbitrary and capricious. .......... 30
E. The notice-and-comment claim fails. .......... 35
V. THE SPENDING CLAUSE CLAIM FAILS. .......... 36
VI. ANY RELIEF MUST ADDRESS THE INJURY ESTABLISHED. .......... 38
CONCLUSION .......... 39

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) .......... 17, 18
*Aetna Life Ins. Co. v. Haworth*,
300 U.S. 227 (1937) .......... 4
*Allied-Signal, Inc. v. NRC*,
988 F.2d 146 (D.C. Cir. 1993) .......... 39
*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) .......... 36, 37
*Baltimore Gas and Elec. Co. v. U.S.*,
133 F. Supp. 2d 721 (D. Md. 2001) .......... 10, 14
*Beck v. McDonald*,
848 F.3d 262 (4th Cir. 2017) .......... 11
*Bennett v. Ky. Dep't of Educ.*,
470 U.S. 656 (1985) .......... 37
*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 21
*Bldg. & Constr. Trades Dep't v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .......... 15
*Bondi v. VanDerStok*,
604 U.S. 458 (2025) .......... 22
*California v. Texas*,
593 U.S. 659 (2021) .......... 2, 10
*Chen Zhou Chai v. Carroll*,
48 F.3d 1331 (4th Cir. 1995) .......... 35
*Children's Hosp. of the King's Daughters, Inc. v. Azar*,
896 F.3d 615 (4th Cir. 2018) .......... 36
*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) .......... 24
*City of Columbus v. Trump*,
453 F. Supp. 3d 770 (D. Md. 2020) .......... 14
*City of Houston v. HUD*,
24 F.3d 1421 (D.C. Cir. 1994) .......... 18
*City of Los Angeles v. Barr*,
929 F.3d 1163 (9th Cir. 2019) .......... 10
*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... Passim
*Cnty. of King v. Turner*,
2026 WL 2489361 (9th Cir. Aug. 25, 2026) .......... 30
*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 34
*Desmond v. PNGI Charles Town Gaming, L.L.C.*,
630 F.3d 351 (4th Cir. 2011) .......... 19

*Digital Realty Tr., Inc. v. Somers*,
583 U.S. 149 (2018) .......... 28
*Doe v. Obama*,
631 F.3d 157 .......... 6, 13, 14
*Doe v. Va. Dep't of State Police*,
713 F.3d 745 (4th Cir. 2013) .......... 17, 18
*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .......... 32, 34
*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 32, 34
*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 35
*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
313 F.3d 852 (4th Cir. 2002) .......... 21
*Food and Drug Administration v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 12
*Gill v. Whitford*,
585 U.S. 48 (2018) .......... 11, 38
*Golden & Zimmerman, LLC v. Domenech*,
599 F.3d 426 (4th Cir. 2010) .......... 21
*Hennepin County v. HHS*,
2026 WL 2426300 (Case No. 1:26-cv-02460-CRC) .......... 9, 21, 31
*HIAS, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021) .......... 23
*Kerns v. United States*,
585 F.3d 187 (4th Cir. 2009) .......... 4, 19
*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) .......... 24
*Lewis v. Casey*,
518 U.S. 343 (1996) .......... 38
*Liberty U., Inc. v. Lew*,
733 F.3d 72 (4th Cir. 2013) .......... 12
*Long Term Care Partners, LLC v. United States*,
516 F.3d 225 (4th Cir. 2008) .......... 21
*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 16, 19
*Maine v. Taylor*,
477 U.S. 131 (1986) .......... 12
*Massachusetts v. EPA*,
549 U.S. 497 (2007) .......... 13
*Mayor of Baltimore v. Azar*
973 F.3d 258 (4th Cir. 2020) .......... 27, 35
*Miller v. Brown*,
462 F.3d 312 (4th Cir. 2006) .......... 18
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 33

*Murthy v. Missouri*,
603 U.S. 43 (2024) .................... 13
*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) .................... 30, 37
*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006).................... 17
*Nat'l Family Planning & Reprod. Health Ass'n v. Kennedy*,
2026 WL 2790025 (M.D. Pa. Sept. 17, 2026).................... 10
*Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*,
979 F.2d 227 (D.C. Cir. 1992).................... 36
*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) .................... 17
*Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*,
508 U.S. 656 (1993) .................... 1, 4, 5, 10
*Oceana, Inc. v. Ross*,
920 F.3d 855 (D.C. Cir. 2019).................... 35
*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) .................... 16, 18, 19
*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .................... 36
*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .................... 25
*Planned Parenthood of Greater N.Y. v. HHS*,
No. 25-cv-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025).................... 31
*Planned Parenthood of Greater Wash. and N. Idaho v. U.S. Dep't of Health & Human Servs.*,
946 F.3d 1100 (9th Cir. 2020) .................... 9
*Planned Parenthood of Wis. v. Azar*,
942 F.3d 512 (D.C. Cir. 2019).................... 18
*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
344 U.S. 237 (1952) .................... 16, 17
*Reno v. Catholic Soc. Servs., Inc.*,
509 U.S. 43 (1993) .................... 4, 10, 19
*Sherley v. Sebelius*,
610 F.3d 69 (D.C. Cir. 2010).................... 6
*Sierra Club v. U.S. Army Corps of Eng'rs*,
909 F.3d 635 (4th Cir. 2018) .................... 39
*South Carolina v. U.S.*,
912 F.3d 720 (4th Cir. 2019) .................... 18
*South Dakota v. Dole*,
483 U.S. 203 (1987) .................... 37
*Stenberg v. Carhart*,
530 U.S. 914 (2000) .................... 28
*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .................... 16
*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967) .................... 4, 16, 17, 18

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) ........ 21
*Trump v. California*,
2026 WL 2473573 (U.S. Aug. 24, 2026) ........ 16
*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 38
*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ........ 21
*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) ........ 7
*Wild Va. v. Council on Env't Quality*,
56 F.4th 281 (4th Cir. 2022) ........ 17
*William F. Wilke, Inc. v. Department of the Army*,
485 F.2d 180 (4th Cir. 1973) ........ 10

**Statutes**

5 U.S.C. § 704 ........ 20, 21
5 U.S.C. § 705 ........ 3, 19
42 U.S.C. 300(a) ........ 7, 27, 28, 37
42 U.S.C. § 300(b) ........ 23, 31
42 U.S.C. § 300a-4(b) ........ Passim
42 U.S.C. § 300a-6 ........ 29

**Regulations**

42 C.F.R. Part 59 ........ Passim
42 C.F.R. § 59.7(a) ........ 29
42 C.F.R. § 59.7(a)(3) ........ 28, 29
42 C.F.R. § 59.2 ........ 22, 24, 25, 28
42 C.F.R. § 59.5(a)(1) ........ 7, 22, 26, 28
42 C.F.R. § 59.5(a)(2)–(5) ........ Passim

## INTRODUCTION

The States ask the Court to invalidate criteria for scoring a grant competition before a single application has been evaluated. A prospective applicant need not await a decision to challenge unequal competitive terms. It must show them. Defendants do not contest that the States are ready to apply. The question is whether the challenged criteria put their proposed activities at an actual or imminent disadvantage. Nothing in the record shows that they do.

The challenged NOFO distinguishes eligibility, evaluation, and performance. Alignment with priorities is not grounds for disqualification. At merit review, applicants receive up to 35 points for "the extent to which the applicant proposes strategies that meaningfully advance" the priorities. AR110. After award, recipients must align funded projects "when authorized by law according to the Title X statute, regulations, legislative mandates, and additional program guidance." AR077. The notice includes performance objectives, but none directs a recipient to omit a service 42 C.F.R. Part 59, Subpart A requires. The States read those provisions as a present command to abandon existing programs. The document contains no such command. Their account rests on subjective mischaracterizations of the notice, not on its text.

The declarations make any connection expressly uncertain and conditional: harm follows "[t]o the extent the State must modify its existing program or application" or "[i]f programmatic changes are required." *E.g.*, ECF 113-22, Sullivan Decl. ¶ 18. New York's asserted incompatibility rests on instructions to de-emphasize contraception and focus exclusively on parenthood that the NOFO does not contain. ECF 113-28, O'Donnell Decl. ¶ 24. An applicant need not prove that it will lose funding, but it must show worse competitive terms. *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

Writing an application is the ordinary price of entering a competition. The States must tie additional work to the allegedly unlawful demands they challenge. Their declarations instead describe determining "if and how" programs must change. Sullivan Decl. ¶ 16; O'Donnell Decl. ¶ 18. Investigating a possible future demand is not the same as bearing a present one. *California v. Texas*, 593 U.S. 659, 678–80 (2021); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415–18 (2013). The sovereign and fiscal theories depend on the same predicted restrictions or funding losses.

If the Court reaches the merits, the States' reading of the priorities fails on the text. Expanding access to fertility-awareness methods does not require restricting other contraception. Counseling grounded in reproductive biology does not require withholding services. Reproductive-goals counseling does not displace nondirective pregnancy-options counseling. The NOFO expressly retains § 59.7(a)'s award criteria, including health equity as regulations define it, and confines agency priorities to lawful program purposes. It also states its terms and its reasons. In the alternative, the Court should deny Plaintiffs' motion and grant Defendants' cross-motion. Any relief should address only the injury established; and any curable explanatory deficiency should be remanded without vacatur.

At this juncture, the practical stakes have come into focus. Three suits have challenged this NOFO. The States filed this suit in August, in a third court. They announced it by invoking "diversity, equity, and inclusion practices" and "the administration's ideological vision of family planning," and promised to go "back to court to defend [Title X] again." Press Release, Off. of the N.Y. Att'y Gen., *Attorney General James Leads Lawsuit to Protect Title X Family Planning Services* (Aug. 27, 2026). Defendants, for their part, have sought an orderly and prompt

disposition of every challenge, including asking that challenges to this notice be decided together and consenting to expedited briefing.

The case reduces to two points. First, the States' claims rest on hypotheticals: readings the notice does not support and predictions on how reviewers might apply it, not a demonstrated connection between the stated criteria and concrete activities the States would propose. Parts I.A, I.D, *infra*. Second, the suit was carefully framed and timed, but the remedy it seeks is a blunt instrument aimed at the wrong target. It would set aside the criteria for a competition set to get underway. Applications are due January 11, awards are anticipated April 1, and current awards end March 31, 2027. Setting aside criteria now would upend the entire FY2027 competition: every applicant nationwide would need notice of the change and an opportunity to revise, and no successor award could issue until revised applications had been reviewed. AR105–11. The States' own submissions identify who those recipients are. The relief the States seek, resting on conjectural readings and allegations, would not restore Title X funding. It would stop it: defunding, at least for a time, the very programs the States supposedly brought suit to protect.

That consequence follows directly from the case the States chose to bring: a third-filed suit in a third forum, challenging a nationwide competition on its face before anyone has applied, and timed to leave little room before the January 11 deadline. Nothing required that approach. They could have intervened in or joined either of the two other challenges. Or they could have waited until the competition produced an actual application, score, or award decision, when their questions would come to the Court with a record rather than speculation, and any relief, including interim relief under 5 U.S.C. § 705, could be fitted to an actual injury.

This case should be dismissed, without prejudice to a challenge grounded in a demonstrated connection between the criteria and a State's proposed activities, or in an actual application, score, or award decision. Parts I, II, VI, *infra*.

## ARGUMENT

### I. THERE IS NO ARTICLE III CASE OR CONTROVERSY.

Defendants do not presently dispute the facts the States' declarations set out. They dispute whether those facts establish standing. Characterizations of the NOFO present a question of interpretation, not a factual dispute requiring credibility findings. *See Kerns v. United States*, 585 F.3d 187, 192–93 (4th Cir. 2009).

A case or controversy is one "admitting of specific relief through a decree of a conclusive character," rather than advice about "a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937). Three questions determine whether a challenge to a funding criterion presents one before any application has been evaluated.

First, injury: what have plaintiffs lost? An unequal opportunity to compete is itself an injury, distinct from the eventual loss of funding. *Ne. Fla.*, 508 U.S. at 666.

Second, connection: how does the challenged action produce the injury for this plaintiff? *Northeastern Florida* did not require proof of an unsuccessful bid, but it did require members able and ready to bid whom the challenged policy prevented from competing equally. *Id.* Stated succinctly, the challenged action must be shown to alter a competitive position.

Third, timing: whether that injury exists now or depends on unresolved future events. *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58–59 & n.19 (1993) ("*CSS*"). A challenge is premature when future application determines the injurious effect on the plaintiff. *Toilet Goods*

*Ass'n v. Gardner*, 387 U.S. 158, 163–64 (1967). But it is not premature when an injury, such as unequal footing, is established and only the award remains uncertain. *Ne. Fla.*, 508 U.S. at 666.

The principal defect here is the missing connection. The States invoke recognized injuries but have not tied the challenged features to an actual or imminent burden on their proposed activities. Were unequal footing concretely shown, uncertainty about the eventual award would not defeat review. Part I addresses Article III; Part II presents the prudential alternative. Dismissal on the first ground does not depend on the second.

**A. The States have not shown that the challenged criteria place their programs on worse competitive terms.**

**i. The instrument does not establish the asserted disadvantage.**

Intending to apply makes a State a competitor. It does not, by itself, make the State an injured one. The State must still identify the disadvantage it asks the Court to remedy. *Ne. Fla.*, 508 U.S. at 666. It need not submit a completed application or predict an exact score. It must link a challenged criterion to the activities it intends to propose.

Begin with the instrument. A set-aside injures on its face: the day it is issued, a class of bidders has lost something, and a court can read the document and name them. *Id.* Here, the disadvantage must follow from the instrument, read with established facts about the applicant, without speculation about how reviewers will exercise the judgment the rubric leaves to them. An injury depending on a particular adverse interpretation requires a basis for finding that interpretation sufficiently imminent.

The rubric awards points for "the extent to which the applicant proposes strategies that meaningfully advance" the priorities. AR110. It prescribes no per-priority weight, mandatory deduction, or automatic zero. AR109–10. Those features do not immunize a scoring preference

from review. They mean that the 35-point maximum, standing alone, does not say which applicant is disadvantaged or how. That answer must come from the criterion's substance and facts about the applicant. An unlawful scoring criterion is still a scoring criterion; alleging its unlawfulness says nothing about its effect on a particular State.

A scoring criterion can create a disadvantage before evaluation. A criterion awarding points for experience operating rural clinics would disadvantage an identified provider that has none; the provider could prove that disadvantage from the criterion and a sentence about itself. Defendants' distinction between instruments that allocate and instruments that evaluate does not foreclose that showing. It identifies why an evaluative rubric, without a demonstrated adverse effect on an applicant, is not itself an injury.

The States posit newly eligible competitors based on AR161's preference for a broad range of recipients rather than repeat players. Pls.' Mem. 12, 14. But a preference is not a rule, and that statement changes no eligibility requirement. Applicants must still qualify and propose projects meeting Part 59. AR074–79, 106–10.[1]

**ii. The declarations describe conditional changes and disputed interpretations.**

The States describe their programs, networks, services, and investments. *See, e.g.*, Sullivan Decl. ¶¶ 4–10; ECF 113-23, Lyon-Callo Decl. ¶¶ 4–10; O'Donnell Decl. ¶¶ 4–12. But their account of what the challenged criteria do to those activities is conditional.

Maryland says it can retain its existing program and "risk losing funding in the event the Office of Population Affairs decides" that the program does not sufficiently align, or make

[1] *Sherley v. Sebelius*, on which the States rely, Pls.' Mem. 14, involved guidelines that made a new class of projects eligible for a fixed pool of funds, 610 F.3d 69, 72–74 (D.C. Cir. 2010), a step this notice does not take, and the Fourth Circuit has not adopted its analysis, *see Doe v. Obama*, 631 F.3d 157, 163–64 (4th Cir. 2011) (expressing "no opinion on the standing issue in *Sherley*")

changes "in an attempt to further align." Sullivan Decl. ¶ 16. Michigan and Rhode Island use the same formulation. Lyon-Callo Decl. ¶ 16; ECF 113-31, Campagna Decl. ¶ 16. They describe priorities that "appear to be in tension, if not conflict," with existing requirements and disruption "[i]f programmatic changes are required." Sullivan Decl. ¶¶ 17–18; Lyon-Callo Decl. ¶¶ 17–18.

New York's declaration states the incompatibility more directly, but identifies the interpretive premise on which it rests. The Department says it "could not comply" with the Overmedicalization Priority, "which deemphasizes contraception," or the Directive Counseling Priority, "which the Department understands to require exclusive focus on parenthood." O'Donnell Decl. ¶ 24. It further objects to compliance with the priorities "as the Department of Health understands them." *Id.* ¶ 25.

The NOFO supplies neither instruction. Expanding access to fertility-awareness-based methods does not direct a project to restrict other contraception. Indeed, § 59.5(a)(1) and the Title X statute expressly include "natural family planning methods" within the required broad range. AR079, 082, 090; *see also* 42 U.S.C. 300(a). The counseling priority asks projects to "affirm marriage and parenthood as meaningful and valued components of adult life" and "support informed decision-making." AR083. That priority does not require an exclusive focus on parenthood, and § 59.5(a)(5)'s pregnancy-options counseling and referral requirements remain in force. AR077–80.

New York's objection based on its Department's "mission and values" likewise is not, by itself, an injury. O'Donnell Decl. ¶ 25. Disagreement is not disadvantage. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485–86 (1982).

The clinical commands the States describe are not only absent from the instrument, the declarations do not establish a particular competitive disadvantage from the priorities the

instrument does contain. A State that complies fully with Part 59 could in principle still be disadvantaged if it declines to propose activities the rubric rewards. The rural-clinic example above illustrates the point. But the declarations do not make that showing. Declining a command the notice does not contain, as New York does, O'Donnell Decl. ¶ 24, is not a disadvantage. And the declarations do not connect the strategies the notice actually describes, such as expanded fertility-awareness access, body-literacy education, or reproductive-goals counseling, AR081–83, to the activities any State would propose, whether because the State would not undertake them, lacks the capacity to, or would incur additional cost in doing so. Without that connection, the Court cannot identify the disadvantage it is asked to remedy.

**iii. The site-specific work plan permits explanation, not exclusion.**

The States say the NOFO's site-specific counseling plans effectively bar their existing projects. Pls.' Mem. 12, 14. The provision requires applicants to describe services at each site, including reproductive-goals counseling, and to supply "a justification for any methods and services that will not be available at the site" with a description of how client access will be ensured. AR093–94. The States' own summary recognizes that alternative. Pls.' Mem. 8.

That is an application requirement, and Defendants do not deny that preparing the description takes work. But the provision does not require every site to provide every listed service directly. Nor does it require the "exclusive focus on parenthood" New York attributes to it. O'Donnell Decl. ¶ 24. The notice expressly accommodates a proposal explaining a service's absence at a site and how access will be provided. The States identify no particular site whose existing services cannot be described under that alternative, or a particular commitment requiring abandonment of nondirective counseling. The ordinary work of describing services is addressed below. It is work, not exclusion.

**iv. The competing cases require the connection missing here.**

In *Planned Parenthood of Greater Washington & North Idaho v. HHS*, the funding announcements required implementation of a specified tool and devoted at least one quarter of the scoring rubric to that implementation. 946 F.3d 1100, 1109–10 (9th Cir. 2020). The applicant alleged it would not implement the required tool and could not compete effectively. The court held that the magnitude of the alleged disadvantage was immaterial. *Id.* at 1109. Defendants do not demand a greater magnitude here. The missing fact is the disadvantage itself: the States' alleged clinical restrictions do not follow from the text, and their declarations predict how reviewers might apply it.

*Hennepin* recognized competitive injury from the new NOFOs independently of the termination of existing awards. The court found that the plaintiffs could not continue their identified programs while complying with the new conditions. *Hennepin County v. HHS*, 2026 WL 2426300, at *8–12 (Case No. 1:26-cv-02460-CRC) (D.D.C. Aug. 19, 2026).

The distinction here turns on what this NOFO requires and how those requirements affect the States' programs. The notice retains the broad-range service requirement and permits applicants to explain how clients will obtain services unavailable at a particular site. AR090, 093–94. Those provisions undermine the asserted necessity of abandoning existing services or requiring every provider to furnish expanded care directly. Campagna's concern, for example, that existing providers lack the resources to offer broader infertility or advanced reproductive care, does not establish that the notice requires that expansion. Campagna Decl. ¶ 19. Whether the priorities nevertheless impose additional application burdens or disadvantage the States in scoring presents a separate question. That question cannot be answered by treating the clinical changes the States predict as requirements the notice imposes.

The procurement cases demand the same showing. *William F. Wilke, Inc. v. Department of the Army* concerns lawful consideration of a bid. 485 F.2d 180, 182–83 (4th Cir. 1973). *Baltimore Gas & Electric Co. v. United States* identifies a specific advantage to competing bidders lacking franchise rights. 133 F. Supp. 2d 721, 726–28 (D. Md. 2001). *City of Los Angeles v. Barr* confirms that uniform criteria can affect applicants differently. 929 F.3d 1163, 1173 (9th Cir. 2019). None dispenses with showing that effect on the plaintiff.

*NFPRHA* dismissed a challenge to this NOFO as unripe. *Nat'l Family Planning & Reprod. Health Ass'n v. Kennedy*, 2026 WL 2790025, at *2–4 (M.D. Pa. Sept. 17, 2026). A materially different record could support a different result, of course, but additional theories resting on the same predicted interpretations do not supply that record.

*CSS* addresses timing, not whether a competitor can be injured. The case contrasted plaintiffs seeking an equal opportunity to compete for the benefit itself, and it relied on the record of bidding in *Northeastern Florida*. 509 U.S. at 58–59 & n.19. Plaintiffs may be ready to apply. *CSS*'s lesson is that injury does not follow from the promulgation of a rule alone. If unequal footing is shown, uncertainty about the eventual award does not defeat review. But if it is not, readiness to apply does not supply it. Here, history and preparation make the States prospective competitors but do not show that HHS demands the departures from Part 59 those competitors fear, or that the priorities the notice contains put their proposals at a disadvantage.

### B. Application work does not establish injury from the alleged unlawful demands.

The States' administrative-cost theory relates to connection and timing. An expenditure can be concrete without being fairly traceable to the allegedly unlawful conduct. *California v. Texas* rejected reliance on administrative expenses imposed by provisions operating independently of the provision challenged. 593 U.S. 659, 678–80 (2021). The States must

distinguish ordinary application work from work caused by or traced to the allegedly unlawful demands. They need not prove unlawfulness but must show that those demands cause or imminently threaten injury.

The declarations identify staff resources devoted to determining "if and how" programs must change. Sullivan Decl. ¶ 16; O'Donnell Decl. ¶ 18; Lyon-Callo Decl. ¶ 16. The declarations also say additional staff time and resources will be needed to determine whether and how existing programs must change to address the new priorities. Those assertions concern present application work. The predictions of replacing providers and reorganizing services concern different, future burdens whose occurrence depends on the disputed interpretation of the notice. The Court should assess those theories separately rather than treating the present expenditure of application resources as establishing the necessity of the predicted clinical changes.

The States thus run together two different notions: revising an application and changing a working program. The notice requires the former now. Their declarations leave the latter contingent. Existing awards are unaffected. Describing a proposed project is not an injury caused by unlawful programmatic demands. Describing counseling services and access arrangements takes work whether the counseling must adopt the unlawful content the States attribute to the priority or not. AR093–94. The declarations identify no distinct additional task that the asserted content requires. Strike the content the States fear, and the work of describing lawful services remains. The requested relief must redress the injury caused by the asserted defect. *Gill v. Whitford*, 585 U.S. 48, 73 (2018).

Expenditures anticipating feared departures from Part 59 cannot themselves resolve the contingency, either. *Clapper* rejected costs incurred to avoid speculative future harm. 568 U.S. at 414–16. *See also Beck v. McDonald*, 848 F.3d 262, 276–77 (4th Cir. 2017) (costs incurred to

mitigate a speculative risk of harm; no standing). *FDA v. Alliance for Hippocratic Medicine* likewise rejected resource diversion as a substitute for concrete injury caused by the challenged action. 602 U.S. 367, 394–96 (2024). Being an applicant does not excuse a plaintiff from showing causation. Investigating whether an injurious demand might arise differs from responding to an established burden. Nor do the declarations show the substantial risk that can support reasonable mitigation expenditures. See *Clapper*, 568 U.S. at 414 n.5.

*Liberty University, Inc. v. Lew* is not to the contrary. There, a statutory employer mandate applied to the plaintiff, and the court found plausible allegations of increased costs, including the burden of assuring compliance even if existing coverage proved sufficient. 733 F.3d 72, 89–90 (4th Cir. 2013). Here, the allegedly unlawful demands—not the need to prepare an application—remain uncertain. The States' declarations describe work to find out whether such demands exist. But money spent asking that question does not answer it.

**C. The sovereign and fiscal theories depend on the same unresolved events.**

The sovereign-injury theory identifies no present displacement of state law. The States cite their authority to create and enforce a legal code, but the NOFO neither preempts their laws nor prevents their enforcement. Their own account makes the conflict conditional. Maryland describes what would follow "[i]f compliance" required reducing or restricting services. Sullivan Decl. ¶ 20. New York's asserted inability to comply depends on its understanding that the priorities de-emphasize contraception and require an exclusive focus on parenthood. O'Donnell Decl. ¶ 24. The notice contains neither instruction.

The Court need not construe state law or read the NOFO's federal-law qualifier to incorporate it. *Maine v. Taylor*, 477 U.S. 131, 137 (1986), recognizes a State's interest in the enforceability of its laws, but identifying that interest does not show this NOFO impairs it. *See*

*also Massachusetts v. EPA*, 549 U.S. 497, 518–23 (2007). Sovereigns, too, must show a concrete injury traceable to the action they challenge.

The fiscal theories require further steps. Seven plaintiffs do not receive direct Title X awards. Pls.' Mem. 11 n.13. Their healthcare expenditures depend on how the criteria affect other applicants, what those applicants do, and how residents' use of state-funded care changes. The direct grantees' replacement-funding theory necessarily depends on a denial or reduction of a future award. The alternative theory—that even successful applicants will restrict care—depends on the same disputed reading of the priorities. Pls.' Mem. 17–19. None is a present fiscal consequence of the notice itself.

*Doe v. Obama*, 631 F.3d 157, 161–62 (4th Cir. 2011), is instructive. There, the plaintiffs challenged an executive order and NIH guidelines expanding federal funding of embryonic stem-cell research; their asserted injuries depended on how third parties would respond to the new funding. The court held that "the independent decision" of those third parties was "an intervening cause," that the asserted link between the policy and the injury was "purely speculative," and that the plaintiffs therefore lacked standing. *Id.* (quotations omitted). The States offer healthcare expenditure theories of the same ilk—theories that depend on what other applicants and providers do and on how residents' use of state-funded care changes. Those providers include Planned Parenthood affiliates that the States identify as grantees and subrecipients in their Title X networks, ECF 113-15, ¶ 4; ECF 113-24, ¶ 5; ECF 113-29, ¶ 6; ECF 113-34, ¶ 6, whose own interests are being litigated in the District of Columbia.

New York begins its account of funding loss with "[i]f New York does not receive Title X funding." O'Donnell Decl. ¶ 26. Serious consequences do not make the condition that precedes them any more likely. *Clapper*, 568 U.S. at 410–14; *Murthy v. Missouri*, 603 U.S. 43,

57–58 (2024); *see Doe*, 631 F.3d at 163 (no standing where "the possibility that [plaintiffs] will never suffer the alleged injury looms too large").

*City of Columbus v. Trump* concerned changes to Affordable Care Act policies, not a scoring criterion whose asserted clinical consequences depend on a disputed future application. 453 F. Supp. 3d 770, 787–88 (D. Md. 2020). *Baltimore Gas* likewise distinguished a concrete competitive allegation from projected rate and safety harms depending on a future award and subsequent noncompliance. 133 F. Supp. 2d at 728–29. Here, the notice preserves the service requirements the States predict will be abandoned. AR077–80.

Redressability requires a corresponding showing that removing priorities would likely alleviate the fiscal injury. Other criteria, funding limits, and independent provider decisions would remain. Relief vacating the criteria would not relieve (and indeed could compound) the funding consequences on which those theories rest. The declarations do not make that showing.

**D. The States' characterizations do not establish an exclusion the document omits.**

The notice separates three stages. At the threshold, it lists grounds for disqualification: eligibility, responsiveness, format, timely submission. Alignment is not among them. AR106–09. At merit review, it awards up to 35 of 100 points for the extent to which proposed strategies advance priorities. AR109–10. After award, it governs the funded project. The first paragraph of AR077 states:

> Consistent with OASH's mission, in carrying out any project that is funded under this NOFO, recipients must align program design and activities with agency priorities where consistent with program authority and the scope of the award (Priorities of the Office of the Assistant Secretary for Health," available online at: https://health.gov/priorities), and when authorized by law according to the Title X statute, regulations, legislative mandates, and additional program guidance. Funded activities must advance and support OASH's mission to improve the health and well-being of Americans.

The following paragraphs require funded projects to promote body and health literacy, advance reproductive-goals counseling, and implement a quality-improvement and quality-assurance plan, with ongoing compliance in programs authorized to advance those objectives. AR077. The notice also states that clinics will be required to incorporate foundational body and health literacy into counseling. AR082. Defendants do not erase those requirements. They distinguish what the requirements say from the service restrictions the States attribute to them. Education about reproductive physiology is no instruction to withhold contraception. Nor is reproductive-goals counseling an instruction to withhold pregnancy-options counseling.

Corrective action and termination provisions enforce applicable award requirements. AR077, 114. Their presence does not turn a bounded performance obligation into an eligibility bar or suggest that following Part 59 will trigger enforcement. Nor does the False Claims Act reference at AR132 mean States must certify the unlawful clinical practices they posit. Pls.' Mem. 21–22. The document must be read as a whole, including its express preservation of governing law.

Federal staff review also retains judgment. OPA will evaluate applications "according to the criteria set forth" in § 59.7(a) and consider alignment "where authorized by law and within the scope of the program," among other factors. AR111. Those provisions therefore do not foreordain a funding denial. Among other reasons, scoring does not necessarily determine outcomes. A theory that depends on a particular adverse implementation requires showing that implementation is sufficiently imminent.

Courts should not presume agencies will act beyond the limit their instruments place on them. *See Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33, 36 (D.C. Cir. 2002). And *Trump v. California* cautions against stacking hypothetical future downstream actions to

establish injury. 2026 WL 2473573, at *2 (U.S. Aug. 24, 2026) (per curiam). The text here commands none of the injurious conduct alleged.

### E. Procedural and notice theories still require a threatened concrete interest.

Procedural rights relax immediacy and redressability, but the procedure must protect a concrete interest threatened by the challenged action. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009). The States' notice-and-comment claim therefore requires a link to their competitive position or another concrete interest; a procedural objection alone does not supply it.

The vagueness and Spending Clause theories also depend on a concrete injury that supports each claim and the relief it seeks. Difficulty understanding the notice is not automatically injury, although a concrete burden from an uncertain operative obligation could be. The declarations identify possible demands, not a present award requiring acceptance of them. The notice label does not supply the missing threat to a concrete interest.

## II. THE RESULT IS THE SAME UNDER THE PRUDENTIAL INQUIRY.

### A. Further development would clarify the issues and the relief.

A dispute fit for decision has "taken on fixed and final shape" so that a court can identify the legal issues, the decision's effect on the parties, and a useful purpose in deciding it. *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952). The States' declarations instead describe uncertainty about what the priorities would require of their programs. A concrete application would identify the proposed activity, the agency's treatment of it, and any conflict with governing requirements. That development would inform the question presented, not merely decide who wins an award. See *Toilet Goods*, 387 U.S. at 163–64; *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 735–36 (1998).

The Fourth Circuit applies the same rule. A claim is unripe where "many steps" must occur between the challenged action and any ultimate harm. *Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 296–97 (4th Cir. 2022). And "[a] claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quotations omitted). Just so here.

The same gap impacts relief. A fit dispute allows a court to see "what effect its decision will have on the adversaries." *Wycoff*, 344 U.S. at 244. Without an established connection between a challenged criterion and a State's proposed activities, the Court cannot determine what relief would be necessary to remedy any injury: which plaintiffs it would run to, or which criteria it would reach. Part VI, *infra*. Once that connection is shown, before or after evaluation, relief can be tailored to it.

The notice provides applicant assistance and a November 9 webinar before the January 11 deadline. AR068, 105. These are not exhaustion requirements. But they do confirm that the notice's meaning need not be guessed at. Indeed, in an earlier Title X dispute, the D.C. Circuit instructed the plaintiff to "inquire of HHS exactly how the agency proposes to resolve any of the conflicts that it claims to spot." *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).[2]

**B. The asserted hardship does not require adjudication of a contingent injury.**

Hardship follows the distinction between *Abbott Laboratories* and *Toilet Goods*. *Abbott Laboratories* involved an immediately effective rule requiring changes to labels and promotional materials, backed by serious penalties. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152–53 (1967).

---

[2] Finality does not answer this inquiry. A final agency action may still present an unripe dispute. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–12 (2003).

*Toilet Goods* involved a final regulation whose effect depended on whether, when, and why the agency ordered an inspection; it required no advance change in primary conduct. 387 U.S. at 163–65. *Ohio Forestry* similarly asked whether the challenged provisions themselves caused legal or practical harm, rather than harm that awaited later implementation. 523 U.S. at 733–36.

To be sure, the States must prepare applications now. But the ordinary cost of competing and uncertainty about whether to revise a proposal are not the programmatic hardship they predict. Part I.B, *supra*. Unlike *Abbott Laboratories*, this notice does not presently require changes to the clinical services supported by the States' existing awards. Nor do reasonable precautions against possible future demands automatically amount to hardship sufficient to overcome the need for a concrete dispute. *Clapper*, 568 U.S. at 416.

Fourth Circuit law comes out the same way. Hardship is measured by "the immediacy of the threat and the burden imposed" on the plaintiff. *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). In *Doe*, the plaintiff had yet to petition for the relief whose denial she feared, and requiring her to wait was not undue hardship. 713 F.3d at 758–59. The States likewise have not yet applied. And in *South Carolina v. United States*, the court held a State's claims resting on contingent future events not presently justiciable, while recognizing that claims "not currently justiciable does not mean that they never will be so." 912 F.3d 720, 731 (4th Cir. 2019).

The States also stress that funds may be obligated before a later challenge can be resolved. Pls.' Mem. 20–21. That concern warrants attention to timely relief once an actual or imminent injury is shown, but it does not supply missing injury now. *Planned Parenthood of Wisconsin v. Azar*, 942 F.3d 512, 516 (D.C. Cir. 2019), and *City of Houston v. HUD*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994), show practical limits of relief after funds have been committed. Defendants do not contend applicants must wait until all money is obligated. The point is that

neither a funding deadline nor the possibility of later mootness creates present unequal footing. *See CSS*, 509 U.S. at 58–59 & n.19. Interim relief may be sought once the requisite injury and other conditions are met. *See* 5 U.S.C. § 705.

Ripeness also asks "whether judicial intervention would inappropriately interfere with further administrative action." *Ohio Forestry*, 523 U.S. at 733. Here it would. The competition is nationwide and underway: applications are due January 11, and awards are anticipated April 1. AR068, 071. Relief now, on a challenge resting on predicted application, would upend the competition for everyone: it would require a revised notice and a renewed opportunity to apply before any award could issue, with a gap in funding for current recipients. Part VI, *infra*. In contrast, a dispute arising from an actual application may permit relief directed to a particular score or award decision. And if a later challenge shows that a criterion governing every applicant is unlawful, the Court will then know which criterion, which applicants, and what effect, and can fashion relief on that record, including interim relief under 5 U.S.C. § 705 where warranted.

## III. THE STATES HAVE NOT ESTABLISHED ENTITLEMENT TO SUMMARY JUDGMENT.

Defendants accept the pleaded facts and reasonable inferences for dismissal. *Kerns*, 585 F.3d at 192–93. The States' motion requires evidence supporting each standing element at summary judgment. *Lujan*, 504 U.S. at 561. Cross-motions are considered separately, with reasonable factual inferences drawn against each movant. *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011).

Surviving dismissal therefore would not entitle the States to judgment. Their staff work shows effort, not an operative unlawful demand, and their descriptions of existing programs

show programs, not competitive disadvantage. Those inferences do not follow merely because the declarants predict adverse application. The notice's meaning remains a legal question.

Defendants seek no resolution of contested jurisdictional facts against the States. Rule 56's factual-inference standard governs their evidence of injury, not the Court's APA review of the administrative record.

## IV. THE APA CLAIMS FAIL ON THE MERITS.

The Court should not reach the merits. If it does, the States recognize that HHS may prioritize different emphases within Title X's statutory and regulatory framework. Pls.' Mem. 40. The question is whether these priorities conflict with that framework or lack a reasoned explanation. They do neither.

The notice preserves the governing requirements, and none of the challenged priorities directs applicants to violate them or states that a project will receive credit for doing so. The States' contrary reading depends on additional premises: that expanding one method requires restricting others, that counseling grounded in biology requires disregarding client preferences, and that discussing long-term reproductive goals displaces nondirective pregnancy-options counseling. The text supports none of them.

A conflict requires the notice to compel what a regulation forbids, or to forbid what it compels. The States must therefore point to text in the notice that conflicts with text in a statute or regulation. Questions are not conflicts, and conditionals are not commands.

### A. The challenged criteria are not final agency action.

The APA authorizes review of "final agency action." 5 U.S.C. § 704. If the Court reaches the merits, the States' APA claims fail at that threshold as to the challenged criteria. Defendants do not dispute that the notice marks the consummation of the agency's process for announcing

this competition. The second condition is not met. Final action must be one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597–98 (2016). In this Circuit, "[a]gency action which carries no 'direct and appreciable legal consequences' is not reviewable under the APA," whatever its practical effects. *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 857–61 (4th Cir. 2002); *see Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 431–33 (4th Cir. 2010).[3]

The merit criteria determine no one's rights or obligations. They describe considerations reviewers will weigh, alongside others, in evaluating applications that do not yet exist. AR109–11. They disqualify no one: the grounds for disqualification are a closed set, and alignment is not among them. AR076, 106–09. They bind no applicant to propose anything, and they leave the agency's judgment over every award in place. AR111–12. Legal consequences flow from the award decision on each application, AR112, and the post-award objectives at AR077 attach to a recipient only upon an award it accepts, and only to the project it proposed. AR077, 113–14.

The decisions the States invoke involve instruments with determinate consequences. The notices in *Hennepin*, for example, provided that a nonaligned application "will not receive funding to the extent permitted by law" and categorically disqualified the plaintiffs' programs, 2026 WL 2426300, at *18. Here, by contrast, the challenged provision is a weighted, discretionary criterion in a competition no one has yet entered. The point is consistent with the

[3] Whether § 704's finality requirement is jurisdictional is not settled. The Fourth Circuit has treated it as jurisdictional, *Flue-Cured Tobacco*, 313 F.3d at 857–61, and has since questioned that approach, *see Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 231–32 (4th Cir. 2008). Other circuits treat finality as an element of the APA cause of action. *E.g.*, *Trudeau v. FTC*, 456 F.3d 178, 183–85 (D.C. Cir. 2006). The Court need not resolve the question. Either way, finality is an element of the States' APA claims, and they bear the burden of establishing it on their cross-motion.

notice-and-comment analysis below: provisions that bind neither the agency nor applicants are neither legislative rules nor actions from which legal consequences flow. Part IV.E, *infra*.

**B. The priorities can be advanced consistently with Part 59.**

The States never describe a project that complies with a regulation and cannot comply with a criterion. Three ordinary Title X projects show what compliance with both could look like. A rural-access project, with evening hours, a satellite clinic, and transportation support, provides the broad range of methods § 59.5(a)(1) requires and advances the notice's access priorities. A project that serves every client without regard to sexual orientation, gender identity, or sex characteristics, and grounds its counseling in reproductive anatomy and pregnancy risk, satisfies §§ 59.2 and 59.5(a)(3)–(4) and the biological-science priority. And a project that offers the full range of methods while expanding access to fertility-awareness-based methods, gives every pregnant client the nondirective options counseling § 59.5(a)(5) requires, and offers reproductive-goals counseling to clients who want it, satisfies the regulations and the remaining priorities at once. The States identify no language displacing those lawful services. And it is not reasonable to infer that the above projects could not achieve full marks on satisfying priorities.

Because each priority admits a lawful course of compliance, the Court need not decide what standard governs a challenge to the notice's text before it has been applied to anyone. Whatever the standard, a claim that compliance with both is impossible fails if a lawful course exists. *Cf. Bondi v. VanDerStok*, 604 U.S. 458, 467–68 & n.2 (2025) (assuming without deciding).

**C. The criteria do not conflict with governing law or exceed the Secretary's authority.**

**i. Alignment operates within the statute and regulations.**

"Align" is not "prioritize." Recipients "must align program design and activities with agency priorities" when authorized by law and consistent with program authority and award scope. AR077. Proposals should describe plans and strategies addressing OPA priorities. AR089–092. Addressing a priority means explaining how proposed activities advance it; it does not require adopting the agency's emphasis as an ordering of the services available to each client.

Congress authorized conditions appropriate to ensure that Title X grants are effectively used for their purposes. 42 U.S.C. § 300a-4(b). The four considerations in § 300(b) are mandatory, not exclusive, and § 59.7(a) supplies additional considerations. The States' concession that lawful program emphases are permissible narrows the dispute to the asserted conflicts. Pls.' Mem. 40. Defendants do not claim authority to disregard the statute or regulations. The NOFO incorporates them and identifies the priorities as additional program guidance operating within them. AR077–80, 111.

The notice describes its priorities as operating "in addition to the statute, regulations, legislative mandates, and additional program guidance" that govern Title X, AR080, and it recites the regulations section by section, AR079. An instrument that repeals regulations does not describe itself as an addition to them.

*HIAS, Inc. v. Trump* requires examining the operative text, not treating a savings clause as a substitute for that examination. 985 F.3d 309, 325 (4th Cir. 2021). There, the order established a clear state-and-local consent requirement for refugee resettlement; the purported exception supplied neither a mechanism nor standards for obtaining relief and would undermine the requirement itself. Here, the substantive standards are Part 59's existing requirements, which

the notice expressly retains. Reading those requirements together with the priorities leaves both operative. The Court need not disregard a clear contrary command to give the limits effect, because the priorities contain no such command.

The States' own theory confirms the point. They argue that the priorities are too indefinite to tell applicants what is required. A limiting clause is disregarded only where the instrument unambiguously commands what the clause purports to negate. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239–40 (9th Cir. 2018); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 176 (D.D.C. 2025). An instrument the States call too indefinite to apply cannot also be the unambiguous command to violate Part 59 that their conflict theory requires. Whatever Part 59 requires, a project must do, and whatever it forbids, a project may not do. The priorities operate in the space between. AR077, 111.

**ii. Evidence-based care and biological science.**

The States invoke regulations requiring client-centered, inclusive, nondiscriminatory services. 42 C.F.R. §§ 59.2, 59.5(a)(3)–(4). Those requirements remain in force. AR077–80. The Title X priority asks for "counseling rooted in biological science" and referral pathways aligned with evidence-based care. AR083. It does not direct a project to turn away a client, withhold a required service, or disregard an individual's medical needs.

The regulations and priority address different questions. Sections 59.2 and 59.5 govern whom a project serves and how it treats clients. The priority addresses the scientific basis for counseling and referrals. A project can comply with both. Respecting a client's identity and preferences does not require a project to disregard reproductive anatomy in counseling it provides. The States' example of anatomy-based screening does not identify a conflict with counseling rooted in reproductive biology. Pls.' Mem. 30–31. Nor does the incorporated agency

language enlarge the obligation beyond the NOFO's express limits. References to "ending support for gender ideology" appear in broader priority statements incorporated only within law and program scope. AR080, 111, 135, 144.

A nondiscrimination rule governs how clients are treated, not whether counseling may describe reproductive anatomy. Counseling that accurately reflects reproductive biology cannot be said to treat clients differently on any listed ground.

The QFP does not help. Section 59.5(a)(3) requires services consistent with nationally recognized standards of care; it does not make every recommendation in a particular guidance document an independently binding rule. The QFP's status as guidance does not make it irrelevant to reasoned decisionmaking. It does mean the States must identify a recommendation that the regulation requires and the NOFO directs projects to abandon to show a conflict with law. They have identified none. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015).

The asserted conflict therefore lies between two silences. Regulations prescribe no particular practice of address or vocabulary. They require nondiscriminatory, client-centered services. §§ 59.2, 59.5(a)(3)–(4). The priority statements address program design and science reflected in program materials, "to the extent permitted by applicable law," and do not direct how any client is served. AR135, 144.

**iii. Overmedicalization and body literacy.**

The NOFO directs applicants to integrate noninvasive, evidence-based practices, expand access to fertility-awareness-based methods, and incorporate foundational body and health literacy into counseling. AR081–82. None of those instructions directs a project to offer less contraception, counsel against it, or make it harder to obtain. The notice's limited references to

prescription contraception do not repeal the broad-range requirement it expressly incorporates. The notice still requires every proposal to describe the statutory broad range of methods. AR089.

The method the priorities do identify is one § 59.5(a)(1) expressly names: natural family planning. Expanding access to it is compatible with providing a broad range of acceptable and effective medically approved methods. The no-coercion rule remains equally applicable to every method. § 59.5(a)(2). A project may expand available choices without steering a client away from the method the client chooses.

A priority that asks applicants to expand access to a method the regulation names cannot conflict with that regulation. The States' reading takes "the agency prioritizes X" to mean "the grantee must subordinate Y," and then finds a conflict between that restatement and the regulation. The priorities state what the Department looks for. AR110. They do not direct any project to rank methods, steer clients, or reallocate services.

Body literacy also has specified content: menstrual-cycle physiology, hormonal health, male and female fertility awareness, and early indicators of identified reproductive disorders. AR082. The mandatory language requires adding that education to counseling, not leaving symptoms untreated. The same paragraph expressly contemplates further medical evaluation when symptoms warrant it. *Id.* The States' concern about "symptom suppression" does not amount to a direction to withhold appropriate treatment or a chosen contraceptive method.

**iv. Reproductive-goals counseling.**

Section 59.5(a)(5) requires pregnant clients to be offered neutral information and nondirective counseling on prenatal care and delivery; infant care, foster care, or adoption; and pregnancy termination. The NOFO's reproductive-goals priority concerns long-term goals and

how life choices, reproductive health, and fertility intersect. AR083. It directs no project to remove any pregnancy option or required referral.

The sentence the States emphasize should be read in full: "Program counseling should affirm marriage and parenthood as meaningful and valued components of adult life, particularly in counseling adolescents on longterm reproductive goals, and support informed decision-making by helping individuals understand how life choices, reproductive health, and fertility intersect to shape long-term stability, health, and wellbeing." AR083. The sentence expresses a view of marriage and parenthood but does not direct a client to choose either, override client preferences, or condition services on agreement. Sections 59.5(a)(2), (3), and (5) continue to prohibit coercion and require client-centered services and nondirective pregnancy-options counseling.

The verb "affirm" and its object are how a subject is presented. The purpose is to "support informed decision-making." Section 706(2)(A) asks whether the notice is contrary to a regulation, not whether framing is congenial. And Title X counseling has never been value-free: Congress itself requires projects to "encourage family participation" in minors' decisions. 42 U.S.C. § 300(a).

*Mayor & City Council of Baltimore v. Azar* involved an actual restriction on pregnancy counseling and referrals. 973 F.3d 258, 283 (4th Cir. 2020) (en banc). The 2019 rule required a prenatal referral even when the patient did not want prenatal care and barred requested abortion referrals. The court held that arrangement inconsistent with the nondirective-counseling mandate. *Id.* The NOFO neither restores those restrictions nor changes the governing regulation. The appropriations requirement that pregnancy counseling be nondirective remains applicable; additional counseling on long-term reproductive goals does not displace it. Pls.' Mem. 40–41.

Section 59.5(a)(4)'s marital-status protection also remains in force. The notice directs no different services or treatment for married and unmarried clients. Presenting "evidence-informed pathways" that include "marriage prior to childbearing," AR083, no more discriminates against unmarried clients than against clients who did not finish school. And services for individuals seeking children fit Title X's express inclusion of infertility services. 42 U.S.C. § 300(a); 42 C.F.R. § 59.5(a)(1).

**v. Health equity and the incorporated OASH priorities.**

The States see a conflict between an OASH statement and § 59.7(a)(3). Pls.' Mem. 43–44. The statement says OASH "has previously invested in ideologically-laden concepts like health equity" and will "prioritize efforts that go beyond the use of ideologically laden concepts and focus on solution-oriented approaches." AR135. The regulation directs consideration of "[t]he ability of the applicant to advance health equity." 42 C.F.R. § 59.7(a)(3). The asserted conflict depends on two steps the text does not take.

First, the regulation defines health equity: "when all persons have the opportunity to attain their full health potential and no one is disadvantaged from achieving this potential because of social position or other socially determined circumstances." 42 C.F.R. § 59.2. That definition controls, even if it departs from ordinary usage. *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018); *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). The criterion asks whether an applicant can advance health equity in that defined sense—not whatever else the phrase may connote in a policy debate. And the alternative the OASH statement names—"solution-oriented approaches," including "evidence-based interventions and treatments that address poor health outcomes," AR135—is a way to advance health equity as § 59.2 defines it. It is not a repudiation of the regulatory criterion.

Second, the regulation and the statement speak to different things. Section 59.7(a)(3) is an award criterion directed to the agency. It is one unweighted factor among several, and it directs applicants to do nothing. The OASH statement does not mention it. The notice does, and it says which governs the award process: OPA evaluates applications and sets funding levels "according to the criteria set forth in Title X regulations at 42 C.F.R. §59.7(a)." AR111. That sentence retains the health-equity criterion. It creates no exception to it.

The same page limits consideration of HHS and OASH priorities to what is "authorized by law and within the scope of the program." *Id.* A general statement of agency priorities cannot displace a regulatory factor the notice specifically retains. The priority on which they rely reaches, by its terms, "discriminatory or otherwise illegal practices," and only "to the extent permitted by law." AR134. A priority confined to practices the law already forbids does not conflict with a regulation. Nothing in it authorizes disregarding § 59.7(a)(3) or abandoning § 59.5(a)(3)'s inclusive, culturally and linguistically appropriate services.

**vi. The Hyde priority and other Department objectives.**

The Hyde priority addresses use of federal funds and lawful program delivery. AR083–84. Title X itself provides that its funds may not be used in programs where abortion is a method of family planning. 42 U.S.C. § 300a-6. That limitation coexists with the counseling and referral duties in § 59.5(a)(5). The notice preserves both. Its references to "life-affirming" services and "strict separation from prohibited activities" do not amend Part 59 or restore the 2019 rule's referral prohibition or physical-separation requirements. The States identify no language requiring either result. Pls.' Mem. 44–45. The phrase "life-affirming" appears alongside "lawful" and "ethical," in a priority that states "[t]o the extent permitted by applicable law." AR083–84. One adjective does not override the qualification that governs the sentence.

The broader HHS priorities require the same contextual reading. The States emphasize subjects such as street crime and foreign institutions. Pls.' Mem. 37, 47–49. AR110's rubric refers to strategies advancing OPA priorities "and HHS priorities"; that line does not repeat the scope qualification. But the NOFO's program-priority section expressly supplies that qualification, AR080, and the staff-review provision repeats it, AR111. The criterion evaluates strategies in a Title X project. It does not direct applicants to undertake every activity mentioned in a Department-wide policy statement.

*County of King v. Turner* is not to the contrary. That case addressed conditions imposed on already awarded grants, including restrictions extending beyond federally funded activities and certifications concerning False Claims Act materiality. 2026 WL 2489361, at *4–12 (9th Cir. Aug. 25, 2026). There, promises of narrower enforcement could not cure the conditions' breadth. Here, the limits appear in the notice itself and confine priorities to Title X's statutory framework.

**D. The priorities are not arbitrary and capricious.**

**i. The notice supplies meaningful guidance for a discretionary competition.**

The States' vagueness theory asks evaluative criteria to supply the precision of an enforcement rule. *Finley* rejects that premise for discretionary grants: imprecision has different consequences when government acts as patron, and subjective criteria are inherent in selective funding. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). *Finley* distinguishes uncertainty about comparative scoring from uncertainty about what conduct is prohibited.

The NOFO also provides definitions and examples. "Optimal health" is defined as physical, mental, and social wellbeing. AR081. Body-literacy counseling addresses specified subjects and early indicators of named conditions. AR082. Each priority supplies strategies applicants may propose, and the application instructions require a work plan and description of

services. AR081–84, 089–94. The absence of a fixed subscore for each strategy leaves evaluative judgment; it does not make the subjects unknowable.

Fair notice is a shield against enforcement, not a right to advance clarity about how an agency will score. The doctrine limits penalties for violating a standard a regulated party could not have known. No applicant has been penalized under this notice. An applicant that misjudges how reviewers will read "optimal health" or "body literacy" loses nothing. A lower score on an evaluative criterion is the ordinary outcome of a competition, not a sanction.

Nor can the test be whether a term is definable but not defined. The statute's own criteria, "the relative need of the applicant" and "its capacity to make rapid and effective use of" the assistance, 42 U.S.C. § 300(b), are definable and undefined. If that were the test, no notice of funding opportunity would survive it. The decisions finding vagueness in funding instruments involved recipients facing sanction for noncompliance with terms they could not construe. *E.g.*, *Planned Parenthood of Greater N.Y. v. HHS*, No. 25-cv-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025); *Hennepin*, 2026 WL 2426300, at *11. Fair notice matters where a party must act now, under threat of loss, and cannot tell what act is required. That is not this notice.

Imprecision is also inherent in merit review. The criteria the States do not challenge use the same kind of language: "the extent to which the applicant substantiates, using current and relevant data," and "the degree to which the project plan adequately provides for" the statutory requirements. AR109–10. Title X applicants have competed under language like this for decades. The declarants expressly describe uncertainty about compliance and its effect on application preparation. Sullivan Decl. ¶¶ 17, 19; Lyon-Callo Decl. ¶ 17; O'Donnell Decl. ¶¶ 19, 23; Campagna Decl. ¶¶ 17, 19. Defendants' response is that the notice's program-specific

instructions, examples, and preservation of Part 59 supply sufficient guidance despite that asserted uncertainty. AR077–84, 089–94.

Post-award duties are real obligations. They are defined by the approved project, Part 59, and the specified objectives at AR077, and they are enforced through the award terms. AR077, 113–14. The lawful-scope provisions and those objectives supply standards that the States' broadest reading omits.

**ii. The agency stated its reasons for the changes in emphasis.**

An agency changing course must display awareness of the change and provide good reasons, with attention to contrary findings and serious reliance interests where implicated. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016). The inquiry is what changed and whether the agency explained it. The States identify supposed departures from continuing service requirements, new program emphases, and reliance on prior policy. The first are not required by this NOFO; the second are explained; the third do not show that the investments identified are displaced.

First, most asserted departures restate the conflict arguments. *Fox* forbids an agency to disregard rules on the books. 556 U.S. at 515. The NOFO instead incorporates them. AR077–80, 111. It neither rescinds the QFP nor directs providers to abandon standards.

Second, the notice announces new priorities and states rationales. The overmedicalization priority identifies dissatisfaction with side effects and calls for expanded fertility-awareness access and education about noninvasive approaches. AR081–82. The body-literacy priority identifies gaps in understanding and the value of recognizing indicators of reproductive disorders. AR082. The reproductive-goals priority identifies a gap between fertility intentions and discussions with providers, and connects counseling to informed planning across the

lifespan. AR082–83. These are explanations for the announced emphasis, not reasons supplied for the first time in litigation.

The NOFO separately reports declining current contraceptive use and side effects as the most common reason for dissatisfaction-related discontinuation. AR081 & nn.1–2. Changes in current use can reflect pregnancy, postpartum status, sexual activity, and other circumstances, as the States observe. Pls.' Mem. 27–28 & n.27. The notice does not attribute every decline to dissatisfaction.

The separate dissatisfaction finding is supported by the cited National Health Statistics Report. Among women who discontinued the pill because of dissatisfaction, 64.1 percent cited side effects; among those who discontinued an IUD for that reason, 64.4 percent did. AR081 (citing Daniels & Abma, Contraceptive Methods Women Have Ever Used: United States, 2015–2019, Nat'l Health Stat. Rep. No. 195, at 7 & tbl. 6 (2023)). The fact that some women switch to another contraceptive method does not contradict those findings. It reinforces the compatibility of expanding options with retaining the required broad range. The agency did not need to conclude that contraception should be withheld to explain a priority broadening access to fertility-awareness methods.

The fertility survey likewise supports discussion of reproductive goals, rather than a demand that every client adopt a particular goal. AR083. The States correctly distinguish that survey from evidence supporting the separate statement about sequencing education, employment, marriage, and childbearing. Pls.' Mem. 25. Defendants do not attribute the latter proposition to the survey. The notice states the association on which the agency relied and the counseling approach it selected. AR083. The APA requires a rational connection between the explanation and the choice; it does not prescribe a footnote format. *Motor Vehicle Mfrs. Ass'n v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And an agency may rest a policy judgment on propositions for which "scant empirical evidence can be marshaled." *Fox*, 556 U.S. at 519. The premise is a judgment Congress left to the Secretary. 42 U.S.C. § 300a-4(b).

The choice here is to offer information about long-term reproductive goals within client-centered, voluntary services. The notice's stated interest in informed planning explains that choice without requiring a conclusion that a particular sequence should be prescribed to each client. If the Court nevertheless finds that the agency inadequately substantiated the sequencing premise or explained its relation to prior guidance, that would present an explanatory deficiency for remand. Part VI, *infra*.

Third, the identified investments remain useful to the services the notice requires. New York describes substantial work on encounter-level reporting, including staff time and vendor costs. O'Donnell Decl. ¶ 12. Rhode Island identifies its own reporting transition and provider training. Campagna Decl. ¶ 10. Those investments are concrete, but the notice does not direct their abandonment. Training, facilities, and systems supporting the broad range of Title X services continue to serve projects providing those services under this competition.

*Regents* and *Encino* require attention to serious reliance on a policy the agency changes. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020); *Encino*, 579 U.S. at 221–22. Reliance requires consideration, not preservation; the question is whether the change materially impairs investments that depended on the prior policy. It does not. The reporting systems, training, and facilities the States identify support the broad range of Title X services the notice retains, and their existing awards remain unaffected.

What remains is an interest in competing for the next award on the last cycle's terms. *Regents* does not require an agency to weigh that preference before announcing new priorities.

*Mayor of Baltimore* addressed materially different changes: binding referral restrictions and physical-separation requirements, medical objections to them, and the resulting costs to providers. 973 F.3d at 276, 281–83. The distinction is substantive, not merely that this action is called a NOFO. Here, the duties whose alteration drove that decision remain in force, and the new strategies can be advanced consistently with them. The States' invocation of clinical consensus does not put a contrary clinical command in this notice.

Finally, the administrative record's length is not the test. The question is whether the reasons are reasonable and adequately explained. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The NOFO states reasons and strategies at AR081–84, and the record includes the direction to incorporate priorities at AR149–51. The agency's use of a Department-wide instruction does not erase the program-specific explanation in the resulting notice. Nor does the absence of internal deliberative materials make the record inadequate. See *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019).

**E. The notice-and-comment claim fails.**

The claim fails because the challenged provisions are not legislative rules. The priorities and merit-review criteria are general statements of agency policy. *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1340–41 (4th Cir. 1995) ("A rule is a general statement of policy if it does not establish a binding norm and leaves agency officials free to exercise their discretion."). Likewise, post-award terms attach to individual awards under existing statutory authority and the governing regulations, 42 U.S.C. § 300a-4(b); AR077, 113–14, and do not amend Part 59.

The States argue that the priorities adopt positions inconsistent with existing regulations and impose substantive conditions. Pls.' Mem. 38–39. This argument fails because the priorities neither amend nor are inconsistent with existing regulations. They do not amend Part 59 or

impose a generally applicable clinical rule on Title X providers. Federal staff retain judgment over awards while remaining subject to the governing regulations. AR111. The funded-performance requirements attach to awards within the existing statutory framework, 42 U.S.C. § 300a-4(b), and are bounded by Title X, the regulations, and the approved project. AR077, 113–14. Their contractual consequences do not, without more, make them amendments to the regulatory framework. Neither set of provisions binds in the way a legislative rule does. The merit-review provisions do not bind the agency, which considers additional factors after merit review and retains judgment over every award, AR111–12, and they do not bind applicants, who may propose whatever lawful project they choose.

The States' authorities hold that an agency cannot use guidance to change binding law. *See Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 619–20 (4th Cir. 2018); *Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 231 (D.C. Cir. 1992). Fair enough. The States have not identified the regulatory command this notice repudiates. Announcing what a competition values, and what funded projects must pursue, within existing authority does not amend the regulations that govern them.

## V. THE SPENDING CLAUSE CLAIM FAILS.

The clear-notice rule protects a State's informed choice whether to accept federal funds on the conditions offered. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Defendants do not dispute its application to the State plaintiffs. The questions are which provisions impose recipient obligations, whether those obligations are ascertainable, and whether they relate to Title X.

A selection criterion guides comparative evaluation; an award condition governs performance. Uncertainty about a comparative score is not inadequate notice of a recipient obligation. See *Finley*, 524 U.S. at 589.

The NOFO imposes recipient obligations. AR077. They are assessed at acceptance, in light of the governing statute, regulations, notice, approved application, and award terms. *Arlington Central*, 548 U.S. at 296; *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665–67 (1985). Although the clear notice rule does not require that every possible application of a grant requirement be resolved in advance, *id*., it does require ascertainable obligations. The notice supplies them: lawful Title X services, specified counseling and quality objectives, and performance within the scope of an approved project.

A recipient cannot be "unable to ascertain" a condition defined by its own approved project. *Arlington Central*, 548 U.S. at 296. The Spending Clause theory is a vagueness argument with a constitutional label, attached to a condition no State has accepted, measured from a moment no State has reached. The States have no successor award before them and identify no new condition on their existing grants. Applying for a grant is not accepting one, much less accepting the hypothetical obligations the States posit.

The relatedness objection likewise overreads the notice. *South Dakota v. Dole* requires a relationship to the federal interest in the funded program. 483 U.S. 203, 207–08 (1987). Fertility, reproductive-goals, and body-literacy counseling relate directly to voluntary family planning and infertility services. 42 U.S.C. § 300(a). Section 300a-4(b) authorizes conditions assuring effective use of grants for those purposes, not unrelated requirements.

The reference to broader HHS priorities must be read within those statutory purposes and the notice's express scope limitations. AR077, 080, 111. It does not obligate a Title X recipient

to operate an unrelated street-crime initiative or undertake every activity mentioned in a Department policy statement. Part IV.C.vi, *supra*. The States' cited cases concerning unrelated conditions on offered or awarded funds do not show that this bounded reference imposes comparable obligations. See Pls.' Mem. 47–49.

## VI. ANY RELIEF MUST ADDRESS THE INJURY ESTABLISHED.

Any relief must be tailored to the injury actually established. *Gill*, 585 U.S. at 73; *Lewis v. Casey*, 518 U.S. 343, 357 (1996). A showing that one State bears a particular burden does not justify relief for every State, or for every applicant in a nationwide competition. Standing is not dispensed in gross, and one plaintiff's injury is not another's. *Lewis*, 518 U.S. at 358 n.6. The Court should identify the affected State, the injury established, and the relief needed to redress it before entering a decree.

An injunction should extend no further than necessary to provide complete relief to plaintiffs with standing. *Trump v. CASA, Inc.*, 606 U.S. 831, 851–52, 861 (2025). Defendants request an opportunity to address the appropriate scope and administration of relief in light of the injury, if any, the Court finds.

*CASA* did not resolve the scope of relief under the APA. 606 U.S. at 847 n.10. Here, applicants compete for a single, fixed pool of funds. AR071. It is not clear how relief could be structured to address a particular State's injury without affecting the relative position of applicants who are not before the Court, or how it would operate alongside any different relief entered in the parallel action on the same notice and record. The concern here is not hypothetical. The States expressly identify Planned Parenthood affiliates among subrecipients or grantees, *e.g.*, ECF 113-29, ¶ 6, and the plaintiff in the District of Columbia action seeks relief on behalf of its member affiliates. Orders in the two cases could therefore reach the funding of the same

providers in the same competition. Those questions should be resolved on the terms of a specific proposed remedy before any decree is entered.

If the Court rejects the substantive conflicts but finds an explanation deficient, it should remand without vacatur. The inquiry considers the seriousness of the deficiency and the disruptive consequences of an interim change that may itself be changed. *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). The Fourth Circuit has not formally embraced that practice, while distinguishing a decision that is inadequately supported from one that is substantively invalid. *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018). The request here is limited to the former. The challenged explanations concern priorities and reasons already stated in the record. AR081–84. A deficiency in substantiating a premise or explaining the relation to prior policy may be curable without abandoning the agency's choice.

Disruption should be measured against the actual timetable. Applications are due January 11, awards are anticipated April 1, the start of the next grant cycle. AR068, 071; Compl. ¶ 67. Between those dates, the notice prescribes a review sequence. AR105–11. Setting aside the criteria now would upend that sequence. Each applicant would need notice of the change and an opportunity to revise, and the sequence would have to begin again before any successor award could issue. The resulting delay would fall on current recipients, including Plaintiffs, and the patients they serve. Remand without vacatur avoids that result.

## CONCLUSION

The Court should dismiss the Complaint without prejudice under Rule 12(b)(1). If it finds jurisdiction, it should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion. Any relief should be confined to the injury established, and any curable explanatory deficiency should be remanded without vacatur.

October 23, 2026

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

/s/ *Matthew C. Zorn*
MATTHEW C. ZORN
Senior Counsel to the Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
matthew.zorn2@usdoj.gov

LANDEN P. BENSON
Attorney
GA Bar No. 863909
U.S. Department of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201
landen.benson@hhs.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2026, the foregoing was filed through the CM/ECF system, which will automatically generate notice upon all counsel of record.

/s/ *Landen P. Benson*

LANDEN P. BENSON
Attorney
GA Bar No. 863909
U.S. Department of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201
landen.benson@hhs.gov

*Counsel for Defendants*