**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | * | Case No. 1:26-cv-03405-DLB |
| | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * *

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iv

INTRODUCTION ..... 1

I. Plaintiffs' Claims Are Properly Before the Court. ..... 1

A. Plaintiffs Have Article III Standing. ..... 2

i. The Challenged Conditions Alter Plaintiffs' Competitive Positions. ..... 2

ii. Plaintiffs Also Suffer Present Application-Preparation Burdens. ..... 8

iii. The Challenged Conditions Threaten Plaintiffs' Sovereign and Fiscal Interests. ..... 9

iv. The Requested Relief Would Redress Plaintiffs' Injuries. ..... 10

B. Plaintiffs' Claims Are Ripe. ..... 11

C. The 2027 NOFO Is Final Agency Action Reviewable Under the APA. ..... 13

II. The NOFO's Incorporation of the Challenged Conditions Violates the APA. ..... 15

A. The Incorporation of the Challenged Conditions Is Contrary to Law Because the Conditions are Inconsistent with Title X's Statutory and Regulatory Requirements. ..... 15

i. Directive Counseling Priority ..... 16

ii. Overmedicalization Priority ..... 19

iii. Gender-Ideology Priority ..... 20

iv. Anti-DEI Priority ..... 21

v. Hyde Amendment Priority ..... 22

B. Defendants' Actions Are Arbitrary and Capricious Because They Have Failed to Provide a Reasoned Explanation for Their Change in Position and Consider Reliance Interests in Incorporating the Challenged Conditions in the NOFO ..... 23

i. Defendants Abandoned Evidence-Based, Reliance-Backed Positions Without Providing a Reasoned Explanation. ..... 24

ii. Defendants Failed to Consider the Effects of Proliferating Inconsistent Standards. 29

iii. Defendants Unreasonably Incorporated Irrelevant HHS Priorities Into Title X. ..... 32

C. The Challenged Conditions Are Procedurally Invalid Because They Were Not Promulgated Through Notice and Comment. ..... 32

III. Plaintiffs Are Entitled to Summary Judgment on Their Spending Clause Claim. ..... 36

A. Defendants Fail to Show that the Challenged Conditions Provide Clear Notice of Applicants' and Grantees' Obligations. ..... 36

B. Defendants Have Not Shown a Reasonable Relationship Between the Challenged Conditions and the Title X Program. .......... 37

IV. Defendants' Remaining Arguments Should Be Rejected. .......... 38

CONCLUSION .......... 40

## TABLE OF AUTHORITIES

### Cases


*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998) ........ 30

*Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461 (D. Md. 2019) ........ 35

*Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66 (D. Md. 2025) ........ 39

*Am. Inst. of Certified Pub. Accts. v. IRS*, 804 F.3d 1193 (D.C. Cir. 2015) ........ 3, 5

*Arizona v. Shalala*, 121 F. Supp. 2d 40 (D.D.C. 2000) ........ 14

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) ........ 37

*Avail Vapor, LLC v. FDA*, 55 F.4th 409 (4th Cir. 2022) ........ 31

*Balt. Gas & Elec. Co. v. United States*, 133 F. Supp. 2d 721 (D. Md. 2001) ........ 7

*Beck v. McDonald*, 848 F.3d 262 (4th Cir. 2017) ........ 8

*Bedford Cnty. Mem'l Hosp. v. Health & Hum. Servs.*, 769 F.2d 1017 (4th Cir. 1985) ........ 27

*Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656 (1985) ........ 37

*Bennett v. Spear*, 520 U.S. 154 (1997) ........ 13, 14

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ........ 39

*Bridgeport Hosp. v. Becerra*, 108 F.4th 882 (D.C. Cir. 2024) ........ 40

*California v. Texas*, 593 U.S. 659 (2021) ........ 8

*Casa de Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019) ........ 32, 34

*Chen Zhou Chai v. Carroll*, 48 F.3d 1331 (4th Cir. 1995) ........ 33

*Cigar Ass'n of Am. v. U.S. FDA*, 132 F.4th 535 (D.C. Cir. 2025) ........ 40

*City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019) ........ 3, 6, 7

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ........ 8

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 144 S. Ct. 2440 (2024) ........ 39

*DHS. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ........ 28

*Doe v. Obama*, 631 F.3d 157 (4th Cir. 2011) ........ 4, 10

*Doe v. Tenenbaum*, 127 F. Supp. 3d 426 (D. Md. 2012) ........ 15

*Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1 (D.C. Cir. 2011) ........ 32

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........ 24, 25, 26

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ........ 9

*FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542 (2025) ........ 24, 30, 31

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852 (4th Cir. 2002) ........ 15

*Franks v. Ross*, 313 F.3d 184 (4th Cir. 2002) .......... 11

*Freedom Network USA v. Trump*, 830 F. Supp. 3d 681 (N.D. Ill. 2026) .......... 37

*Gen. Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) .......... 34

*Guardian Fed. Sav. & Loan Ass'n v. FSLIC*, 589 F.2d 658 (D.C. Cir. 1978) .......... 34

*Hennepin Cnty. v. H.H.S.*, No. 26-cv-02460,
2026 WL 2426300 (D.D.C. Aug. 19, 2026) .......... 5, 7, 14, 19, 32

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) .......... 16, 38

*Jean v. Nelson*, 711 F.2d 1455 (11th Cir. 1983) .......... 33

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205 (4th Cir. 1989) .......... 33

*Jimenez-Cedillo v. Sessions*, 885 F.3d 292 (4th Cir. 2018) .......... 24

*Laufer v. Naranda Hotels, LLC*, 60 F.4th 156 (4th Cir. 2023) .......... 6

*Leaf Tobacco Exporters Ass'n, Inc. v. Block*, 749 F.2d 1106 (4th Cir. 1984) .......... 4

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) .......... 16

*League of Women Voters of the United States v. USCIS*, 839 F. Supp. 3d 292 (D. Md. 2026) .......... 33

*Liberty University, Inc. v. Lew*, 733 F.3d 72 (4th Cir. 2013) .......... 9

*Louisiana Energy & Development Authority v. FERC*, 141 F.3d 364 (D.C. Cir. 1998) .......... 5, 6

*Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987) .......... 33

*Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68 (D. Md. 2025) .......... 35

*Mayor & City Council of Balt. v. Azar*, 141 S. Ct. 2618 (2021) .......... 15

*Mayor & City Council of Balt. v. Azar*, 973 F.3d 258 (4th Cir. 2020) .......... 15, 31

*McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988) .......... 34

*Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006) .......... 11

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 23

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998) .......... 4

*Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046 (D. Or. 2018) .......... 4

*Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479 (1998) .......... 4

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 572 (1998) .......... 30, 36

*National Family Planning & Reproductive Health Ass'n v. Kennedy*,
2026 WL 2790025 (M.D. Pa. Sept. 17, 2026) .......... 8

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993) .......... 7

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) .................................................. 36

*PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405 (D. Md. 2025).................................................. 12, 38

*Phila. Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, No. 25-0243-TDC, 2026 WL 280089 (D. Md. Feb. 3, 2026).................................................. 14

*Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107 (D.C. Cir. 1974) .................................................. 34

*Planned Parenthood of Greater N.Y. v. H.H.S.*, No. CV 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025).................................................. 19, 30

*Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100 (9th Cir. 2020) .......... 7

*R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58 (D.R.I. 2025) ................ 29, 31

*Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993).................................................. 7

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) .................................................. 3, 5, 6

*Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010).................................................. 4

*Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635 (4th Cir. 2018) .............................. 39, 40

*Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260 (4th Cir. 2018)........................................11

*South Carolina v. United States*, 912 F.3d 720 (4th Cir. 2019)..................................................11

*South Dakota v. Dole*, 483 U.S. 203 (1987).................................................. 36, 38

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) .................................................. 13, 14

*Toilet Goods Association v. Gardner*, 387 U.S. 158 (1967).................................................. 7

*Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025) .................................................. 39, 40

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590 (2016)........................................ 13

*U.S. Dep't of Com. v. New York*, 588 U.S. 752 (2019).................................................. 10

*Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200 (4th Cir. 2022)...................................... 12

*Williams F. Wilke, Inc. v. Dep't of the Army*, 485 F.2d 180 (4th Cir. 1973) .................................. 7

*Zeneca, Inc. v. Shalala*, 213 F.3d 161 (4th Cir. 2000).................................................. 4

**Statutes**

42 U.S.C.

§ 300(a) .................................................. 19, 20, 38

§ 300a-4(a).................................................. 36

§ 300a-4(b).................................................. 38

5 U.S.C.

§ 553.................................................. 32

§ 706(2)(B) ... 36
§ 706(2)(D) ... 35

Pub. L. No. 119-75, 140 Stat. 173 (2026) ... 22

**Regulations**

42 C.F.R.
§ 59 ... 15
§ 59.2 ... 17, 19, 20
§ 59.5(a)(1) ... 20
§ 59.5(a)(2) ... 19
§ 59.5(a)(3) ... 17, 20, 23
§ 59.5(a)(4) ... 20
§ 59.5(a)(5) ... 23
§§ 59.1–59.11 ... 36

**Other Authorities**

Off. Of Population Affairs, Funding Opportunities, https://opa.hhs.gov/grant-programs/funding-opportunities#TitleX ... 12

## INTRODUCTION

In opposing Plaintiffs' motion for summary judgment, Defendants raise a host of arguments concerning standing, the nature and effect of the incorporation of a subset of conditions ("Challenged Conditions") into the 2027 Notice of Funding Opportunity ("NOFO" or "2027 NOFO"), and the lawfulness of those conditions. But none withstands scrutiny. The States have established concrete injuries resulting from the NOFO, which imposes binding conditions rather than mere guidance. Moreover, Plaintiffs have established that Defendants' attempt to undermine the Title X family planning program by bootstrapping their political goals into a NOFO is unlawful several times over: The conditions exceed Defendants' statutory authority, conflict with governing Title X requirements, are arbitrary and capricious, impose substantive requirements without notice and comment, and fail to provide the clear notice required for federal funding conditions. Defendants' non-binding assurances and savings language do not cure these defects. The Court should grant Plaintiffs' motion for summary judgment, and deny Defendants' cross motion.

### I. Plaintiffs' Claims Are Properly Before the Court.

Defendants wrongly contend that the States lack Article III standing, arguing that Plaintiffs' competitive, administrative, programmatic, sovereign, and fiscal injuries are all either speculative or insufficiently connected to the Challenged Conditions. Defs.' Reply in Supp. of Mot. to Dismiss, Cross-Mot. for Summ. J., & Opp'n to Pls.' Mot. for Summ. J. ("Defs.' MSJ") at 4–16, ECF No. 124-1. Defendants also argue that the claims are unripe because the U.S. Department of Health and Human Services ("HHS") has yet to apply the Challenged Conditions, Defs.' MSJ at 16–19, and that the 2027 NOFO is not final agency action because the Challenged Conditions purportedly do not impose binding requirements, Defs.' MSJ at 20–22. None of these arguments succeed; Plaintiffs have established present injuries, their claims are fit for judicial review, and the NOFO constitutes final agency action.

### A. Plaintiffs Have Article III Standing.

#### *i. The Challenged Conditions Alter Plaintiffs' Competitive Positions.*

Defendants characterize the 2027 NOFO—the instrument governing the five-year, billion-dollar Title X grant cycle—as merely an "evaluative rubric" with no adverse effect on applicants. Defs.' MSJ at 6. This mischaracterizes the NOFO's present impact: it changes Plaintiffs' competitive position before any award is issued. This is sufficient injury for Article III standing.

Alignment with HHS, Office of the Assistant Secretary for Health ("OASH"), and Office of Population Affairs ("OPA") priorities is incorporated into the application, merit-review, selection, and various post-award processes. At the application stage, the NOFO orders applicants to "[d]escribe plans and strategies for providing family planning services that address OPA program priorities." A.R. 091. It further provides that, "[c]onsistent with OASH's mission, in carrying out any project that is funded under this NOFO, recipients *must* align program design and activities with the following agency priorities . . . ." A.R. 077 (emphasis added). Alignment accounts for up to 35 points out of 100 at merit review, and agency staff again consider alignment when making funding recommendations. A.R. 109–10. Upon award of funding "recipients *must* demonstrate ongoing compliance with these priorities, in all programs that are authorized to advance them, through program design, implementation, reporting, and evaluation." A.R. 077 (emphasis added). And "failure to meaningfully align funded activities with the applicable requirements may result in corrective action, additional reporting requirements, or other actions . . ." including potential termination. *Id.* Further, HHS's own April 3, 2026, Memorandum, says all its grant awarding agencies "**must include** language" in their NOFOs "regarding alignment with agency priorities." A.R. 160 (emphasis in original).

These terms meaningfully degrade Plaintiffs' competitive position in the grant competition, establishing at least two competitive disadvantages: (1) An incumbent-grantee State that proposes to maintain existing services rather than reorient them toward the new priorities may be less able

to earn points awarded for meaningfully advancing the priorities; and (2) an incumbent-grantee State must determine how to describe its existing services, develop its work plan, and address the priorities while maintaining compliance with the existing statutory and regulatory framework, including state law requirements, all while competing with applicants the NOFO advantages.

Defendants do not dispute that the direct-grantee States are ready and intend to apply for FY2027 Title X funding. Defs.' MSJ at 1. Nor do they contend that the States must submit completed applications or predict or receive scores before challenging the NOFO. *Id.* at 5. Instead, Defendants insist that Plaintiffs have not suffered competitive injuries because the 2027 NOFO does not assign a fixed point value to each agency priority, prescribe a mandatory deduction, or automatically disqualify an applicant that does not advance particular priorities. Defs.' MSJ at 5–6, 14–15. But criteria affect the comparative evaluation of applications in a zero-sum competition even if they do not operate as an automatic bar. And criteria need not impose an automatic deduction, establish a quantifiable scoring disadvantage, or disqualify anyone to alter an applicant's relative position in a competition. *See, e.g.*, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1173–74 (9th Cir. 2019) (finding competitive injury where a grant contest awarded bonus points for "illegal immigration focus area[s]," disadvantaging potential applicants that chose not to prioritize immigration enforcement); *Am. Inst. of Certified Pub. Accts. v. IRS*, 804 F.3d 1193, 1197–98 (D.C. Cir. 2015) (finding competitive injury where a new IRS directory enabled previously uncredentialed tax preparers to compete more effectively with certified public accountants, without altering eligibility standards); *Shays v. FEC*, 414 F.3d 76, 91–92 (D.C. Cir. 2005) (finding competitive injury where FEC regulations permitted tactics otherwise prohibited by law, requiring plaintiffs to account for those tactics in their campaigns). Further, the fact that the precise scores are not yet known does not eliminate the present burden of deciding how to design a project, describe services, justify omissions, and address the priorities.

In attempting to limit competitive standing to situations in which an agency action formally expands the pool of eligible competitors, Defendants misapply *Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010). Defs.' MSJ at 6 & n.1. First, Defendants imply the Fourth Circuit disfavors *Sherley*'s analysis by misreading *Doe v. Obama*, 631 F.3d 157, 163–64 (4th Cir. 2011), a case reviewing the same NIH policy expanding stem cell research grant eligibility at issue in *Sherley*. The plaintiffs in *Sherley* were scientists competing for research grants under the new policy and had adequately pleaded competitor standing. By contrast, the plaintiffs in *Doe* were a putative class of embryo-adopting parents and frozen embryos who did not, and could not, allege competitor standing. *Doe*, 631 F.3d at 164. The Fourth Circuit "express[ed] no opinion on the standing issue in *Sherley or any other case not presently before this court*, but simply note[d] that such cases are different from the one that is before us." *Doe*, 631 F.3d at 164 (emphasis added).

However, the Fourth Circuit has in fact recognized the "numerous cases" establishing competitors' standing to challenge unlawful agency actions that expose them to increased competition. *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 170 n.10 (4th Cir. 2000) (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998) and citing D.C. Circuit authorities); *cf. Leaf Tobacco Exporters Ass'n, Inc. v. Block*, 749 F.2d 1106, 1112 (4th Cir. 1984) (finding Article III standing for plaintiffs who "face increased competition from the direct entry of [competitors] into [their] markets"); *Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 488–91 (1998) (collecting Supreme Court cases finding Article III and prudential standing for incumbents challenging agency actions that increased competition from new entrants). Courts applying this doctrine in the grant context have found standing when the plaintiff has alleged "changed terms of [a] new [NOFO] have intensified the competition by allowing programs that do not qualify under" applicable law to compete. *Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1055 (D. Or. 2018);

*see also Hennepin Cnty. v. H.H.S.*, No. 26-cv-02460, 2026 WL 2426300, at *10, *10 n.6 (D.D.C. Aug. 19, 2026) (recognizing injury where agency's actions "allow increased competition").

Second, Defendants improperly confine *Sherley* to cases involving an expansion of the competitor pool. But *Sherley* is not so narrow; the D.C. Circuit recognized that those competing for a governmental benefit may also "assert competitor standing when the Government takes a step that benefits his rival and therefore injuries him economically." *Sherley,* 610 F.3d. at 72. In *Sherley*, the D.C. Circuit relied on *Louisiana Energy & Development Authority v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998), which held that an electric utility had standing to challenge FERC's approval of a current competitor's sale of electricity at market-based rates. There, the agency action lifted regulatory restrictions on an existing competitor; it did not change market eligibility. *See id.* *Sherley*'s reliance on *Louisiana Energy* confirms that that competitor standing encompasses a range of actions that alter the competitive conditions for applicants. Other competition standing cases underscore that the doctrine is not limited to changes in eligibility. *See, e.g.*, *Am. Inst. of Certified Pub. Accts.*, 804 F.3d at 1197–98; *Shays*, 414 F.3d at 91–92.

Defendants also argue that the States have not identified the particular proposal activities that conflict with the Challenged Conditions. Defs.' MSJ at 7–8. In doing so, Defendants ignore specific, detailed conflicts between Plaintiffs' programs and the Challenged Conditions that were identified in attached declarations, including tensions with state laws with which applicants' programs must comply. *See infra* Section II.B.i (describing concrete conflicts between each Priority and specific QFP recommendations).[1] But more importantly, Plaintiffs need not submit

[1] *See also, e.g.*, ECF No. 113-22 ¶¶ 17 ("[F]orcing grantees to alter counseling or restrict access to certain contraceptive methods undermines clinical standards of care, violates patient autonomy, and creates irreconcilable legal conflicts for state health agencies bound by statutory obligations to provide comprehensive reproductive healthcare."), 20; ECF No. 113-28 ¶ 21 ("[T]he New York State Family Planning Program require[s] that all subrecipients follow nationally recognized standards of care and must implement services as outlined in the QFP."); ECF No. 113-35 ¶ 20 ("The Agency Priorities directly conflict with the State's essential services and priorities . . . .")

applications or identify every activity that they ultimately may propose to establish that the altered terms put them at a competitive disadvantage. *See Barr*, 929 F.3d at 1173–74 (grant applicant with "longstanding polic[ies]" of not participating in federal civil immigration enforcement injured by bonus points for applicants who prioritized immigration enforcement); *Shays*, 414 F.3d at 91–93 (recognizing competitive injury without requiring proof that particular opponents had already employed those tactics now permitted by challenged regulations).

Defendants conflate a merits issue with standing when asserting that the States' disadvantage rests on incorrect interpretations of the Priorities. For example, they argue that expanding access to fertility-awareness methods does not require restricting other contraceptive methods; that reproductive-goals counseling does not displace nondirective pregnancy-options counseling; and that the anti-gender ideology priority is limited to counseling and referrals, based on the NOFO's explicitly non-exhaustive list of "key strategies." Defs.' MSJ at 7–8, 14–15; *see* A.R. 083. The question of whether the NOFO deviates from past agency policy, regulations, and the law—thus disadvantaging Plaintiffs' incumbent state agencies, all of whom have affirmed that their current programming was carefully developed to comply with these standards—goes to the merits of the States' claims. *See infra*, Section II. And "[w]hen assessing whether a plaintiff possesses Article III standing to sue, a court 'accept[s] as valid the merits of [the plaintiff's] legal claims.'" *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 161 (4th Cir. 2023) (quoting *FEC v. Cruz*, 596 U.S. 289, 298 (2022)); *see also, e.g.*, *Louisiana Energy*, 141 F.3d at 367 ("[W]hether [] pricing is likely to be predatory or simply competitive is a question that goes to the *merits* of FERC's

(listing state law requirements); ECF No. 113-26 ¶ 19 (same); ECF No. 113-31 ¶ 20 (same); ECF No. 113-33 ¶ 17 (same); ECF No. 113-14 ¶ 19 (conflicts between state law and the Anti-DEI priority); ECF No. 113-26 ¶ 20 (same); ECF No. 113-14 ¶ 20 (conflicts between state law and the Anti-Gender Ideology Priority); ECF No. 113-28 ¶ 24 (conflicts between state law and the Overmedicalization and Directive Counseling Priorities); ECF No. 113-34 ¶ 21 (same); ECF No. 113-29 ¶ 17 (conflicts between state law and the Overmedicalization Priority).

decision to permit market-based rates and not to constitutional standing."). In any event, Defendants offer no evidence to counter Plaintiffs' sworn testimony demonstrating the harms they suffer in having to parse the meaning of these terms, make immediate programmatic decisions regarding their Title X programs, and crafting their applications. *See, e.g.*, ECF No. 113-28 ¶¶ 20–22; ECF No. 113-22 ¶¶ 17–21.

Defendants also wrongly recast competitor standing cases as requiring proof that challenged terms expressly mandate particular changes. *See* Defs.' MSJ at 9–10 (citing *Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100 (9th Cir. 2020); *Hennepin Cnty. v. HHS*; *Williams F. Wilke, Inc. v. Dep't of the Army*, 485 F.2d 180 (4th Cir. 1973); *Balt. Gas & Elec. Co. v. United States*, 133 F. Supp. 2d 721 (D. Md. 2001); and *City of Los Angeles v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019)). These cases impose no such requirement. They instead ask if the challenged criteria alter the competitive landscape to a plaintiff's detriment. *Cf., e.g.*, *Planned Parenthood of Greater Wash. & N. Idaho*, 946 F.3d at 1108 ("A plaintiff need not participate in the competition; the plaintiff need only demonstrate that it is 'able and ready to bid.'" (quoting *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).

Finally, neither *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993), nor *Toilet Goods Association v. Gardner*, 387 U.S. 158 (1967), undermines Plaintiffs' showing of present competitive injury. Defs.' MSJ at 4–5, 10. In both cases, the injury depended on future events. In *Reno*, the plaintiffs' eligibility for the statutory benefit depended on taking further affirmative steps and satisfying additional requirements beyond those addressed by the disputed regulation. *Reno*, 509 U.S. at 58–59 n.19. And in *Toilet Goods*, the challenged regulation would have adverse consequences only if and when the Food and Drug Administration sought an inspection and decided to suspend certification services. Neither case involved criteria already governing an ongoing competition. Defendants' reliance on *National Family Planning & Reproductive Health*

*Ass'n v. Kennedy*, 2026 WL 2790025, at *2–4 (M.D. Pa. Sept. 17, 2026), likewise does not resolve the issue for the reasons set out in Plaintiffs' motion for summary judgment. *See* Pls.' Mot. for Summ. J. ("Pls.' MSJ") at 14–16, ECF No. 113-1.

***ii. Plaintiffs Also Suffer Present Application-Preparation Burdens.***

Plaintiffs also suffer present administrative injuries from the work required to prepare applications responsive to the Challenged Conditions. Defendants concede that the declara

tions describe staff resources devoted to determining "if and how" existing programs must change, Defs.' MSJ at 11, but claim that this work is ordinary application preparation or investigation of a possible future requirement, rather than an incremental burden caused by the Challenged Conditions. *Id.* at 10–12. Defendants are incorrect.

Plaintiffs do not claim that the ordinary work of preparing a grant application is itself an injury. Instead, it is the additional work required to evaluate the new priorities, assess their implication for existing Title X programs and state-law obligations, and determine how to address them in applications that constitutes injury. *See, e.g.,* ECF No. 113-22 ¶¶ 15–19; ECF No. 113-23 ¶¶ 16–18; ECF No. 113-28 ¶¶ 18–23; ECF No. 113-31 ¶¶ 16–19. The NOFO requires applicants to address alignment in their proposals, making that work necessary now. A.R. 089–94, 109–11. *Sherley* confirms that grant applicants may suffer present injury when they must invest additional time and resources to compete under challenged criteria. *See* 610 F.3d at 74.

Defendants have not identified contrary authority. *See* Defs.' MSJ at 2, 11–12 (citing *California v. Texas*, 593 U.S. 659, 678–80 (2021), *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414–18 (2013), *Beck v. McDonald*, 848 F.3d 262, 276–77 (4th Cir. 2017)). Rather, Defendants' cited cases reject expenditures incurred to mitigate or investigate speculative future harm where the challenged action did not itself cause injury. *See, e.g.*, *Beck*, 848 F.3d at 274–77 (plaintiffs' asserted increased risk of future identity theft and the cost of measures to protect against it were

too speculative to establish Article III injury). Here, the States' work is not an effort to avoid only a hypothetical future enforcement action; it is necessary to apply under already-imposed criteria.

Defendants also incorrectly rely on *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394–96 (2024), arguing that resource diversion cannot substitute for a concrete injury caused by the challenged action. Defs.' MSJ at 12. But Plaintiffs do not rely on resource diversion alone. Their asserted costs are tied to the concrete requirements of the FY2027 NOFO and the additional resources necessary to prepare applications responsive to those requirements. *See* Pls.' MSJ at 16–17. This distinguishes their claims from an applicant's unilateral decision to spend resources opposing or investigating a policy that does not directly regulate its conduct.

Finally, Defendants do not meaningfully distinguish *Liberty University, Inc. v. Lew*, 733 F.3d 72, 89–90 (4th Cir. 2013), which established that administrative burdens can constitute imminent injury where a plaintiff "must take measures to ensure compliance in advance." *See* Pls.' MSJ at 10 (citing *Liberty*); Defs.' MSJ at 12 (attempting to distinguish *Liberty* on the basis that "the court found plausible allegations of increased costs"). As in *Liberty*, Plaintiffs here establish that they must expend additional time, effort, and money to apply for the 2027 Title X funding competition under the NOFO's novel and unprecedented terms.

***iii. The Challenged Conditions Threaten Plaintiffs' Sovereign and Fiscal Interests.***

Plaintiffs also separately assert injuries to their sovereign interests and to the public health systems they administer that are sufficient to demonstrate standing.

Defendants argue that the NOFO does not presently preempt state law or prevent its enforcement, and that Plaintiffs' asserted conflicts depend on their interpretation of the priorities. Defs.' MSJ at 12–13. However, Plaintiffs do not contend that the NOFO formally repeals or preempts their laws, nor is such an argument required. Their injury is the practical and legal conflict created when the federal government conditions competitive funding and continued

project compliance on advancing priorities that Plaintiffs contend may be inconsistent with their state statutory obligations. *See supra* note 1 and accompanying text.

Defendants further contend, without accounting for Plaintiffs' distinct theories of fiscal injury, that those injuries depend on future award decisions and independent actions by providers and patients. Defs.' MSJ at 13–14. But Plaintiffs' fiscal theories of injury include both the consequences of reduced federal support for direct grantees and the effects on States that rely on in-state providers to deliver services. The latter consequences are supported by declarations describing Plaintiffs' relationships with those providers and their reliance on Title X-funded services as integral to their public health systems. *See* Pls.' MSJ at 17–19 (citing declarations).

Defendants' reliance on *Doe*, 631 F.3d at 161–62, is also misplaced. *See* Defs.' MSJ at 13. There, the Fourth Circuit deemed the asserted injury too speculative where it depended on independent decisions by third parties responding to expanded federal funding for embryonic stem-cell research. *Id.* By contrast, Plaintiffs here identify existing Title X programs and provider networks on which their public health systems rely, and the NOFO governs the criteria under which those programs and providers will compete for successor funding. The involvement of grantees and providers does not automatically sever causation where, as here, their responses to federal funding criteria are predictable consequences of the challenged action. *See U.S. Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) ("Respondents' theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties.").

***iv. The Requested Relief Would Redress Plaintiffs' Injuries.***

Besides challenging Plaintiffs' injuries, Defendants also argue that removing the Challenged Conditions would not redress Plaintiffs' fiscal injuries because other scoring criteria, funding limitations, and independent provider decisions would remain. Defs.' MSJ at 14. But that argument wrongly equates Plaintiffs' injuries with the loss of grant awards when their injury is the

unequal opportunity to compete. Removing the Challenged Conditions would redress that injury even though other lawful criteria would continue to govern the competition. *Cf. Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) ("[T]he causation element of standing does not require the challenged action to be the sole or even immediate cause of the injury.").

Defendants also conflate the scope of any remedy with the question of redressability for purposes of Article III by arguing that vacatur could disrupt the nationwide competition, require all applicants to receive notice and an opportunity to revise their applications, delay successor awards, and interrupt Title X funding after current awards expire on March 31, 2027. Defs.' MSJ at 2–3. Those are remedial considerations; they do not negate Article III standing.

**B. Plaintiffs' Claims Are Ripe.**

Plaintiffs' claims are "presented in a clean-cut and concrete form," and "final and not dependent on future uncertainties or intervening agency rulings," *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (internal quotation marks omitted) (first quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006); then quoting *Franks v. Ross*, 313 F.3d 184, 195 (4th Cir. 2002)). They are ripe for review.

Defendants misapprehend the nature of Plaintiffs' challenge in arguing that the States may not seek judicial review until they apply under the NOFO, await HHS's evaluation of their applications, and identify conflicts with the Challenged Conditions. *See* Defs.' MSJ at 16. As previously discussed, the 2027 NOFO already governs the competition, and the States are incurring injury now as they make programmatic and funding decisions under its requirements. For the same reason, the Court should reject Defendants' argument that the Court would need to speculate as to the relief necessary to remedy Plaintiffs' injuries. *See* Defs.' MSJ at 17. The relief requested in Plaintiffs' Complaint—a declaration that the Challenged Conditions are unlawful, vacatur of their incorporation in the NOFO, and an injunction barring Defendants' from applying or imposing them in evaluating applications or grantee compliance—would remedy Plaintiffs' present injuries.

Defendants also insist that HHS's plans to hold a November 9, 2026, webinar concerning the 2027 Title X grant cycle warrants postponing review. Defs.' MSJ at 17. But Defendants cannot manufacture a ripeness problem with promises to resolve uncertainty stemming from Defendants' own failure to clarify in the NOFO how the Challenged Conditions could possibly operate alongside conflicting regulations governing Title X. As another Court in this District explained in rejecting a ripeness challenge to funding conditions imposed through Executive Orders, defendants "cannot avoid judicial review through a vagueness problem of their own making." *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 422 (D. Md. 2025).

In any event, HHS posted the prerecorded technical webinar to its website on November 3, 2026. *See* Off. of Population Affairs, Funding Opportunities, https://opa.hhs.gov/grant-programs/funding-opportunities#TitleX (last visited Nov. 6, 2026) (linking to the pre-recorded technical webinar). It did not offer a live opportunity to ask questions or seek clarification from program staff. And the webinar's concluding offer that applicants may contact agency staff with administrative and budgetary questions for a Q&A to be posted on OPA's website at some future date does not offer a serious or timely opportunity to resolve the serious legal and practical questions the NOFO has raised. Moreover, even if this potential, future Q&A were to contain information relevant to resolution of this case, the Court could consider it. *See Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 208 (4th Cir. 2022) ("[W]e may look to factual developments that occurred after the complaint was filed to determine whether [a plaintiff's] claims were ripe for review at the time of the district court's judgment.").

Contrary to Defendants' arguments, Plaintiffs' burdens are immediate and must be remedied at this stage. With applications due January 11, 2027, the States must make these programmatic and funding decisions now. Defendants say that review now could disrupt the competition, Defs.' MSJ at 19, but waiting until after awards are made would create substantially greater disruption as the grant contest cannot be rerun. *See* Pls.' MSJ at 20–21 (citing cases).

**C. The 2027 NOFO Is Final Agency Action Reviewable Under the APA.**

Defendants concede that the 2027 NOFO marks the consummation of HHS's decisionmaking process for announcing the FY2027 competition. Defs.' MSJ at 20–21. The decisive question in determining whether the NOFO constitutes final agency action is therefore whether it determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted). For the reasons set out in Plaintiffs' summary judgment motion, Pls.' MSJ at 21–22, it does.

In arguing that the 2027 NOFO does not determine rights or obligations of the agency because it "leave[s] the agency's judgment over every award in place," Defs.' MSJ at 21, Defendants disregard the multitude of decisions holding that an agency action satisfies *Bennett*'s second prong if it "alter[s] the legal regime to which the action agency is subject." 520 U.S. at 178. In *Bennett*, the Supreme Court held that a Biological Opinion requiring the Bureau of Reclamation to comply with certain "reasonable and prudent alternatives," including maintaining certain minimum water levels at select reservoirs, in order to be permitted to "take" fish designated as an endangered species, changed the legal obligations governing the agency's conduct. *Id.* *Bennett* held that agency action is final, and not merely advisory, when it establishes operative requirements governing a subsequent decisionmaker's conduct. *Id.*; *see also, e.g.*, *Texas v. EEOC*, 933 F.3d 433, 443 (5th Cir. 2019) (final agency action found where guidance "b[ound] EEOC staff to an analytical method in conducting Title VII investigations and direct[ed] their decisions about which employers to refer for enforcement action"); *cf. U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599–600 (2016) (agency order that "give[s] notice of how the [agency] interpret[s] the relevant statute" is a final agency action even absent an enforcement action against a particular party). Relatedly, courts have held that "'where agency action withdraws an entity's previously-held discretion' in an area subject to its coverage, it effectively binds the entity and thus constitutes a final action agency." *Phila. Yearly Meeting of Religious Soc'y of Friends v. U.S.*

*Dep't of Homeland Sec.*, No. 25-0243-TDC, 2026 WL 280089, at *3 (D. Md. Feb. 3, 2026) (quoting *Texas*, 933 F.3d at 442) (holding that Department of Homeland Security's 2021 Protected Areas Policy restricted immigration officers' discretion and imposed obligations on agency personnel, and that a 2025 Policy rescinding it constituted final agency action because it materially redetermined officers' rights and obligations). The 2027 NOFO both alters the legal framework governing HHS officials' evaluation of Title X applications and oversight of recipients' continued compliance with agency priorities. It also constrains officials' discretion by requiring them to emphasize those priorities in grant selection and post-award compliance review. For each of these reasons, the NOFO constitutes final agency action.

Defendants fail to distinguish the present case from *Hennepin County*, in which a court held that a notice of funding opportunity for HHS's Teen Pregnancy Prevention Program constituted final agency action because it established agency priorities and considerations for evaluating grant applications. *See* 2026 WL 2426300, at *18. The fact that the Challenged Conditions do not categorically disqualify applicants or require them to propose particular projects, Defs.' MSJ at 21, does not mean they lack legal consequences. As in *Hennepin County*, the NOFO establishes a mandatory evaluation framework. Applicants may be free to propose projects that do not advance the Challenged Conditions, but they cannot avoid the prescribed framework or the consequences of being evaluated under it. *Cf. Arizona v. Shalala*, 121 F. Supp. 2d 40, 48–49 (D.D.C. 2000) (holding HHS guidance interpreting federal cost-allocation requirements was final agency action where it required plans to comply with the policy, required resubmission of noncompliant plans, and "led states to believe that non-complying plans would not be approved").

Defendants' invocation of the principle that consequences must be legal in nature is similarly unavailing. Defs.' MSJ at 21. First, "it bears emphasis that the *Bennett* court stated the second prong of the finality test in the disjunctive. . . . Therefore, the finality vel non of agency action does not automatically turn on the presence of legal consequences to the plaintiff." *Doe v.*

*Tenenbaum*, 127 F. Supp. 3d 426, 461 (D. Md. 2012); *cf. Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 858–59 (4th Cir. 2002) (assessing whether legal consequences flowed from an EPA report only after concluding that it "create[d] no 'legal rights or obligations' and ha[d] no direct regulatory effect on plaintiffs"). In any event, because the Challenged Conditions establish the criteria governing agency evaluations and set out legal obligations on award recipients, whose failure to comply may trigger corrective action, additional reporting requirements, or termination of awards, they produce legal consequences.

## II. The NOFO's Incorporation of the Challenged Conditions Violates the APA.

### A. The Incorporation of the Challenged Conditions Is Contrary to Law Because the Conditions are Inconsistent with Title X's Statutory and Regulatory Requirements.

The NOFO's incorporation of the Directive Counseling, Overmedicalization, Anti-Gender Ideology, Anti-DEI, and Hyde Priorities is contrary to law.

Defendants concede that the NOFO must operate consistently with Title X's governing rules, including Congressional mandates and regulations codified at 42 C.F.R. § 59. *See* Defs.' MSJ at 23. However, to argue that these Priorities permissibly "operate in the space between" the rules, *see id.* at 23–24, Defendants distort the Priorities' language and suggest that apparent conflicts are adequately addressed by the existence of the NOFO's savings clauses and its occasional invocations of the rules it flatly contradicts. These attempts to recast the Priorities cannot overcome the NOFO's own text and represent "nothing but a convenient litigation position which does not support the validity of the [agency action]." *Mayor & City Council of Balt. v. Azar*, 973 F.3d 258, 284 (4th Cir. 2020) (en banc), *cert. voluntarily dismissed*, 141 S. Ct. 2618 (2021).

Defendants cannot "immunize the [NOFO] from review through . . . savings clause[s] which, if operational, would nullify [its] 'clear and specific' substantive provisions," including many of the specific "key strategies" and mandates the NOFO established for each priority. *HIAS,*

*Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021).[2] Despite relying heavily on the savings clause language throughout their opposition, *see* Defs.' MSJ at 23, 25, 29, Defendants fail to explain what the certain Conditions contain when modified by "where authorized by law" or "within the scope of the program," nor do they state how applicants or grantees should make sense of these Conditions' meaning. Nonbinding statements by counsel during litigation would not provide Plaintiffs with relief in any event, but here, Defendants fail to identify any concrete element of any Condition that the savings clauses actually strike. What is clear is that the conflicts between the Challenged Conditions and Title X rules render the savings clauses inoperable. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 176 (D.D.C. 2025) (when plaintiffs' challenge "cannot be possibly implemented consistent with applicable law, a command to do so in a saving[s] clause is meaningless"). Defendants' unsubstantiated assurances that the Challenged Conditions can and will be implemented lawfully do not and cannot resolve the specific, substantive conflicts Plaintiffs identify.

***i. Directive Counseling Priority***

The plain language of the Directive Counseling Priority contradicts Title X's requirements that *all* services must take their cues from clients' values and that pregnancy counseling services must provide nondirective information about client-requested options.

Defendants attempt to rewrite both the NOFO and the law by arguing that the Priority is lawful because it allegedly only dictates how Title X providers "discuss[] long-term reproductive

---

[2] Defendants mispresent the logic of Plaintiffs' brief to suggest that its conditional framing and arguments about vagueness are inconsistent with its arguments about these clear and specific conflicts. Defs.' MSJ at 24. As Plaintiffs have explained, it is Defendants' decision to *pair* many otherwise "unambiguous command[s] to violate" Title X requirements with vague savings clauses that makes the NOFO's meaning indefinite in the first place. *Id.*; *see infra* Section B; *see also* Pls.' MSJ at 36–37. A "limiting clause is disregarded . . . where the instrument unambiguously commands what the clause purports to negate." Defs.' MSJ at24. The remaining sources of vagueness are likewise irrelevant to the clarity of these conflicts; see *infra* Section B.

goals" and does not "displace[] nondirective pregnancy-options counseling." Defs.' MSJ at 20. In making this argument, Defendants concede two decisive points: that the Priority mandates Title X counseling that is *not* "value-free," *id.* at 27; and that the Priority could not be lawfully applied to pregnant clients seeking options counseling, *id.* at 26–27. But, as Plaintiffs have explained, the regulations require *all* counseling be driven by client values, not just pregnancy options counseling, and the NOFO's own stated intention to promote this counseling "for all clients" forecloses any post hoc carveout for pregnant clients. *See, e.g.*, Complaint ¶ 202, Pls.' MSJ at 24. Even by Defendants' own account, the Priority is contrary to law.[3]

First, Defendants effectively concede that this Priority violates the regulatory requirement of client-centered care. Title X grantees must provide care that is "client-centered": all services, including *all* counseling, must be "respectful of, and *responsive to, individual client preferences, needs, and values*; client values guide all clinical decisions." 42 C.F.R. §§ 59.5(a)(3), 59.2 (emphasis added). Yet, the NOFO states that "Title X clinics *will be expected* to offer reproductive goals counseling that presents evidence-informed pathways associated with improved economic stability and family stability, including . . . marriage prior to childbearing" and that "program counseling *should affirm* marriage and parenthood as meaningful and valued components of adult life, particularly in counseling adolescents on long term reproductive goals." A.R. 083 (emphasis added). These are commands that providers endorse Defendants' ideological preferences—promoting the values of this administration rather than those of individual clients. Defendants' admission that the Directive Counseling Priority dictates "how a subject is presented" to clients, Defs.' MSJ at 27, is fatal to their claim. Ordering all providers to present parenthood and marriage

[3] Having not advanced any claims in their summary judgment motion related to 42 C.F.R. § 59.5(a)(4)'s prohibition on marital status discrimination, the States decline to address the arguments on the subject Defendants appear to have mistakenly recycled from a different suit's filings. *Compare* Defs.' MSJ at 28 *with* PPFA ECF 30 at 25 (same arguments on marital nondiscrimination and verbatim phrasing).

as "valued and meaningful" and inform their clients about the superiority of Defendants' preferred life trajectories means that counseling is dictated by values that are not the client's, in direct contravention of the regulations.

Defendants' attempt to distinguish between counseling that imposes values on clients and counseling that merely informs clients about the superiority of living in accordance with those values cannot be sustained. Defendants distort the meaning of non-directive counseling when they insist that the requirement that counseling "affirm marriage and parenthood as meaningful and valued components of adult life," merely "expresses a view of marriage and parenthood but does not direct a client to choose either." And tellingly, Defendants never attempt to offer such a distinction between directing clients toward marriage and informing them of its benefits for HHS's Priority of "support[ing] programs that encourage marriage"—a Priority incorporated, without qualification as Defendants now concede, in the NOFO's rubric. *See* A.R. at 143; Defs' MSJ at 30 (conceding that the rubric contains no savings clause).

Second, while reproductive goals counseling for non-pregnant clients may differ from options counseling for pregnant clients in theory, the NOFO's articulation of the Priority belies the line Defendants now attempt to draw. Defendants suggest that a project that "gives every pregnant client the nondirective options counseling § 59.5(a)(5) requires, and offers reproductive-goals counseling *to clients who want it*, satisfies the regulations and the remaining priorities at once." Defs.' MSJ at 22 (emphasis added). But the Priority states that the agency seeks projects that propose "innovative strategies to . . . advance reproductive goals counseling *for all clients*," A.R. 073 (emphasis added); *see also* Complaint ¶ 202, not just the "clients who want it." Defendants' convenient carveout for pregnant clients appears nowhere on the face of the NOFO. Nor does the Priority qualify its categorical statement that "*program counseling* should affirm . . . parenthood as meaningful." A.R. 083 (emphasis added). Even if Defendants' proposed "qualifications may be sensible" and necessary to reconcile the Priority with the law, the Priority's purported

inapplicability to pregnancy counseling is both "'not at all obvious or even apparent' from the policy documents the Court has before it" and was "proposed by counsel, not the agency," without binding effect. *Hennepin Cnty.*, 2026 WL 2426300, at *23 (quoting *Planned Parenthood of Greater N.Y. v. H.H.S.*, No. CV 25-2453, 2025 WL 2840318, at *25 (D.D.C. Oct. 7, 2025)).

***ii. Overmedicalization Priority***[4]

Defendants contend that the Overmedicalization Priority does not direct a project "to offer less contraception, counsel against it, or make it harder to obtain" because a project can "expand available choices" without "steering a client away from the method the client chooses," Defs.' MSJ at 25–26, but this position is untethered from the text of the NOFO and conflicts with the regulations.

The Priority "expect[s] applicants to demonstrate" how their Title X projects will integrate "practices that promote . . . fertility awareness . . . without unnecessary medicalization or symptom suppression." AR 081–82. The Priority's rejection of the "overreliance on pharmaceutical and surgical treatments" refers to medical contraception; immediately following this rejection, the Priority discusses "a decrease in females' current use of any contraception," attribute the decrease to "dissatisfaction" with medical contraception due to "side effects," and declare that "[t]his approach has failed." *Id.* (see also section B, denigrating medical contraception). Yet, the Title X statute and regulations mandate that Title X programs "offer a broad range of acceptable and effective family planning methods and services," 42 U.S.C. § 300(a), including "[FDA]-approved contraceptive products" and "natural family planning methods," 42 C.F.R. § 59.2. Furthermore, projects are prohibited from promoting one contraceptive method over another. Projects must "[p]rovide services without subjecting individuals to any coercion . . . to employ or not to employ any particular methods of family planning." 42 C.F.R. § 59.5(a)(2).

[4] Because Plaintiffs do not challenge the NOFO's separate body literacy priority, *see* A.R. 083–84, Defendants' arguments in support of that priority are irrelevant.

In violation of this clear mandate, the Priority denigrates the widespread use of medical contraception as "overreliance" and "unnecessary medicalization or symptom suppression" and directs projects to "expand access to fertility-awareness-based methods" instead. But projects have long been required to offer natural family planning methods to clients; fertility-awareness-based methods are already part of the "available choices" in the Title X program. *See id.* § 59.5(a)(1). Defendants' argument that this Priority aligns with the requirements in 42 U.S.C. § 300(a); 42 C.F.R. § 59.2 misconstrues those requirements and Plaintiffs' argument.

***iii. Gender-Ideology Priority***

The Gender-Ideology Priority establishes that the agency "will prioritize funding" for those who "respect[] biological reality," defined as the notion "that a person's sex, as either male or female, is unchangeable and determined by objective biology," and reject the idea of a vast spectrum of genders that are disconnected from one's sex. A.R. 083, 135. The NOFO's explicitly non-exhaustive list of "key strategies for implementing" the priority include "providing developmentally appropriate counseling rooted in biological science" and "ensuring referral pathways align with evidence-based care." A.R. 083. Plaintiffs allege that, to the extent that the priority requires projects to reject patients' transgender identities, it clashes with Title X regulatory mandates that require project provide "client-centered" services that are "consistent with nationally recognized standards of care" and sufficiently inclusive that "transgender . . . persons" "are fully included and can actively participate in and benefit from family planning," 42 C.F.R. § 59.5(a)(3); 42 C.F.R. § 59.2, and prohibit projects from "discriminat[ing] against any client based on . . . sex . . . [or] gender identity." 42 C.F.R. § 59.5(a)(4).

Seemingly recognizing the Priority's incompatibility with the regulations, Defendants now assert that Title X projects can comply both with the regulations and the Anti-Gender Ideology Priority because they govern distinct elements of projects. Defs.' MSJ at 24. Defendants assert that, whereas the Title X regulations "govern whom a project serves and how it treats clients," the

Anti-Gender Ideology Priority "addresses the scientific basis for counseling and referrals." *Id.* But the differentiation is nonsensical. The "scientific basis for counseling and referrals" necessarily governs how a project treats its clients; if a project embraces the "science" the Anti-Gender Ideology Priority mandates, which diminishes transgender people, the project will treat transgender patients differently than a project that respects their gender identities. For example, preventing providers from recognizing medical transition impedes those providers from accurately counseling transgender Title X clients on fertility preservation that respectfully and inclusively addresses their family planning needs. Moreover, Defendants' invented distinction also redrafts the priority, which by its own language extends beyond the scientific basis for counseling and referrals: the priority announces that the agency will prioritize funding grantees who "respect[] biological reality." A.R. 083. Defendants explain that there is no regulatory conflict because "counseling rooted in reproductive biology" is aligned with client-centered and non-discriminatory care. Defs.' MSJ at 24. But they do not define the phrase or "reproductive biology" by itself, neither of which appears in the priority or the rest of the NOFO. *See id.* Defendants' arguments do nothing to alleviate the fundamental misalignment of the Priority and the regulations. Asking providers to deny that transgender people exist, while simultaneously providing client-centered care to those transgender patients who seek their help, simply cannot be reconciled under the Title X framework.

#### *iv. Anti-DEI Priority*

As Defendants acknowledge, the Anti-DEI Priority states that the agency "has previously invested in ideologically-laden concepts like health equity" and now will "prioritize efforts that go beyond the use of ideologically laden concepts." Defs.' MSJ at 28 (quoting A.R. 135). Title X regulations require the agency to consider "[t]he ability of the applicant to advance health equity" when assessing applications. 42 C.F.R. § 59.7(a)(3). The Anti-DEI Priority clearly rejects what the regulation requires.

Defendants assert that the "health equity" in the priority is *not* the "health equity" in the regulation. Defs.' MSJ at 28. The "health equity" of the Anti-DEI Priority is potentially the "health equity" of "policy debate[s]," *id.*, and the rest of the Priority, which directs applicants to focus on "solution-oriented approaches" *as an alternative to "health equity"* is aligned with the "health equity" of the regulation. Again, even assuming applicants could make sense of this explanation—which is doubtful—it finds no textual support in the NOFO. It was invented post-hoc.

Defendants also argue that the regulation and the Priority "speak to different things": 42 C.F.R. § 59.7(a) is a criterion for the agency and it "directs applicants to do nothing." Defs.' MSJ at 29. This distinction, too, is puzzling. First, when applicants know that the entity judging their applications must take their ability to advance health equity into account, it is in the applicants' interest to speak to that ability. The regulation necessarily impacts applicants' behavior. Second, the Anti-DEI Priority by its own terms governs, in part, what "OASH will prioritize." Thus, even if the regulation only directs agency behavior, the Priority runs counter to the regulation. Defendants further argue that the NOFO "retains the health-equity criterion" because the document states that OPA will evaluation applications in accordance with 42 C.F.R. 59.7(a). But if anything, this line merely makes the NOFO internally inconsistent, does nothing to ameliorate the conflict between the Priority and the regulation, and causes more confusion.

***v. Hyde Amendment Priority***

The Hyde Amendment Priority directs applicants and grantees to demonstrate that they will "contribute to broader HHS efforts to safeguard life-affirming . . . program delivery" and "maintain strict separation" with any delivery of abortion services. The NOFO does not define "life-affirming" program delivery, and to the extent that it requires providers not to "support elective abortion" and instead to counsel patients to carry pregnancies to term, the Priority is inconsistent with Title X law and regulations requiring client-centered, nondirective counseling. *See* Pub. L. No. 119-75, 140 Stat. 173, 262 (2026) ("all pregnancy counseling shall be nondirective"); 42

C.F.R. § 59.5(a)(5) (projects must "offer pregnant clients the opportunity to be provided information and counseling regarding . . . (A) Prenatal care and delivery; (B) Infant care, foster care, or adoption; and (C) Pregnancy termination" and "neutral, factual information and nondirective counseling on each of the options, and, referral.'").

Defendants' principal response is that there is no conflict with Part 59 or 42 C.F.R. § 59.5(a)(5). Defs.' MSJ at 29. But Defendants fail to address the inconsistency between the Priority's directives that projects engage in "life-affirming" program delivery and avoid "support[ing] elective abortion" and the legal and regulatory mandate that projects provide "neutral, factual information and nondirective counseling" on *all* options, including continuing a pregnancy, adoption, *and abortion* if a patient so desires. 42 C.F.R. § 59.5(a)(5); § 59.5(a)(3). Defendants instead rely on insufficient savings language, arguing that the "life-affirming" sentence's "qualification"— that the phrase "'life-affirming' appears alongside 'lawful' and 'ethical'" and within a priority that elsewhere states "[t]o the extent permitted by applicable law"— is not "override[n]" by that "[o]ne adjective." Defs.' MSJ at 29. But Defendants' proposed gloss reduces the priority to mere surplusage in suggesting that the agency intended to prioritize compliance with the legal floor that all applicants already *must* meet. Their post hoc narrowing construction developed for litigation binds no reviewer and offers no relief.

### B. Defendants' Actions Are Arbitrary and Capricious Because They Have Failed to Provide a Reasoned Explanation for Their Change in Position and Consider Reliance Interests in Incorporating the Challenged Conditions in the NOFO.

Defendants do not meaningfully address Plaintiffs' contention that the Agencies acted arbitrarily and capriciously by failing to engage in reasoned decisionmaking when they departed from prior policies. *See* Pls.' MSJ at 23–34; *see also Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible

that it could not be ascribed to a difference in view or the product of agency expertise."). Instead, Defendants attempt to recast the NOFO's failure to acknowledge the changes it occasioned as evidence that they never occurred. But their silences, savings clauses, and toothless invocations of the operative standards for Title X participation cannot undo the unreasoned nature of their departure from past practices or reconcile the NOFO's conflicts with those standards, nor can they cure Defendants' failure to address or contest evidence of Plaintiff' reliance interests.

***i. Defendants Abandoned Evidence-Based, Reliance-Backed Positions Without Providing a Reasoned Explanation.***

Defendants suggest that, because the NOFO never formally purports to repeal or amend existing requirements, it has not departed from past practice. *See* Defs.' MSJ at 25–26, 29, 35–36. But the NOFO's failure even to acknowledge its departures only compounds its arbitrary and capricious nature. *See, e.g.*, *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018) (agency silence while adopting a new position that contradicts specific past commitments does not justify "the government [in] tak[ing] the view that there is no change to be explained"). By incorporating the Challenged Conditions in the NOFO, the Agencies both "simply disregard[ed] rules that are still on the books," *see supra* Section II.A, and "depart[ed] from a prior policy *sub silentio*" by ordering grantees to violate the QFP's evidence-backed, reliance-courting recommendations on quality counseling for all clients, options counseling for pregnant clients, contraception, serving transgender clients, and DEI. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see* Pls.' MSJ at 23–34.[5] Yet Defendants mention the QFP in only two places: first to dismiss its

[5] As Plaintiffs have established, the QFP itself reflects the Agencies' own position on "how to provide high-quality [sexual and reproductive health] care," ECF No. 113-3 at S42, and has been embedded in both the Agencies' recommendations for regulatory compliance, ECF No. 113-4, and various binding instruments. *Cf. FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 570 n.6 (2025). The Agencies have mandated compliance since publishing its first edition by embedding the QFP in binding instruments, including incorporating the QFP in past mandatory agency guidelines, adding QFP adherence to Notice of Award special terms, and evaluating grantees on

relevance to regulatory conflicts, Defs.' MSJ at 25, and then simply to observe that the NOFO never explicitly "rescinds the QFP," *id.* at 32.

If Defendants mean to suggest that their arguments about the Priorities' consistency with the regulations also demonstrate the Priorities do not depart from the QFP, those arguments are both inadequate on their own terms, *see supra* Section II.A, and particularly inadequate for addressing the QFP. Defendants' arguments rely on characterizing Title X's regulations as too vague to generate conflicts with the Challenged Conditions—a mischaracterization that is especially inapt for the QFP, which explicitly recommends many of the concrete, conflicting practices Defendants claim the regulations omit. For example, while Defendants argument that "[r]egulations prescribe no particular practice of address or vocabulary" for transgender clients, Defs.' MSJ at 25, is inadequate on its own terms, it also flatly contradicts the QFP, which *does* recommend respecting pronouns and names, providing fertility preservation counseling, and offering referrals both to community groups and to providers of gender affirming care, ECF No. 113-3 at S72–73.

Defendants have not demonstrated any rational connection between the Agencies' new positions and the evidence on which the NOFO relied—much less shown that the Agencies offered the "more detailed justification" they were required to provide when departing from the evidence-backed QFP. *Fox Television Stations*, 556 U.S. at 515. Indeed, Defendants' arguments strip all the possible sources of evidentiary support from the actual changes the Directive Counseling and Overmedicalization Priorities instituted: Defendants concede that the evidence cited by the Directive Counseling Priority merely supports counseling, not *directive* counseling, and fail to connect the Overmedicalization Priority's conclusions to its evidence. *See* Defs.' MSJ at 30–35.

their adoption of specific QFP practices during site visits. *See, e.g.*, ECF No. 113-28 ¶¶ 11, 21; *see also* Pls.' MSJ at 4–6.

Absent any rational connection between the research consulted and the Priorities adopted, Defendants cannot satisfy the APA merely by listing new policy objectives.

After conceding that "[t]he States correctly distinguish" the 2020 Fertility Knowledge Survey from "the separate statement about sequencing," and that "Defendants do not attribute the latter proposition to the survey," Defendants are left without any record evidence to defend the Agencies' abandonment of the evidence-based QFP position on quality counseling and nondirective pregnancy options counseling. Defs.' MSJ at 33. Defendants' suggestion that the efficacy of directive counseling is the sort of "proposition[] for which scant empirical evidence can be marshaled" and is therefore insulated from review, *id.*, is unavailing. *See Fox Television Stations*, 556 U.S. at 519. Courts routinely "set aside agency action under the Administrative Procedure Act because of failure to adduce empirical data that can readily be obtained." *Id.* In this case, not only is empirical evidence about the effectiveness of directive counseling's demonstrably possible to gather, it is also data that the agency *has* gathered previously. To develop the QFP, OPA evaluated research on the efficacy of various approaches for all types of sexual and reproductive health counseling, including life counseling. Pls.' MSJ at 25. Based on that review, the QFP recommended clinicians deploy a client-centered model of counseling, in which "the patient shares their values and preferences, and the provider shares relevant information with the patient . . . [in order] to determine what clinically appropriate course of action suits the patient's preferences, clinical needs, and goals," which "has been shown to improve the quality of contraceptive counseling and contraceptive method satisfaction." ECF No. 113-3 at S50–51. OPA never explains why the agency now considers it impossible to marshal any evidence of directive counseling's efficacy at promoting parenthood, childrearing in wedlock, or patient health generally—all propositions that the Agency must substantiate to justify diverging from the QFP.

Similarly, Defendants asserts that the Overmedicalization Priority "identifies dissatisfaction with side effects and calls for expanded fertility-awareness access" and

"noninvasive approaches" but fail to elucidate how the cited studies support the Priority's "announced emphasis." Defs.' MSJ at 32–33. They never articulate a rational connection between the position the Agencies adopted and the research the NOFO consulted on declining rates of contraception use and on the relationship between dissatisfaction with particular brands and side effects. *See Bedford Cnty. Mem'l Hosp. v. Health & Hum. Servs.*, 769 F.2d 1017, 1022 (4th Cir. 1985) (agency action was arbitrary and capricious based on "failure to consider problems regarding the . . . relevancy of the study"). Defendants now concede that the decline in contraception usage in the CDC studies the NOFO cited "can reflect pregnancy, postpartum status, sexual activity, and other circumstances, as the States observe," but then suggests that the NOFO hardly meant to "attribute *every* decline to dissatisfaction." Defs.' MSJ at 33 (emphasis added). But the CDC studies already attributed *all but 0.3%* of the decline to these causes—and never suggest that dissatisfaction is a meaningful cause of this insignificant remainder.[6] Defendants suggest that the NOFO's other cited source, the NHSR study, provided a "separate dissatisfaction finding" that supported the Priority—but they never explain the relevance of a study that was expressly limited in scope to the reasons women gave for stopping their use of particular brands, not contraception entirely. *Compare* Defs.' MSJ at 33, *with* NHSR, ECF No. 113-12 at 3.

The NOFO wrongly used the CDC studies and NHSR report to justify the Priority's mandate that Title X projects should shift to promoting fertility awareness and "noninvasive approaches." Defendants do not now identify the legally required "satisfactory explanation" for this change in approach. Defendants say the fact that "some" women in the NHSR study switch

[6] The three cited CDC snapshots demonstrate that, between 2015 and 2023, the percentage of women using contraception fell by roughly 10.7 percentage points—and the percentage of women who reported that they were not using contraception because they were pregnant, seeking pregnancy, postpartum, sterile, or not sexually active rose by 10.4 percentage points. The total percentage of "other nonusers"—women who did not explain why they declined to use contraception by referring to one of the CDC's suggested factors—rose by 0.3 percentage points over the entire period, from 7.9% in 2015 to 8.2% in 2023. Pls.' MSJ at 28 n.27.

to another contraceptive method does not "contradict those findings," likely referring to the finding that side effects were the most common reason for dissatisfaction-related switching, but rather "reinforces the compatibility of expanding options." Defs.' MSJ at 33. Yet when OPA previously considered similar evidence demonstrating that "side effects are one of the most common reasons for discontinuation" of methods during the QFP's creation, the Agency concluded that "discontinuation or switching of a method is normal and expected" and therefore recommended that clinics offer a wide range of options, including medical contraception. ECF No. 113-3 at S55–58. But the Priority does not urge Title X projects to "expan[d] options," as Defendants assert. Instead, it directs projects to promote non-medical family planning, a choice that the studies do not support and the Defendants cannot defend.

Defendants fare no better in addressing the final element of the change-in-position doctrine: reliance interests. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). Defendants argue that Plaintiffs' existing investments in reporting systems, provider networks, facilities, and training remain useful under the new NOFO, and that the States identify no investment that must be abandoned. Defs.' MSJ at 34. But Plaintiffs' reliance interests are not limited to investments that become entirely worthless, and the NOFO marks radical changes in position that will force States to shift existing infrastructure. *See, e.g.*, ECF No. 113-28 ¶ 21 (New York Department of Health requires subrecipients to "implement services as outlined in the QFP"); ECF No. 113-23 ¶ 17 (program provides "client-centered, non-directive counseling"); ECF No. 113-29 ¶ 20 (program uses "health equity" as a guiding principle); ECF No. 113-20 ¶ 9, 16 (program provides "inclusive, nondiscriminatory family planning services care for transgender clients"); ECF No. 113-22 ¶ 20 (program must provide "a broad range of acceptable and effective medically approved family planning methods" including "hormonal contraception"). Because Defendants neither offer evidence to contest Plaintiffs' showing on their reliance interests, nor

attempt to demonstrate that the Agencies considered those interests, Defendants' arguments fail as a matter of law. *See* Defs.' MSJ at 32–35.

***ii. Defendants Failed to Consider the Effects of Proliferating Inconsistent Standards.***

The inapposite constitutional precedent Defendants cite on vagueness does not address Plaintiffs' argument that, in publishing a NOFO that "unfairly require[s] [grant applicants] to guess at what formerly unobjectionable activities are now proscribed" or disfavored, the Agencies "'entirely failed to consider' . . . that the vague and confusing language in the challenged conditions would cause significant adverse effects on [grant applicants] and the vulnerable populations that they serve." *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 70–72 (D.R.I. 2025); *see* Pls.' MSJ at 34–37. Confusing Title X participants by issuing a NOFO whose own savings clauses appear to strike many of the priorities it establishes does not constitute reasoned decision-making. The constitutional standards Defendants cite are not the relevant test here; the APA imposes a higher bar that Defendants have not met.

Plaintiffs' declarations speak for themselves. Every single direct grantee state agency to file a declaration in this case has averred that the NOFO's apparent conflicts and tensions with Title X's own rules has already adversely impeded their application process.[7] For example, New Mexico's declarant, representing a grantee that has participated in the program for four decades and administers the state's only Title X grant stated:

> The FY2027 NOFO itself states that the Agency Priorities apply only where consistent with federal law, regulations, and the authority and scope of the award; however, it does not sufficiently identify how applicants are to reconcile potentially competing requirements. This ambiguity directly affects New Mexico's ability to

[7] ECF No. 113-14 ¶ 16; ECF No. 113-16 ¶ 17; ECF No. 113-18 ¶ 17; ECF No. 113-19 ¶ 17; ECF No. 113-20 ¶ 16; ECF No. 113-22 ¶ 17; ECF No. 113-23 ¶ 17; ECF No. 113-26 ¶ 17; ECF No. 113-28 ¶ 19; ECF No. 113-29 ¶ 17; ECF No. 113-31 ¶ 17; ECF No. 113-32 ¶ 18; ECF No. 113-33 ¶ 17; ECF No. 113-34 ¶ 17; and ECF No. 113-35 ¶ 17.

> prepare an application that both responds to the Agency Priorities and complies with all applicable legal and programmatic requirements.

ECF No. 113-26 ¶ 17.

Subjecting grant applicants to commands as incompatible as ending health equity and simultaneously advancing it is unreasoned. Forcing them to reconcile those commands based on such inscrutable "savings clauses" as the NOFO's instruction that each "recipient is required to administer any project that is awarded under this NOFO in accordance with the following objectives in Title X that are authorized to advance them," A.R. 077, does not cure this fatal defect, but rather, stretches reasoned decision-making far past its breaking point. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 375–76 (1998) (agency's internally inconsistent standard was unreasoned when "[e]ach sentence of [its] explanation [was] nonsense, and the two sentences together [were] not even compatibly nonsensical").

The case Defendants cite about the constitutionality of grant selection criteria is both doctrinally irrelevant to Plaintiffs' APA argument and—on Defendants' own account—inapplicable to the Priorities once they become conditions on awarded grants. *Finley* establishes, in the context of a First and Fifth Amendment challenge to such statutory grant evaluation criteria as "artistic excellence" and "general standards of decency," that "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not *constitutionally* severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 572, 589 (1998) (emphasis added). But Plaintiffs' "vagueness argument is premised on the APA prohibition on arbitrary and capricious decision making, not the Fifth Amendment of the Constitution, despite the overlap here with void-for-vagueness principles." *Planned Parenthood of Greater N.Y. v. HHS*, Civil Action No. 25-2453, 2025 WL 2840318, at *23 n.16 (D.D.C. Oct. 7, 2025) (noting that, as a result, it requires "no showing of a constitutionally protected property interest"); *cf. Wages & White Lion*, 604 U.S. at 569 (noting overlap between due process-related "conception of 'fair notice' and our [APA]

change-in-position doctrine" and resolving case under APA). Plaintiffs alleged that issuing a NOFO so ambiguous and confusing that applicants cannot tell what standard applies to Title X shows that Agencies did not engage in reasoned decision-making—not that they violated the First or Fifth Amendments. *See R.I. Coal. Against Domestic Violence*, 794 F. Supp. 3d at 70 (addressing NOFO's vagueness in context of APA claims as failure of reasoned decision-making, separately from constitutional claims). Courts evaluating APA cases regularly affirm that agencies have a basic obligation to consider the "important factor" of their actions' impact on regulated parties and provide fair warning of what is required or prohibited. *E.g.*, *Mayor & City Council of Balt. v. Azar*, 973 F.3d 258, 282 (4th Cir. 2020) (en banc) (finding that the agency had to consider the costs imposed on regulated parties); *Avail Vapor, LLC v. FDA*, 55 F.4th 409, 422 (4th Cir. 2022) (noting that regulated parties are entitled to "fair warning" of requirements); *see also Wages & White Lion*, 604 U.S. at 567–69 (explaining that agencies "should not mislead regulated entities" by departing from announced standards without notice). But the NOFO's incoherence demonstrates no consideration of the applicants who now must interpret it.

Further, beyond its inapplicability to this APA case, *Finley* does not insulate the NOFO's vagueness from review because the Challenged Conditions are not just criteria for reviewing applications but *conditions*. Defendants concede that *Finley*'s limited holding extended only to evaluative grant criteria and that numerous courts have therefore found "vagueness in funding instruments" that impose "sanction for noncompliance with terms [that prospective grant recipients] could not construe." Defs.' MSJ at 31 (collecting cases). But, as Plaintiffs have explained, after applying the Priorities throughout the application and review process to constrain and evaluate applicants, the NOFO converts them into conditions on grants—violation of which

subjects recipients to termination.[8] Indeed, *Hennepin County*, which Defendants cite as an example of a case that found vagueness in a NOFO, Defs.' MSJ at 31, concerned a recent HHS NOFO whose structure similarly converted evaluative agency priorities into grant conditions upon award. *See Hennepin County*, 2026 WL 2426300 at *11.

##### ***iii. Defendants Unreasonably Incorporated Irrelevant HHS Priorities Into Title X.***

Finally, Defendants concede the absence of any savings clauses when the NOFO incorporates HHS's entire list of priorities, including patently irrelevant objectives, into the scoring of Title X applications. *See* Defs.' MSJ at 29. Rather than defend the incorporation of the Irrelevant HHS Priorities on the merits, Defendants point to savings clauses elsewhere in the NOFO. *Id.* But those clauses do not cure the arbitrary-and-capricious inclusion of conditions for which Defendants offer no reasoned justification.

#### C. The Challenged Conditions Are Procedurally Invalid Because They Were Not Promulgated Through Notice and Comment.

Next, Defendants insist that the Challenged Conditions are general statements of agency policy exempt from the APA's notice-and-comment requirements. Defs' MSJ at 35–36. But this narrow exemption does not apply here because the Challenged Conditions constitute legislative rules, which are subject to typical notice-and-comment requirements under 5 U.S.C. § 553.

"The critical question in distinguishing between legislative rules and general statements of policy is whether the statement 'is of present binding effect; if it is, then the APA calls for notice and comment.'" *Casa de Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 702 (4th Cir. 2019) (quoting *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011)). Legislative rules have "the force of law, and create[] new law or impose[] new rights or duties." *Jerri's Ceramic Arts, Inc. v.*

---

[8] See, e.g., Pls.' MSJ at 21–22 (also explaining how the mechanics of the grant application process, which require applicants to commit *now* to binding plans, mean that their proposals' failure to comply with the conditions can subject them to future penalties).

*Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989). By contrast, "general policy statements allow[] agencies to announce their tentative intentions for the future without binding themselves." *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995). Policy statements do not establish "binding norm[s]" and "leave[] agency officials free to exercise their discretion." *Casa de Maryland*, 924 F.3d at 702.

Here, the Challenged Conditions constrain agency officials' discretion by establishing binding norms for evaluating Title X applications. The NOFO directs reviewers to assess "[t]he extent to which the applicant proposes strategies that meaningfully advance OPA's program priorities" and assigns that criterion 35 points out of 100—the highest point allocation in the merit-review rubric. A.R. 110. The NOFO then separately directs that federal staff "will take into consideration" "[a]lignment with HHS and OASH priorities, where authorized by law and within the scope of the program." A.R. 111. These provisions prescribe how agency officials must evaluate applications. HHS's own April 3, 2026, Memorandum also confirms that these requirements reflect an agency-wide directive, mandating that divisions include language in NOFOs requiring alignment with agency priorities. A.R. 149.

Defendants contend that agency officials have discretion because they consider other factors along with the Challenged Conditions and exercise some judgment in reaching ultimate funding decisions. Defs.' MSJ at 36. But the relevant question is "'the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case.'" *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987) (quoting *Jean v. Nelson*, 711 F.2d 1455, 1481 (11th Cir. 1983)). There is no such discretion here. Courts have repeatedly held that similar directives were legislative rules because they prescribed standards that agency officials had no latitude to set aside. *See, e.g.*, *League of Women Voters of the U.S. v. USCIS*, 839 F. Supp. 3d 292, 342–44 (D. Md. 2026) (finding USCIS's categorical prohibition on voter registration activities at naturalization

ceremonies to be a legislative rule where agency offices lacked discretion to permit activities); *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321–23 (D.C. Cir. 1988) (holding that EPA's model for predicting groundwater contamination was binding, even though the agency retained discretion to consider other factors, because it did not genuinely entertain challenges to the model's determinations and underlying methodology); *Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1112–13 (D.C. Cir. 1974) (holding that parole guidelines were substantive rules because, despite allowing flexibility in individual cases, they established a framework limiting the Board's discretion). In contrast, courts have found agency pronouncements to be general statements of policy where officials retained genuine authority to depart from or ignore the announced policy in individual cases. *See, e.g.*, *Casa de Md.*, 924 F.3d at 702–703 (finding the rescission of DACA to be a general statement of policy where the agency action did not foreclose immigration officials from granting deferred action on a case-by-case or ad hoc basis); *Guardian Fed. Sav. & Loan Ass'n v. FSLIC*, 589 F.2d 658, 666–68 (D.C. Cir. 1978) (finding agency audit criteria nonbinding where the chief examiner retained authority to accept nonconforming audits and prescribe other requirements in a particular case). Here, HHS officials are not at liberty to disregard the Challenged Conditions in making funding decisions, so they are not "free to exercise their discretion." *Casa de Md.*, 924 F.3d at 702.

The Challenged Conditions also have binding consequences for Title X applicants and recipients. Applicants must address OPA's priorities in their project narratives, indicate whether they will provide reproductive goals counseling at each site or provide a site-specific justification and referral plan, and compete under the scoring rubric that assigns 35 points to alignment with OPA's priorities. A.R. 089–94, 110; *cf. Gen. Elec. Co. v. EPA*, 290 F.3d 377, 384 (D.C. Cir. 2002) (holding that EPA guidance governing applications for approval of alternative cleanup methods at PCB-contaminated sites imposed binding requirements on applicants by directing that both cancer and non-cancer risk "must be addressed," prescribing two permissible methods of assessment, and

foreclosing other approaches). The Challenged Conditions set out even more plainly binding terms for recipients who "must align program design and activities" with the OPA priorities and "must demonstrate ongoing compliance" through program design, implementation, reporting, and evaluation, and in programs authorized to advance those priorities. A.R. 077. The NOFO further provides that failure to meaningfully align may result in corrective action, additional reporting requirements, or other action, including possible termination. These are mandatory requirements backed by concrete consequences, not tentative, nonbinding statements of future agency intention. Applicants' notional freedom to propose any lawful project, Defs.' MSJ at 36, does not change the fact that applicants who seek Title X funding must either tailor their proposals to HHS's priorities or risk losing points under the NOFO's highest-weighted criterion and ultimately risk funding.

Defendants also argue that the Challenged Conditions do not amend the Title X regulations. Defs.' MSJ at 35–36. However, as discussed above, because the Conditions depart from specific requirements of the existing Title X framework, they "adopt[] a new position inconsistent with existing regulation" and are therefore legislative rules. *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 494 (D. Md. 2019); see *supra* Sections II.A.ii–iv (demonstrating that the contraception element of the Overmedicalization Priority, the Anti-Gender Ideology Priority, and Anti-DEI Priority conflict with existing regulations).

Defendants' failure to use the procedures required to amend the Title X regulations requires that the Challenged Conditions to be held unlawful and set aside under 5 U.S.C. § 706(2)(D).[9]

[9] In their two dispositive motions, Defendants have not argued that 5 U.S.C. § 552(a)(2), which generally exempts matter relating to "grants" from notice and comment applies here. It does not. Courts in this District have held that Section 553(a)(2)'s exemption may be preempted by more specific language governing the program. *See, e.g.*, *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 114 n.21 (D. Md. 2025) (holding that Section 553(a)(2)'s "exemption is preempted by the more specific language in the appropriations act" requiring changes to AmeriCorps programs requirements, service delivery, or policy of the AmeriCorps proceed through notice-and-comment rulemaking). Here, Congress specifically directed that "[g]rants and contracts made under this subchapter shall be made in accordance with such regulations as the

### III. Plaintiffs Are Entitled to Summary Judgment on Their Spending Clause Claim.

Plaintiffs have demonstrated that they are entitled to summary judgment on their claim that the NOFO's imposition of the Challenged Conditions violates the Spending Clause, and, thus, the APA, 5 U.S.C. § 706(2)(B). *See* Pls.' MSJ at 45–50. The Challenged Conditions do not provide sufficient notice of the obligations incurred by applying for and receiving federal funding under the NOFO, *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), and they are not reasonably related to the Title X program, *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987). Defendants have not offered any valid arguments to the contrary.

#### A. Defendants Fail to Show that the Challenged Conditions Provide Clear Notice of Applicants' and Grantees' Obligations.

Defendants contend that the Challenged Conditions do not contravene the Spending Clause's requirement that the obligations attached to federal funds be sufficiently unambiguous to provide "clear notice" to applicants and grantees. Defs.' MSJ at 36–37. Defendants' opposition brief repeats three arguments from their opening brief, *see* ECF No. 102-1 at 14–15, all of which were addressed in Plaintiffs' opening brief. First, Defendants contend that *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), stands for the proposition that scoring criteria cannot constitute funding conditions for Spending Clause purposes. Defs.' MSJ at 37; ECF No. 102-1 at 14. But, because *Finley* did not review a challenge brought under the Spending Clause, it is inapposite. Pls.' MSJ at 48 n.34. This was Defendants' only support for this argument, and it fails.

Second, Defendants argue that the Spending Clause requires clear notice only at the time award terms are accepted, and thus Plaintiffs' claim is not ripe. Defs.' MSJ at 37; ECF No. 102-1 at 14–15. But Plaintiffs' claims *are* ripe, *see supra* Section I.B, and Defendants' ripeness arguments have no bearing on the merits of Plaintiffs' Spending Clause claim. Defendants cite no

---

Secretary may promulgate." 42 U.S.C. § 300a-4(a). HHS exercised that authority by promulgating the existing regulations through notice-and-comment rulemaking. *See* 42 C.F.R. §§ 59.1–59.11.

authority for the proposition that a litigant may not bring a Spending Clause claim before submitting a funding application. Neither of the two cases that Defendants cite, Defs.' MSJ at 37, say anything about timing; they concern whether particular funding statutes permit a state official to "knowingly accept" the terms of grants thereunder, but not when such acceptance takes place. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (considering whether a federal funding statute provided clear notice to a grantee that participating in a funding program would create potential liability to third parties); *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665–67 (1985) (considering whether the federal government may demand repayment from a grantee that violated statutory requirements of the grant program). Defendants do not engage with the cases cited in Plaintiffs' opening brief granting relief against NOFO conditions on claims brought by potential applicants, including under the Spending Clause. *See* Pls.' MSJ at 49 n.34 (citing *Freedom Network USA v. Trump*, 830 F. Supp. 3d 681, 707–08 (N.D. Ill. 2026)).

Finally, Defendants contend that any funding conditions are necessarily ascertainable because Plaintiff States will craft the projects that are subject to agency approval. Defs.' MSJ at 37; ECF No. 102-1 at 14–15. But this turns the Spending Clause analysis on its head; it is the government's terms that must be clearly noticed, not the proposal offered by Plaintiffs. Moreover, it is clear on the face of the NOFO that grantees will be bound to terms and conditions beyond those defined by their own approved projects. *See* A.R. 113 ("The approved project or activity is the project described in your application . . . .").

### B. Defendants Have Not Shown a Reasonable Relationship Between the Challenged Conditions and the Title X Program.

Defendants make two arguments in support of their position that the Challenged Conditions are sufficiently related to the Title X program to withstand a challenge under the Spending Clause. First, they contend that "[t]he relatedness objection . . . overreads the notice" because "[f]ertility, reproductive-goals, and body-literacy counseling relate directly to voluntary family planning and

infertility services" as contemplated by 42 U.S.C. §§ 300(a), 300a-4(b). Defs.' MSJ at 37. Defendants appear to take the position that, because the Challenged Conditions employ certain buzzwords that have some connection with reproductive health care, they therefore relate to the Title X program. But, as explained *supra* Section II.A, each of the Challenged Conditions employ these terms in a manner that directly conflicts with the Title X statute and regulations—including by implying that applicants must deemphasize hormonal birth control, or engage in directive counseling—and thus cannot be read to reasonably relate to the purposes of Title X.

Second, Defendants argue that the Irrelevant Priorities withstand Plaintiffs' Spending Clause challenge because the NOFO's various savings clauses require they "be read within [Title X's] statutory purposes and the notice's express scope limitations." Defs.' MSJ at 37. In other words, they concede those priorities have no conceivable application within the context of the Title X program. This is fatal to their argument. Nor can the "savings clauses" revive it, as the unrelated terms still leave Plaintiffs to guess as to which, if any, of the priorities their applications should address. Defendants fail to engage with Plaintiffs' legal authorities recognizing this infirmity, *PFLAG, Inc.*, 769 F. Supp. 3d at 437 (stating that there are no "magic words that can override" the "plain meaning" of a text and cure all legal infirmities and rejecting reliance on a "purely theoretical" savings clause (quoting *HIAS*, 985 F.3d at 325)); *see supra* Section II.A, or to provide any legal authority of their own. This court should find that the savings clauses may not convert conditions which are unrelated on their face to the spending program at issue sufficiently related under the Spending Clause. *See South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987).

## IV. Defendants' Remaining Arguments Should Be Rejected.

The Court should issue the full relief the plaintiffs have requested—vacatur, a permanent injunction, and declaratory relief. Defendants have not presented any valid reasons to limit relief.

The Court does not need to carve up the relief awarded in this case to benefit certain Plaintiff States and exclude others. When multiple plaintiffs seek the same relief, only one plaintiff

needs to demonstrate standing. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023). In any event, each Plaintiff has submitted evidence, uncontested by Defendants, establishing its standing to seek all the relief the States have requested. *See* Pls.' MSJ at 11–21.

No narrower relief would be sufficient to remedy Plaintiffs' injuries. Vacatur of the Challenged Conditions is appropriate because vacatur is the standard remedy authorized by the APA. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018); *see also Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2460–61 (2024) (Kavanaugh, J., concurring); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66, 119–21 (D. Md. 2025). The APA does not even provide a way to limit vacatur to particular plaintiffs. *See Am. Fed'n of Tchrs.*, 796 F. Supp. 3d at 120 ("[A] vacatur is by definition universal. APA suits ultimately target the rule, and not necessarily the application of it to a particular person."). As for Plaintiffs' request for injunctive relief, because Plaintiffs are competing for "a single, fixed pool of funds," Defs.' MSJ at 38, the only way to redress the harm to Plaintiffs is an injunction that prevents application of the challenged conditions to any applicant. Such an injunction is permissible even though it will affect nonparties. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2556–57 (2025) (reaffirming that "a court of equity may fashion a remedy that awards complete relief" to the plaintiffs even when it may have incidental effects on nonparties).

Defendants argue that relief should be denied because it will necessarily disadvantage nonparties competing for the same grants who are better off under the current NOFO. But that is precisely the point—Defendants' actions have improperly disadvantaged Plaintiffs relative to other applicants. There is no reason why competing applicants who gained advantages solely because of Defendants' unlawful actions should be allowed to retain those advantages.

Defendants also assert that this Court and the court in *Planned Parenthood Federation of America v. U.S. Department of Health and Human Services*, No. 1:26-cv-02656 (D.D.C.), could issue inconsistent decisions. That hypothetical possibility is no reason to deny relief. There is no

reason to expect any such conflict, and even if an inconsistency were to arise, the parties and the Court could address it at that time. *Cf. CASA, Inc.*, 145 S. Ct. at 2569, 2571 (Kavanaugh, J., concurring) (recognizing that "different district courts may enter a slew of preliminary rulings on the legality of that statute or executive action [or] grant or deny the functional equivalent of a universal injunction" under the APA and acknowledging the ultimate role of the Court "to resolve major legal questions of national importance and ensure uniformity of federal law").

Defendants argue that, if the Court finds that the agency's actions were invalid only because they were not adequately explained, the Court should simply remand for additional explanation without vacating the agency's actions. It first bears noting that Plaintiffs have presented numerous reasons to vacate the challenged conditions besides the lack of adequate explanation, and Defendants do not dispute that vacatur is warranted if the Court rules for Plaintiffs on any of those other grounds. Defendants also acknowledge that the Fourth Circuit has never endorsed the District of Columbia Circuit's approach of allowing courts to decline to vacate inadequately supported rules in some circumstances. *See* Defs.' MSJ at 39 (citing *Sierra Club*, 909 F.3d at 655). Even in the D.C. Circuit, remand without vacatur is the exception, not the rule. *See Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (noting that "vacatur is the normal remedy"); *Cigar Ass'n of Am. v. U.S. FDA*, 132 F.4th 535, 541 (D.C. Cir. 2025) (describing remand without vacatur as an "exceptional remedy" appropriate in "limited circumstances"). Remand without vacatur is inappropriate because it would leave Plaintiffs' injuries entirely unaddressed, and Defendants identify no basis to conclude that they could cure the deficiencies on remand. *See Bridgeport Hosp.*, 108 F.4th at 890 (noting that remand without vacatur is appropriate only where the deficient explanation is "curable").

## CONCLUSION

For the aforementioned reasons, this Court should grant Plaintiffs' Motion for Summary Judgment, deny Defendants' Cross-Motion for Summary Judgment, and order the relief requested.

Dated: November 6, 2026

Respectfully submitted,

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson (D. Md. Bar No. 31472)
James C. Luh (D. Md. Bar No. 31776)
Adam Kirschner (D. Md. Bar No. 31767)
*Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6584
vwilliamson@oag.maryland.gov

*Attorneys for State of Maryland*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Galen Sherwin*
Galen Sherwin†
*Special Counsel for Reproductive Justice*
Rabia Muqaddam†
*Chief Counsel for Federal Initiatives*
Andres Ivan Navedo†
Molly Brachfeld†
Victoria Ochoa†
*Assistant Attorneys General*
28 Liberty St.
New York, NY 10005
(929) 736-3392
galen.sherwin@ag.ny.gov
rabia.muqaddam@ag.ny.gov
ivan.navedo@ag.ny.gov
molly.brachfeld@ag.ny.gov
victoria.ochoa@ag.ny.gov

*Attorneys for the State of New York*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Allyson Slater*
Allyson Slater†
*Director, Reproductive Justice Unit*
Nita K. Klunder†
Morgan Carmen†
Abigail Gabrieli†
*Assistant Attorneys General*
One Ashburton Pl.
Boston, MA 02108
(617) 963-2255
allyson.slater@mass.gov
morgan.carmen@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Ketakee Kane*
Neli N. Palma†
*Senior Assistant Attorney General*
Anna Rich*
*Supervising Deputy Attorney General*
Ketakee Kane†
David Houska†
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612
(510) 879-1519
Ketakee.Kane@doj.ca.gov

*Attorneys for the People of the State of California*

**PHIL WEISER**
Attorney General of Colorado

By: */s/ Gabe Podesta*
Gabe Podesta†
Ryan Lorch†
*Senior Assistant Attorneys General*
1300 Broadway, 10th Fl.
Denver, CO 80203
(720) 508-6000
gabe.podesta@coag.gov
ryan.lorch@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Alma Nunley*
Alma Nunley†
*Assistant Solicitor General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5318
Alma.Nunley@ct.gov

*Attorney for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston†
*Director of Impact Litigation*
Vanessa L. Kassab†
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General of Hawai'i

By: */s/ Kaliko'onālani D. Fernandes*
Kaliko'onālani D. Fernandes†
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorney for the State of Hawai'i*

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Caitlyn G. McEllis*
Caitlyn G. McEllis†
*Senior Policy Counsel*
Holly F.B. Berlin†
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St. Chicago, IL 60603
(312)814-3000
Caitlyn.McEllis@ilag.gov

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
Governor of the Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo†
*General Counsel*
Sam Flynn*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Office of the Governor

Holly.berlin@ilag.gov

*Attorneys for the State of Illinois*

501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
Attorney General of Maine
By: */s/ Katherine W. Thompson*
Katherine W. Thompson†
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
kate.thompson@maine.gov

*Attorneys for State of Maine*

**DANA NESSEL**
Attorney General of Michigan
By: */s/ Neil Giovanatti*
Neil Giovanatti†
*Assistant Attorney General*
P.O. Box 30212
Lansing, MI 48909
(517) 241-1050
GiovanattiN@michigan.gov

*Attorney for the State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/Katherine Bies*
Katherine Bies†
*Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Attorney for the State of Minnesota*

**AARON D. FORD**
Attorney General of Nevada

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland†
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorney for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Meghan K. Musso*
Meghan K. Musso†
*Deputy Attorney General*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Aletheia V.P. Allen*
Aletheia V.P. Allen†
*Solicitor General*

New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
Meghan.Musso@law.njoag.gov

*Attorney for the State of New Jersey*

New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
aallen@nmdoj.gov

Seth C. McMillian†
*Deputy Solicitor General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-546-9919
smcmillan@nmdoj.gov

*Attorneys for State of New Mexico*

**DAN RAYFIELD**
Attorney General State of Oregon

By: */s/ Leanne Hartmann*
Leanne Hartmann†
*Senior Assistant Attorney General*
Galen Knowles†
*Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Leanne.Hartmann@doj.oregon.gov
Galen.Knowles@doj.oregon.gov

*Attorneys for the State of Oregon*

**JOSH SHAPIRO**
Governor for the Commonwealth of
Pennsylvania

By: */s/ Jacob B. Boyer*
Jennifer C. Selber*
Jacob B. Boyer*
*Deputy General Counsel*
Governor's Office of General Counsel
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Attorneys for Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Kathryn T. Gradowski*
Kathryn T. Gradowski†
*Special Assistant Attorney General*
150 South Main St.
Providence, RI 02903
(401) 274-4400
kgradowski@riag.ri.gov

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: /s/ Ryan Patrick Kane
Ryan Patrick Kane†
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov

*Attorney for the State of Rhode Island*

**JAY JONES**
Attorney General for the Commonwealth of Virginia

By: */s/ Megan C. Keenan*
Megan C. Keenan (D. Md. Bar No. 32426)
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Lynn K. Lodahl*
Lynn K. Lodahl†
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, WI 53707
(608) 264-6219
lynn.lodahl@wisdoj.gov

*Attorney for the State of Wisconsin*

* *pro hac vice application forthcoming*
‡ *pro hac vice application pending*
† *appearing pro hac vice*

*Attorney for the State of Vermont*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: /s/ *Lauryn K. Fraas*
Lauryn K. Fraas†
*Assistant Attorney General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Tel (206) 464-7744
lauryn.fraas@atg.wa.gov

*Attorney for the State of Washington*