**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

STATE OF NEW YORK, *et al.*,

Plaintiffs,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

Defendants.

Civil Action No. 1:26-cv-03405-DLB

**DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1
ARGUMENT ............................................................................................................. 2
I. THE STATES STILL HAVE NOT SHOWN STANDING. ........................................... 2
A. The declarations do not connect any State's position to the NOFO's text. ................... 3
B. Reading the NOFO is not an injury. ........................................................................ 5
C. The fiscal and sovereign theories rest on the decisions of others. ................................ 5
II. THE CONFLICTS THE STATES ALLEGE ARE NOT RIPE. ....................................... 6
III. THE NOFO IS NOT CONTRARY TO LAW. ............................................................. 10
A. The States do not meet their own test. ..................................................................... 10
B. Health equity. ........................................................................................................ 11
C. Counseling rooted in biological science. ................................................................... 12
D. Fertility awareness. ................................................................................................ 14
E. Reproductive-goals counseling. ................................................................................ 15
F. The Hyde priority. .................................................................................................. 16
IV. THE NOFO IS REASONED. ..................................................................................... 17
A. A grant competition is not a rule. ............................................................................ 17
B. The NOFO does not depart from the QFP, and the QFP is not a regulation. .............. 17
C. The NOFO's limiting clauses are instructions, not confusion. .................................... 20
V. NO NOTICE AND COMMENT WAS REQUIRED. ...................................................... 21
VI. THE SPENDING CLAUSE CLAIM FAILS. ................................................................ 22
VII. THE RELIEF THE STATES SEEK WOULD FALL ON THEIR OWN PROJECTS. 23
A. Relief must attach to what the agency did. ............................................................... 23
B. The States make no showing for an injunction. ........................................................ 23
C. Under existing regulations, the relief the States seek would fall on their own projects. ............ 24
D. Any explanatory deficiency warrants remand without vacatur. ................................. 25
CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases** Page(s)

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) .......... 8
*Aetna Life Ins. Co. v. Haworth*,
300 U.S. 227 (1937) .......... 7
*Allied-Signal, Inc. v. NRC*,
988 F.2d 146 (D.C. Cir. 1993) .......... 19, 20, 25
*Bennett v. Ky. Dep't of Educ.*,
470 U.S. 656 (1985) .......... 22
*Bldg. & Constr. Trades Dep't v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .......... 7
*Casa de Md. v. DHS*,
924 F.3d 684 (4th Cir. 2019) .......... 21
*City of Los Angeles v. Barr*,
929 F.3d 1163 (9th Cir. 2019) .......... 4
*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 3, 5
*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) .......... 6
*Doe v. Obama*,
631 F.3d 157 (4th Cir. 2011) .......... 5
*Doe v. Va. Dep't of State Police*,
713 F.3d 745 (4th Cir. 2013) .......... 7
*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .......... 23
*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 17, 18
*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 2, 17, 18
*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 5
*FEC v. Cruz*,
596 U.S. 289 (2022) .......... 4, 5
*Hennepin Cnty. v. HHS*,
No. 1:26-cv-02460-CRC, 2026 WL 2426300 (D.D.C. Aug. 19, 2026) .......... 15, 16
*HIAS, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021) .......... 10, 22
*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*,
502 U.S. 183 (1991) .......... 10, 16
*Leaf Tobacco Exporters Ass'n v. Block*,
749 F.2d 1106 (4th Cir. 1984) .......... 4
*Liberty Univ., Inc. v. Lew*,
733 F.3d 72 (4th Cir. 2013) .......... 5

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 2
*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 6
*Mass. Trs. of E. Gas & Fuel Assocs. v. United States*,
377 U.S. 235 (1964) .......... 19
*Mayor & City Council of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) .......... 10
*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) .......... 3
*Miller v. Brown*,
462 F.3d 312 (4th Cir. 2006) .......... 7
*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .......... 23
*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) .......... 19
*Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*,
522 U.S. 479 (1998) .......... 4
*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) .......... 10, 11, 17, 21, 22
*Nat'l Family Planning & Reprod. Health Ass'n v. Kennedy*,
2026 WL 2790025 (M.D. Pa. Sept. 17, 2026) .......... 2, 8
*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*,
538 U.S. 803 (2003) .......... 8
*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993) .......... 4
*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) .......... 24
*PDK Labs. Inc. v. DEA*,
362 F.3d 786 (D.C. Cir. 2004) .......... 19
*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 22
*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) .......... 6
*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .......... 22
*PFLAG v. Trump*,
769 F. Supp. 3d 405 (D. Md. 2025) .......... 8, 22
*Planned Parenthood Fed'n of Am., Inc. v. HHS*,
No. 1:26-cv-02656 (D.D.C.) .......... 2, 13
*Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 12
*Reno v. Catholic Soc. Servs., Inc.*,
509 U.S. 43 (1993) .......... 7, 8
*Reno v. Flores*,
507 U.S. 292 (1993) .......... 10

*Rust v. Sullivan*,
500 U.S. 173 (1991) ........................................................................................................ 10
*Schmidt v. Lessard*,
414 U.S. 473 (1974) ........................................................................................................ 22
*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .......................................................................................................... 20
*Sherley v. Sebelius*,
610 F.3d 69 (D.C. Cir. 2010)........................................................................................ 4, 5
*Shinseki v. Sanders*,
556 U.S. 396 (2009) ........................................................................................................ 19
*Sierra Club v. U.S. Army Corps of Eng'rs*,
909 F.3d 635 (4th Cir. 2018) .......................................................................................... 25
*South Carolina v. United States*,
912 F.3d 720 (4th Cir. 2019) ............................................................................................ 6
*South Dakota v. Dole*,
483 U.S. 203 (1987) ........................................................................................................ 22
*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ...................................................................................................... 3, 6
*Texas v. United States*,
523 U.S. 296 (1998) .................................................................................................... 7, 10
*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967) .......................................................................................................... 8
*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................................................................................ 23
*Trump v. New York*,
592 U.S. 125 (2020) ........................................................................................................ 10
*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) ........................................................................................................ 15
*United States v. Skrmetti*,
145 S. Ct. 1816 (2025)..................................................................................................... 14
*United States v. Texas*,
599 U.S. 670 (2023) .......................................................................................................... 6
*Zeneca Inc. v. Shalala*,
213 F.3d 161 (4th Cir. 2000) ............................................................................................ 4

**Statutes**

5 U.S.C. § 702.................................................................................................................... 6
5 U.S.C. § 705.................................................................................................................... 9
5 U.S.C. § 706.................................................................................................... 19, 22, 23
42 U.S.C. § 300(a) ............................................................................................................. 1
42 U.S.C. § 300a-6........................................................................................................... 16
42 U.S.C. § 710(b)(3)(C) ................................................................................................. 20
Pub. L. No. 119-75, 140 Stat. 173, 262 (2026)................................................................ 15

**Rules**

Fed. R. Civ. P. 56(c)(4) .......... 4, 21
Fed. R. Civ. P. 65(d)(1)(C) .......... 22

**Regulations**

2 C.F.R. § 200.204(b)–(c) .......... 23
42 C.F.R. Part 59 .......... Passim
42 C.F.R. §§ 59.1–59.11 .......... 20
42 C.F.R. § 59.2 .......... Passim
42 C.F.R. § 59.7(a) .......... Passim
42 C.F.R. § 59.5(a)(2)–(5) .......... Passim
42 C.F.R. § 59.7(a)(3) .......... 1, 11
42 C.F.R. § 59.9 .......... 22
42 C.F.R. § 59.11 .......... 20, 22

## INTRODUCTION

The States' reply describes a different document. The NOFO, in their telling, "denigrates" contraception, "diminishes transgender people," and asks providers "to deny that transgender people exist." ECF No. 129 at 20–21. It subjects applicants to "commands as incompatible as ending health equity and simultaneously advancing it," *id.* at 30, "bootstrap[s]" political goals into Title X, *id.* at 1, and "stretches reasoned decision-making far past its breaking point," *id.* at 30.

The NOFO says none of this. When the focus turns to what it actually says, the States' claims evaporate. Here is what the NOFO says:

- It asks applicants to show how their projects will integrate "practices that promote health literacy, fertility awareness, and reproductive health without unnecessary medicalization or symptom suppression," A.R. 081–82, and fertility awareness is among the "natural family planning methods" that Title X and its regulations name, 42 U.S.C. § 300(a); 42 C.F.R. §§ 59.2, 59.5(a)(1).

- It asks for "developmentally appropriate counseling rooted in biological science" and describes reproductive-goals counseling that "support[s] informed decision-making." A.R. 083.

- It provides that applications will be evaluated "according to the criteria set forth in Title X regulations at 42 C.F.R. §59.7(a)," A.R. 111, one of which is "[t]he ability of the applicant to advance health equity," 42 C.F.R. § 59.7(a)(3).

- It states its abortion-related priority "[t]o the extent permitted by applicable law," A.R. 083–84, and requires every project to be administered in accordance with "the Title X statute, regulations, legislative mandates, and additional program guidance," A.R. 077.

The States' contrary-to-law claim can take one of two forms, and it fails both ways. If the claim is that the NOFO's text requires a project to act contrary to 42 C.F.R. Part 59, Subpart A, it is a facial challenge, and it fails if the document can be read consistently with the regulations. The NOFO can be. It says the law controls, A.R. 077, 111, and the States' conditional allegations, which assert conflicts only "to the extent" a priority requires something, ECF No. 129 at 20, 22, identify no command that forecloses that reading. If instead the claim is that a priority, applied to a project in a particular way, would conflict with Part 59, the States are asking for a ruling on an

application that has yet to happen and is not imminent. That claim is not ripe. The States cannot escape the first bucket by pleading conditionally and the second by calling the condition a command.

Where the States do quote the NOFO, they read it to say what it does not: a priority to "go beyond the use of ideologically laden concepts," A.R. 135, becomes a command to end health equity; "go beyond" becomes "go without." Where the NOFO adds information to counseling, they read it as taking decisions from clients. It does the opposite. The NOFO is client-centered in the sense Part 59 defines the term: it adds subjects to the information a provider presents and leaves every decision where 42 C.F.R. § 59.2 puts it, with clients. More information is not less choice. The States' separate challenge to the agency's explanation asks whether priorities are reasonable and reasonably explained, not whether the Court would choose them. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

The States also ought to consider where a strategy of facial, successive suits leads. A rule that a funding notice is reviewable the day it issues, and can be vacated before anyone has applied, belongs to whoever sues next, in whatever district the next plaintiff prefers, so that the funding of a national program must wait, every cycle, on whichever court heard the first challenge, or the second, or the third. *See Nat'l Family Planning & Reprod. Health Ass'n v. Kennedy*, 2026 WL 2790025, at *2–4 (M.D. Pa. Sept. 17, 2026) (dismissing first challenge to this NOFO as unripe); *Planned Parenthood Fed'n of Am., Inc. v. HHS*, No. 1:26-cv-02656 (D.D.C.) (second challenge).

## ARGUMENT

### I. THE STATES STILL HAVE NOT SHOWN STANDING.

The States moved for summary judgment. They therefore "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Their reply adds argument, not facts.

**A. The declarations do not connect any State's position to the NOFO's text.**

Defendants do not contend that the States must apply, receive a score, or prove they will lose. ECF No. 124-1 at 5. But they must show, from the instrument and facts about themselves, that the criteria place them on worse competitive terms. They do not.

The States identify "two competitive disadvantages." ECF No. 129 at 2. Neither is one. The first is that an incumbent "that proposes to maintain existing services rather than reorient them toward the new priorities *may be less able* to earn points." *Id.* at 2–3. An injury must be "certainly impending," or at least a "substantial risk," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013). "May be less able" describes a possibility that turns on a choice the NOFO does not pose. The criterion measures "the extent to which the applicant proposes strategies that meaningfully advance" the priorities, A.R. 110, and a project can keep every service it now offers and also propose to expand access to fertility-awareness methods or to offer reproductive-goals counseling, A.R. 081–83. Nor do the States say what they would propose, or why it would earn fewer points than anyone else's; the 35-point category specifies no per-priority weight, fixed deduction, or automatic zero for leaving a priority unaddressed, A.R. 109–10; ECF No. 124-1 at 5–6, and awards turn on the Department's judgment under the regulatory factors, 42 C.F.R. § 59.7(a), A.R. 111; ECF No. 124-1 at 15. Those are the facts summary judgment requires, and where an injury depends on contingent future events, standing and ripeness "boil down to the same question," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)). Here the answer to both is no one yet knows.

The second asserted disadvantage, that an incumbent must "address the priorities while maintaining compliance with the existing statutory and regulatory framework, . . . all while competing with applicants the NOFO advantages," ECF No. 129 at 3, is not competitive at all. It

describes "the ordinary work of preparing a grant application," which the States concede is not an injury, *id.* at 8, and the "applicants the NOFO advantages" go unnamed.

Both disadvantages measure the States against the last competition, not against any competitor. That confuses competition with unequal footing. An unequal-footing injury exists when the government "erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Competitor standing arises when the government benefits a rival or admits new ones. *See Sherley v. Sebelius*, 610 F.3d 69, 72–74 (D.C. Cir. 2010). Each case the States cite is of one of those kinds. *See, e.g.*, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1173–74 (9th Cir. 2019) (bonus points for a focus area the plaintiff, by settled policy, would not select). A State that would not or could not propose what a criterion rewards or that would bear a cost in doing so could make the same showing. ECF No. 124-1 at 5–10. No State has. Without that fact, every applicant could challenge every scoring criterion in every competition, and an incumbent has no claim to the terms of the competition it last won.[1]The declarations describe existing programs and characterize the priorities as conflicting with them, ECF No. 129 at 5 n.1, but a declaration must "set out facts," Fed. R. Civ. P. 56(c)(4), and a conclusion that a document conflicts with the law is a legal position, not a fact.[2] *FEC v.*

---

[1] The States' remaining authorities confirm the point. ECF No. 129 at 11. Each involved government action that relaxed restrictions on a rival or admitted a new one. *See Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479 (1998) (agency interpretation expanding the customers federal credit unions could serve); *Zeneca Inc. v. Shalala*, 213 F.3d 161 (4th Cir. 2000) (FDA approval of rival's generic drug). The States also cite *Leaf Tobacco Exporters Ass'n v. Block*, 749 F.2d 1106 (4th Cir. 1984), but the Fourth Circuit in that case dismissed the competitors' suit on zone-of-interests grounds, noting that the dispute belonged "in the halls of Congress and the Department of Agriculture, not in the courtrooms of our country," *id.* at 1116.

[2] Defendants do not address the content of State law. It is enough that no NOFO provision requires any State to act contrary to it.

*Cruz*, 596 U.S. 289 (2022), assumes the plaintiff's legal theory, not the facts of its injury, *see* ECF No. 129 at 6, and whether the criteria place any State on worse terms is a question of fact the declarations do not answer.

**B. Reading the NOFO is not an injury.**

The States concede that "the ordinary work of preparing a grant application" is not an injury. ECF No. 129 at 8. What they claim instead is "additional work required to evaluate the new priorities, assess their implication for existing Title X programs and state-law obligations, and determine how to address them in applications." *Id.* Set aside addressing the criteria in an application, which the States concede is ordinary. What's left is evaluating and assessing: reading the NOFO and working out what it means. But if that were injury, anyone who reads a federal notice closely has standing to challenge it. A plaintiff "cannot spend its way into standing simply by expending money to gather information" about a defendant's action, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024), or "manufacture standing merely by inflicting harm on themselves," *Clapper*, 568 U.S. at 416. *Sherley* and *Liberty University* involved newly admitted competitors and a statutory mandate that applied of its own force. *Sherley*, 610 F.3d at 74; *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 89–90 (4th Cir. 2013). Here, nothing in the NOFO obliges a State to do anything before an award except, if it chooses to apply, to prepare an application. What remains is uncertainty about how the criteria will be read, the same uncertainty on which the States' vagueness claim rests, *see* ECF No. 129 at 29–31, and uncertainty is not injury.

**C. The fiscal and sovereign theories rest on the decisions of others.**

The States' fiscal theory relies on "the effects on States that rely on in-state providers to deliver services." ECF No. 129 at 10. That is an injury to providers, which reaches a State only if providers lose competitive awards and the State then chooses to replace the funding. *See Doe v. Obama*, 631 F.3d 157, 161–62 (4th Cir. 2011). A State's decision to spend its own money is not

an injury the defendant caused, *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam), and indirect effects on "state revenues or state spending" are the kind of injury the Supreme Court has called "more attenuated," *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). *Dep't of Commerce v. New York*, 588 U.S. 752, 767–68 (2019), by contrast, involved a formula that reduced the States' *own* funds. The sovereign theory fares no better: the States disclaim preemption, ECF No. 129 at 9, and the "practical and legal conflict" they assert, *id.* at 9–10, rests on the same declarants' legal conclusions.

## II. THE CONFLICTS THE STATES ALLEGE ARE NOT RIPE.

The APA grants review to a person "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, and a rule "is not ordinarily considered the type of agency action 'ripe' for judicial review" until "some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him," unless the rule "as a practical matter requires the plaintiff to adjust his conduct immediately." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). The States must prepare applications now, but the conflicts they assert concern how the priorities would affect project operations.[3]

The States' own standard asks the same question. A claim is ripe, they say, when it is "final and not dependent on future uncertainties or intervening agency rulings." ECF No. 129 at 11 (quoting *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019)). Then they frame their central conflict to depend on just that: "*to the extent that the priority requires* projects to reject patients' transgender identities, it clashes with" Part 59. *Id.* at 20. The Hyde conflict is

[3] Section 702 itself preserves "the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702. Whatever the continuing force of prudential ripeness, *see Susan B. Anthony List*, 573 U.S. at 167, the APA preserves a reviewing court's authority to withhold review of a dispute not yet fit for it.

framed the same way: "*to the extent that it requires* providers . . . to counsel patients to carry pregnancies to term." *Id.* at 22. The problem is in the States' own description of their claims. If the priority does not require what the condition describes, there is no conflict. If it might be applied that way, the conflict rests on "contingent future events that may not occur as anticipated, or indeed may not occur at all," *Texas v. United States*, 523 U.S. 296, 300 (1998), and a ruling on it would be advisory, *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937).

The States' footnote defending the "conditional framing," ECF No. 129 at 16 n.2, confirms the problem. The NOFO, they urge, pairs "unambiguous command[s] to violate" Title X with savings clauses that make its meaning "indefinite." *Id.* A provision cannot be both. The rule the States invoke disregards a limiting clause only "where the instrument *unambiguously* commands what the clause purports to negate," *id.* (quoting ECF No. 124-1 at 24); if the NOFO contained such a command, the States would quote it, and what they write instead is "to the extent." And if the NOFO's meaning is indefinite, there is no unambiguous command to override the clause that subordinates every priority to the statute and regulations. A.R. 077, 111; *see Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). The footnote tries to occupy both positions at once. *See* Part III.A, *infra*. The burden of establishing ripeness is the States', *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013); *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006), and a conflict that exists only "to the extent" a priority is later applied in a particular way cannot carry it. And if the question whether these conflicts depend on later application is a close one, the closeness is itself the answer: a party that bears the burden of establishing ripeness does not prevail on a claim the Court cannot say is ripe.

The States' only response to *Catholic Social Services* is to attempt to distinguish it, asserting that there, plaintiffs there had to take "further affirmative steps" to obtain the benefit, and

that the case did not involve "criteria already governing an ongoing competition." ECF No. 129 at 7. Both describe this case, too: a State must apply, and its application must be evaluated under factors the States do not challenge, A.R. 106–12, just as the legalization program there was an open application period governed by the challenged regulations, which "limit[ed] access to a benefit . . . not automatically bestowed on eligible aliens." 509 U.S. at 58. The States never engage with that holding. *See NFPRHA*, 2026 WL 2790025, at *2–4.

*Toilet Goods* confirms that finality and a legal question do not alone make a dispute fit for review. The Court accepted both but held that the agency's reasons and the practical need for its action would be better evaluated in a specific application, and that availability of adequate later review, absent irremediable consequences from waiting, weighed against immediate adjudication. *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 162–65 & n.2 (1967). So too here. The Notice of Award will identify the project's purposes and terms. A.R. 112–14, 120. If a State proposes services consistent with Part 59 and the agency approves the project, the conflict never arises. If the agency instead applies a criterion to impose an obligation contrary to Part 59, the recipient may seek review of that application, and the Court will have a concrete application to assess.

Nor do the States show hardship. Their argument is one sentence: waiting until after awards "would create substantially greater disruption as the grant contest cannot be rerun." ECF No. 129 at 12. Hardship means an impact "sufficiently direct and immediate" to present a dilemma now, *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967), and "mere uncertainty as to the validity of a legal rule" is not it, *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 811 (2003). The enforcement provisions at A.R. 077 concern performance of projects funded under this NOFO; they require no State to change services under an existing award. *PFLAG v. Trump*, 769 F. Supp.

3d 405, 422 (D. Md. 2025), involved existing grants and threatened present loss; no State holds an award under this NOFO.

There is a better path, and the APA builds it. An award decision is final agency action, A.R. 112, reviewable on a showing of injury from an unlawful application of a criterion, and § 705 authorizes a reviewing court, on the proper showing, "to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," including by staying an award decision while it is reviewed. That review would have what this case lacks: an application, an evaluation, a funding decision, and an injury. It also protects the States' own interests. A dismissal without prejudice decides nothing against them.[4] Every claim survives; the competition proceeds; and if the agency later applies a criterion as they fear, they return with a record and with § 705 available on the proper showing. The ruling they seek instead would set aside the NOFO on predictions and hypothesized readings, before a single application has been read, with nationwide vacatur at the end, a re-run competition, and successor awards that could arrive after their current grants expire. Part VII.C, *infra*. A dismissal also spares the Court an advisory opinion. The inadequate-explanation and notice-and-comment claims fail for the independent reasons in Parts IV and V.

[4] Defendants also preserve, without asking the Court to rest on it, their objection that the criteria are not themselves final agency action: they inform scoring and funding recommendations under 42 C.F.R. § 59.7(a) without prescribing any award or denial, A.R. 076, 107–11, and the performance provisions at A.R. 077 concern awards no State holds, A.R. 112–14.

## III. THE NOFO IS NOT CONTRARY TO LAW.

### A. The States do not meet their own test.

The States' heading says the incorporation is unlawful "Because the Conditions are Inconsistent with Title X's Statutory and Regulatory Requirements." ECF No. 129 at 15. That is a claim about what the NOFO says. The claim can take one of two forms.

On the one hand, if the NOFO's text requires a project to do what Part 59 forbids, it is a facial challenge: such a challenge fails if the document can be read consistently with the governing law. *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 188–91 (1991); *Reno v. Flores*, 507 U.S. 292, 301 (1993); *see Rust v. Sullivan*, 500 U.S. 173, 183 (1991) (Title X regulations are valid "on their face" where they "can be construed" to be lawfully applied). Here, the NOFO does more than merely permit such a reading. The NOFO directs it by subordinating every priority to "the Title X statute, regulations, legislative mandates, and additional program guidance." A.R. 077, 111. And the States' conditional pleading, which alleges conflicts only "to the extent" a priority requires something, ECF No. 129 at 20, 22, identifies no command that forecloses that reading. Where an instrument can be read consistently with the governing law, it is read that way, *NCIR*, 502 U.S. at 188–91; *Rust*, 500 U.S. at 183, and the NOFO's text and structure support Defendants' reading, under which the asserted conflict disappears.

On the other hand, if instead the claim is that a priority, applied to a particular project in a particular way, would conflict with Part 59, it is an as-applied claim, and a ruling on it would be an opinion on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. at 300; *see Trump v. New York*, 592 U.S. 125, 131–32 (2020) (per curiam). The facial logic gives way only where the text itself commands the conflict, as in *Mayor & City Council of Baltimore v. Azar*, 973 F.3d 258, 283 (4th Cir. 2020) (en banc), where the rule required a prenatal referral the patient had not requested and barred the abortion

referral she had, and *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021), where a savings clause was set against text commanding the contrary. The States quote no such command here.

Two points follow. First, expressing a preference is not a conflict. In a discretionary competition, the government may say what it values and fund accordingly. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998). Second, the conflict must be found in the NOFO's *operative* text, what it asks applicants to do, not its *explanatory* text, the agency's statements of why it holds a priority.

The States' counseling claims share a further premise: that presenting information directs a decision. Part 59 says otherwise. Client-centered care is care "respectful of, and responsive to, individual client preferences, needs, and values," in which "client values guide all clinical decisions." 42 C.F.R. § 59.2. The NOFO asks providers to present information, A.R. 081–83, and leaves the decision there. As the States' own exhibit explains: "the patient shares their values and preferences, and the provider shares relevant information with the patient," and "the decision about which method to use should be made by the patient." ECF No. 113-3 at S50–51, S57 (quoted at ECF No. 129 at 26). A provider who shares more relevant information decides nothing. Part 59 forbids coercion and directive pregnancy counseling, 42 C.F.R. § 59.5(a)(2), (5), not information.

**B. Health equity.**

The States say the "Anti-DEI Priority" "clearly rejects what the regulation requires." ECF No. 129 at 21. Applications will be evaluated "according to the criteria set forth in Title X regulations at 42 C.F.R. §59.7(a)," A.R. 111, one of which is "[t]he ability of the applicant to advance health equity," 42 C.F.R. § 59.7(a)(3). The incorporated OASH statement says that OASH "has previously invested in ideologically-laden concepts like health equity" and will "prioritize efforts that *go beyond* the use of ideologically laden concepts and focus on solution-oriented

approaches," including "evidence-based interventions and treatments that address poor health outcomes." A.R. 135.

Against that text, the claim fails. The NOFO applies the regulation the States say it violates. The regulation defines health equity as the opportunity to attain full health potential without disadvantage from social circumstances, 42 C.F.R. § 59.2, and the NOFO requires applicants to identify access barriers, including transportation, language, housing, and financial barriers, and describe how they will address them, A.R. 089–90. The OASH statement applies only "where authorized by law and within the scope of the program." A.R. 111. The States call this reading "post-hoc," ECF No. 129 at 22, but it is the text, and the rule against post hoc rationalization bars new reasons for agency action, not reading the words. *Cf. DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20–21 (2020).

### C. Counseling rooted in biological science.

The States say the "Gender-Ideology Priority" requires projects "to reject patients' transgender identities," ECF No. 129 at 20, and asks providers "to deny that transgender people exist," *id.* at 21. The NOFO never says that. What it says is that OPA will prioritize projects that "respect[] biological reality," and that projects may implement the priority by "providing developmentally appropriate counseling rooted in biological science" and "ensuring referral pathways align with evidence-based care." A.R. 083. The incorporated statements deprioritize programs providing specified interventions, subject to applicable law and court orders. A.R. 135, 144. Read with the NOFO's scope limits and its requirement that proposed services comply with every provision of Part 59, A.R. 077, 091, 111, nothing in those provisions directs a provider to deny a client otherwise available services because of gender identity.

The States' conflict depends on conflating sex and gender identity. Defendants distinguished the regulations, which govern whom a project serves and how it treats clients, from

the priority, which addresses the scientific basis for counseling. ECF No. 124-1 at 24. The States call the distinction "nonsensical," ECF No. 129 at 21, but their own exhibit draws it. The QFP defines its anatomical terms by anatomy, "without connecting this anatomy to the experience of gender identity," ECF No. 113-3 at S44, and tells providers to ask every patient about "sex assigned at birth, current anatomy, preferred name, gender identity, and pronouns" as separate things, *id.* at S48. Part 59 draws the same line. It separately lists "sex," "gender identity," and "sex characteristics," 42 C.F.R. § 59.5(a)(4), and the NOFO's statement is about sex, A.R. 083, 135. The States convert it into a requirement to "reject patients' transgender identities," and then into a requirement that providers "deny that transgender people exist." ECF No. 129 at 20–21. Hyperbole aside, the States cite nothing for that last phrase because nothing in the NOFO addresses whether anyone exists. Their one example confirms the point: counseling a client on fertility preservation, *id.* at 21, is counseling rooted in biological science. It cannot be done any other way.

Stripped of the command the NOFO does not contain, the objection is that the priority "diminishes transgender people" and that counseling about anatomy is inconsistent with the care some clients prefer. ECF No. 129 at 20–21. That is another objection to information. And it proves too much: other clients could make the same objection to counseling organized around gender identity, and if a client's discomfort with the content of counseling made a criterion unlawful, no counseling model could survive. Part 59 resolves the problem differently. It requires that every client be served respectfully and without discrimination, § 59.5(a)(3)–(4), and that client values guide decisions, § 59.2. The regulations prescribe no vocabulary for providers.

Nor is the NOFO's premise contested ground. That sex is a matter of anatomy, and that a provider must know and address a patient's anatomy, is a premise of the States' own exhibit. ECF No. 113-3 at S44, S48. *See also* Defs.' Surreply at 5, *Planned Parenthood Fed'n*, No. 1:26-cv-

02656 (D.D.C. Oct. 30, 2026), ECF No. 34-1 (guidance relied on by the plaintiff's amici there defines sex "based on assessment of external genitalia, as well as chromosomes and gonads" and distinguishes it from gender identity) (quoting ACOG Comm. Op. No. 823, cited in Br. of Amici Curiae ACOG et al., ECF No. 31, at 12, 22). What is contested is the gender-identity framework the States would read into § 59.5(a)(3)'s "nationally recognized standards," which the QFP itself presents as recommendations subordinate to Title X law, ECF No. 113-3 at S42 n.b, in a field the Supreme Court has described as marked by "fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments." *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025). Disagreement with the NOFO's framing is not a Part 59 conflict. The States do not prevail by showing that some disagree with describing sex in biological terms—and they are in a poor position to try, because the authorities they and their allies rely on describe it the same way.

The disagreement that remains is a policy disagreement, which the APA channels into the question whether the agency explained itself, Part IV, *infra*. Vacating the NOFO would not settle the debate, of course. But its predictable effect would be a competition halted while it was re-run, with clinics at risk of going unfunded in the interval. Part VII.C, *infra*.

**D. Fertility awareness.**

The States say the "Overmedicalization Priority" "denigrates the widespread use of medical contraception." ECF No. 129 at 20. They build the claim from *explanatory* text, the NOFO's discussion of "a decrease in females' current use of any contraception" and its statement that "[t]his approach has failed," *id.* at 19, which requires nothing of anyone. The *operative* text asks applicants to show how projects will integrate "practices that promote health literacy, fertility awareness, and reproductive health without unnecessary medicalization or symptom suppression." A.R. 081–82. Against that text, the claim fails. The States concede that fertility-awareness-based methods "are already part of the 'available choices' in the Title X program." ECF No. 129 at 20.

They say the NOFO directs projects to expand that method "instead" of contraception. *Id.* "[I]nstead" is the States' word. The NOFO's word is "expand," and its work-plan instructions preserve access to the client's method of choice: a site unable to provide the full range must provide a prescription for that method or a requested referral. A.R. 094.

**E. Reproductive-goals counseling.**

The States say the "Directive Counseling Priority" requires directive counseling. ECF No. 129 at 16. The NOFO does not say that. The States' quotation of the operative sentence stops early. *Id.* at 17. In full, it says program counseling "should affirm marriage and parenthood as meaningful and valued components of adult life, particularly in counseling adolescents on long term reproductive goals, and support informed decision-making by helping individuals understand how life choices, reproductive health, and fertility intersect to shape long-term stability, health, and wellbeing." A.R. 083. The sentence identifies content for counseling, including a favorable view of marriage and parenthood, and its stated purpose is the client's informed decision, which Part 59 protects: "client values guide all clinical decisions." 42 C.F.R. § 59.2. Nothing in it requires a provider to prescribe marriage or parenthood for a client, withhold information regulations require, or condition services on a client's agreement.

The nondirective requirement the States invoke governs a narrower subject: options counseling for pregnant clients. 42 C.F.R. § 59.5(a)(5); Pub. L. No. 119-75, 140 Stat. 173, 262 (2026). Defendants did not concede that the priority "could not be lawfully applied" to pregnant clients, ECF No. 129 at 17. Rather, they explained that § 59.5(a)(5) governs options counseling and remains in force. ECF No. 124-1 at 26–27; A.R. 077, 083. A pregnant client receives the nondirective options counseling the regulation requires; counseling about long-term goals does not displace it.

The States answer that this limit was "proposed by counsel, not the agency," and so lacks "binding effect." ECF No. 129 at 18–19 (quoting *Hennepin Cnty. v. HHS*, No. 1:26-cv-02460-CRC, 2026 WL 2426300, at *23 (D.D.C. Aug. 19, 2026)). The limit is not counsel's. It is § 59.5(a)(5) and the appropriations rider, which bind the agency of their own force, *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954), and which the NOFO applies, A.R. 077. In *Hennepin*, only counsel's gloss stood between recipients and instruments that operated by their own terms; here the regulation does that work. Part 59 protects a client's decision, not a provider's silence.

**F. The Hyde priority.**

The States say the Hyde priority requires providers "to counsel patients to carry pregnancies to term." ECF No. 129 at 22. Not so. The States quote two fragments, "life-affirming" and "support[ing] elective abortion," and supply the rest. *Id.* What the priority says is that applicants should "contribute to broader HHS efforts to safeguard life-affirming[, lawful, and ethical] program delivery" and "maintain strict separation" from prohibited activities, and it opens "[t]o the extent permitted by applicable law." A.R. 083–84. Against that text, the claim fails. The priority ties its safeguards to Section 1008's prohibition, 42 U.S.C. § 300a-6, A.R. 084, and must be read with that prohibition and the NOFO's preserved counseling and referral requirements, A.R. 077–79, 091; a referral required by § 59.5(a)(5) is not a prohibited activity from which a project must separate itself. The limiting phrase is the agency's text, which the States quote, ECF No. 129 at 23, so it is no "post hoc narrowing construction developed for litigation," *id.*

The States' remaining objection is that, so read, the priority is "mere surplusage," because it prioritizes "compliance with the legal floor that all applicants already must meet." *Id.* That objection assumes the lawful construction Defendants defend, and an argument that assumes the

construction cannot show that it is unavailable. An available lawful construction defeats the contrary-to-law claim. *NCIR*, 502 U.S. at 188–90.

## IV. THE NOFO IS REASONED.

### A. A grant competition is not a rule.

The States ask more of a funding notice than the APA does. The NOFO binds no one who does not apply and accept an award; it describes what the agency will look for in a competition for discretionary grants, and no applicant is entitled to an award. The question is whether the action is "reasonable and reasonably explained." *Prometheus*, 592 U.S. at 423. A statement of what the agency values in a competition needs reasons, and the NOFO gives them. A.R. 081–84. When the government acts "as patron rather than as sovereign," it may allocate competitive funding by criteria that cannot be reduced to data, *Finley*, 524 U.S. at 587–89, and it need not produce perfect empirical data before making a predictive judgment, *Prometheus*, 592 U.S. at 427. The States' theory would require an evidentiary record for every scoring priority in every funding notice. The APA requires no such thing.

### B. The NOFO does not depart from the QFP, and the QFP is not a regulation.

The States' change-in-position argument treats the QFP as a regulation the NOFO must disprove with evidence. ECF No. 129 at 24–27. It is not one—and it says so. The QFP provides that "in places where recommendations in this QFP document may conflict with the Title X statute, legislative mandates, regulations, or court orders, the Title X federal requirements control," and that "Title X providers are prohibited from using Title X funds for some of the recommendations set out in this document." ECF No. 113-3 at S42 n.b. It was issued as recommendations, not as a Part 59 amendment. The 2024 edition was published as a journal supplement. *Id.* at S41. The "concrete" practices the NOFO supposedly abandons are found in the QFP, ECF No. 129 at 25,

not in Part 59. The NOFO does not rescind the QFP, ECF No. 124-1 at 32, and § 59.2's client-centered model remains in force because the regulation requires it.

A change in policy does not require proving the prior policy wrong. An agency changing course "need not demonstrate . . . that the reasons for the new policy are better than the reasons for the old one," and a more detailed justification is required when the new policy "rests upon factual findings that contradict those which underlay its prior policy," or when the prior policy engendered serious reliance interests. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

The States read the record too narrowly. They call the NHSR study "expressly limited" to discontinuation of particular brands. ECF No. 129 at 27. But the study includes women who switched brands or formulations, ECF No. 113-12 at 3, and finds that side effects were the most common reason women gave for discontinuing the pill or IUD because of dissatisfaction, *id.* at 16 tbl. 6. The States' accounting of CDC data, ECF No. 129 at 27 n.6, does not negate that finding. The NOFO draws a limited inference from both: dissatisfaction with existing methods supports making additional options accessible, while preserving access to the client's method of choice. A.R. 081–82, 094.

The States say the agency had to "substantiate" the "efficacy at promoting parenthood, childrearing in wedlock, or patient health generally." ECF No. 129 at 26. The question is whether the agency reasonably connected its premises to the counseling priority, not whether it proved that counseling would cause clients to marry or become parents. *Prometheus*, 592 U.S. at 427. *Fox* is not to the contrary. The States quote the principle that courts may set aside agency action for "failure to adduce empirical data that can readily be obtained." ECF No. 129 at 26. That sentence continues: "It is something else to insist upon obtaining the unobtainable." 556 U.S. at 519. *Fox* then upheld a policy change resting on the agency's judgment that "children mimic the behavior

they observe," a premise the Court accepted without a study because it was one "as to which it is not possible to have hard evidence." *Id.* Here, the counseling priority rests on a stated policy judgment and on OPA's cited 2020 survey, which found that most surveyed adults who wanted children had not discussed those plans with a medical provider, A.R. 082–83, a finding the States do not dispute. The objection is to the further statement that education, work, and "marriage prior to childbearing" are associated with economic and family stability, and that research demonstrates "substantially lower risks of poverty across socioeconomic groups" for those who follow that sequence. ECF No. 129 at 26; A.R. 083. The survey supports the agency's identified need for reproductive-goals counseling, and the sequencing statement supplies an additional reason for the subjects the agency proposes to discuss. The agency did not need to commission a study to prove the second statement. The NOFO instead identifies an unmet counseling need and proposes discussion of long-term reproductive goals while preserving the client's choice. A.R. 082–83.

Importantly, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. The burden of showing prejudice rests on the States, *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009), and an error is harmless where it "clearly had no bearing on the procedure used or the substance of decision reached," *Mass. Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964); *see Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659–60 (2007) (declining to remand over a statement that had no bearing on the challenged action). The NOFO's text shows what the priority rests on. Its operative instructions, that counseling "affirm marriage and parenthood as meaningful and valued components of adult life" and "support informed decision-making by helping individuals understand how life choices, reproductive health, and fertility intersect," follow from the survey and a policy judgment the NOFO states; the sentence about poverty risk supports one described pathway. A.R. 083. The NOFO's separately stated

counseling rationale supports finding that the disputed assertion did not determine the priority's adoption, *cf. PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004), and the States do not explain how the asserted gap affected the priority the agency adopted. If the Court nevertheless finds the record support for the assertion about poverty risks insufficient and prejudicial, that deficiency concerns one stated reason for one priority, and its seriousness is assessed in relation to that priority and the agency's other reasons, and weighed against the disruption of disturbing the competition, before any remedy follows. *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993); *see* Part VII.D, *infra*. The reliance examples the States identify concern practices the NOFO continues to permit, ECF No. 129 at 28, and they never connect the asserted departure to a reliance interest the agency overlooked.[5]

### C. The NOFO's limiting clauses are instructions, not confusion.

The States say the NOFO is unreasoned because applicants cannot reconcile priorities with the law. ECF No. 129 at 29–30. The NOFO tells them how: where a priority and the law diverge, the law controls, A.R. 077, 111, and applicants must explain compliance with each provision of

---

[5] Defendants offer no sources outside the record on the merits, because the agency's reasons are judged on the record it made, *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). On remedy the first consideration is "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)." *Allied-Signal*, 988 F.2d at 150–51. The premise the States say is unsupported—that completing education, working, and marrying before having children is associated with substantially lower poverty risk across socioeconomic groups—has been the subject of published research for more than a decade, which bears on whether the premise is one further explanation could substantiate. *See, e.g.*, Wendy Wang & Brad Wilcox, *The Power of the Success Sequence for Disadvantaged Young Adults* 2, 4–5 (AEI & Inst. for Fam. Stud. 2022) (97% of those who followed the sequence, and 94% of those raised in the bottom third of the income distribution, were not poor in their mid-thirties; the association "is robust after controlling for" race, income, family structure, and education). Congress has likewise treated the subject as a legitimate one for a related HHS program, directing that it teach "[t]he increased likelihood of avoiding poverty when youth attain self-sufficiency and emotional maturity before engaging in sexual activity." 42 U.S.C. § 710(b)(3)(C). If the Court finds an explanatory defect that can be cured on remand, it should weigh that defect against the disruption of restarting a national competition. And for the same reason, any failure to cite support is non-prejudicial error.

§§ 59.1–59.11, A.R. 091. The States call the clause "inscrutable." ECF No. 129 at 30. Yet their own exhibit contains the same one, ECF No. 113-3 at S42 n.b, and so does the policy notice on which their QFP argument depends, ECF No. 113-4 at 3. If the clause leaves the NOFO's meaning "indefinite," ECF No. 129 at 16 n.2, it leaves the QFP's meaning indefinite too. The States' whole Count Three rests on their understanding of what the QFP recommends, ECF No. 129 at 24–27. The QFP carrying that instruction issued in December 2024, and the policy notice applying it to Title X projects a month earlier. ECF No. 113-3 at S41; ECF No. 113-4. The clause meant something then, and it will mean the same thing in the next competition, under whichever Administration issues the notice. The States must explain why that familiar instruction fails to resolve the particular conflicts they allege here today. And the declaration the States block-quote answers itself. ECF No. 113-26 ¶ 17 (priorities "apply only where consistent with federal law, regulations, and the authority and scope of the award").[6]

Nor does the NOFO command anyone to "end[] health equity," ECF No. 129 at 30, for the reasons in Part III.B. HHS and OASH priorities apply "where authorized by law and within the scope of the program," A.R. 111; *see* A.R. 080, so the rubric line the States cite, A.R. 110, evaluates strategies in a Title X project, not every activity mentioned in a Department-wide policy statement. *See Finley*, 524 U.S. at 588–90.

## V. NO NOTICE AND COMMENT WAS REQUIRED.

The States state the test: does the NOFO have "present binding effect"? ECF No. 129 at 32 (quoting *Casa de Md. v. DHS*, 924 F.3d 684, 702 (4th Cir. 2019)). It does not. The selection criteria guide agency judgment. Priority alignment bears on subrecipient review, the 35-point strategies

---

6 The States cite fifteen declarations for this point. ECF No. 129 at 29 n.7. The number does not resolve whether the asserted conflicts follow from the NOFO's text; a declaration must supply facts, Fed. R. Civ. P. 56(c)(4), and characterizing a priority as legally inconsistent is not a fact.

category, and the program office's funding recommendations, which the NOFO directs be made "where authorized by law and within the scope of the program" and under the regulatory criteria. A.R. 109–11. The regulation reserves the award to the Department's judgment, 42 C.F.R. § 59.7(a), and neither a score nor an alignment determination compels an award or denial. *See Casa de Md.*, 924 F.3d at 702–03. The performance provisions at A.R. 077 operate within a framework Part 59 already supplies: funds must be used for the approved application and award purposes, § 59.9, and the Department may attach conditions to protect the approved program, § 59.11. The NOFO implements that framework through the award's terms and the approved project, A.R. 112–14, 120, and prescribes no change to any applicant's existing operations as a condition of applying. Nor does a change from prior guidance itself trigger notice and comment. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015).

## VI. THE SPENDING CLAUSE CLAIM FAILS.

The Spending Clause asks whether a State "voluntarily and knowingly accepts the terms" of federal funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The Notice of Award supplies the terms of the particular project before a recipient accepts by drawing funds, A.R. 112–14, and no State has received an award to date. *See Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665–67 (1985). An evaluative preference is not a funding obligation. *See Finley*, 524 U.S. at 587–89. As for relatedness, the States say that confining HHS-wide priorities to the Title X program "concede[s] those priorities have no conceivable application" to it. ECF No. 129 at 38. Not so. A limitation that applies HHS priorities only "within the scope of the program," A.R. 111, is what makes them related to it. *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987). *PFLAG*, 769 F. Supp. 3d at 437, and *HIAS*, 985 F.3d at 325, rejected savings clauses set against commands in the text, ECF No. 129 at 38; here there is no such command. A.R. 077, 091.

## VII. THE RELIEF THE STATES SEEK WOULD FALL ON THEIR OWN PROJECTS.

### A. Relief must attach to what the agency did.

Vacatur sets aside "agency action," 5 U.S.C. § 706(2), and an injunction must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained," Fed. R. Civ. P. 65(d)(1)(C); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). The States seek both vacatur and an injunction against so-called "Challenged Conditions," a phrase the States created and which describes the States' reading of the NOFO, not the NOFO's text. Setting aside or enjoining a priority by reference to the States' name for and description of the priorities would send the agency to the States' briefs to learn what is forbidden.

Nor does a conditional conflict support relief. Section 706(2) sets aside agency action "found to be" unlawful. A finding that a priority would be unlawful "to the extent" it required something it does not say, ECF No. 129 at 20, 22, is not that finding, and an order in those terms would command only what the NOFO already commands of itself: follow the law. A.R. 077.

### B. The States make no showing for an injunction.

An injunction is "a drastic and extraordinary remedy," and where vacatur would redress the injury, "no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010); *see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The States say that an injunction barring application of the criteria "to any applicant" is needed because the competition draws on a single pool, and that its effect on other applicants is "precisely the point." ECF No. 129 at 39. But relief is limited to what is necessary to give the plaintiffs complete relief. *Trump v. CASA, Inc.*, 606 U.S. 831, 851–52, 861 (2025). The single-pool argument addresses the proposed injunction's breadth, not why an injunction is necessary in addition to vacatur.

### C. Under existing regulations, the relief the States seek would fall on their own projects.

The States call the consequences of vacatur "remedial considerations." ECF No. 129 at 11. They are, and the States do not address them. The Uniform Guidance requires publication of evaluation criteria and ordinarily contemplates at least 60 days for applications. 2 C.F.R. § 200.204(b)–(c). An order materially changing evaluation criteria would require notice to applicants, an opportunity to revise proposals, and review under the revised criteria. Applications are due January 11, 2027, and awards are anticipated April 1, the start of the next grant cycle. A.R. 068, 071. Current awards end March 31, 2027, as Defendants have explained, and the States do not dispute. ECF No. 124-1 at 2–3; *see* ECF No. 129 at 11.

The States' requested relief would not give them a better competition, and it risks opening a gap between current awards and their successors. Thus, the relief the States seek actually risks defunding their own programs. The direct-grantee Plaintiff States deliver Title X services through subrecipient networks described in their declarations, *e.g.*, ECF No. 113-28 ¶ 21; and the States' own exhibits show Planned Parenthood affiliates holding Title X awards in fourteen States and serving as subrecipients in the States' networks, ECF No. 113-27, Ex. 1, at 4–7; ECF No. 113-29 ¶ 6; ECF No. 113-34 ¶ 6. If a revised competition delayed successor awards beyond current project periods, the disruption would fall on those programs and their patients.

Consider, too, where this strategy of successive facial challenges to a funding announcement leads. Title X competitions recur. Priorities generally change with the Administration that issues them. The rule the States propose, review on the day a notice issues and vacatur "by definition universal," *id.* at 39, will belong to whoever sues next, in a district of their choosing, with declarations of their own. The machinery that produced three suits in three districts against this NOFO on its face today will point the other way tomorrow. The arguments and the

strategy will change sides, and the operational problem will remain: revised notices and applications, delayed awards, funding gaps. And the losers, under either set of priorities? The people who need these services without interruption and whom neither side claims to be suing against. An approach like that keeps litigation on the front burner, from one district and cycle to the next, but would not keep clinics open. Ripeness doctrine exists to prevent this. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 735 (1998).

### D. Any explanatory deficiency warrants remand without vacatur.

Defendants dispute the States' other grounds on the merits, *contra* ECF No. 129 at 40. If the Court rejects the asserted conflicts but finds an explanation wanting, the question becomes the seriousness of the deficiency and the disruptive consequences of vacatur. *Allied-Signal*, 988 F.2d at 150–51. The Fourth Circuit distinguishes an inadequately supported decision from one that is substantively invalid. *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018). A gap in substantiating a premise can be cured by explanation without vacatur.

## CONCLUSION

The States' asserted conflicts depend on requirements the NOFO does not impose. The challenge to the NOFO's text fails because the text can be read with Part 59 and directs that it be, and the challenge to its application awaits an application.

The States also seek relief that serves neither them nor their patients. Altering the competition's criteria at this juncture could require an amended notice, revised applications, and review under the revised criteria while current awards end on March 31, 2027, and the programs exposed in that gap would be the Plaintiff States' own. The APA offers a better path: review of a concrete award decision, on a record, with relief fitted to the injury shown.

The Court should dismiss the Complaint without prejudice or, in the alternative, grant Defendants' cross-motion for summary judgment and deny Plaintiffs' motion.

November 13, 2026

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

/s/ *Matthew C. Zorn*
MATTHEW C. ZORN
Senior Counsel to the Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
matthew.zorn2@usdoj.gov

/s/ *Landen P. Benson*
LANDEN P. BENSON
Attorney
GA Bar No. 863909
U.S. Department of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201
landen.benson@hhs.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2026, the foregoing was filed through the CM/ECF system, which will automatically generate notice upon all counsel of record.

/s/ *Landen P. Benson*

LANDEN P. BENSON
Attorney
GA Bar No. 863909
U.S. Department of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201
landen.benson@hhs.gov

*Counsel for Defendants*